IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM A. MACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 06-1144 (PLF) |
| ) | |
| WP COMPANY, L.L.C., d/b/a , ) | Jury Trial Demanded |
| THE WASHINGTON POST ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS
FILED PURSUANT TO LOCAL RULE 56.1**

Pursuant to Rule 56.1 of the Local Rules governing practice before the United States District Court for the District of Columbia, Defendant, WP Company, L.L.C. d/b/a The Washington Post ("Post"), hereby submits this Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment on all Counts of the Complaint filed by Plaintiff, William A. Mack ("Mack").

The following facts are undisputed, and are accepted by The Post as true for purposes of this Motion only:

1.      The Post hired Mack to work as a part-time on-call security guard at its production facility in Springfield, Virginia on November 21, 1999. Mack Dep. at 151.

2.      At the time of Mack's termination, part-time on-call security guards were responsible for covering shifts for regular security guards who were unavailable to work, and for working shifts that The Post does not cover with its regular security force or Guardsmark contractors. Corso Decl. at ¶ 4.

3.  When Mack started working at The Post, he was not assigned a regular schedule, but at some point during the first several years of his employment he began to receive regularly scheduled shifts in advance. Mack Dep. at 109-11; Jackson Dep. at 17.

4.  Mack worked sufficient hours at The Post to be eligible for medical and other benefits. Mack Dep. at 149 and 151.

5.  At all times, Mack remained classified as a part-time on-call security guard. Mack Dep. at 260-63; Mack Dep. Ex. 37; Corso Decl. at ¶ 6.

6.  During his employment with The Post, Mack sporadically had jobs with other employers. Mack Dep. at 108-13.

7.  The Post's security force serves a critical function at The Post's production facilities, as it protects the safety and security of Post employees, facilities, and equipment. Mack Dep. Ex. 44.

8.  Consistent and regular attendance was a crucial part of every security officer's job, but it was particularly critical for those individuals, like Mack, who were called upon to cover shifts not otherwise covered by full-time Post security guards or contractors. Corso Decl. at ¶ 4.

9.  The Post's Security Department issued Work Rules that, among other things, addressed attendance-related issues. Mack Dep. Ex. 39 at p. 4.

10. The Security Department Work Rules required two weeks' advance notice for vacation leave requests, Mack Dep. at 210.

11. Mack received and understood the Security Department's Work Rules. Mack Dep. at 121-22 and 210.

12. The Post has a published Family and Medical Leave Act ("FMLA") policy. Dep. Ex. 39 at p. 1. Mack received a copy of this policy at least twice during his employment – once in 2001, and again in 2006. Mack Dep. at 144, 314-15; Dep. Exs. 39, 42.

13. Mack understood that the FMLA policy allows employees to take medical leave. Mack Dep. at 144-45.

14. Mack was diagnosed with sarcoidosis in September 2001, and he began to receive steroid shots in November 2001. Mack Dep. at 28-29.

15. The steroid shots caused side effects that generally required Mack to miss work for two days. Mack Dep. at 106.

16. Mack's medical records indicate that he received one shot in 2002, two in 2003, two in 2004, and two in 2005. Holmes Decl. Ex. D.

17. Mack's last steroid shot prior to his termination was on November 6, 2005. Mack Dep. Ex. 31.

18. In 2005, Mack asked that he be permitted to work for The Post on only Saturdays, Sundays, and Mondays. Mack Dep. at 147-149; Mack Dep. Ex. 1. The Post accommodated this request, and generally scheduled Mack to work a total of 32 hours per week on these days. Mack Dep. at 153-59; Dep. Ex. 2. Although his hours varied, The Post typically scheduled Mack to work 8 hours on Saturday and Monday, and 16 hours on Sunday. *Id.*

19. Mack was absent on January 14-16, 2005 for an upper respiratory infection. Mack Dep. at 203-04; Mack Dep. Ex. 22.

20. Mack was absent on January 28-30, 2005 for an unspecified illness. Mack Dep. at 204-05; Mack Dep. Ex. 23.

21. Mack was absent on April 30-May 1, 2005 for an unspecified medical diagnosis. Mack Dep. at 207-09; Mack Dep. Ex. 25.

22. Mack was absent on May 2, 2005 for back pain. Mack Dep. at 224-25; Mack Dep. Ex. 27.

23. Mack was absent on May 6-7, 2005 for a hypertension evaluation. Mack Dep. at 225-27; Mack Dep. Ex. 28.

24. Mack was absent on June 13, 2005 because his car would not start. Mack Dep. at 228-29; Mack Dep. Ex. 29.

25. Mack was absent on July 30, 2005 because the police detained his son in connection with a carjacking. Mack Dep. at 230-31; Mack Dep. Ex. 30.

26. Mack was absent on October 22, 2005 due to an unspecified emergency. Mack Dep. Ex. 33.

27. Mack was absent on November 6, 2005 due to a steroid shot. Mack Dep. Ex. 31.

28. Mack was absent on December 4-5, 2005 because he became ill from drinking an expired soda, and was treated for gas and bloating. Mack Dep. at 233; Mack Dep. Ex. 32.

29. The Post approved Mack's use of sick leave in connection with all of his health-related absences, and paid him for these absences. Mack Dep. at 34, 69, and 71.

30. The Post approved emergency vacation for last-minute absences for personal reasons. Smith Dep. at 46-48.

31. Mack never requested FMLA leave for any of his health-related absences, or attempted to comply with the notice provisions of the FMLA or The Post's FMLA policy. Mack Dep. at 104-06, 142-45, and 210-16.

32. Mack did not give his supervisors advance notice of any sarcoidosis-related absences, or advise his supervisors that any particular health-related absences related to his sarcoidosis. Mack Dep. at 67-69; Smith Dep. at 37-38 and 41; Jackson Dep. at 29-30.

33. Mack told other Post personnel that he had a skin disease called sarcoidosis. Mack Dep. at 56-57, 64, 66-68, 71-80, 103-04, 138-43, and 287-90. He also mentioned that he occasionally received injections from a dermatologist, and that he experienced side effects such as drowsiness, stiffness in his leg, bloating, facial lesions, and shortness of breath. Mack Dep. at 56-58, 60, 64-69, 71-78, 80, 138-43, and 323; Smith Dep. at 37-38.

34. Mack discussed various other health-related issues, such as muscle spasms and high blood pressure, with his co-workers. Mack Dep. at 54-55, Jackson Dep. at 30.

35. In October 2005, Security Manager, Ulysses S. Smith ("Smith"), met with Mack in connection with his annual performance review. Mack Dep. at 260; Mack Dep. Ex. 37. Mack admits that he received this review, and his signature appears on it. *Id.*; Mack Dep. at 260-61 and 266-67.

36. Mack's attendance record was a problem because Mack frequently requested "emergency vacation," and he failed to bring in doctor's notes to verify his health-related absences. Smith Dep. at 28-30, 45-48; Jackson Dep. at 31-33.

37. Mack had five absences in the first four months of 2006 –none of which related to sarcoidosis. Mack missed a shift on January 7, 2006 for an undisclosed illness, on February 13, 2006 due to a power outage at his home, on March 11, 2006 and April 17, 2006 because he "just didn't feel good," and April 22, 2006 because someone tried to break into his car. Mack Dep. at 239-44; Mack Dep. Exs. 33 and 34.

38. In March 2006, Gary Corso ("Corso") became The Post's Director of Administration and Operating Services. Mack Dep. at 101; Corso Decl. at ¶ 1.

39. Corso was Smith's supervisor, and had overall responsibility for the Security Department. Corso Decl. at ¶ 1.

40. Shortly after assuming this responsibility, Corso met with Smith to obtain an overview of the Security Department, and to discuss any employees who had performance issues, including Mack. Smith Dep. at 57; Corso Decl. at ¶ 5.

41. Smith also gave Corso a copy of the employees' attendance reports. Smith Dep. at 58.

42. Smith told Corso that Mack "seemed to call off on a lot of shifts," that he had a few problems with employees, and that he had a problem with falsifying documents. Smith Dep. at 57-58; Corso Decl. at ¶ 6. *See also* Mack Dep. at 269-71; Mack Dep. Ex. 38.

43. At around the same time as Corso's meeting with Smith, Corso was reevaluating The Post's use of its own security force, and considering eliminating all of the part-time on-call security guard positions in favor of independent contractors supplied by Guardsmark. Corso Decl. at ¶ 7. To help achieve this objective, Corso planned to reduce the overall number of hours worked by the part-time on-call security guards. *Id.*

44. Based on Smith's description of Mack's attendance record, as well as this planned hours reduction, Corso decided to remove Mack from the part-time on-call roster. *Id.* at ¶ 8; Smith Dep. at 63.

45. When Corso made this decision, he was unaware of any claim by Mack that some of his absences were FMLA-covered. Corso Decl. at ¶ 10. However, given the nature of Mack's

-6-

absences, many of which involved repeated absences related to problems with his car and home, Corso maintains that there were sufficient grounds to remove Mack from the on-call roster. *Id.*

46. Some days later, Corso telephoned Smith and informed him that The Post was going to remove Mack from the part-time on-call roster due to his poor attendance. Smith Dep. at 63 and 65; Corso Decl. at ¶ 9.

47. On or about April 28, 2006, Mack requested, and Smith agreed to provide, a copy of Mack's absence report. Mack Dep. at 100-101 and 125. Jackson Dep. Ex. 2. Only the absences from April 29, 2005 through May 1, 2005, and on May 6 and 7, 2005 – related to sarcoidosis. Mack Dep. at 207-09 and 225-27. Most of the absences listed on the report related to personal problems and health issues unrelated to his sarcoidosis. Mack Dep. at 224-25, 228-31, 233, and 240-44; Mack Dep. Exs. 27, 29, 30, 32, 33 and 34.

48. On May 8, 2006, Smith telephoned Mack and informed him that The Post was removing him from the part-time on-call roster. Mack Dep. at 128-29. Mack then called Corso, who confirmed that Mack had been removed from the roster. *Id.* at 129. Corso sent Mack a letter confirming his removal from the part-time on-call roster. Mack Dep. Ex. 44.

49. Immediately after his termination from The Post, Mack became employed by Personnel Resources as a full time security guard at a rate of $13 per hour – approximately $3 less per hour than he made while working for The Post. Mack Dep. at 115-16. His new job also includes benefits. Mack Dep. at 116-17.

50. Mack remains employed full time by Personnel Resources. Mack Dep. at 316-18.

51. Mack acknowledges that he has made no further effort to look for a better paying job. Mack Dep. at 316-17.

52. On May 11, 2006, Mack filed a Charge of Discrimination with the Fairfax County Human Rights Commission. Mack Dep. at 308. In the Charge, Mack claimed that The Post discriminated against him due to an unidentified disability when it terminated his employment. *See* Holmes Decl. Ex. E.

53. In December 2006, Mack amended this Charge to include claims that The Post discriminated against him on the basis of race, gender, and religion. Mack Dep. at 308-13; Holmes Decl. Ex. F.

54. On July 10, 2006, Corso met with the remaining part-time on-call security guards, and informed them that The Post planned to reduce their hours to sixteen per week, effective September 1, 2006. Corso Decl. at ¶ 11. Effective May 1, 2007, The Post stopped staffing security shifts at its facilities with part-time on-call security guards. *Id.* at ¶ 12.

Dated: June 7, 2007

Respectfully submitted,

_____/s/ Jacqueline M. Holmes____
Jacqueline M. Holmes
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939 (telephone)
(202) 626-1700 (telecopy)

Attorneys for Defendant
The Washington Post