## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAM A. MACK, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No.: 06-1144 (PLF) |
| WP COMPANY, L.L.C., d/b/a ,<br>THE WASHINGTON POST | ) ) | Jury Trial Demanded |
| Defendant. | ) ) ) | |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Jacqueline M. Holmes
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3939 (telephone)
(202) 626-1700 (telecopy)

Attorneys for Defendant
The Washington Post

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................3

    A.   Mack Worked As a Part-Time On-Call Security Guard For The Post...................3

    B.   The Post's FMLA Policy ....................................................................................4

    C.   Mack's Sarcoidosis Diagnosis............................................................................5

    D.   Mack Missed An Excessive Number of Shifts in 2005 and 2006 ........................5

    E.   Mack's Attendance Problems Continue into 2006 ...............................................7

    F.   The Post Decides to Restructure Its Security Department And Removes Mack  from The On-Call Roster For Excessive Absenteeism...............................8

    G.   Mack Immediately Obtains Comparable Alternate Employment .......................10

    H.   Mack Claims The Post Terminated Him In Violation Of The FMLA (And Other EEO Laws) ..............................................................................................11

    I.   The Post No Longer Uses Part-Time On-Call Security Guards...........................11

III.   ARGUMENT......................................................................................................12

    A.   Standard of Review ...........................................................................................13

    B.   Mack's Interference Claim Must Be Dismissed..................................................13

        1.   Mack Cannot Show That He Gave The Post Sufficient Notice Of His Need  For FMLA Leave..............................................................14

            a. The Alleged "Notice" That Mack Provided Was Untimely ...............15

            b. The "Notice" Mack Allegedly Provided Was Substantively Inadequate..................................................................................17

        2.   Because Mack Failed to Make Any Effort to Schedule His Medical Appointments to Minimize the Disruption to The Post's Operations,  Absences for Those Appointments Are Not Protected by the FMLA ......................................................................................19

        3.   Mack Cannot Show that The Post Ever Denied Him FMLA Benefits, And  The Post Can Show It Would Have Terminated Mack Even If It Did Not  Consider Absences That He Now Claims are FMLA-Covered ..............................................................................20

    C.   Mack's FMLA Retaliation Claim Must Be Dismissed ........................................23

        1.   Mack Cannot Establish a Prima Facie Case of FMLA Retaliation..........23

       2.     Mack's Unreliable Attendance Record Was A Legitimate, Non-Discriminatory Reason for His Termination, And Mack Cannot Demonstrate That This Reason Was A Pretext For Retaliating Against Him for Exercising His FMLA Rights.......................................25

    D.    Mack is Not Entitled to Reinstatement, But Only to Minimal Damages.............28

IV.    CONCLUSION .........................................................................................................30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 13

*Aubuchon v. Knauf Fiberglass*, 359 F.3d 950 (7th Cir. 2004) ..................................................... 15

*Bailey v. Amsted Industrial, Inc.*, 172 F.3d 1041 (1999) .............................................................. 19

*Beal v. Rubbermaid Commer. Products*, 972 F.Supp. 1216 (S.D. Iowa 1997) ............................. 17

*Bohman v. County of Woods*, 2004 WL 1563209 (W.D. Wis. 2004) ............................................. 25

*Bones v. Honeywell Intern., Inc.*, 366 F.3d 869 (10th Cir. 2004) ................................................. 21

*Brennaman v. MedicalCentral Health System*, 366 F.3d 412 (6th Cir. 2004) ........................ 17, 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 13

*Chambliss v. National Railroad Passenger Corp.*, 2007 WL 581900 (D.D.C. 2007) ................. 26

*Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088 (10th Cir. 2005) .............................................. 25

*Collins v. NTN-Bower Corp.*, 272 F.3d 1006 (7th Cir. 2001) ................................................. 17, 18

*DeMar v. PA Consulting Group, Inc.*, 2006 WL 1827373 (D.D.C. June 30, 2006) ..................... 11

*Diamond v. Atwood*, 43 F.3d 1538 (D.C.Cir. 1995) ...................................................................... 13

*Gaghan v. Guest Services*, 2005 WL 3211591 (D.D.C. Oct. 26, 2005) ............................ 11, 23, 28

*Greene v. Dalton*, 164 F.3d 671 (D.C.Cir. 1999) ......................................................................... 13

*Harding v. Gray*, 9 F.3d 150 (D.C.Cir. 1993) .............................................................................. 13

*McFall v. BASF Corp.*, 406 F.Supp.2d 763 (E.D.Mich. 2005) .......................................... 16, 17, 18

*O'Reilly v. Consolidated Edison Co.*, 374 F.Supp.2d 278 (E.D.N.Y. 2005) ................................ 25

*Palazzolo v. Galen Hospitals of Texas, Inc.*, 1997 WL 837951 (N.D. Ga. Nov. 25, 1997) .......... 19

*Phillips v. Quebecor World RAI Inc.*, 450 F.3d 308 (7th Cir. 2006) .................................. 16, 17, 18

*Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000) ................................................ 26

*Reid-Falcone v. Luzerne County Committee College*, 2005 WL 1527792 (M.D. Pa. June 28, 2005) ............................................................................................................................ 23, 24

*Sampson v. Citibank*, 53 F.Supp.2d 13 (D.D.C. 1999) .................................................... 14

*Throneberry v. McGehee Desha County Hospital*, 403 F.3d 972 (8th Cir. 2005) ............ 21

*Walton v. Ford Motor Co.*, 424 F.3d 481 (6th Cir. 2006) ............................................... 14

*Wilkerson v. Autozone, Inc.*, 152 Fed. Appx. 444, 450-51 (6th Cir. 2005) ..................... 29

*Woods v. DaimlerChrysler Corp.*, 409 F.3d 984 (8th Cir. 2005) ..................................... 18, 25

## FEDERAL STATUTES AND REGULATIONS

29 C.F.R. § 825.117, 825.302(e) & (f) .............................................................................. 19

29 C.F.R. § 825.220(c) ...................................................................................................... 11

29 C.F.R. § 825.302(b) ...................................................................................................... 16

29 C.F.R. § 825.302(c) ...................................................................................................... 17

29 C.F.R. § 825.312(d) ...................................................................................................... 28

29 U.S.C. §§ 2612(b)(1), (e)(2) ........................................................................................ 19

29 U.S.C. § 2612 (e)(2) (2001) ......................................................................................... 15

29 U.S.C. § 2617(a)(1)(A)(i)(I) ........................................................................................ 29

29 U.S.C. § 2617(a)(1)(A)(iii) .......................................................................................... 29

Fed.R.Civ.P. 56(c) ............................................................................................................ 13

# I.  INTRODUCTION

Despite the fact that Plaintiff William A. Mack ("Mack") worked only three days per week as a part-time on-call security guard for The Washington Post ("Post"), he managed to rack up literally weeks worth of absences in 2005.  After being specifically warned that he needed to improve his attendance, Mack failed to do so, and in 2006 continued to miss work for various personal reasons, including problems with his home and car.  When these longstanding attendance problems finally caused The Post to remove him from its part-time on-call roster of security guards in May 2006, he brought this suit, claiming, for the first time, that some of his absences were covered by the Family and Medical Leave Act ("FMLA") because he has a skin condition called sarcoidosis that at times requires him to receive steroid shots to relieve his symptoms.

The summary judgment record – and, in particular, Mack's own admissions – defeat his FMLA claim:

- Mack admits that the vast majority of his absences in 2005 and 2006, including all of his 2006 absences, were unrelated to sarcoidosis, his only alleged serious health condition.  Mack Dep. at 224-25, 228-31, 233-34, and 240-44; Mack Dep. Exs 27, 29, 30, 32, 33, and 34.

- Mack admits that, although he received copies of The Post's FMLA policy during his employment, and although at least two people told him that his sarcoidosis might qualify him for leave, he never requested FMLA leave.  Mack Dep. at 142-44 and 314-15; Mack Dep. Exs 39 and 42.

- Mack admits that, even though his steroid shots generally were scheduled about a month in advance, he never made any effort to notify The Post in advance of his need to be absent for the shots.  Mack Dep. at 210-14.

- Mack admits that, despite the fact that he worked only weekends and Mondays at The Post, he never attempted to schedule his steroid shots to accommodate his work schedule, or arrange the shots for a time that would not adversely impact The Post's operations.  Mack Dep. at 104-06 and 213.

These admissions completely foreclose any claim that The Post interfered with Mack's FMLA rights, or discriminated against him for attempting to exercise those rights. Mack's admissions that he failed to give advance notice of foreseeable leave, that he failed to make an effort to schedule his intermittent leave at a time least disruptive to The Post's operations, and that he failed to request FMLA leave at all establish that none of his absences qualify for FMLA leave. His admission that he never requested FMLA leave also establishes that The Post cannot possibly have retaliated against him for doing so. And his admission that the vast majority of his absences were unrelated to sarcoidosis, the only serious health condition he claims to have experienced, establishes a complete defense to his claims: The Post would have made the same employment decision regardless of whether he was absent on the few days that he now claims were FMLA-covered.

The undisputed record evidence, largely made up of Mack's admissions, clearly demonstrates that his FMLA claims (which, even if he prevails, would amount to no more than a few thousand dollars in damages) are wholly without merit. His complaint should therefore be dismissed in its entirety.

## II. STATEMENT OF FACTS[1]

### A. Mack Worked As a Part-Time On-Call Security Guard For The Post

The Post hired Mack to work as a part-time on-call security guard at its production

facility in Springfield, Virginia on November 23, 1999. Mack Dep. at 151. At the time, part-

time on-call security guards were responsible for covering shifts for regular security guards who

were unavailable to work, and for working shifts that The Post does not cover with its regular

security force or Guardsmark contractors. Corso Decl. at ¶ 4.

When Mack started working at The Post, he was not assigned a regular schedule, but at

some point during the first several years of his employment he began to receive regularly

scheduled shifts in advance. Mack Dep. at 109-11; Jackson Dep. at 17. He also worked

sufficient hours at The Post to be eligible for medical and other benefits. Mack Dep. at 149 and

151. At all times, however, Mack remained classified as a part-time on-call security guard.

Mack Dep. at 260-63; Mack Dep. Ex. 37; Corso Decl. at ¶ 6. During his employment with The

Post, Mack also sporadically had jobs with other employers. Mack Dep. at 108-13.

The Post's security force serves a critical function at The Post's production facilities, as it

protects the safety and security of Post employees, facilities, and equipment. Mack Dep. Ex. 44.

Consistent and regular attendance was a crucial part of every security officer's job, but it was

particularly critical for those individuals, like Mack, who were called upon to cover shifts not

---

[1] This statement of facts is based primarily on Mack's deposition testimony, and is taken as true for purposes of this motion only. Relevant excerpts of the Mack deposition transcript and exhibits are attached as Exhibit A to the sworn Declaration of Jacqueline M. Holmes, which is submitted as Exhibit 1 to this Memorandum. During discovery, Mack deposed his former supervisors, Ulysses S. Smith and Donald L. Jackson. Relevant excerpts of these deposition transcripts and exhibits are attached as Exhibits B and C, respectively, to the Holmes Declaration. Although The Post identified him in its Rule 26(a)(1) initial disclosures, Mack chose not to notice the deposition of Gary Corso, The Post's Director of Administration and Operating Services, who made the decision to remove Mack from The Post's part-time, on-call roster and signed Mack's termination letter. Accordingly, The Post will support a few additional facts not contained in the record with Corso's sworn Declaration, which is submitted as Exhibit 2 to this Memorandum. The deposition transcripts are cited herein as "Mack Dep. at __," and "Mack Dep. Ex. __" or Mack Dep. Ex. __ at __." All other references to the Holmes and Corso Declarations are cited as "Holmes Decl. at __," and "Holmes Decl. Ex. __" or Holmes Decl. Ex. __ at __."

otherwise covered by full-time Post security guards or contractors. Corso Decl. at ¶ 4. For this reason, the Security Department issued Work Rules that, among other things, addressed attendance-related issues. Mack Dep. Ex. 39 at p. 4. These Rules set forth various notice requirements for the taking of leave, and stressed that non-excused, repeated, or excessive absenteeism would not be tolerated and. *Id.* The rules require two weeks' advance notice for vacation leave requests, Mack Dep. at 210, and at least four hours' notice in the case of requested sick leave. Mack Dep. Ex. 39 at p. 4. Medical absences longer than two consecutive days, or six non-consecutive days, also require a "verifiable medical certificate" indicating that the employee "was under medical care and unable to report to work." *Id.* The Rules also permit the Security Department Manager, at that time, Ulysses S. Smith ("Smith"), to request a verifiable medical certificate for any absence. *Id.* Mack admits that he received and understood these Work Rules. Mack Dep. at 121-22 and 210.

### B. The Post's FMLA Policy

The Post's policy governing FMLA leave closely tracks the federal regulations governing such leave. It begins by generally describing an employee's entitlement to leave, and an employee's right to reinstatement upon return from leave. Mack Dep. Ex. 39 at p. 1. It also explicitly sets forth the notice requirements for obtaining any type of FMLA leave, stating that "[t]o qualify for [FMLA] leave . . . the employee must notify his or her **supervisor and benefits administrator** of the reasons why leave is needed at least 30 days in advance, if the need for leave is foreseeable, or as soon as practicable, if the need for leave is not foreseeable." *Id.* (emphasis in original). The policy reiterates that failure to provide adequate notice "may result in delay or denial of leave." *Id.*

In addition to these notice requirements, The Post's FMLA policy expressly enumerates other requirements for intermittent leave. *Id.* Specifically, the policy provides that

4

> If the employee is seeking intermittent leave that is foreseeable, the employee must make a reasonable effort not to unduly disrupt the employer's operation. If intermittent leave is needed, the employee should consult his or her supervisor to discuss a schedule that suits the needs of both the employee and the employer.

*Id.* Mack acknowledges, and contemporaneous documentation confirms, that he received copies of The Post's policy governing FMLA leave on more than one occasion. Mack Dep. at 142-44 and 314-15; Mack Dep. Ex. 42. However, Mack never talked to anyone about the FMLA. Mack Dep. at 144. Rather, after he received the policy, he "just looked at it, and I held it all these years." *Id.* Mack acknowledges that he understood that the FMLA policy "said you can take time off." Mack Dep. at 144-45.

### C. Mack's Sarcoidosis Diagnosis

In September 2001, Mack was diagnosed with sarcoidosis, a skin disease that causes lesions to appear on various parts of his body. Mack Dep. at 18. To relieve these symptoms, Mack began to receive steroid shots in November 2001. Mack Dep. at 28-29. His medical records indicate that he received one shot in 2002, two in 2003, two in 2004, and two in 2005, Holmes Decl. Ex. 5, and that each shot relieved his symptoms for approximately 4-6 months. *Id.* Mack's last steroid shot prior to his termination was on November 6, 2005. Mack Dep. Ex. 31. Directly contradicting these records, Mack testified in deposition that he received shots more frequently, and that he was scheduled to receive shots every two months. Mack Dep. at 161-62. These shots caused side effects that generally required Mack to miss work for two days. Mack Dep. at 106.

### D. Mack Missed An Excessive Number of Shifts in 2005 and 2006

In 2005, Mack asked that he be permitted to work for The Post on only Saturdays, Sundays, and Mondays. Mack Dep. at 147-149; Mack Dep. Ex. 1. The Post accommodated this request, and generally scheduled Mack to work a total of 32 hours per week on these days. Mack

Dep. at 153-59; Mack Dep. Ex. 2.  Although his hours varied, The Post typically scheduled

Mack to work 8 hours on Saturday and Monday, and 16 hours on Sunday.  *Id.*

Excluding regularly scheduled vacation, Mack was absent 22 shifts in 2005, even though

he was scheduled to work only 3 days per week.  Mack was absent on:

- January 14-16, 2005, for an upper respiratory infection.  Mack Dep. at 203-04; Mack Dep. Ex. 22.

- January 28-30, 2005, for an unspecified illness.  Mack Dep. at 204-05; Mack Dep. Ex. 23.

- April 30-May 1, 2005, for an unspecified "medical diagnosis."  Mack Dep. at 207-09; Mack Dep. Ex. 25.

- May 2, 2005, for back pain.  Mack Dep. at 224-25; Mack Dep. Ex. 27.

- May 6-7, 2005, for a hypertension evaluation.  Mack Dep. at 225-27; Mack Dep. Ex. 28.

- June 13, 2005, because his car would not start.  Mack Dep. at 228-29; Mack Dep. Ex. 29.

- July 30, 2005, because the police detained his son in connection with a carjacking. Mack Dep. at 230-31; Mack Dep. Ex. 30.

- October 22, 2005, due to an unspecified emergency.  Mack Dep. Ex. 33.

- November 6, 2005, due to a steroid shot.  Mack Dep. Ex. 31.

- December 4-5, 2005, because he became ill from drinking an expired soda, and was treated for gas and bloating.  Mack Dep. at 233-34; Mack Dep. Ex. 32.

The Post approved Mack's use of sick leave in connection with all of his health-related absences,

and paid him for these absences.  Mack Dep. at 34, 69, and 71.  It also approved emergency

vacation for last-minute absences for personal reasons.  Smith Dep. at 46-48.

Mack never requested FMLA leave for any of his health-related absences, or attempted to

comply with the notice provisions of the FMLA or The Post's FMLA policy.  Mack Dep. at 104-

06, 142-45, and 210-16.  In particular, Mack did not give his supervisors advance notice of any

6

sarcoidosis-related absences, or, for that matter, advise his supervisors that any particular health-related absences related to his sarcoidosis. Mack Dep. at 67-69; Smith Dep. at 37-38 and 41; Jackson Dep. at 29-30. The most that he did was to inform a handful of Post personnel, including Smith and Corso, that he had a skin disease called sarcoidosis. Mack Dep. at 56-57, 64, 66-68, 71-80, 103-04, 138-43, and 287-90. He mentioned that he occasionally received injections from a dermatologist, and that he experienced side effects such as drowsiness, stiffness in his leg, bloating, facial lesions, and shortness of breath. Mack Dep. at 56-58, 60, 64-69, 71-78, 80, 138-43, and 323; Smith Dep. at 37-38. Mack also discussed various other health-related issues, such as muscle spasms and high blood pressure. Mack Dep. at 54-55, Jackson Dep. at 30.

In October 2005, Smith met with Mack in connection with his annual performance review. Mack Dep. at 260; Mack Dep. Ex. 37. Smith identified several areas as needing improvement, including Mack's diplomacy, his decision-making, and his attendance. Mack Dep. Ex. 37. The review specified that Mack needed to improve his "overall attendance record." *Id.* Mack admits that he received this review, and his signature appears on it. *Id.*; Mack Dep. at 260-61 and 266-67. According to Smith, Mack's attendance record was a problem because Mack frequently requested "emergency vacation," and he failed to bring in doctor's notes to verify his health-related absences. Smith Dep. at 28-30, 45-48. Donald L. Jackson ("Jackson"), the Springfield Scheduling Supervisor, confirmed that Mack sometimes failed to bring in doctor's notes. Jackson Dep. at 31-33.

### E. Mack's Attendance Problems Continue into 2006

Despite having been told in his performance review that he needed to improve his attendance, Mack's poor attendance record continued into 2006. In the first four months of 2006, Mack was absent five times – none of them related to sarcoidosis. Specifically, Mack missed shifts on

7

- January 7, 2006, for an undisclosed illness.  Jackson Dep. Ex. 2.

- February 13, 2006, due to a power outage at his home.  Mack Dep. Ex. 33.

- March 11, 2006, because he "just didn't feel good."  Mack Dep. at 239-40; Mack Dep. Ex. 33.

- April 17, 2006, again, because he "didn't feel good."  Mack Dep. at 240-41.

- April 22, 2006, allegedly because someone tried to break into his car.  Mack Dep. at 241-44; Mack Dep. Exs. 33 and 34.

### F.  The Post Decides to Restructure Its Security Department And Removes Mack from The On-Call Roster For Excessive Absenteeism

In March 2006, Gary Corso ("Corso") became The Post's Director of Administration and Operating Services.  Mack Dep. at 101; Corso Decl. at ¶ 3.  Corso was Smith's supervisor, and had overall responsibility for the Security Department.  *Id.*  Shortly after assuming this responsibility, Corso met with Smith to obtain an overview of the Security Department, and to discuss any employees who had performance issues, including Mack.  Smith Dep. at 57; Corso Decl. at ¶ 5.  Smith also gave Corso a copy of the employees' attendance reports.  Smith Dep. at 58.  Smith told Corso that Mack "seemed to call off on a lot of shifts," that he had a few problems with employees, and that he had a problem with falsifying documents.  Smith Dep. at 57-58; Corso Decl. at ¶ 6.  *See also* Mack Dep. at 269-71; Mack Dep. Ex. 38.  Corso confirms that Smith told him Mack had a pattern of last-minute absences for personal reasons.  Corso Decl. at ¶ 6.

At around the same time as his meeting with Smith, Corso was reevaluating The Post's use of its own security force, and considering eliminating all of the part-time on-call security guard positions in favor of independent contractors supplied by Guardsmark.  Corso Decl. at ¶ 7.  To help achieve this objective, Corso planned to reduce the overall number of hours worked by the part-time on-call security guards.  *Id.*  Based on Smith's description of Mack's attendance

record, as well as this planned hours reduction, Corso decided to remove Mack from the part-

time on-call roster. *Id.* at ¶ 8; Smith Dep. at 63. When Corso made this decision, he was

unaware of any claim by Mack that some of his absences were FMLA-covered. Corso Decl. at

¶ 10. However, given the nature of Mack's absences, many of which involved repeated absences

related to problems with his car and home, Corso maintains that there were sufficient grounds to

remove Mack from the on-call roster. *Id.* Some days later, Corso telephoned Smith and

informed him that The Post was going to remove Mack from the part-time on-call roster due to

his poor attendance. Smith Dep. at 63 and 65; Corso Decl. at ¶ 9.

On or about April 28, 2006, Mack claims that he learned from Smith that his employment

would be terminated for abusing his sick leave and for missing eighteen days of work. Mack

Dep. at 100-101 and 125. Mack requested, and Smith agreed to provide, a copy of Mack's

absence report. *Id.* The report showed Mack had taken eighteen days of sick leave since January

2005. Jackson Dep. Ex. 2. It also showed that Mack had taken numerous vacation days (many

of them last-minute "emergency" vacation),[2] and had several unexcused absences, during the

same time period. *Id.* Mack confirms that only a handful of absences – specifically, the

absences from April 29, 2005 through May 1, 2005, and on May 6 and 7, 2005 – related to

sarcoidosis. Mack Dep. at 207-09 and 225-27. Further, he admits that the documentation he

submitted to The Post's Health Center in connection with these absences merely indicated that he

was absent on these dates for "medical diagnosis" and a "hypertension evaluation." Mack Dep.

at 207-09 and 225-27; Mack Dep. Exs. 25 and 28. Finally, he confirms that most of the absences

---

[2] Mack requested emergency vacation on the following dates between January 2005 and May 2006: June
13, 2005 (car trouble); July 30, 2005 (son detained in connection with carjacking); October 22, 2005 (reason
unknown); February 13, 2006 (power outage at home); and April 22, 2006 (car trouble). *See* Mack Dep. at 228-31
and 241-44; Mack Dep. Exs. 29, 30, 33, and 34.

listed on the report related to personal problems and health issues unrelated to his sarcoidosis. Mack Dep. at 224-25, 228-31, 233-34, and 240-44; Mack Dep. Exs. 27, 29, 30, 32, 33 and 34.

On May 8, 2006, Smith telephoned Mack and officially informed him that The Post was removing him from the part-time on-call roster. Mack Dep. at 128-29. Mack then called Corso, who confirmed that Mack had been removed from the roster. *Id.* at 129.[3] Mack claims Corso told him "we don't want people here like you no more" and that Mack was terminated because he took off eighteen sick days. Mack Dep. at 129 and 324. However, his contemporaneous notes of the conversation with Corso do not indicate that Corso told him he was being terminated for taking eighteen sick days. Mack Dep. Ex. 43. Moreover, the letter that Corso sent to Mack confirming Mack's removal from the roster states that Mack had been "unavailable for work when called for eighteen shifts," and also stresses that "The Washington Post places a great deal of emphasis on the safety and security of our employees and requires that all part time on call security personnel be able to work when required by their respective managers." Mack Dep. Ex. 44. Mack acknowledges that the termination letter does not refer to sick leave. Mack Dep. at 333.

### G. Mack Immediately Obtains Comparable Alternate Employment

Immediately after his termination from The Post, Mack became employed by Personnel Resources as a full time security guard at a rate of $13 per hour – approximately $3 less per hour than he made while working for The Post. Mack Dep. at 115-16. His new job also included benefits. *Id.* at 116-17. Mack remains employed full time by Personnel Resources. *Id.* at 316-18. He acknowledges that he has made no further effort to look for a better paying job. *Id.*

---

[3] In deposition, Mack claimed the conversation with Corso occurred on May 8, 2006. Mack Dep. at 128-29. However, contemporaneous notes he kept on his calendar suggest it occurred on May 10, 2006. Mack Dep. Ex. 43.

### H. Mack Claims The Post Terminated Him In Violation Of The FMLA (And Other EEO Laws)

On May 11, 2006, a month before he filed the present lawsuit, Mack filed a Charge of Discrimination with the Fairfax County Human Rights Commission. Mack Dep. at 308. In the Charge, Mack claimed that The Post discriminated against him due to an unidentified disability when it terminated his employment. *See* Holmes Decl. Ex. E. Seven months later, in December 2006, Mack amended this Charge to include claims that The Post discriminated against him on the basis of race, gender, and religion. Mack Dep. at 308-13; *see* Holmes Decl. Ex. F.

On June 23, 2006, Mack filed his Complaint in this Court alleging that The Post terminated him for "missing too much work because of sickness," that this reason was a pretext, and that the real reason was that he took medical leave and to interfere with his FMLA rights. Compl. at ¶ 13. He asserted two separate FMLA claims. First, he claimed that The Post "discriminatorily terminated his employment" because of his use of FMLA leave.[4] *Id.* at ¶ 20. Second, he claimed that The Post interfered with his FMLA rights. *Id.* at ¶ 22. In the Complaint, Mack claimed his sarcoidosis constituted a "serious health condition under the FMLA." *Id.* at ¶ 11. This is the only serious health condition alleged in the Complaint. *See* Compl. at ¶¶ 1-18.

### I. The Post No Longer Uses Part-Time On-Call Security Guards

On July 10, 2006, Corso met with the remaining part-time on-call security guards, and informed them that The Post planned to reduce their hours to sixteen per week, effective

---

[4] The Complaint refers to this claim as discrimination under the FMLA, mirroring the statutory and regulatory language. *See* 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave."). However, most courts analyze an employee's claim that he was discharged because he took FMLA leave as a retaliation claim, rather than a discrimination claim, using the *McDonnell Douglas* burden-shifting scheme of proof. *See, e.g., DeMar v. PA Consulting Group, Inc.*, 2006 WL 1827373, at * 2 (D.D.C. June 30, 2006); *Gaghan v. Guest Services*, 2005 WL 3211591, at * 5-6 (D.D.C. Oct. 26, 2005).

September 1, 2006.  Corso Decl. at ¶ 11.  Effective May 1, 2007, The Post stopped staffing security shifts at its facilities with part-time on-call security guards.  *Id.* at ¶ 12.

### III.     ARGUMENT

Mack's FMLA claims are completely without merit and must be dismissed.  Mack cannot establish the prima facie elements of an FMLA interference claim, because he has no evidence whatsoever to establish that he notified The Post that he needed FMLA leave, or that any of his specific absences qualified for FMLA leave.  He also made no effort to give The Post advance notice of absences that were scheduled as much as a month in advance, or to schedule his foreseeable, intermittent treatments at a time that would be least disruptive to The Post's operations.  These defects are fatal to his claims.  Moreover, because Mack admits that the vast majority of his absences were unrelated to sarcoidosis, his only alleged FMLA-qualifying condition, The Post would have removed Mack from its on-call roster even if he had never missed a day of work due to sarcoidosis.  This provides an independent basis for dismissing his claim.

Mack's retaliation claim must also fail for a most fundamental reason:  he never requested FMLA leave, and therefore never engaged in any arguably protected activity under the FMLA.  Moreover, even if he had, the law is clear that The Post's decision to remove him from the on-call roster for excessive absenteeism was a legitimate business decision.  And, of course, Mack cannot show pretext – the record is clear that nobody at The Post, including Corso and Smith, knew that Mack wished to exercise his FMLA rights with respect to certain of his absences.  Mack therefore has no evidence to show that The Post's explanation that it removed him from the roster for excessive absenteeism is unworthy of credence, or is a pretext for discriminating against him because of rights that he never attempted to exercise.

For all of these reasons, and because the material facts necessary to draw these conclusions are undisputed, The Post is entitled to judgment as a matter of law.

## A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In opposing a motion for summary judgment, the nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Anderson*, 477 U.S. at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## B. Mack's Interference Claim Must Be Dismissed

In Count II of the Complaint, Mack claims The Post interfered with his rights under the FMLA. To establish an interference claim, Mack must show that: (1) he was an eligible employee; (2) the defendant was an eligible employer; (3) the employee was entitled to leave

13

under the FMLA; (4) the employee gave the employer notice of his or her intention to take leave;

and (5) the employer denied the employee FMLA benefits to which he was entitled. *See Walton*

*v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2006).

Mack's interference claim fails because the credible evidence affirmatively refutes his

entitlement to FMLA leave. His failures to attempt to request leave, to notify The Post of his

need for foreseeable leave, or to attempt to schedule any intermittent leave so that it would not

interfere with his weekend work schedule completely defeat any claim that he was entitled to

FMLA leave, or that his absences were protected under the FMLA. Moreover, Mack actually

received all the leave that he ever requested from The Post, including leave for sarcoidosis-

related issues, other illnesses, and myriad personal reasons. And the record is clear that The Post

would have removed Mack from its part-time on-call roster even if he had not been absent a few

times for sarcoidosis, the only allegedly FMLA-covered condition that he experienced. Each of

these reasons provides an independent basis upon which to dismiss Mack's interference claim.

### 1. Mack Cannot Show That He Gave The Post Sufficient Notice Of His Need For FMLA Leave

Because one purpose of the FMLA is to provide an employee with medical leave while

simultaneously accommodating an employer's legitimate business interests, employees who wish

to avail themselves of FMLA leave must provide notice to their employer of their desire to do so.

*See Sampson v. Citibank*, 53 F.Supp.2d 13, 19 (D.D.C. 1999) (granting summary judgment in

favor of the employer because the employee never expressly sought FMLA leave; rejecting the

employee's argument that "the FMLA should somehow have been automatically triggered").

"Conditioning the right to take FMLA leave on the employee's giving the required notice to his

employer is the quid pro quo for the employer's partial surrender of control over his work force.

Employers do not like to give their employees unscheduled leave even if it is without pay,

because it means shifting workers around to fill the temporary vacancy and then shifting them around again when the absentee returns. The requirement of notice reduces the burden." *Aubuchon v. Knauf Fiberglass*, 359 F.3d 950, 951-52 (7th Cir. 2004). In order to qualify for FMLA leave, an employee must provide notice that is both timely and substantively sufficient to advise the employer of the reason for the leave and its duration.

Although Mack acknowledges that he never specifically requested FMLA leave in connection with any of his absences, Mack Dep. at 142-44, he nonetheless claims that he provided The Post with proper notice of his need for FMLA leave (1) because he told various employees at The Post that he had a skin condition that required him to get steroid shots; and (2) because he submitted doctor's notes to The Post's Health Center when he returned to work from sick leave. Mack Dep. at 287-90. Neither of these communications was sufficient to establish notice under the FMLA.

a.    The Alleged "Notice" That Mack Provided Was Untimely

Where leave is foreseeable, such as in the case of a planned medical treatment, the FMLA requires the employee to provide 30 days' notice or—at a minimum—such notice "as is practicable:"

> In any case in which the necessity for leave [] is foreseeable based on planned medical treatment, the employee [] shall provide the employer with
>
> — not less than 30 days' notice, before the date the leave is to begin, of the employee's intention to take leave [],
> — except if the date of the treatment requires leave to begin in less than 30 days, the employee shall provide such notice as is practicable.

29 U.S.C. § 2612 (e)(2) (2001). The FMLA's implementing regulations interpret the "as soon as practicable" provision to require at least verbal notification to the employer shortly after the employee learns of the need for leave:

> For foreseeable leave where it is not possible to give as much as 30 days notice "as soon as practicable" ordinarily would mean at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee.

29 C.F.R. § 825.302(b).

None of Mack's communications to anyone at The Post were made within the FMLA's required time limits. Mack admits that he usually knew about his steroid shots a month before they were scheduled. Mack Dep. at 210-14. Thus, Mack does not dispute that his need for leave was foreseeable. However, he concedes that he never provided anyone at The Post with advance notice of his injections, much less the thirty days' advance notice, or notice within one or two days after his appointments were scheduled, as the FMLA and its implementing regulations require:

> Q:    [I]f you had an appointment on [a particular date] . . . how far in advance did you know about that usually, about a month?
>
> A:    [Y]eah, you're right. Sometimes a month, I would know about a month.
>
> Q:    Did you ever tell Mr. Smith or [Mr.] Jackson, hey, don't schedule me to work on that day because I['ve] got a medical appointment?
>
> A:    No. . . .

Mack Dep. at 211; *see also id.* at 216. This concession defeats his FMLA claim as a matter of law, because Mack cannot show that he provided notice within the applicable time limits, and he has provided no explanation as to why it was unreasonable for him to do so. *See, e.g., Phillips v. Quebecor World RAI Inc.*, 450 F.3d 308, 311 (7th Cir. 2006) (affirming summary judgment on behalf of the employer; employee failed to provide adequate notice of her need for medical leave where she neither notified her supervisor nor submitted medical documentation within one or two days of the date she learned of her need for leave); *McFall v. BASF Corp.*, 406 F.Supp.2d 763, 768 (E.D.Mich. 2005) (granting summary judgment to the employer; employee failed to

16

provide adequate notice of her need for medical leave where she never actually requested leave

for her medical condition, and doctor's notes she submitted to the employer's medical

department were submitted after the fact); *Beal v. Rubbermaid Commer. Prods.*, 972 F.Supp.

1216, 1226 (S.D. Iowa 1997) (granting summary judgment for employer because "it is

unreasonable to expect an employer to offer time off when no request has been made.").

        b.    The "Notice" Mack Allegedly Provided Was Substantively
             Inadequate

In addition to providing timely notice, an employee seeking FMLA leave has an

obligation to provide the employer with sufficiently definite information regarding the need for

leave, and the necessary duration of leave. Although an employee need not expressly assert

rights under the FMLA or even mention the FMLA, he must provide at least verbal notice

sufficient to make the employer aware that he needs FMLA-qualifying leave. See 29 C.F.R. §

825.302(c). "[T]he critical test for substantively-sufficient notice is whether the information that

the employee conveyed to the employer was reasonably adequate to apprise the employer of the

employee's request to take leave for a serious health condition that rendered him unable to

perform his job." *Brennaman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004); *see

also Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008 (7th Cir. 2001); *Phillips, supra*, 450 F.3d

at 311; *McFall, supra*, 406 F.Supp.2d at 768.

The undisputed facts fail that test. Taken together, Mack's comments to Post personnel

indicated nothing more than the fact that he had a skin condition called sarcoidosis, he received

steroid shots to treat his condition, and he experienced certain side effects as a result of the

condition and/or treatment, including facial swelling, facial lesions, stiffness in his leg, and

tiredness. Mack Dep. at 56-57, 60, 64-69, 71-80, 138-43, 287-90 and 323. The doctor's notes

Mack submitted to the Health Center when he returned from sick leave provided even less

information.  From the time Mack was diagnosed with sarcoidosis until his termination, only one

of the doctor's notes he submitted actually mentioned sarcoidosis, and that note provided no

further information about the nature of the condition, its effect on Mack's ability to perform his

job, or the course of future treatment.  Mack Dep. Ex. 31.  Most of the doctor's notes related to

various other ailments not obviously related sarcoidosis, such as "upper respiratory infection,"

"office visit," "medical illness," "medical diagnosis," "back pain," "hypertension evaluation,"

and "abdominal bloating."  Mack Dep. Exs. 22, 23, 24, 25, 27, 28, and 32.  Mack concedes that

almost none of his absences were for sarcoidosis or steroid shots.  Mack Dep. at 224-25, 228-31,

and 240-41.

The law does not require The Post to infer from such generic information that Mack may

have wanted FMLA leave.  *See, e.g., McFall, supra*, 406 F.Supp.2d at 768-69 (employee's

requests for "sick" days without any clear explanation as to why were "generic excuses" that

were insufficient to notify her employer that her leave was FMLA-qualifying); *Brennaman,

supra*, 366 F.3d at 423-24 (employee's bare statement that he was unwell was insufficient to

create a genuine issue of material fact as to whether his "call-in" gave the employer sufficient

notice that his absence was FMLA-qualifying); *Collins, supra*, 272 F.3d at 1008-09 (employee

suffering from depression, who informed her employer that she was "sick," did not provide the

kind of notice that would inform her employer that the FMLA may apply); *Phillips, supra*, 450

F.3d 311-12 (rejecting the employee's assertion that she notified her employer that her absences

qualified as FMLA leave, because the only information available to the employer indicated that

the employee was "sick" and had been seen at the health center); *Woods v. DaimlerChrysler

Corp.*, 409 F.3d 984, 992-93 (8th Cir. 2005) (employee who left voice message indicating he was

seeing a physician and provided a note saying that he was "stressed" did not provide a sufficient

basis to determine FMLA eligibility).  It is simply not sufficient notice, as Mack suggests, for the employer to be generally aware of the employee's health condition.  As the Eighth Circuit has aptly reasoned in rejecting a similar argument:

> Bailey argues that the notice requirements were satisfied by the company's knowledge that he had serious medical conditions, was under medical care, and needed to miss work from time to time. An attempt to satisfy the notice requirements by an indication that he might have to be absent at some unforeseen time in the future satisfies neither the requirement of notice of the 'anticipated timing and duration of the leave,' nor the requirement of notice 'as soon as practicable if dates . . . were initially unknown.'

*Bailey v. Amsted Indus., Inc.*, 172 F.3d 1041, 1046 (1999) (citations omitted).

In sum, because Mack cannot show that he gave The Post legally-required notice of his intention to take FMLA leave, Mack cannot establish a prima facie case of FMLA interference.

### 2.    Because Mack Failed to Make Any Effort to Schedule His Medical Appointments to Minimize the Disruption to The Post's Operations, Absences for Those Appointments Are Not Protected by the FMLA

Because Mack claims that he was entitled to FMLA leave for "intermittent," planned medical treatments, he is required to prove not only that he gave The Post adequate notice of his need for leave (which he cannot), but also that he attempted to schedule his appointments so as to avoid unduly disrupting The Post's operations.  29 U.S.C. §§ 2612(b)(1), (e)(2); 29 C.F.R. § 825.117, 825.302(e) & (f); *see also Palazzolo v. Galen Hospitals of Texas, Inc.*, 1997 WL 837951, *4 (N.D. Ga. Nov. 25, 1997) (dismissing FMLA claim where treatment was not urgent and employee made no effort to avoid disrupting his employer's business when scheduling his appointment) (*citing Kaylor v. Fannin Regional Hospital, Inc.*, 946 F.Supp. 988, 998 (N.D. Ga. 1996)).  The Post's FMLA policy explicitly incorporates this well-settled legal requirement. Mack Dep. Ex. 39 at p. 1.

It is undisputed that Mack fails this test.  Mack admits that he made no effort whatsoever to consult with The Post regarding his need for leave, or to otherwise make any effort to schedule his leave so as to minimize its impact on The Post's operations.  Specifically, even though his shots were scheduled well in advance, he gave Smith no notice of upcoming shots, made no effort whatsoever to discuss with Smith how he could obtain the shots while minimizing the disruption to The Post's operation, and did not ask Smith to refrain from scheduling him to work on a day when he was scheduled to receive a shot.  Mack Dep. at 145-46, 210-12.  There is no evidence whatsoever that Mack asked his doctor to schedule his steroid shots on a different day of the week so that he would be recovered in time to work his weekend shifts at The Post, perhaps because the employer that he worked for on most weekdays did not pay for sick leave.  Mack Dep. at 114-15.  The consequence of this failure was that, despite the fact that Mack was only regularly scheduled to work for The Post on Saturdays, Sundays, and Mondays, he routinely had to be absent from work at The Post to receive and/or recover from steroid shots.  Mack Dep. at 104-06 and 213.  Because Mack concedes that he failed to satisfy this independent requirement for intermittent leave, his absences do not qualify for FMLA leave and his interference claim must be dismissed.

### 3.  Mack Cannot Show that The Post Ever Denied Him FMLA Benefits, And The Post Can Show It Would Have Terminated Mack Even If It Did Not Consider Absences That He Now Claims are FMLA-Covered

Even if Mack had provided proper notice of his intention to take FMLA leave, had attempted to schedule that leave with minimal disruption to The Post's operations, and otherwise satisfied the other statutory requirements for intermittent leave, he still cannot establish a prima facie case of FMLA interference because he cannot show The Post ever denied him FMLA benefits.  Mack admits that The Post approved all of his requests for sick leave, including his sick leave requests in connection with his sarcoidosis-related absences.  Mack Dep. at 34, 69,

and 71. This admission is fatal to his effort to establish that The Post denied him FMLA benefits

– a necessary element of his interference claim.

The only other arguable basis for Mack's interference claim is the suggestion that The

Post improperly considered his sarcoidosis-related absences in deciding to remove him from the

part-time on-call roster. But this claim fails, too, because the law is clear that an employer is not

liable under the FMLA, even if it considers FMLA-covered absences in reaching a termination

decision, if it can show that it would have made the same decision absent the protected absences.

*See, e.g., Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 976-80 (8th Cir. 2005)

(holding an employer that interferes with an employee's FMLA rights will not be liable if the

employer can prove it would have made the same decision had the employee not exercised his

FMLA rights); *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 877-78 (10th Cir. 2004) (holding

plaintiff failed to prove FMLA interference case where record showed she had a history of

tardiness and noncompliance with the company absence policy, and noting that plaintiff's

request for FMLA leave does not shelter her from her obligation to comply with company

policies, including its absence policy).

Here, for the reasons discussed above, none of Mack's absences were covered by the

FMLA. But even if the sarcoidosis absences were covered, as he now claims, his interference

claims still fails. The Post removed Mack from its part-time on-call roster because Corso

believed that Mack had missed eighteen shifts due to personal and other reasons. Corso Decl. at

¶ 9. Corso did not know that a few of these absences related to Mack's sarcoidosis, and that

Mack would later claim that these absences were covered under the FMLA. *Id.* at ¶ 10.

However, Mack does not dispute that the vast majority of the absences Corso considered in

reaching the decision to terminate his employment were for personal reasons and health issues

unrelated to his sarcoidosis. From January 1, 2005 until his termination on May 8, 2006, Mack

testified that he requested "emergency vacation" on five separate occasions. Mack Dep. at 228-

31, 241-44; Mack Dep. Exs. 29, 30, 33 and 34. And he called out sick for reasons other than

sarcoidosis for seventeen shifts. Mack Dep. at 224-25, 233-34, and 239-41; Mack Dep. Exs. 22,

23, 27, 32, and 33. Thus, even excluding Mack's sarcoidosis-related absences, he was absent

twenty-two shifts during this period – several more than the number upon which The Post based

its decision.

Not surprisingly, Corso confirms that, given the nature of many of Mack's other

absences, which involved repeated personal issues with his home and car, he would have

removed Mack from the on-call register even if Mack's few sarcoidosis-related absences had not

occurred. Corso Decl. at ¶ 10. Corso further maintains that Mack's 2006 attendance record was

sufficient to justify termination. In the first four months of 2006, Mack requested "emergency

vacation" on two occasions and was absent three more times for reasons unrelated to sarcoidosis.

Mack Dep. at 239-44; Mack Dep. Exs. 33-34. Given The Post's "emphasis on the safety and

security of [its] employees" and the requirement that "all part-time on-call security personnel be

able to work when required," *see* Mack Dep. Ex. 44, five absences in four months for an

employee scheduled to work only three days a week were more than sufficient to justify

termination.

In sum, given the overwhelming evidence that Mack's overall attendance record was

poor, and that The Post would have terminated Mack regardless of his arguably FMLA-covered

absences because of this attendance record, Mack's interference claim should be dismissed.

### C. Mack's FMLA Retaliation Claim Must Be Dismissed

In Count I of the Complaint, Mack claims The Post retaliated against him for exercising his rights under the FMLA. Courts generally analyze claims based on the employee's allegation that the employer terminated him for taking FMLA leave under the *McDonnell Douglas* burden-shifting scheme of proof. *See Gaghan, supra,*, 2005 WL 3211591, at * 5. Under this analysis, the plaintiff must first establish a prima facie case of retaliation by showing (1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Id.* If the employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer articulates such a reason, the burden shifts back to the employee to establish that the proffered reason is a pretext for retaliation. *Id.*

Mack's retaliation claim must be dismissed because he cannot establish a prima facie case of retaliation, or demonstrate that The Post's explanation that it removed him from the part-time, on-call roster because of his poor attendance was merely a pretext to retaliate against him for exercising his rights under the FMLA.

### 1. Mack Cannot Establish a Prima Facie Case of FMLA Retaliation

Mack cannot establish a prima facie case of retaliation because he cannot show that he invoked a right protected by the FMLA, or, as a logical consequence, that the motivation behind his removal from The Post's part-time, on-call roster was his exercise of FMLA-protected rights. *See, e.g.*, *Reid-Falcone v. Luzerne County Comm. College*, 2005 WL 1527792, at * 3-4 (M.D. Pa. June 28, 2005). In short, Mack did not engage in protected activity, and therefore his removal from the on-call roster cannot possibly have been because of such activity.

In *Reid-Falcone*, the employee alleged that her employer violated the FMLA by reducing

her responsibilities when she returned to work following maternity leave. *See* 2005 WL

1527792 at * 2-3. As in this case, she asserted claims under both an interference theory and a

retaliation theory. *Id.* at * 5. The court found the employee could not establish a prima facie

case of retaliation because she could not show that she invoked her rights under the FMLA. *Id.*

at * 7-9. The evidence showed the employee never requested FMLA leave, and that the

employer never treated her leave as covered by the FMLA. *Id.* at * 8. In rejecting the

employee's argument that "retaliation for taking leave is enough to support a claim, regardless of

whether the leave was taken under the FMLA," the court reasoned that, in contrast with an

interference claim, which does not turn on the employer's intent, a discrimination claim requires

proof of discriminatory intent. *Id.* at * 8-9. The court concluded that "[a]llowing a plaintiff to

pursue a retaliation theory for adverse action taken after a leave of absence that the employee did

not take (for whatever reason) under the FMLA, would effectively conflate the interference and

retaliation theories of recovery." *Id.* at * 9.

Just as in *Reid-Falcone*, the undisputed evidence here establishes that Mack never

requested, much less took, FMLA leave. Specifically, Mack acknowledges that he never applied

for, or even mentioned, FMLA leave. Mack Dep. at 144:

> Q:    So she gave you a paper about the FMLA. . . . Did you talk to anybody
>       about the FMLA?
>
> A:    No, I just looked at it, and I held it all these years.

Mack Dep. at 144. This is true notwithstanding the fact that, on at least two occasions, Mack had

been informed about, or given a copy of, The Post's FMLA policy, and had been advised at least

twice, in 2001 and 2006, that his sarcoidosis-related absences may be covered by the FMLA. *Id.*

at 141-44. Since Mack never requested leave, The Post cannot possibly have intended to retaliate against him for exercising his FMLA rights.

Moreover, the timing of Mack's termination negates any inference of retaliatory intent. Mack admits that his last sarcoidosis-related absence was on November 6, 2005, six months prior to his termination. Mack Dep. Ex. 31. Absent other evidence of retaliatory intent, the temporal proximity between Mack's last arguably FMLA-covered absence and his termination is too remote to establish causation. Mack therefore cannot establish a prima facie case of retaliation.

### 2. Mack's Unreliable Attendance Record Was A Legitimate, Non-Discriminatory Reason for His Termination, And Mack Cannot Demonstrate That This Reason Was A Pretext For Retaliating Against Him for Exercising His FMLA Rights

Moreover, even if Mack could establish a prima facie case of retaliation, his claim still fails because The Post can show it had a legitimate, non-discriminatory reason for its actions. It is well established that an employee's failure to comply with his employer's internal leave policies constitutes a legitimate, non-discriminatory reason for an adverse employment action. *See*, *e.g.*, *Woods, supra*, 409 F.3d at 994 (where employee left plant during his shift without permission and failed to submit any verification that he had a serious health condition that would qualify for FMLA leave, he failed to show that he was discharged for requesting FMLA leave rather than for unauthorized absences from work in noncompliance with company policy); *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1104 (10th Cir. 2005) (upholding summary judgment for employer that terminated employee based on no-show attendance policy); *O'Reilly v. Consolidated Edison Co.*, 374 F.Supp.2d 278, 288-89 (E.D.N.Y. 2005) (employer's termination of employee for her misuse of sick leave policy was legitimate, nondiscriminatory reason for her termination); *Bohman v. County of Woods*, 2004 WL 1563209, at * 5-6 (W.D.

Wis. 2004) (employer's termination of employee for excessive illness-related absences was legitimate, non-discriminatory reason for employee's termination).

It cannot be disputed, on this record, that The Post removed Mack from the on-call roster because of his poor attendance – 22 missed shifts in 2005, and 5 additional missed shifts in the first four months of 2006.  Mack Dep. at 203-05, 207-09, 224-31, 233-34, and 239-44; Mack Dep. Exs. 23, 25, 27-30, and 32-34.  The documentary evidence, and Mack's own admissions, establish that Mack was often absent for personal reasons, regularly requesting "emergency vacation" without providing The Post any notice.  Mack Dep. at 228-31 and 241-44; Mack Dep. Ex. 33.  In addition, Mack took a lot of sick leave, Mack Dep. at 203-09, 224-27, 233-34, and 239-41, and frequently failed to provide doctor's notes verifying that these absences were health-related, which clearly violated the Work Rules.  Smith Dep. at 28-30, 45-48.  Mack's excessive absences were particularly problematic in light of the crucial importance of consistent and regular attendance to the part-time on-call security guard position.  Mack Dep. Ex. 44. Therefore, by offering this explanation, The Post has satisfied its burden to articulate a legitimate, non-discriminatory reason for Mack's termination.

Because The Post has satisfied its burden of articulating a legitimate, non-discriminatory reason for its actions, Mack bears the burden of showing that this reason was a pretext for retaliating against him for exercising his FMLA rights.  There is no evidence that would enable Mack to make the requisite showing.  In evaluating an employee's claims of pretext, courts generally look to whether the employee has established that the employer's proffered explanation is "unworthy of credence." *Chambliss v. National Railroad Passenger Corp.*, 2007 WL 581900, at * 16 (D.D.C. 2007); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of

the explanation that the employer is dissembling to cover up a discriminatory purpose."). Mack

has presented no evidence to establish that The Post's explanation that it terminated him for poor

attendance was false.

As an initial matter, Mack does not dispute that his attendance was poor, and that, on

several occasions, he failed to comply with the Security Department's Work Rules related to

vacation and sick leave. Mack admits that he frequently requested last minute, "emergency

vacation," for personal reasons, and that, despite Smith's constant requests that he verify his sick

leave, at times he failed to bring in doctor's notes until Smith asked him. Mack Dep. at 84. In

the time period Corso considered in reaching the decision to terminate Mack's employment,

Mack requested "emergency vacation" on five separate occasions. Moreover, Mack

acknowledges that Smith warned him in his 2005 performance review that he needed to improve

his attendance, and also admits that Smith regularly talked to him about his "abuse" of sick leave

(and, indeed, that Smith had done so regularly since 2000, before Mack was even diagnosed with

sarcoidosis). Mack Dep. at 244-48; Mack Dep. Ex. 37. In light of these admissions, Mack

cannot show that The Post's explanation that it terminated him for poor attendance is unworthy

of belief.

Furthermore, because he admits that he never requested FMLA leave, Mack Dep. at 144,

Mack cannot establish that the decision-maker, Corso, had any knowledge whatsoever that any

of his absences may be covered by the FMLA. Absent this connection, Mack cannot show that

Corso's proffered explanation for his actions – Mack's poor attendance record as a whole – is a

pretext for discrimination against Mack because he attempted to exercise his rights under the

FMLA.

In sum, Mack cannot establish a prima facie case of retaliation, but even if he could, his FMLA discrimination claim still fails because he cannot show that The Post's explanation that it terminated his employment due to his poor attendance record was a pretext for his alleged exercise of FMLA rights. The crux of Mack's complaint is his dissatisfaction with the way in which The Post, and Smith in particular, administered its sick leave policy. This is the complaint that he registered with The Post multiple times over the years, well before he was ever diagnosed with sarcoidosis. Mack Dep. at 244-48. Mack simply did not like being required to justify his multiple absences, or Smith's continued reminders that Mack was abusing The Post's sick leave policy. However, complaints about an employer's sick leave policy do not state a valid claim under the FMLA. For this reason, Count I of Mack's complaint should be dismissed as well.

### D. Mack is Not Entitled to Reinstatement, But Only to Minimal Damages

In his Complaint, Mack seeks, among other things, reinstatement to his position as a part-time on-call security guard at The Post. Compl. at 4. But it is clear under the FMLA that once a position is eliminated, a plaintiff loses the right to be reinstated to that position. *See* 29 C.F.R. § 825.312(d) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. Thus, an employee's rights to continued leave, maintenance of health benefits, and restoration cease under FMLA if and when the employment relationship terminates (e.g., layoff)...."); *see also Gaghan, supra,* at *3. Effective May 1 of this year, The Post stopped staffing any security shifts with part-time on-call security guards (Corso Decl. at ¶ 12), thus eliminating the position completely. Mack is therefore not entitled to reinstatement, and this Court should so hold.

Moreover, it is clear from the relevant legal principles that, even if he had a viable case,
Mack is at most entitled to very minimal damages.  It is well settled that, in an FMLA case, the
measure of damages is the amount of "any wages, salary, employment benefits, or other
compensation denied or lost to [the] employee by reason of the violation." *See* 29 U.S.C.
§ 2617(a)(1)(A)(i)(I).  This amount is subject to doubling in the event that the employer is unable
to show that it had reasonable grounds to believe that its actions were not in violation of the Act.
*Id.* at § 2617(a)(1)(A)(iii); *see also Wilkerson v. Autozone, Inc.*, 152 Fed. Appx. 444, 450-51 (6th
Cir. 2005).  Here, Mack can show that he is entitled to at most meager damages; he certainly
cannot show that he is entitled to liquidated damages.

Upon his removal from The Post's part-time on-call roster, Mack promptly secured
alternate full-time employment, with medical and other benefits at an hourly rate $3 less than he
earned at The Post.  Mack Dep. at 115-16.  Since he worked for The Post an average of 32 hours
per week, Mack is thus out at most $96 per week for the 17-week period from May 8 –
September 1, 2006, when The Post reduced the hours of all part-time on-call security guards to
sixteen.  Mack Dep. Ex. 2; Corso Decl. at ¶ 11.  His potential damages for this period thus total
$1,632.00.  Mack is also out $48 per week for the 35-week period from September 1, 2006
through May 1, 2007, when The Post discontinued the use of part-time on-call security guards
entirely.  Corso Decl. at ¶ 12.  His potential damages for this period total $1,680.00, and his total
potential economic damages are $3,312.00.

Mack cannot establish that he is entitled to liquidated damages.  Given that he failed to
request FMLA leave at all, it certainly was reasonable for The Post to believe that it was in no
way violating the Act when it removed Mack from the part-time, on-call roster.  Indeed, given
Mack's poor attendance, and his admissions that the vast majority of his absences were not

related to sarcoidosis, his alleged serious health condition, The Post's decision was fully justified. Thus, the Court should hold that, even if he prevails at trial, Mack is entitled to at most $3,312.00 in damages.

## IV.    CONCLUSION

For the foregoing reasons, The Post respectfully requests that the Court dismiss all Counts of the Complaint.

Dated:  June 7, 2007                                 Respectfully submitted,


                                              _____/s/Jacqueline M. Holmes_____
                                              Jacqueline M. Holmes
                                              JONES DAY
                                              51 Louisiana Avenue, N.W.
                                              Washington, D.C.  20001-2113
                                              (202) 879-3939 (telephone)
                                              (202) 626-1700 (telecopy)

                                              Attorneys for Defendant
                                              The Washington Post