# EXHIBIT A

William A.  Mack

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

------------------------------X
WILLIAM A. MACK,                 :
          Plaintiff              :   Case No:  06-1144
                                 :   (PLF)
          -vs-                   :
                                 :   Pages 1 - 338
WP COMPANY, L.L.C., dba THE      :
WASHINGTON POST,                 :
                                 :
          Defendant.             :
------------------------------X


          Deposition of William A. Mack

               Washington, D.C.

          Tuesday, March 13, 2007


Reported by:  Kathleen M. Vaglica, RMR

Job No:  179711

William A.  Mack

## Page 2

```
 1
 2
 3
 4
 5
 6
 7                    Tuesday, March 13, 2007
 8                         (9:49 a.m.)
 9
10    Deposition of William A. Mack, held at the offices
11    of:
12       Jones Day
13       51 Louisiana Avenue, N.W.
14       Washington, D.C. 20001-2113
15
16
17    Pursuant to notice, before Kathleen M. Vaglica, RMR,
18    a Notary Public in and for the District of Columbia.
19
20
21
22
```

## Page 3

```
 1                  A P P E A R A N C E S
 2
 3
 4    COUNSEL FOR PLAINTIFF
 5       NILS G. PETERSON, ESQUIRE
 6       2009 North 14th Street
 7       Suite 708
 8       Arlington, VA 22201
 9       (703) 527-9900
10
11    COUNSEL FOR DEFENDANT
12       JACQUELINE M. HOLMES, ESQUIRE
13       TONYA OSBORN, ESQUIRE
14       Jones Day
15       51 Louisiana Avenue, N.W.
16       Washington, D.C. 20001-2113
17       (202) 879-3620
18
19    ALSO PRESENT
20       JOHN KENNEDY, WASHINGTON POST
21
22
```

## Page 4

```
 1                      CONTENTS
 2
 3    EXAMINATION OF WILLIAM A. MACK           PAGE
 4    BY MS. HOLMES                        8, 329
 5    BY MR. PETERSON                        323
 6
 7              E X H I B I T S
 8    NUMBER                               PAGE
 9
10    1    6/26/05 Handwritten Note          147
11    2    Memo                             153
12    3    6/5/02 Handwritten Note          164
13    4    7/8/02 Kaiser Permanente Referral  166
            Form/Verification of Treatment
14
     5    8/13/02 Kaiser Permanente          170
15        Referral Form/Verification of
          Treatment
16
     6    10/7/02 Kaiser Permanente          171
17        Referral Form/Verification of
          Treatment
18
     7    10/16/02 Kaiser Permanente         173
19        Referral Form/Verification of
          Treatment
20
     8    10/28/02 Kaiser Permanente         175
21        Referral Form/Verification of
          Treatment
22
     9    11/9/02 Kaiser Permanente          177
```

## Page 5

```
 1        Referral Form/Verification of
          Treatment
 2
     10   2/27/03 Kaiser Permanente          178
 3        Referral Form/Verification of
          Treatment
 4
     11   3/20/03 Washington Post Release    180
 5        to Work Slip with Attachments
 6   12   8/12/03 Washington Post Release    182
          to Work Slip with Attachments
 7
     13   5/6/03 Washington Post Release to  185
 8        Work Slip with Attachments
 9   14   7/3/03 Kaiser Permanente Referral  187
          Form/Verification of Treatment
10
     15   7/30/03 Kaiser Permanente          189
11        Referral Form/Verification of
          Treatment
12
     16   Fairfax Hospital Discharge         191
13   and  Instructions of 8/13/03 and
     17   8/13/03 Kaiser Permanente
14        Referral Form/Verification of
          Treatment
15
     18   8/20/03 Kaiser Permanente          197
16        Referral Form/Verification of
          Treatment
17
     19   9/18/03 Kaiser Permanente          199
18        Referral Form/Verification of
          Treatment
19
     20   Prince George's County Police      200
20        Report with Handwritten Note
          dated 1/31/04
21
     21   4/30/04 Kaiser Permanente          201
22        Referral Form/Verification of
          Treatment and Washington Post
```

2  (Pages 2 to 5)

William A.  Mack

Page 18

1  job or anything like that?
2      A.  Just my skin. It's a different type of
3  acne because the average person would get acne, but,
4  when the bumps come on my face, it's blood clots,
5  and you can pop them, but constantly big black spots
6  on your face.
7      Q.  And how often does this acne appear? And
8  I'm asking that because it doesn't appear to me, and
9  maybe I'm wrong, but just looking at you it doesn't
10  appear as though you have it right now.
11      A.  Yes, because I take medication for it
12  right now.
13      Q.  So is it completely controlled with
14  medication?
15      A.  No, the medication, it don't control it,
16  but I can take the medication and get away the black
17  spots, but the acne can always pop back up.
18      Q.  And let me ask you this.
19      A.  Yes.
20      Q.  When were you diagnosed with sarcoidosis?
21  I should have asked you this sooner.
22      A.  Oh, September 2001.

Page 19

1      Q.  And how often since that time have you
2  experienced this acne? I am trying to get a feel
3  for this.
4      A.  I didn't experience the acne until the
5  year of 2005.
6      Q.  So in 2005 that was a new symptom?
7      A.  Yes, ma'am.
8      Q.  And how often have you experienced it
9  since that time?
10      A.  None since that time.
11      Q.  So you just had it once?
12      A.  Yes, in the year of 2005.
13      Q.  And are you able to remember what
14  medication you took to control it?
15      A.  No, but I, no, ma'am. No, ma'am.
16      Q.  But there was some medication you took?
17      A.  Yes, I was given medication.
18      Q.  I apologize for skipping around, but I am
19  a little bit.
20      A.  It's okay.
21      Q.  Thanks. In September of 2001 was there a
22  particular doctor that diagnosed you with sarcoid?

Page 20

1      A.  Dr. Allen Flood.
2      Q.  Is that, if you know, is that A-L-A-N?
3      A.  A-L-L-E-N.
4      Q.  And then Flood, F-L-O-O-D?
5      A.  Yes, ma'am.
6      Q.  And where does Dr. Flood practice?
7      A.  He was practicing as Kaiser Medical Center
8  in Camp Springs, Maryland.
9      Q.  And is Dr. Flood the only doctor you've
10  seen for your sarcoid issues?
11      A.  No, ma'am.
12      Q.  Could you tell me what other doctors
13  you've seen?
14      A.  Jeffrey Wittington.
15      Q.  Okay. And when did you see Dr.
16  Wittington?
17      A.  I started seeing Jeff Wittington in the
18  year of 2000. 2002. I'm sorry. Yes, ma'am.
19      Q.  You saw my confusion.
20      A.  Yes.
21      Q.  Okay. And where does Dr. Wittington
22  practice?

Page 21

1      A.  Dr. Wittington also practicing at Kaiser
2  Medical Center.
3      Q.  Is there a reason you switched from
4  Dr. Flood to Dr. Wittington?
5      A.  Yes, it was a reason. Dr. Allen Flood
6  went into a private practice.
7      Q.  And have you seen any other doctors other
8  than Dr. Flood and Wittington -- I'm sorry. Could
9  you please try to let me finish my question so that
10  the court reporter doesn't jump out the window?
11      A.  Yes.
12      Q.  What other doctors have you seen?
13      A.  Dr. Lorik.
14      Q.  And do you know how to spell that? Just
15  your best guess.
16      A.  L-O-R-I-K.
17      Q.  And where does Dr. Lorik practice?
18      A.  North Capital.
19      Q.  And is it a he or she?
20      A.  It's a man.
21      Q.  Is he with Kaiser as well?
22      A.  Yes, ma'am.

6  (Pages 18 to 21)

William A.  Mack

Page 26

1  black spots.
2     Q.  And that's what happened in 2006; is that
3  right?
4     A.  Yes.  I also have pictures of the acne
5  when I had it on my face.
6     Q.  Okay.  And, when you experienced the acne
7  in 2006, whenever it was, and I know we don't know
8  exactly, and that's fine, did that affect your
9  ability to work?
10    A.  No.
11    Q.  Does the weight gain issues that you
12 experience, does that effect your ability to work?
13    A.  Yes.
14    Q.  How does that effect your ability to work?
15    A.  It affect my walking, especially when I
16 was at the Washington Post.  We had close to 35
17 locations to make our rounds, and one of the
18 locations was going up to the top of the roof and
19 going up 35 steps, and I was always out of breath
20 and always --
21    Q.  And you attributed that to your weight
22 gain; is that right?

Page 27

1     A.  Yes.
2     Q.  Any other health issues going on at that
3  time that you, that you feel may have made you out
4  of breath in walking up the 35 steps?
5     A.  Yes.
6     Q.  What other issues?
7     A.  Stiffness in my left leg.
8     Q.  And I think you told me that stiffness in
9  your joints was something you experienced because of
10 the sarcoidosis; is that right?
11    A.  Yes, ma'am.
12    Q.  Can you explain to me how this manifests
13 itself?
14    A.  Once I receive steroid shot in my left hip
15 by the medication, if my body is not used to being
16 treated for nothing.  No smoking, no -- I don't
17 drink, but by the medication going in my body have
18 to react to something it ain't used to, so by my
19 walking the stiffness in my leg will always come
20 until I had to go to a physical therapist.
21    Q.  I want to sort of break that down.  The
22 stiffness in your leg came from getting the steroid

Page 28

1  shot; is that what I understood?
2     A.  Yes, ma'am.  Yes, ma'am.
3     Q.  So is it a symptom of the treatment?  In
4  other words, a symptom you experience as a result of
5  the shot itself?
6     A.  Yes, ma'am.
7     Q.  Okay.  And when did that first show up, as
8  best you can remember?
9     A.  The month of October 2002.
10    Q.  And has that been something that's been
11 constant or does it come and go?
12    A.  It comes and goes.
13    Q.  How often about do you experience that
14 stiffness in your leg?
15    A.  Every other month.
16    Q.  How often do you receive these steroid
17 shots?
18    A.  Every other month.
19    Q.  Thought that might be the case.  And has
20 that been true since you were first diagnosed or has
21 it changed over time?
22    A.  It's still the same from, my first shot

Page 29

1  was in the month of November 2001.  It's every other
2  month I have to get a steroid shot.
3     Q.  And that's been consistent throughout
4  today?
5     A.  All the way up to March the 5th of this
6  year, 2007.
7     Q.  And you haven't had the next one just
8  because it's not due yet?
9     A.  My next one will be May the 5th, 2007.
10    Q.  So it sounds like you expect that course
11 of treatment to continue?
12    A.  Yes.  That's when the doctor see me again.
13    Q.  And does the doctor decide every time
14 whether to give you a shot, or is it the expectation
15 you're going to the doctor and you're going to get a
16 shot?
17    A.  No, it's up to the doctor.
18    Q.  Has the doctor ever told you, oh, this
19 month you don't need a shot?
20    A.  No, ma'am.
21    Q.  Okay.  So you've had it every other month
22 since you were diagnosed basically?

8  (Pages 26 to 29)

William A.   Mack

Page 30

1      A.  Yes.
2      Q.  And tell me if this is right.  The
3  stiffness in your leg shows up after you get the
4  shot?
5      A.  Majority of the time, yes, ma'am.
6      Q.  And how long does it typically last?
7      A.  It could last a week.
8      Q.  And, when you have the stiffness in your
9  leg, does that prevent you from working?
10     A.  Yes, it will.
11     Q.  Does it always prevent you from working?
12     A.  Yes, ma'am.
13     Q.  So do you have to take time off of work?
14     A.  My employer I work with now is Personnel
15  Resources, name Valerie Welch.  Whenever I have
16  stiffness in my leg, I inform her, and she tell me
17  when I know the stiffness is there, tell me to sit
18  down for an hour, whatever I need, then continue my
19  rounds.
20     Q.  So it sounds like right now you're able to
21  work because you're able to sit down for some period
22  of time when it shows up?

Page 31

1      A.  Yes, ma'am.  Yes, ma'am.
2      Q.  Is that right?  Okay.  Does it affect --
3  let me ask the question this way.  When you are, you
4  know, as you've been working since November of 2001
5  and you've been getting these shots every two
6  months, have you ever taken time off of work because
7  of the stiffness in your leg, just specifically
8  that?
9      A.  Yes.
10     Q.  Okay.  And what were the circumstances of
11  that?  Has that happened once or more than once?
12     A.  More than once.
13     Q.  Okay.  And can you tell me, can you tell
14  me when that's happened?
15     A.  There's so many dates.  There's so many
16  dates from 2001 to the time I was at the Washington
17  Post.  There's so many dates.
18     Q.  About how often?  Is it something that
19  happens every month or something that happens every
20  couple months?  Again, I'm just referring to the
21  stiffness in your leg to be clear.  I'm not
22  referring to the whole banner of symptoms, and we'll

Page 32

1  go through them all, but just for the stiffness in
2  your leg can you tell me about how often that
3  requires you to take time off work?
4      A.  Right now with my new employer or with the
5  Washington Post?
6      Q.  I'm going back not just with the
7  Washington Post.  If you want to go employer by
8  employer, if that's easier, I'm happy to do it that
9  way.
10     A.  The stiffness always in my leg once I take
11  a shot.  The stiffness can come, but I never know
12  when it's going to come.  The Washington Post never
13  let me take off.  I asked.  They wouldn't let me
14  take off.  Wouldn't even give me a sit-down post
15  like they gave ten other employees that have medical
16  conditions.  Never give it to me.  I was always told
17  you do your job.  I done my job to the best of my
18  ability with the stiffness in my leg.
19     Q.  Are you saying you never took time off at
20  the Post for the stiffness in the leg?
21     A.  When I was under doctor's care.
22     Q.  And what does that mean?

Page 33

1      A.  When I was under my doctor's care and had
2  to state medical illness, gave me a shot; I had
3  stiffness in my leg or some type of pain from the
4  sarcoidosis from the steroid shot.
5      Q.  I'm not trying to be difficult.
6      A.  I understand.
7      Q.  I am just trying to make sure I
8  understand.  So, when you were working with the
9  Washington Post, you did or you didn't take time off
10  from work because of the stiffness in your leg?
11     A.  I took time off, but it wasn't, the
12  Washington Post didn't offer me the time.  They
13  didn't give me the time off, but I went to my
14  doctor.  He'd say you're under my care today, so
15  that was the time I took off.
16     Q.  So you would go to the doctor, the doctor
17  would say you need to be out today, and you were
18  out; is that right?
19     A.  Yes, ma'am.  Yes, ma'am.
20     Q.  Do you know again, just specifically for
21  now referring to your employment with the Washington
22  Post, how often that happened with respect to the

9  (Pages 30 to 33)

William A.  Mack

1   stiffness in your leg?  Again, I'm trying to sort of
2   keep this --
3        A.   I couldn't tell you.  It's been so long.
4   I couldn't tell.
5        Q.   Do you have a feel if it was 25 times or
6   five times or any kind of a range?
7        A.   No, ma'am.
8        Q.   And, when you went to the doctor and got
9   the doctor's note, were you, was that accepted by
10  the Post?
11       A.   Yes, it was accepted by the Post.
12       Q.   When I first asked you about the symptoms
13  you experience, you said stiffness in joints.  Were
14  you referring to just the stiffness in your leg or
15  is there some other stiffness in other joints that
16  we didn't focus on?
17       A.   My left arm.
18       Q.   Your arm?
19       A.   My left arm.
20       Q.   And when does that manifest itself?
21       A.   It manifests on December the 17th I was
22  rushed to Virginia Hospital Center for stiffness in

1   my arm.
2        Q.   December 17 of what year?
3        A.   Of this year.
4        Q.   2006; is that right?
5        A.   Two thousand --
6        Q.   'Cause we're in seven now.
7        A.   2007.
8        Q.   But we're not to December yet.  You said
9   December the 17.
10       A.   December just passed.
11       Q.   2006?
12       A.   Yes.  Yes.  I'm sorry.  I'm sorry.
13       Q.   I am not trying to trick you.  I'm just
14  trying to figure this out.
15       A.   I understand.
16       Q.   So is that the first time you had ever had
17  stiffness in your arm?
18       A.   Yes, ma'am.
19       Q.   And you weren't working for the Post at
20  that time; right?
21       A.   No, ma'am.
22       Q.   What --

1        A.   Correct.
2        Q.   Sure.
3        A.   2003 I had a stiffness in my left arm.
4   The Washington Post nurse, male, his name is Andy, I
5   walked from lower parking lot straight into the
6   front door of the Washington Post, went straight to
7   the Health Service.  The male nurse, Andy, he took
8   my blood pressure.  He said I got to get you out of
9   here.  He rushed me to Fairfax Center Hospital.
10       Q.   Okay.  Do you know roughly when in 2003
11  that happened?
12       A.   No, ma'am.
13       Q.   That's fine.  Now, you are saying, you
14  were at work at the time, I take it, at the Post?
15       A.   Yes, ma'am.
16       Q.   And you started to experience some
17  stiffness in your left arm?
18       A.   Yes.
19       Q.   So you went to the Health Center?
20       A.   Yes.
21       Q.   Was this the beginning of your shift,
22  middle of your shift, after your shift, end of your

1   shift?  Do you remember?
2        A.   Before my shift because I was on my way to
3   work coming across the Woodrow Wilson Bridge.
4        Q.   And you said you went to the nurse?
5        A.   Yes.
6        Q.   He took your blood pressure?
7        A.   He took my blood pressure.
8        Q.   And said I have to get you out of here?
9        A.   He said you need to get out of here.
10       Q.   Do you know why he said that?
11       A.   My pressure was up so high.  He said you
12  need to get out of here.
13       Q.   So what happened next?
14       A.   They called the paramedics.  They came,
15  and they, I don't know what type of tests they ran,
16  but they did what they had to do and took me out of
17  there.  And they kept me in Fairfax County Hospital
18  from the time of 11 p.m. and, if I'm correct, it
19  could have been 2 p.m. when I left.
20       Q.   2 a.m. or p.m.?
21       A.   2 a.m. in the morning.  I'm sorry.  Yes,
22  ma'am.

William A.  Mack

Page 54

```
1      Q.  So it was sometime in 2005?
2      A.  Yes, but I was at work.
3      Q.  And were you at work at the Washington
4  Post or somewhere else?
5      A.  Yes, Washington Post.
6      Q.  Did you take any time off from work
7  because of this incident?
8      A.  No.
9      Q.  Did you see the doctor or anything like
10 that?
11     A.  No, only in January because I remember,
12 since the plant manager, Roddy MacPherson, came to
13 the desk, and he said, yeah, I experienced muscle
14 spasm before, too, and also Donald Jackson, the
15 scheduling supervisor, he experienced back pain at
16 the same time.
17     Q.  I just want to ask you a little bit more
18 about that.  This is in connection with the
19 January 2005 incident; right?  That's what we're
20 talking about?
21     A.  Yeah.
22     Q.  And you said Roddy MacPherson who you said
```

Page 55

```
1  was the assistant plant manager.  Did you have a
2  conversation with him?
3      A.  Yes, when I came back.  I was at the front
4  desk because I was the first officer assigned to the
5  front desk in the lobby.  When he came back, he said
6  I heard you was out sick with a muscle spasm.  I
7  said, yes, sir.  He says he experienced them before,
8  so he know what I was going through.
9      Q.  Was there anything else to the
10 conversation or was that it?
11     A.  No, ma'am.
12     Q.  And then you said you had a conversation
13 with Mr. Jackson?
14     A.  Donald Jackson.  He said he experienced
15 them, too.
16     Q.  And who is Mr. Jackson?
17     A.  He's a shift, he's a scheduling
18 supervisor.  He scheduled everybody's schedule,
19 every officer's schedule at the Washington Post in
20 the Springfield plant when it comes to the security
21 officers.
22     Q.  Any other incidence of back pain or muscle
```

Page 56

```
1  spasms or anything else that you experienced since
2  you've been diagnosed with sarcoid?
3      A.  Not that I can remember, Miss.
4      Q.  Another symptom you mentioned to me was
5  swelling of your face?
6      A.  Yes, ma'am.
7      Q.  Does that ring a bell?  And can you tell
8  me how that affects you when you get the swelling of
9  the face?
10     A.  The face gets so bloated and, well, most
11 of the time I wouldn't even notice it until another
12 employee coming up and say, Mary Clark, the nurse at
13 the Washington Post, Springfield plant, she's a part
14 time nurse and also works full time with Lockheed
15 Martin, and I will go in to see her once before I
16 make my rounds, and she always would state you just
17 got your steroid shot, and yes, how can you tell?
18 Because your face is so bloated.
19     Q.  So is this another thing that you
20 experienced because you get the steroid shots?
21     A.  Yes, ma'am.
22     Q.  And you said Mary Clock?
```

Page 57

```
1      A.  Mary Clark, C-L-A-R-K.
2      Q.  Clark?
3      A.  Yes, ma'am.
4      Q.  And she would see this and say something
5  to you?
6      A.  Yes, ma'am.
7      Q.  And were you visiting her before your
8  rounds because she was a friend of yours, or were
9  you in the health place to get medical attention or
10 what was it?
11     A.  No, I'm a friend to everybody at the
12 Washington Post when it came to the nurses.  Every
13 employee, every nurse know I'm here today and make
14 the comment on the swelling in my face, and I was
15 always jumping on the scale.
16     Q.  You were jumping on the scale?
17     A.  To see if my weight went down, but I was
18 weighing 232.  I put myself on the diet, but my
19 weight went all the way up to 259, and I'm still
20 eating healthy.
21     Q.  So you had those weight gain issues that
22 we've already talked about?
```

15 (Pages 54 to 57)

William A.   Mack

Page 58

1    A.   Yes, ma'am.
2    Q.   How often do you experience the swelling
3  of your face?
4    A.   After I get the shot.  Because I just had
5  a shot on March the 5th, and my face was so swollen
6  the doctor had to cut, you can see on the left side
7  of my cheek my face was completely cut.  He wanted
8  to cut tissue out of there.
9    Q.   Was that --
10    A.   Take the swelling out of my face, but it's
11  still swollen on the left side.
12    Q.   Okay.  I got it.  And, when you
13  experienced the swelling of the face, does it make
14  you unable to work, or are you still able to work?
15    A.   No, I can still work with the swelling in
16  the face, but it's the other side effects that will
17  come when I'm on certain medication that they gave
18  me was the drowsiness or if they gave me and said
19  don't drive; then I wouldn't drive.
20    Q.   And drowsiness is not something I think
21  you've mentioned so far, so I'll ask you some more
22  about that.  Was drowsiness the symptom of the

Page 59

1  sarcoidosis or from some other medication?
2    A.   Some of the medication they gave me for
3  sarcoidosis.
4    Q.   What medication was that?
5    A.   I don't know right off, but I -- I will
6  give to my attorney.
7    Q.   So, in addition to getting steroid shots
8  to treat the sarcoidosis, you also take medicine; is
9  that what I understand?
10    A.   Yes, I take pills.
11    Q.   And you just can't remember what those
12  are?
13    A.   I just got them.  My lawyer have them.
14    Q.   That's fine.  When you say you just got
15  them, what do you mean by that?  Have you not been
16  taking them very long?
17    A.   No.  When I went to the new doctor, Dr.
18  Golomb, he put me on pills.  I have to take two
19  pills twice a day.
20    Q.   And that's been since August of 2006?
21    A.   Yes, ma'am.  Yes, ma'am.
22    Q.   That's when you told me you started seeing

Page 60

1  him.  So, while you were working for the Washington
2  Post, you were not taking this medication?
3    A.   No, every doctor treat me in a different
4  way.
5    Q.   I know how that is.  So, while you were
6  working with the Washington Post at least, the way
7  that your sarcoid was being treated was with the
8  steroid shots?
9    A.   Yes.
10    Q.   And no pills?
11    A.   No.  They was giving me a face cream
12  called Hydroxy, if I'm correct, because the
13  Washington Post nurse, Andy, he gave me Hydroxy II,
14  and he asked me why Hydroxy II, and I said 'cause
15  they said Hydroxy II is stronger than Hydroxy I, and
16  it's a face cream you put on the area where the
17  lesion is.  The word "lesion" is another name they
18  call it when it's swelling up spots from the
19  sarcoidosis pop up on the face.  They call it
20  lesions.  So you stick it on the lesion, tries to
21  help bring some of the swelling down.
22    Q.   Are the lesions what you call acne before

Page 61

1  or something else?
2    A.   No, it's the sarcoidosis which is on my
3  left side of my cheek, right side of my leg, right
4  side behind my leg.  I got one just grew on my left
5  side of my leg and I have two on my left side of the
6  leg, and one just grew on my right side of the leg.
7  I have a total of three.
8    Q.   And what are they?  Some kind of --
9    A.   It look like a cyst.
10    Q.   Okay.
11    A.   That's what it look like, a cyst.
12    Q.   And do they, do these cysts or lesions
13  affect your ability to do your job or go to work or
14  anything like that?
15    A.   Only time it affects me is when I bump up
16  into something, and then, once it starts growing,
17  once it grow, I can feel the growth of it.  If I
18  bump into something with my leg, rub my leg, touch
19  my face a certain way, like I told my doctor, I
20  don't know what it's like to give birth, the pain
21  women say they go through, but just touching it is
22  painful.

16  (Pages 58 to 61)

William A.   Mack

Page 62

1    Q.  So they are painful to touch?
2    A.  Yes.
3    Q.  Beyond being painful to touch, do they
4  affect your ability to do your job as a security
5  guard?
6    A.  Yes, because sarcoidosis dealing also
7  with, like, again my breathing, my health, walking.
8    Q.  And I get that.  I'm trying to sort of
9  figure this out sort of piece by piece.  I'm just
10  talking about the lesions themselves.  Do they have
11  any impact on your ability to do your job just
12  having the lesions?
13    A.  Yes, because the lesions have to do with
14  my breathing and walking.
15    Q.  I see.  So is the walking something
16  different than we've already talked about?
17    A.  Walking have to do with the sarcoidosis.
18    Q.  Right, but is it what we already talked
19  about in terms of the stiffness in your leg?
20    A.  Yeah, 'cause the lesions is another name
21  they call for the sarcoidosis.  It's another name
22  doctors, another term they use.  Some doctors say

Page 63

1  sarcoidosis; some doctors say lesions, because a
2  lesion, if they give me a shot here, it breaks off
3  and become one, two, three or four.  Give me a shot
4  in my left leg, it breaks off, so they say you have
5  a lesion popping up.  You have another lesion
6  popping up.  That's why they call it lesion.
7    Q.  And I've got that, and I've got you have
8  these lesions and that's part of the sarcoidosis.
9    A.  Yes.
10    Q.  And we already talked about you having
11  stiffness in the leg and that affecting your
12  walking.
13    A.  Yes, ma'am.
14    Q.  And what I'm trying to get at, are you,
15  when you say you have trouble walking in connection
16  with sarcoidosis, are you talking about what we
17  already talked about?
18    A.  Yes, ma'am.
19    Q.  Or are you talking about something
20  different?
21    A.  It's the same.
22    Q.  Okay.  I am just trying to not go through

Page 64

1  all that again.
2    A.  I understand.
3    Q.  The breathing we hadn't yet gotten to.
4  You say that you have issues breathing; is that
5  right?
6    A.  Yes.
7    Q.  And how does that manifest itself?
8    A.  Well, the Washington Post gave me a test.
9  I don't remember exactly what year, and they asked
10  me, I had to blow into a tube and see how my
11  breathing is, and I failed the test twice, and I
12  told her the reason I know I failed the test because
13  I take steroid shots, and it's hard for me when I'm
14  walking, my breath lose, I lose breath a lot.
15    Q.  Okay.  And have you consulted with your
16  doctor about this issue?
17    A.  Yes.  They told me just keep my eating
18  healthier and keep my weight down.
19    Q.  And it sounds to me like this is another
20  thing that's a result of the steroid shots; is that
21  right?
22    A.  Yes, ma'am.

Page 65

1    Q.  Any other symptoms that we haven't already
2  talked about that you experience as a result of the
3  sarcoidosis?
4    A.  No, ma'am.
5    Q.  Since you were diagnosed with sarcoidosis
6  in September of 2001, did you tell anyone at the
7  Washington Post that you had sarcoidosis?
8    A.  Yes.
9    Q.  Did you tell one person or more than one
10  person?
11    A.  More than one.
12    Q.  I'd like to go back, if you can, to the
13  first time you told somebody you had sarcoidosis.
14  Just try to go back there in your mind, and I'll ask
15  you some questions about that.  Can we do that?
16    A.  Yes, the first person I told was Belcher
17  McNeil.  Belcher, B-E-L-C-H-E-R, McNeil.
18    Q.  And who's Mr. McNeil?
19    A.  He's the 10:45 to 6:45 p.m. shift
20  supervisor.
21    Q.  10:45 p.m. to 6:45 a.m.?
22    A.  I'm sorry.  Yes.

17  (Pages 62 to 65)

William A.   Mack

Page 66

1    Q.  I want to make sure we're speaking the
2    same language here.  I think we are.
3        A.  Yes.
4        Q.  And you were on that shift at least some
5    of the time; is that right?
6        A.  Yes, ma'am, I was on that shift with him.
7        Q.  When were you on that shift?
8        A.  That was in the year of 2001, 2002 and
9    2003.
10       Q.  And can you remember about when you told
11   him?
12       A.  Yes, I can remember.  It was anywhere
13   between, well, had to be after 11 p.m. because he
14   was always sitting in there with me.
15       Q.  Do you remember when in terms of 2001,
16   2002, 2003?
17       A.  2002.
18       Q.  Do you know when in 2002?
19       A.  It was the month of October.
20       Q.  And was there something that happened that
21   prompted you to tell him about this?
22       A.  Yes, because I was taking, going to see a

Page 67

1    physical therapist for the stiffness in my leg.
2        Q.  And when was the recommendation made to
3    you that you see a physical therapist?
4        A.  Had to be the month before, if I went in
5    October, had to be a month before October.  It was a
6    month before that.
7        Q.  So sometime in September, somewhere in
8    there?
9        A.  Yes.
10       Q.  And are you able to remember what you said
11   to Mr. McNeil?
12       A.  Yes, I told him I have a skin disease
13   called sarcoidosis, and I told him, I told him I had
14   a skin disease called sarcoidosis, and he said what
15   is that.  It's like a tissue that grows, because he
16   was asking me about making my rounds, and I said
17   this sarcoidosis is giving me a hard time to walk
18   because I have a lot of stiffness in my leg.  He
19   said okay.  Just do the best you can.  Do the best
20   you can do.
21       Q.  All right.  Anything else that he said to
22   you or that you said to him in this conversation?

Page 68

1        A.  No, ma'am.  No, ma'am.
2        Q.  Nothing else?
3        A.  No.
4        Q.  Did you talk to him about needing time off
5    to go to physical therapy or anything like that?
6        A.  Yes, I did.
7        Q.  Okay.  Same conversation?
8        A.  Yes, same conversation, yes.
9        Q.  And what did you tell him about that?
10       A.  Well, I told him eventually I'll need time
11   off.  This stiffens my leg.  He said okay, that as
12   long as I bring a doctor slip back.  And the policy
13   was bring a doctor slip back after you out sick for
14   two days.
15       Q.  Did you have any other conversation --
16   well, let me just wrap up this one.  Is that the
17   total conversation, as best you can remember it,
18   with Mr. McNeil at that time?
19       A.  Yes, ma'am.  Yes, ma'am.
20       Q.  Let me try to get my questions out, and
21   then you can answer me.  Did you have any other
22   conversations with Mr. McNeil at any point about

Page 69

1    sarcoidosis?
2        A.  No.
3        Q.  Did you have any conversations with
4    Mr. McNeil at any point about needing to be out
5    sick?
6        A.  No, 'cause he always told me bring your
7    doctor's slip, and you're covered.
8        Q.  And were you, in fact, out sick -- well,
9    Mr. McNeil was your supervisor; right?
10       A.  Yes, ma'am.
11       Q.  And were you, in fact, out sick while he
12   was your supervisor?
13       A.  Yes, I was.
14       Q.  Were you out sick for sarcoidosis?
15       A.  Yes, I was.
16       Q.  Did you bring in doctor's slips?
17       A.  Yes, ma'am.
18       Q.  And were the absences approved?
19       A.  Yes, ma'am.  Mr. Smith -- I'm sorry.  Not
20   Mr. Smith.  Mr. McNeil is the submitter, but the
21   submitter at the Washington Post is once you look,
22   once he look at the doctor slip, he pass it on to

18  (Pages 66 to 69)

William A.  Mack

Page 70

1  Mr. Smith, but I'm sorry. Go farther back. When I
2  come back off from being sick, I cannot go to my
3  department unless Health Service clear me. Once
4  Health Service look at my doctor slip, they keep a
5  copy. They put, they xerox a copy and give it to
6  the shift supervisor, security manager, which is
7  Mr. Smith. I couldn't go to my department unless
8  the nurses clear you, which is Ann Griffin or
9  whoever staff is working that night.
10     Q.    Just to make sure I understand this, I
11  think I do, but you come back from being off sick
12  for whatever reason?
13     A.    Yes, ma'am.
14     Q.    You come back, give your doctor's slips to
15  the Health Services Office?
16     A.    Yes.
17     Q.    They clear you to return to work?
18     A.    To that department.
19     Q.    To whatever department you're assigned to?
20     A.    Yes, ma'am.
21     Q.    And they send, as far as you know, they
22  keep a copy of your doctor's slip and send a copy to

Page 71

1  somebody in your department?
2     A.    Belcher McNeil.
3     Q.    Mr. McNeil?
4     A.    Look at it, approve it 'cause they approve
5  it and give it to Mr. Smith.
6     Q.    And did you typically get paid for your
7  absences?
8     A.    Yes, ma'am.
9     Q.    Okay. After the conversation with
10  Mr. McNeil which you told me was the first
11  conversation you could remember about sarcoidosis,
12  who else did you talk to -- I want to go to the next
13  conversation that you had that you can remember with
14  anybody at the Post about sarcoidosis, and I'd like
15  you to tell me about that, if you remember.
16     A.    Mr. King.
17     Q.    Who is Mr. King?
18     A.    David King, right now he was a security
19  officer. He's a shift supervisor on the 11 p.m.
20  shift, 11 p.m. to 7 a.m. shift.
21     Q.    Okay. He was a security officer, and now
22  he's a shift supervisor?

Page 72

1     A.    Yes, ma'am.
2     Q.    When did you have a conversation with
3  Mr. King?
4     A.    It could have been 2004, if I'm correct.
5     Q.    And was he, at that time, was he a shift
6  supervisor or security officer?
7     A.    Security officer.
8     Q.    So he was one of your peers sort of,
9  somebody you worked with?
10     A.    Yes, I worked with his sister at Riggs
11  National Bank years ago.
12     Q.    And, at this point, you were working with
13  him at the Post?
14     A.    Yes, ma'am.
15     Q.    What was the nature of your conversation
16  with Mr. King?
17     A.    The nature of the conversation was I told
18  him I have sarcoidosis, and I was informing him how
19  the bumps grow up on your skin because only if I'm
20  correct on his right side of his face he had a bump
21  that looked like sarcoidosis, and I said you should
22  have it checked out because it might be sarcoidosis

Page 73

1  because my doctor's giving me this cream called
2  Treadmill, if I'm correct, and I say this cream
3  works pretty, is working right now for me. So he
4  said bring it and let me see it. I showed it to him
5  and why don't you go to your doctor.
6     Q.    Anything else in that conversation?
7     A.    Yes. The following year of 2005 David
8  King was sitting in there with me, and Maurice
9  Turner, who worked as a paper handler, he came in
10  and said, "Damn, what's wrong with your face?"
11     Q.    To you?
12     A.    Yes. I said, "What you mean? He said,
13  "Did your wife beat you up?" My left side of my
14  face was swollen. I said, "No, I have a skin
15  disease called sarcoidosis." Sarcoidosis? What is
16  that? Same thing that Bernie Mac have, the actor.
17     Q.    And did you, you told him that or --
18     A.    Yes, I told him; I said, same skin disease
19  as Bernie Mac have I have.
20     Q.    Now, at the time of this conversation,
21  which you said was in 2005, was King a security
22  officer or shift supervisor?

19 (Pages 70 to 73)

William A.  Mack

Page 74

1    A.  King was a security officer at the time.
2    Q.  And the two of you were, were you on a
3  break or what?
4    A.  Yes, I came in from making my rounds
5  because he was at the desk.
6    Q.  So you were standing at the security desk?
7    A.  Yes, I came in, came into the security
8  office, yes.
9    Q.  And Mr. Turner is a paper handler at the
10 Post?
11   A.  No, his name is Maurice -- I'm sorry --
12 Maurice Cosby.
13   Q.  Cosby?
14   A.  Carsby.
15   Q.  C-A-R-S-B-Y, something like that?
16   A.  Yes, ma'am.
17   Q.  So you were just having a casual
18 conversation with him, and he asked you what was
19 wrong with your face?
20   A.  Yes, he was coming on duty.
21   Q.  Any other conversations about sarcoidosis
22 which Mr. King was present that you can recall?

Page 75

1    A.  No.
2    Q.  Any other conversations about sarcoidosis
3  with Mr. Carsby that you can recall?
4    A.  No, ma'am.
5    Q.  Okay.  I'd like to sort of take you -- are
6  there any other conversations you've had with
7  anybody at the Post about sarcoidosis?
8    A.  Yes, ma'am.
9    Q.  Can we go to the next --
10   A.  Mary Powell.
11   Q.  Mary Powell?
12   A.  Yes, ma'am.
13   Q.  And who's that?
14   A.  She's a Registered Nurse in the Health
15 Center at the Washington Post, and she also was
16 working the 6:45 a.m. to 10:45 p.m. shift.
17 Correction.  She's working -- yes, 6:45 a.m. to
18 2:45 p.m. shift.
19   Q.  2:45?
20   A.  Yes, ma'am.
21   Q.  Any particular day or just --
22   A.  It was a Saturday.

Page 76

1    Q.  Saturday.  And are you able to remember
2  what month or what year you had the conversation
3  with her about?
4    A.  No, ma'am.
5    Q.  Okay.  Are you able to remember whether it
6  was before or after your conversation with Mr. King
7  that we just talked about?
8    A.  It was after.
9    Q.  So sometime after?
10   A.  Yes.
11   Q.  Okay.  And what was the nature of your
12 conversation with Miss Powell?
13   A.  Well, I told her to check could she define
14 the word for me and give me some research on
15 sarcoidosis, so she went into Health Center because,
16 if I'm correct, she's a nurse also at the time for
17 the United States Army.  And she went into her
18 office and did research and told me what sarcoidosis
19 was.
20   Q.  Are you able to remember what she told
21 you?
22   A.  No, but she gave me all the papers.

Page 77

1  That's what I can remember.
2    Q.  She gave you some documents you mean?
3    A.  Documents, yes, ma'am.
4    Q.  Lawyer's word for paper.  Do you still
5  have that, what she gave you?
6    A.  No, ma'am.  But I have so much
7  documentation my doctors gave me after that.
8    Q.  Do you remember what the documentation
9  said?
10   A.  It talked about what sarcoidosis comes
11 from.
12   Q.  What causes it you mean?
13   A.  Yes.  Average African male between the age
14 of 30 and 40, they get it, but that's all I can
15 remember.
16   Q.  So the purpose of your conversation, you
17 were trying to get information from Miss Powell?
18   A.  Yes.  She give me a little history on
19 sarcoidosis.
20   Q.  Were you asking her to approve any time
21 off or anything like that in this conversation?
22   A.  No, she can't approve no time off.  She's

20  (Pages 74 to 77)

William A.  Mack

Page 78

1  a nurse, not my immediate supervisor.
2      Q.  Anyone else at the Post who you have had
3  conversations with about sarcoidosis?
4      A.  Mary Hurst.
5      Q.  H-U-R-S-T?
6      A.  Yes.
7      Q.  And who's that?
8      A.  She's a Registered Nurse at the Washington
9  Post.
10      Q.  And what was -- well, when was the
11  conversation with Miss Hurst, as best you can
12  remember?
13      A.  On a Saturday.
14      Q.  And was it after, some point in time after
15  your conversation with Miss Powell?
16      A.  Yes, could have been after or before
17  because I always talk to the nurses.
18      Q.  Do you remember what year it was by any
19  chance, approximately?
20      A.  I'd say the end of 2004, going into 2005,
21  yes.
22      Q.  Do you remember what shift you were

Page 79

1  working by any chance?
2      A.  Yes.  It was the morning shift.
3      Q.  6:45 a.m. --
4      A.  Yes.
5      Q.  -- to 2:45, is that the morning shift?
6      A.  Yes, 6:45 a.m. to 2:45 p.m.
7      Q.  What was the nature of your conversation
8  with Miss Hurst?
9      A.  Well, I stepped in; I always step in
10  before I make my rounds, and she said, always just
11  joke with the nurses, say, well, where you been at.
12  I said I've been out sick, been out sick.  What's
13  wrong, and I told her.  And she said, oh, you have
14  sarcoidosis.  I said yes.  She say you know what; I
15  have worked with a doctor, and he have, she said she
16  had a friend with sarcoidosis on her leg, and she
17  said she uses healing cream, and I also gave her
18  some healing lotion.  She said I'm going to bring
19  you some.  I want you to try it, and from this day I
20  still have the healing cream and lotion, and she
21  gave me a brochure on it.
22      Q.  What kind of cream was it?

Page 80

1      A.  A healing cream, you rub it on; you rub it
2  on the lesions.
3      Q.  Did it help?
4      A.  No, 'cause she said some people it help,
5  and some people it don't.
6      Q.  Anything else?  Any other part of your
7  conversation with Miss Hurst?
8      A.  No, the swelling of the face, she said I
9  can always tell when you have took that shot because
10  your face don't look like -- it make me feel down
11  'cause my face is so bloated.
12      Q.  Anything else?
13      A.  No, that's it.
14      Q.  Any other conversations with Miss Hurst
15  about sarcoidosis?
16      A.  No, ma'am.
17      Q.  Any other conversations with anybody else
18  at the Post about sarcoidosis?
19      A.  The nurse, Ann Griffin.
20      Q.  Ann Griffin?  Who's Ms. Griffin?
21      A.  She's the supervisor in the Health Center,
22  the overall supervisor of all the nurses.

Page 81

1      Q.  As far as you know, she's a nurse?
2      A.  Yes.
3      Q.  And when did you talk to her, if you can
4  remember?
5      A.  Well, I had to talk to her very first time
6  I started turning in documentations.
7      Q.  When was that?
8      A.  It been so long I don't remember, 'cause I
9  can't come back to work unless I give the health
10  nurses all the information, and by her being the
11  shift supervisor, the supervisor of all the
12  nurses, you have to look at all of the
13  documentation.
14      Q.  So are we talking, this was back in 2002
15  or was this in 2005?  Just trying to get a feel for
16  this.
17      A.  I remember she approaching me about it,
18  the sarcoidosis, and it could have been 2003, yes,
19  ma'am.  That was the first time she ever say
20  anything about it.
21      Q.  And what was the nature of the
22  conversation with her?

21 (Pages 78 to 81)

William A.  Mack

Page 98

1  are you doing, and that's when I said not so good.
2  Why? Mr. Smith keep harassing me about my sick
3  leave. And, Ms. Doll, I have a skin disease. I
4  told you once about sarcoidosis, and, at that time,
5  I was wearing makeup on my face. A lot of times
6  when the swelling comes up on my face I would put
7  makeup on, so I took the makeup off, and she said
8  yes, I can see it, and she said, well, I will talk
9  to Mr. Smith.
10  Q.  Anything else in that conversation about
11  sarcoidosis?
12  A.  That was it.
13  Q.  Any other conversations with Ms. Doll
14  about sarcoidosis?
15  A.  Yes.
16  Q.  Okay. When?
17  A.  That date was May the 8th when they
18  terminated me.
19  Q.  Of 2006; right?
20  A.  Yes.
21      MS. HOLMES:  Do we need to take a break?
22  Let's take a quick break.

Page 99

1      (Whereupon, a short recess was taken from
2  11:13 to 11:19 a.m.)
3  BY MS. HOLMES:
4  Q.  Okay. Mr. Mack, before the break we were
5  talking about a conversation you had with Ms. Doll
6  on the 8th of May 2006. Are you able to tell me
7  what you talked to her about on that date?
8  A.  I told her Mr. Smith was harassing me
9  about sick leave. I'm tired of Mr. Smith harassing
10  me about the sick leave when I bring him
11  documentation. I went on to tell her and told her I
12  had a skin disease. I told her again, and I took
13  the makeup off my face, and she said, well, I'll
14  talk to Mr. Smith.
15  Q.  She said she had talked to him?
16  A.  She said she's going to. No, she said
17  she's going to do an investigation and also talk to
18  Mr. Smith.
19  Q.  Anything else to the conversation?
20  A.  No, ma'am.
21  Q.  Do you know whether or not she ever did an
22  investigation?

Page 100

1      A.  She did not do it.
2      Q.  On May 8, am I right that's the day you
3  were notified that the Post wouldn't be calling you
4  anymore?
5      A.  No, ma'am. That is not the date.
6      Q.  I'm sorry. Okay. What date was that?
7      A.  It was April 28.
8      Q.  April the 28th is the day you talked to
9  Ms. Doll?
10      A.  No, April the 28th is the day I talked to
11  Mr. Smith on the phone.
12      Q.  I see.
13      A.  And he told me he was going to terminate
14  me, and I asked him why, and he said you take too
15  much time off. You abuse the sick leave. Sir, I am
16  not abusing my sick leave. He said, well, I have
17  the information right in front of me. I'm looking
18  at it. So I said okay. So I hung up. I turned
19  around, called him back. I said, Mr. Smith, can you
20  fax me what you have. He said yes, sir. He faxed
21  it to my wife's job, Catholic University. He said
22  I'm going to terminate you because you missed

Page 101

1  18 days, and he faxed it to her.
2      Q.  Okay. So you talked to Smith on the 28th,
3  and then you talked to Ms. Doll on May 8?
4      A.  Mm-hmm.
5      Q.  And asked her to do an investigation?
6      A.  Way before May 8 I talked to Gary Corso.
7  I talked to Gary Corso April the 25th. Excuse me.
8  I talked to Gary Corso April the 3rd. I called him
9  approximately 10:32 a.m., and he called me back. I
10  said yes, Mr. Corso, this is Mr. Mack. I got my
11  e-mail that you are the new security director 'cause
12  he e-mailed me back on March 30.
13      So, when I called him on April 3, I said I
14  have a complaint. What's your complaint? Mr. Smith
15  been harassing me for sick leave for the longest
16  time, and I said I notice you're the new security
17  director. Can you talk to him? I tell you what.
18  Bring it up at the meeting, and I told him, went on
19  to tell him when is the meeting going to be. Within
20  the next week or two.
21      I gave my lawyer the information to the,
22  e-mail he gave me, and the meeting came up on April

26 (Pages 98 to 101)

William A.  Mack

Page 102

1 the 9th. That was the same day that I was to go in
2 to Kaiser to get a shot, so I said, since this
3 meeting is mandatory, let me reschedule this
4 meeting. And I rescheduled my meeting to see the
5 doctor, and it was set for May the 15th. And Gary,
6 when we got to the meeting, Delvin, D-E-L-V-I-N,
7 Woods brought up to Gary about the sick leave
8 policy.
9     Q. I'm sorry to interrupt you. I just didn't
10 get the name of that person.
11    A. Delvin Woods.
12    Q. Delvin Woods?
13    A. Yes.
14    Q. Okay.
15    A. Before I brought it up, he brought sick
16 leave up. He brought it in, what is the sick leave
17 procedure, because every time I take off you all
18 make me feel like I'm doing something wrong, but he
19 answered the question. He gave Gary the question I
20 was going to ask and have nothing else to say, and
21 Gary just went on and start talking about security
22 officers in Northwest, how we give them tee-shirts,

Page 103

1 so then I talked to Gary again on April the 25th.
2     Q. Let's go back to the, let's just sort of
3 go back in time first to April 3. You said you
4 called Mr. Corso?
5     A. Yes.
6     Q. Told him you had a complaint?
7     A. Yes.
8     Q. He told you to bring it up in the meeting
9 on April 9?
10    A. Yes, but I told him what the complaint
11 was. He said to bring it up again at the meeting on
12 April 9.
13    Q. And the complaint was that Smith was
14 harassing you for taking sick leave?
15    A. Sick leave.
16    Q. Did you mention sarcoidosis to Mr. Corso
17 in this meeting?
18    A. Yes, I mentioned it to him on April
19 the 3rd and April the 25th.
20    Q. Let's stick with April the 3rd so we can
21 go in order. Otherwise, we'll be here forever.
22 What did you say to him on April 3?

Page 104

1     A. I told him I'm tired of Mr. Smith
2 harassing me about the sick leave. I have a skin
3 disease called sarcoidosis, and, whenever I get a
4 shot, I take off. The doctor puts me under his
5 care. I'm always bringing a doctor's slip. I
6 always give anywhere from eight-hour notice when I'm
7 going to be out.
8     Q. Let me ask you this. You said that you
9 told him that when you got a shot you would take
10 off; is that right?
11    A. Yes, that's true.
12    Q. How many days would you take off each time
13 you got a shot?
14    A. The doctors give me the days. I don't
15 take it. When they fill the form out, this is when
16 I want you to go back to work. I look and say okay.
17    Q. I get that. I get you don't make the
18 decision necessarily, but how many was it typically?
19 Was it a day, two days?
20    A. That day or --
21    Q. Let's say you go to the doctor and get a
22 shot.

Page 105

1     A. You know what? It would be three days,
2 but what Mr. Smith was looking at, okay, William
3 Mack is already off Tuesday, Wednesday, Thursday,
4 Friday. I was sick on my days off and when I, if I
5 go to the doctor appointment on Friday, okay, I want
6 you off this weekend, don't go back until Tuesday,
7 then Mr. Smith feel like he already been off all
8 those days under doctor care; he thought I was
9 joining everything together.
10    Q. I'm not asking you to get into his head.
11 My question really is a lot simpler than that. How
12 many days typically did you take off when you got a
13 shot? How many did you need to take off until you
14 were ready to work again?
15    A. All depends on the doctor, two days, three
16 days, four. It was up to the doctor. It wasn't up
17 to me.
18    Q. Right. Two to four; is that fair?
19 Sometimes it was two, three or four?
20    A. Two, three or four. It was up to the
21 doctor, yes, ma'am.
22    Q. Ever more than four?

27 (Pages 102 to 105)

William A.   Mack

Page 106

1    A.  I think, yes, it was four when I had the
2  muscle spasm back in January.  That could have been,
3  like, a week.
4    Q.  Right, but I thought -- okay.  But I'm
5  talking about when you got your shots and needed to
6  take time off because you had just gotten a steroid
7  shot and all the symptoms we've already talked
8  about.  In those instances did you typically take --
9    A.  Two days.
10   Q.  -- two days?
11   A.  And the reason it was two days because,
12  again, I was off Tuesday, Wednesday, Thursday,
13  Friday.  If I was scheduled to work Saturday and
14  Sunday, Mr. Smith would consider Saturday one day,
15  and 16 hours Sunday, he would consider that two
16  days.
17   Q.  So you would take off Saturday and
18  Sunday --
19   A.  Right.
20   Q.  -- if you got the shot on a Friday?
21   A.  Right.
22   Q.  Did you ever get the shot on, like, a

Page 107

1  Monday and take days off from your other employers
2  because you had another job, right, on Monday,
3  Tuesday, Wednesday, Thursday?  Is that right?
4    A.  Yes, I take, as a matter of fact, job I
5  have now, the job I have now, if my pressure is up,
6  I'll call off sick, and she just have me call the
7  other security offer.  Okay.  Make sure, you just do
8  all the coverage and everything.  As long as I have
9  a body there, she said I understand, Mack.
10   Q.  I think I'm not asking this question very
11  well.  Did you ever, during the time you worked at
12  the Post --
13   A.  Yes.
14   Q.  -- did you ever have your steroid shots on
15  a Monday or a Tuesday or a Wednesday or a Thursday?
16  Or was it always on a Friday?
17   A.  No, I had them all different days, even on
18  the days I have off.
19   Q.  And did you ever take time off from your
20  other employer after getting a shot?
21   A.  No, because I wasn't with no other
22  employer until in May.  That's when I started

Page 108

1  working for Jefferson House Condominiums, but I was
2  on call.  But they never called me on, so that's
3  when I picked up a new part-time job at Personnel
4  Resources.  I was doing three jobs at one time.
5    Q.  Right.  I got that, and that's what I'm
6  trying to figure out.  When you were -- let's take
7  2001, which is when you were diagnosed.  How many
8  jobs were you working at that time?  I know you were
9  working at the Post; right?
10   A.  Right.  I worked Potomac Job Corps from
11  1996 all the way up to 2001.  Going into 2001 I was
12  at the Washington Post; I was still with Potomac Job
13  Corps.
14   Q.  And are you able to remember what hours
15  you typically worked at the Post in 2001?
16   A.  Yes, I worked 11 to 7 shift.
17   Q.  11 p.m. to 7 a.m.?
18   A.  Yes.
19   Q.  How many days a week?
20   A.  It was so much overtime could have been,
21  like, 32 to 40.
22   Q.  32 to 40 hours a week?

Page 109

1    A.  Yes, it was a lot of overtime back then,
2  if I'm correct.
3    Q.  And how many hours a week -- do you
4  remember what days you worked for the Post or did it
5  change around in 2001?
6    A.  It changed.  I can't really -- I know it
7  was nights.  I was always on nights.
8    Q.  And what was your work schedule with
9  Potomac Job Corps in 2001?
10   A.  My work schedule was 3 to 11, yes, but by
11  me having to be at the Post at 10:45 we always have
12  got an hour for lunch break or half an hour, so I
13  was close to the Woodrow Wilson Bridge because I was
14  down Southwest by the police academy, so it was easy
15  for me to get to the Beltway and get to the Post.
16   Q.  So you were able to --
17   A.  Right.
18   Q.  -- even though you had a 3 to 11 shift,
19  you were able to skip your lunch to get to the Post
20  on time?
21   A.  Right, so it was really slow by then;
22  supervisor let me go ahead.

28  (Pages 106 to 109)

William A.   Mack

Page 110

1    Q.  And was it typically the same days that
2  you worked as you worked at the Post?
3    A.  Yes, I left Potomac Job Corps and went
4  straight to the Post.
5    Q.  When did you stop working at Potomac Job
6  Corps?
7    A.  Could have been, like, close to the middle
8  of, the middle of 2001 because I remember the Post
9  started giving a lot of overtime.  Well, I don't
10  want to be in conflict rushing to work being late,
11  so I let Potomac Job Corps go.
12    Q.  And then were you only working for the
13  Post?
14    A.  Yes, ma'am.
15    Q.  And for how long did that last?
16    A.  I worked for the Post, that was my only
17  employer all the way up until when I started working
18  for Jefferson House Condominiums in 2005.
19    Q.  I think you said that was May 2005.  Does
20  that sound about right?
21    A.  No.  I can tell you when it was because I
22  remember Gary first came.  It was in April.

Page 111

1    Q.  April 2005?
2    A.  Yes.  It was April.
3    Q.  And what were your work hours with the
4  Post at that time?
5    A.  Work hours at the Post was the weekends,
6  Monday 6:45 -- I'm sorry -- Monday 2:45 p.m. to
7  10:45 p.m., Saturday, 6:45 a.m. to 10:45 p.m. and
8  Sunday, 6:45 a.m. to 10:45 p.m.
9    Q.  And what were your hours at Jefferson
10  Condominiums?
11    A.  It was between, anywhere between Tuesday
12  and Friday.  That was the day they would call me in.
13    Q.  And you were a part time on call for them?
14    A.  Yeah, I was a part time on call for them.
15    Q.  And how regularly did you get called in?
16    A.  I worked there three times.  They wasn't
17  calling me consistent.
18    Q.  So you only worked three shifts you mean?
19    A.  Right.  That's it.
20    Q.  And for how long did you have a
21  relationship with them in terms of being on their on
22  call list?

Page 112

1    A.  It wasn't that long, 'cause it could have
2  been maybe April, and I was on call from April
3  'cause I started work for, I started working for
4  Personnel Resources right in between there, so I
5  started getting more hours at Personnel Resources,
6  so I said I have three jobs.  I need to let one go
7  because the Washington Post was my main source of
8  income, so I said I'll take Jefferson House away.
9    Q.  About when did you start working for
10  Personnel Resources?
11    A.  October.
12    Q.  Of 2005?
13    A.  Yes, ma'am.  October the 15th, 2005.
14    Q.  And what was your, what were your job
15  responsibilities?  I'm sorry.  That's the wrong
16  question.  What shifts did you work?
17    A.  The shift that I worked was 8 p.m. till
18  4 a.m.
19    Q.  And what days?
20    A.  At that time it was Tuesday -- no, no.  I
21  can tell you what day it was because I had to be at
22  the Washington Post at night.  So it could have

Page 113

1  been, if I'm correct, it was Tuesdays because I had
2  to be at the Washington Post Saturday morning and
3  Fridays.  I remember always getting off work 4 a.m.
4  in the morning, Personnel Resources, going home,
5  sleeping for two hours, and my wife bring me to,
6  that morning to the Washington Post.  That's what it
7  was.  So Tuesdays and Wednesdays, 8 p.m. to 4 a.m.
8  and Fridays, 8 p.m. to 4 a.m. Saturday morning.
9    Q.  So you had Thursdays off it seems like?
10    A.  Yes, 'cause I wasn't full time at
11  Personnel Resources at the time.
12    Q.  Right.  Were you regular part time or part
13  time on call there?
14    A.  Personnel Resources?
15    Q.  Yes.
16    A.  I was part time.
17    Q.  Did you ever take any time off from your
18  work at Personnel Resources because of your, the
19  shots that you were receiving?
20    A.  Yes.
21    Q.  How often?
22    A.  I probably took off twice.

29 (Pages 110 to 113)

William A.  Mack

Page 114

1    Q.  Okay.
2    A.  It was twice.
3    Q.  And can you remember when that was?
4    A.  It could have been, like, three months ago
5    because Blue Cross/Blue Shield haven't kicked in,
6    and I know I couldn't get my medication, so I took
7    off, yes, and it was another time that I took off.
8    Q.  I think I asked another bad question.
9    A.  That was only twice, yeah.
10   Q.  While you were working for the Washington
11   Post and for Personnel Resources at the same time,
12   did you ever take off from your job at Personnel
13   Resources because of your sarcoidosis or steroid
14   shots or treatments?
15   A.  No, because at Personnel Resources Valerie
16   Welch, when I first told her about the skin disease
17   I have and the side effects and it was only two
18   security officers, me and Robert Atkins, but I was
19   the full-time security officer by then, and she
20   said, as long as I make it to work and if my
21   pressure go up, I don't feel good, she said you can
22   sit down for one, two or three hours, as long as I

Page 115

1    know you are there. She said as long as she have a
2    body there, and that worked out great for me because
3    she knew my condition, and she worked with me.
4    Q.  So, as far as you know, while you were
5    working with the Post, you didn't take time off from
6    Personnel Resources for your shots or anything like
7    that?
8    A.  No. Excuse me. I put in vacation when I
9    was not feeling good. I had a week's vacation
10   because she don't pay for sick leave. Personnel
11   Resources don't pay for sick leave. So, when it got
12   that bad, I always called off.
13   Q.  And did you take vacation from Personnel
14   Resources while you were still working at the
15   Washington Post?
16   A.  No, ma'am.
17   Q.  So, when you say you took vacation to deal
18   with your illness, you're talking about since you
19   went full time at Personnel Resources?
20   A.  Yes. I took vacation, yes.
21   Q.  And, when did you go full time at
22   Personnel Resources, as best you can remember?

Page 116

1    A.  After I was terminated from the Post, I
2    went in, and she said, the owner, she's the owner of
3    the company, and she said, Mr. Mack, 'cause I called
4    her, left a voice mail at home. I need extra hours.
5    And she got back with me a day later. She said,
6    "Mack, what's wrong? Did the Post let you go?" I
7    said, "Yes." So she said I'll tell you what. I'll
8    rush your medical, and I'm going to give you a raise
9    because you've been doing an outstanding job here,
10   and I'm going to make you full time.
11   Q.  So that was right after, sometime in May
12   of 2006?
13   A.  Yes.
14   Q.  And what did she raise your pay to?
15   A.  $13. I went from part time from $11 an
16   hour, and it went to 13, but all my raises was
17   approved through, it's a condominium I work at,
18   through the board.
19   Q.  Okay. So you got a raise, and was that in
20   May of 2006? Is that when that happened?
21   A.  Yes, ma'am.
22   Q.  And you said she, I think you said she

Page 117

1    rushed your medical benefits?
2    A.  Yes.
3    Q.  What does that mean?
4    A.  When I mean she rushed my benefits, I
5    wasn't receiving no benefit at all because I, I had
6    the family benefits with the Washington Post.
7    Q.  Right.
8    A.  And then she said tell you what I'm going
9    to do. I'll make you full time, and she said I'll
10   leave the paperwork down there for you to fill out
11   and rush it as fast as I can.
12   Q.  For medical benefits?
13   A.  Yes, ma'am.
14   Q.  And when did you start getting medical
15   benefits through Personnel Resources?
16   A.  2006, but I don't remember exactly what
17   date, but it was after the Post terminate me.
18   Q.  Right. Was it in the summertime or was it
19   way up or towards Christmas?
20   A.  I'd say August.
21   Q.  August?
22   A.  Yes, ma'am. I would say August.

30 (Pages 114 to 117)

William A.   Mack

Page 118

1    Q.  And are those family benefits?
2    A.  Yes.  No, it's just for me.
3    Q.  Single coverage?
4    A.  Just for me, yes.
5    Q.  Do you know how much you pay for that, if
6  you can remember?
7    A.  No.  What I have, talking about for
8  Personnel Resources?
9    Q.  Yes.
10    A.  What I have is -- as a matter of fact, I
11  have it on me.  I have what you call a Master debit
12  card, and what she would do, put $1,000 on this card
13  every month, and, when I go to the doctor, it pay
14  for medication and everything off this card.
15    Q.  Do you pay any kind of premium out of your
16  paycheck for that?
17    A.  No, everything come off this card.
18    Q.  Okay.  Got it.  I want to go back to the,
19  you said there was a meeting on April 9; is that
20  right?
21    A.  Yes, ma'am.
22    Q.  And I apologize for skipping around with

Page 119

1  you sometimes.  It makes sense to me, believe it or
2  not.  And you said that at that meeting, is that the
3  meeting where Mr. Corso had instructed you to bring
4  up your complaint about Mr. Smith or about sick
5  leave?
6    A.  About sick leave, yes.
7    Q.  And I think what you said is that
8  Mr. Woods brought up a complaint about it?
9    A.  Yes.
10    Q.  And what did Mr. Woods say?
11    A.  He said he want to know what is the sick
12  leave policy, because every time he out sick he said
13  the department make him feel like he's doing
14  something wrong.
15    Q.  Okay.  And did you say anything at this
16  meeting about sick leave?
17    A.  He answered the question.
18    Q.  I'm sorry?
19    A.  He gave the, what I was going to say.
20  Mr. Woods said exactly what I was going to say, so I
21  didn't have to say nothing.
22    Q.  You didn't say anything?

Page 120

1    A.  I didn't have to.
2    Q.  Did Mr. Corso respond to Mr. Woods'
3  concern?
4    A.  No.  Mr. Smith jumped in and start talking
5  about the policy.
6    Q.  What did Smith say?
7    A.  Well, Mr. Smith told Mr. Woods exactly
8  what he told me.  That you earn -- no, he said we
9  give you sick leave, which we receive sick leave by
10  the hours that we work.  We earned that.  And they
11  was always saying that we give it to you.
12    Q.  So Smith said that?
13    A.  Yes.
14    Q.  And did anybody respond to that?
15    A.  No, everybody look, because Mr. Smith is
16  always making up the policies.  And I don't blame
17  him 'cause Lisa Martin downtown have told me when I
18  called about the sick leave policy, every management
19  at the Washington Post in every department make up
20  their own policies.  So every department had a
21  different policy when it came to sick, vacation.
22    Q.  Did you have an understanding as to what

Page 121

1  the policy was for the security department?
2    A.  Yes, I had a very good understanding what
3  the policy was.
4    Q.  What was it?
5    A.  The policy was, whenever you are out sick
6  more than two days, you must, they will allow you
7  two days off, but you are allowed to take six days
8  here and six days there before the security manager
9  can ask you to bring in sick certification.
10    Q.  Okay.  Let me make sure I understand it.
11  You probably understand it better than I do.
12  Whenever you're out sick more than two days, you
13  need a doctor's note?
14    A.  Yes, but we'll still allow you to take a
15  day here and day there before it's mandatory to
16  bring in a sick certification slip.
17    Q.  So, if you're out one day, you don't have
18  to bring in one?
19    A.  Right.
20    Q.  And, if you're out one day up to six
21  times, you don't have to bring one.  Is that what
22  the six days is?

31  (Pages 118 to 121)

William A.  Mack

Page 122

1    A.  Right.  They have to be like that.  It was
2 so confusing.  It was so confusing.
3    Q.  Well, what did you think you were supposed
4 to do?
5    A.  The policy is, if you are out one day, you
6 don't have to bring a slip, but, if you are out two
7 days, you must bring a doctor's slip.  Right, if the
8 management asks you.  But, when I was out two days,
9 I was always bringing in doctor's slips, so they
10 never made it mandatory for me to bring in a
11 doctor's slip.  I was bringing them anyway out of
12 courtesy.  If my doctor gave me one, I would turn it
13 in.
14    Q.  Okay.  Now, did Smith explain the policy
15 at this meeting or no?
16    A.  No, he didn't.
17    Q.  He just said we give you sick leave?
18    A.  Yes.  He said we give you all sick leave.
19    Q.  Did he say anything else?
20    A.  No.
21    Q.  Did you say anything else?
22    A.  I didn't say nothing else, but likely

Page 123

1 Mr. Smith did, was speaking to Mr. Woods, but I
2 didn't say nothing else.
3    Q.  Anybody else in the meeting say anything
4 about sick leave?
5    A.  No.  No, ma'am.
6    Q.  Now, is there any mention in this meeting
7 of sarcoidosis?  I take it not, but --
8    A.  No, because when it comes to me talking
9 about my personal problems with the disease, I mean,
10 the officers didn't need to know.
11    Q.  Sure.  I'm just making sure that's right.
12    A.  Only my superiors.
13    Q.  Now, after the meeting on the 9th, you
14 said you had another conversation with Mr. Corso on
15 April 25; is that right?
16    A.  Yes.
17    Q.  What was the content of that conversation?
18    A.  The content was I was out sick before the
19 25th one day, and, when I called off that morning,
20 and, when I mean that morning, it could have been,
21 like, 12 a.m., Imani McGruder informed me that, she
22 said, wow, she said Otis Brooks just called off.  I

Page 124

1 said, oh, yeah.  Well, you need to called Donald
2 Jackson.  If I'm correct, she said, Donald Jackson
3 just left.  I said you need to call him.  And I
4 don't know if she called him.  Likely she did, but
5 once I got my paycheck they didn't pay me for sick
6 leave, and I asked Mr. Jackson why didn't you pay
7 for sick leave.  He said you need to see, talk to
8 Mr. Smith.  But Mr. Smith is on vacation.  And he
9 said, well, Mr. Smith will be back Tuesday.  You
10 need to talk to him.  So I called Gary.  And, when I
11 contacted Gary, I told him, I said I'm tired.  He
12 said what are you tired of.  I said I'm sick and
13 tired of Mr. Smith harassing me about sick leave.  I
14 said I have 177 hours of sick leave on the books,
15 and they won't pay me sick leave.  He said, well,
16 you need to see Mr. Smith.  I said, well, Mr. Smith
17 won't be back to Tuesday.  He said, no, he said
18 Mr. Smith will be back Friday, but he might not come
19 in 'til Tuesday.
20        So I called Mr. Smith and left a message
21 on his voice mail, and that's when Mr. Smith called
22 me on April the 23rd and told me I'm going to

Page 125

1 terminate you.  I said for what.  He said you keep
2 abusing your sick leave, and I'm sick of it.
3    Q.  That was April 28?  You just said the
4 23rd.  I want to make sure.
5    A.  It was April the 28th.  Yes, ma'am.
6    Q.  So the conversation with Corso on the 25th
7 was I didn't get paid for this; I'm sick of Smith
8 for harassing me about sick leave?
9    A.  Yes, for harassing me about sick leave.
10    Q.  Anything else --
11    A.  That was it.
12    Q.  -- in that conversation?  What did
13 Mr. Corso say in response to that?
14    A.  Well, you need to talk to Mr. Smith.
15    Q.  Just work it out with Mr. Smith?
16    A.  No, talk to Mr. Smith.  I said, I told him
17 this man know I have a skin disease.  He have every
18 documentation there is, but I feel like Gary, he's
19 the new security director.  He should have said,
20 well, let me check.  This is the second time this
21 guy is bringing it up.  Let me check his records.
22    Q.  Did you ask him to do that, or that's just

32  (Pages 122 to 125)

William A.  Mack

Page 126

1   what you thought?
2       A.  He should have as the security director.
3       Q.  Did you ask him, though?
4       A.  No, I shouldn't have to ask him.
5       Q.  I'm just making sure I understand.  Any
6   other conversations with Corso where sick leave or
7   sarcoidosis were mentioned that you had with him?
8       A.  It was mentioned to Jan Doll on the 28th,
9   and I went on to tell Jan Doll I want to have a
10  meeting with you.  And she said you want a meeting,
11  and I said, yes, I want to have a meeting with you.
12  Yes, ma'am, because I'm sick and tired of Mr. Smith
13  harassing me about this sick leave.  She said,
14  Mr. Mack, I'm going to set a meeting up with you and
15  Mr. Smith on May the 1st.  I said okay.
16      May the 1st came, which was a Monday.  I
17  got to work at 2:45.  Ms. Doll walked past the desk
18  at 3:30.  She didn't say hi, good evening, nothing.
19  She came back past going back towards her office.
20  She said, hello, Mr. Mack.  Hello.  She came back
21  past 3:40.  She didn't say nothing about the
22  meeting, nothing whatsoever, and Mr. Smith came and

Page 127

1   said, oh, I'm going to go ahead and pay you for your
2   sick leave.  And what about my emergency vacation
3   that I took?  It was during that same period.
4       The reason I took emergency vacation, and
5   I gave Mr. Smith all the scoop.  My 18-year-old, no,
6   my 16-year-old son at the time was on his way home,
7   and a young lady that he was with, a female school
8   mate he was with, the young lady knew somebody
9   driving a car, and he said where are you going.  My
10  younger son said, well, I'm going, the female with
11  my son said I'm going home; I'm going to Southeast,
12  home.  He said I'm going that way.  Y'all want a
13  ride.  So the young girl said yes.  She told my son
14  he's her friend.
15      I found out that the car that my son was
16  in, my son didn't know, was in a strong-armed
17  holdup, strong arm robbery holdup.  So me and my
18  wife was at church on Friday night, so, when my
19  teenager, 16-year-old son, called me, my wife and I
20  were in church.  Cell phone is off in church, so we
21  didn't get home 'til, like, 12:30 a.m.  And that's
22  when the D.C. police called and said they have my

Page 128

1   young son in juvenile.  They said he's not in no
2   trouble.  He was just a passenger in a UV car, and
3   we went and got him that morning.
4       That's when I called off.  I explained to
5   the person at the front desk.  I said, look, I won't
6   be in.  I'm on emergency vacation, and tole them
7   why.  I said I have to pick up my son.  I picked my
8   son up that morning, and I called off.  As a matter
9   of fact, I got the call at 12:30 a.m.  I called up
10  12:40 a.m., and I went and picked up my son, and
11  that's my sick leave, emergency vacation.
12      Q.  Okay.  I gotcha.  I'm trying to kinda go
13  through this, and we're going to get to all this.
14  So I'm trying to go through this in some order, and
15  what I'm trying to ask you is whether, other than
16  the conversations we've talked about focusing on
17  Mr. Corso, whether you had any other conversations
18  with Mr. Corso about sick leave or sarcoidosis that
19  we haven't already talked about?
20      A.  Yes.  May the 8th.  I pleaded with that
21  man.
22      Q.  And on May the 8th did he call you or did

Page 129

1   you call him?
2       A.  I called him.
3       Q.  And what happened in that conversation?
4       A.  I told him Mr. Smith just called me and
5   told me I got terminated, and I pleaded with him,
6   no, keep my job.  He said we don't want people like
7   you here no more.
8       Q.  Okay.  And did you say anything in
9   response to that?
10      A.  No, he just said we don't want people here
11  like you no more.
12      Q.  That's what he said?
13      A.  Yes, because you took off 18 days, and so
14  I hung up.  I said okay.  So I called my wife and
15  told her.
16      Q.  Okay.
17      A.  Give me a minute, please.
18      Q.  Sure.  You want to take another break?
19  I'm happy to do it.
20      A.  No.  I called my wife and called him back,
21  called Gary back and let him know that I have a kid
22  going to college.  I can't lose my job.  He just

33 (Pages 126 to 129)

William A.   Mack

Page 138

1  you had it?
2      A.  Yes, I told him.
3      Q.  Do you remember when that was?
4      A.  No, ma'am.
5      Q.  Okay.  That's fine.  Anybody else at the
6  Washington Post who you can remember telling that
7  you had sarcoidosis?
8      A.  No.  It was really management, management,
9  because you don't tell nobody you have some
10  type of disease.  They start don't wanting to be
11  around you.
12      Q.  We spent a good amount of time going
13  through, and I've tried to ask you about every time
14  you can remember telling anybody at the Post,
15  management or not, that you had sarcoidosis, and
16  what I'm asking you now is, other than what we've
17  already talked about, is there anybody else at the
18  Post that you can remember telling that you had
19  sarcoidosis?
20      A.  Imani McGruder.
21      Q.  Imani?
22      A.  Imani.  Imani, I-M-A-N-I, McGruder.

Page 139

1      Q.  And who's that?
2      A.  She was a security officer, but she's a
3  supervisor right now.
4      Q.  When did you talk to her?
5      A.  And I talked to her, this was in February.
6      Q.  Of what year?  I'm sorry.
7      A.  February of 2005.
8      Q.  And was she a security officer at that
9  time or a supervisor?
10      A.  Security officer.
11      Q.  And what conversation did you have with
12  her that you can remember?
13      A.  Because she worked with me on the weekends
14  in February, and I said, Imani, where you been at.
15  She said I've been out 15 days for a foot injury,
16  surgery on my left foot.
17      Q.  Okay.
18      A.  I said, well, I was out in January.  And
19  she said I'm getting ready to go out again in May.
20  So, after I got terminated, because we was close
21  because she was a minister, and she was involved in
22  her church, and I was involved in my church heavy,

Page 140

1  and that's when I told her.  She told me on May
2  the 14th at 2:45 a.m. in the morning when I talked
3  to her.  She said I just got back to work, and I
4  read in the logbook that you were terminated.  I
5  hope they don't let me go she said, because I just
6  got back out sick, too.  She was out, she missed
7  30 days of sick leave that same year I was
8  terminated.
9      Q.  In 2006?
10      A.  200 --
11      Q.  Is that right?
12      A.  2005.
13      Q.  But you were terminated 2006?
14      A.  Okay.  Yes.
15      Q.  So do you think you talked to her in
16  February of 2006?
17      A.  It was when I got terminated.  May
18  the 14th, 2:45 a.m. in not morning.
19      Q.  Okay.  You mentioned you talked to her in
20  February 2005.  Did you mean 2006?
21      A.  Yes.
22      Q.  Okay.  Just trying to understand.  And did

Page 141

1  you tell her in that conversation that you had
2  sarcoidosis?
3      A.  Well, I told her way back because we was
4  so close.
5      Q.  Do you remember when you told her that?
6      A.  No, I don't remember.
7      Q.  Okay.  Besides what we talked about, any
8  other conversations where you talked to somebody at
9  the Washington Post, whether management or not,
10  about sarcoidosis that we haven't already talked
11  about?
12      A.  One more person.  I don't know this nurse
13  name 'cause she wasn't one of the nurses always come
14  that I will always go in and talk to, because I
15  didn't see her that much.  I can't think of her
16  name.  It wasn't Martha Cummings; she wore glasses.
17  It was the other nurse that wore glasses and smoke.
18  And they was, it was the month of April 'cause I
19  went in and asked her could I see my records.
20      Q.  April of what year?
21      A.  April of 2006.
22      Q.  Okay.

36  (Pages 138 to 141)

William A.  Mack

Page 142

1    A.   And I asked her could I see my records,
2  and she said what you looking for. I want to see
3  all of the doctor's slips that I have turned in.
4  And I think that's when she said she couldn't find
5  them all. They transferred them to Northwest, but
6  she said what's the problem, and I started telling
7  her I was off because I had a skin disease,
8  sarcoidosis. And she said, if you have a skin
9  disease called sarcoidosis, whenever you need a time
10  off, you fall under Family Medical Leave Act, and
11  that was my first time hearing anything about the
12  family medical leave. She said, yeah, go on the
13  website, and I forget what else she told me to go
14  on. It's there. You qualify for that.
15    Q.   Okay. And in response to that did you go
16  to wherever she told you to go, the website?
17    A.   Yes, and it was there.
18    Q.   What was there?
19    A.   About the family leave, how your
20  supervisors can give you time off.
21    Q.   Was this, was she telling you to go to a
22  Washington Post website or a different website like

Page 143

1  for the government or something?
2    A.   It probably was the Washington Post policy
3  covers, it's the same policy.
4    Q.   Yes.
5    A.   It's nothing different. It's still
6  covered by Human Rights Commission or whoever,
7  Department of Labor. It still covers it, but she
8  told me to go to the website.
9    Q.   That's what I'm asking you. Was she
10  telling you to go to a Washington Post website to
11  look up the Post policy or the law somewhere?
12    A.   The law, but I have the Post policy. I
13  gave it to my attorney.
14    Q.   And just to make sure I understand, this
15  conversation was in April of 2006?
16    A.   Yes.
17    Q.   Had you received the Post policy at some
18  point prior to that?
19    A.   Yeah, I received it back in, someone gave
20  it to me back in -- her name was Brenda Bailey. She
21  used to work in Building Services, and, if I'm
22  correct, she gave it to me the year of 2001. And

Page 144

1  the reason she gave it to me is 'cause I was telling
2  her about the skin disease and how I was not
3  promoted because of my sickness. She said they
4  can't do that. She said there's a policy called,
5  it's a law called Family Medical Leave Act. And I
6  said what's that, and she gave me the paper. I'm
7  going to bring you the paper tomorrow, and that's
8  the same paper I had for years and I gave my
9  attorney.
10    Q.   And Brenda Bailey, who was Miss Bailey?
11    A.   She work in Building Services. Her
12  supervisor was Norma Brown.
13    Q.   So do you know what her job was?
14    A.   Yeah, she was Building Services.
15    Q.   Okay. I got it. So she gave you a paper
16  about the FMLA. Did you do anything with that
17  paper? Did you talk to anybody about the FMLA?
18    A.   No, I just looked at it, and I held it all
19  these years.
20    Q.   What was your understanding of the Post's
21  FMLA policy?
22    A.   When she gave it to me, I really didn't,

Page 145

1  when she gave me and I was reading it, I know it
2  said you can take time off.
3    Q.   Okay.
4    A.   You know, but I put it up. And I didn't
5  bring it, I didn't pull it out again until after the
6  Post let me go. When I called the Human Rights, I
7  contacted the Human Rights Commission when I filed a
8  claim, and they brought the word up family, FMLA.
9  And I said wait a minute. I have something on that
10  from the Post, because I always kept all of the
11  Washington Post documentation when it came to sick
12  leave policy, harassment. I have a copy of
13  everything.
14    Q.   Okay. I got it. Let me ask you a couple
15  quick questions, and then I think it will probably
16  be a good time for a lunch break. When you get your
17  steroid shots --
18    A.   Mm-hmm.
19    Q.   -- are those shots, are they scheduled,
20  like, you make an appointment, you get one and you
21  make an appointment at that time for the next one?
22    A.   When I make an appointment to see my

37 (Pages 142 to 145)

William A.  Mack

Page 146

1  doctor in, like, March, well, like last month my
2  appointment was March the 5th, and I always try to
3  schedule it on my day off. They are always on a
4  Monday, and then I have to go again May 5, so the
5  doctor would look at me, and he'll see how it is,
6  and he will touch and feel and say I feel swelling,
7  and he'll give me the shot.
8      Q.  But my question is a little different from
9  that. Are those appointments, like now you said you
10  had an appointment on March 5 and have one on May
11  the 5th. Were they usually like that? They were
12  planned out, and you knew about them a while in
13  advance? Do you see what my question is?
14      A.  Yes, yes. I knew about the date that my
15  appointment was. Yes, I knew what date my
16  appointment was when I was with Kaiser.
17      Q.  And was that also true when you were
18  working for the Post, that you might know in March
19  that you had an appointment coming up in May?
20  That's just an example, but --
21      A.  Yes.
22      Q.  Okay. I'm going to start into a new area,

Page 147

1  so why don't we have a lunch break now and come back
2  in maybe an hour.
3      (Whereupon, a lunch recess was taken from
4  12:07 to 1:20 p.m.)
5  BY MS. HOLMES:
6      Q.  Mr. Mack, I'd like to start off by showing
7  you a document, and I'm going to have the court
8  reporter mark it, and then I'm going to ask you to
9  look at it, and, after you've looked at it, I'm
10  going to ask you to tell me whether or not you're
11  able to identify it. This will be Mack 1.
12      (Mack Exhibit No. 1, 6/26/05 Handwritten
13  Note, was marked for identification.)
14      THE WITNESS: Yes.
15  BY MS. HOLMES:
16      Q.  Okay. What is this document, Mr. Mack?
17      A.  This document is, we had a meeting, as a
18  matter of fact, I guess it should have been that
19  same day, and Mr. Smith wanted all part time, part
20  time on call employees, he called a meeting, and he
21  wanted to know everybody's schedule. He said the
22  days that you can work and the days you can't. And,

Page 148

1  at that time, that's when I started working a
2  part-time job. So Tuesday, Wednesday, Thursday and
3  Friday would have been a conflict with my part-time
4  job on call which was Jefferson House Condominium,
5  so I was already on this schedule, so it weren't no
6  use for them to change my schedule because then I
7  would have to give up the part-time job.
8      Q.  You wrote this note, I take it, to Don,
9  and is that Mr. Jackson?
10      A.  Yes, Don Jackson, yes, ma'am.
11      Q.  And what were you trying to convey to him?
12  I take it, Number 1 says, "Don, the days I work are
13  great"; is that right?
14      A.  Right. It was the same days, yes, yes,
15  ma'am.
16      Q.  So, at least at this point in time when
17  you wrote this note, you were pleased with the days
18  you were working?
19      A.  Yes, because I was working another
20  part-time job, and, if we don't give them a note,
21  they are going to change our days to whatever days
22  they want to give us.

Page 149

1      Q.  So in response to this note were your days
2  changed or did they remain Saturday, Sunday, Monday?
3      A.  Days right there, yes.
4      Q.  So they weren't changed?
5      A.  Yes, ma'am. They wasn't changed.
6      Q.  Mr. Mack, this is a question I probably
7  should have asked you way back at the beginning, but
8  what was your job at the Washington Post?
9      A.  Security guard.
10      Q.  And were you full time, part time?
11      A.  Part time. Regular part time.
12      Q.  You were regular part time or were you
13  part time on call?
14      A.  Regular part time. I received a memo in
15  the year of 2002, July that say welcome, Mr. Mack.
16  Now you are regular part-time employee that receive
17  benefits.
18      Q.  Is that a memo -- have you given that memo
19  to your lawyer?
20      A.  Yes, he have it.
21      MS. HOLMES: Nils, do you know if that's
22  been produced to us? It doesn't ring a bell.

38 (Pages 146 to 149)

William A.  Mack

Page 150

1    MR. PETERSON: I've given you everything I
2  have, I believe.
3    MS. HOLMES: Does that memo sound familiar
4  to you? It just doesn't ring a bell to me.
5    MR. PETERSON: I believe so, but I don't
6  want to swear to it, but I believe I have identified
7  it. If you have my sack of documents, I'll be glad
8  to go through there for you.
9    MS. HOLMES: We can take a break as well
10  and take a look.
11  BY MS. HOLMES:
12    Q.  In your view, you were not a part time on
13  call?
14    A.  No, ma'am. On my time card we do, got by
15  computer from the Washington Post, it says at the
16  top "Full Time, Part Time", and at the end it say
17  "PT", part time.
18    Q.  Were you ever a part time on call --
19    A.  No, ma'am.
20    Q.  -- person? Never when you worked for the
21  Post?
22    A.  Never. Never. Never part time on call.

Page 151

1    Q.  How about, you said you got a memo in
2  2002 --
3    A.  Yes.
4    Q.  -- saying you were regular part-time
5  employee?
6    A.  Yes.
7    Q.  How about before that?
8    A.  I just started in the Post on November
9  the 23rd, 1999.
10    Q.  Right.
11    A.  So the year of 2000, that's when I worked
12  enough hours to become, receive benefits.
13    Q.  Okay. Is that what it means to you to be
14  part time, that you worked enough hours to receive
15  benefits?
16    A.  Yes, I already knew they were part time,
17  but they gave me enough hours I would have benefits.
18  I would have no benefits at all.
19    Q.  How many hours did you have to work to
20  receive benefits?
21    A.  I don't know.
22    Q.  Let me go back to my other question, which

Page 152

1  was between 1999 and 2002 when you say you got this
2  memo, were you part time on call in that period?
3    A.  No. I was always part time.
4    Q.  Okay. Do you know what a part time on
5  call person is? Do you know what that job
6  classification refers to at the Washington Post?
7    A.  Yes. A part time on call?
8    Q.  Yes?
9    A.  Yes, I know what it's classified as. Part
10  time on call is you don't have no shift. You don't
11  have no set schedule, and, if a full-time person
12  call off or a part-time person call off, then it's
13  up to the shift supervisor, which is Donald Jackson,
14  it go by a list they have. What they have to
15  contact every full-time person, personnel first to
16  come in, security officer. If they don't come in,
17  you have to go to the next security level, which is
18  part time. And if you can't get nobody from that,
19  that's when you contact the part time on call person
20  and say I need you to come in at night, and that
21  person should then come in. That's the policy. I
22  have a copy of it.

Page 153

1    Q.  You do?
2    A.  Yes, ma'am.
3    Q.  And have you given that to your lawyer?
4    A.  Yes, ma'am. And also Human Rights
5  Commission.
6    MS. HOLMES: Let's just go off for a
7  second.
8    (Discussion held off the record.)
9  BY MS. HOLMES:
10    Q.  Mr. Mack, I'm going to hand you, I'm going
11  to ask the court reporter to mark Exhibit 2 and hand
12  to you a document, take a look at it, and, after
13  you've looked at it, I'm going to ask you whether
14  you can identify it again, so just take a look and
15  let me know.
16    (Mack Exhibit No. 2, Memo, was marked for
17  identification.)
18    THE WITNESS: Yes.
19  BY MS. HOLMES:
20    Q.  What is this document?
21    A.  This document first say my shift was going
22  to start Friday. This was my schedule before they

39 (Pages 150 to 153)

William A.  Mack

Page 154

1  changed my hours to the second shift, which is 2:45
2  to 10:45, and the year that they changed that is
3  when they made David King as a full-time employee
4  because David King was part time on call, and they
5  made him full time, so, in order to make him full
6  time, they changed his schedule, and they changed
7  mine, so they moved me to the 2:45 p.m. to
8  10:45 p.m. Mondays and Saturdays, 6:45 a.m. to
9  2:45 p.m. and Sundays 6:45 a.m. to 10:45 p.m.
10      Q.  Now, you say this is when --
11      A.  Donald Jackson.
12      Q.  -- Mr. Jackson changed.  So you said this
13  happened when Mr. King was made full time?
14      A.  In 2003.  That's when he started changing
15  shifts, schedules.
16      Q.  Was Mr. King in the same job category as
17  you when you were employed by the Post?
18      A.  I don't know.  I was a regular part time.
19  I don't know if he was regular part time or regular
20  part time on call.
21      Q.  Now, when did you put this document
22  together, can you remember?

Page 155

1      A.  Yes.  I put this document together when I
2  had Mr. Biani, the Human Rights Commission told me
3  to bring all my information to him, and he wanted to
4  know my schedule and everything.
5      Q.  So you put this together in response to a
6  request by the Fairfax County Human Rights
7  Commission?
8      A.  Yes, and also my attorney.
9      Q.  And is that, was that sometime in 2006?
10      A.  Yes, after I was terminated.  That's when
11  I contacted them.
12      Q.  I'm just trying to understand what you're
13  trying to convey in this document, and I was having
14  a little bit of trouble.  It says here, "Donald
15  Jackson and Mr. Smith knew I attended church
16  services on Fridays, Saturdays and Sundays.  They
17  gave me this schedule so I wouldn't be able to
18  attend church."  Is that the first schedule or the
19  second schedule?
20      A.  No, it's -- yes.
21      Q.  Which is it, first or second?
22      A.  The second, which was the 6:45 a.m. to

Page 156

1  10:45 p.m.
2      Q.  On Sundays?
3      A.  Mm-hmm.
4      Q.  But it looks like your schedule -- this is
5  what confused me a little bit.  It looks like the
6  only thing that changed from the first to second
7  thing is you moved from a Friday shift to a Monday
8  shift?
9      A.  Yes, but in 2001 I wasn't on weekends like
10  that on Sundays.  I was off.  But they changed, they
11  always changed my schedule whenever I was out sick.
12  I would never know when Mr. Smith would come in and
13  change my schedule.  I'm not the only person.
14  Bernard Carr never knew when his schedule was going
15  to change if we were out sick.  We never knew.
16      Q.  What I'm trying to understand is when --
17  it says here that the schedule was given to you, and
18  you told me what you were referring to was the
19  second schedule?
20      A.  Mm-hmm.
21      Q.  So what's the first schedule?
22      A.  The first schedule was the one Donald

Page 157

1  Jackson gave me, and I worked it.
2      Q.  When did he give you that?
3      A.  I don't know exactly when.
4      Q.  Do you know roughly?  I mean, I'm just
5  trying to get a ballpark here.
6      A.  Could have been 2003, 2004.
7      Q.  Okay.  And then when was it changed to
8  this second schedule on here?
9      A.  I don't know exactly when.  Mr. Jackson
10  would have the information.
11      Q.  Do you know roughly?  I mean, was it '05?
12  Was it --
13      A.  No, it wasn't '05.
14      Q.  So before that?
15      A.  Yes.
16      Q.  Maybe, so '04?
17      A.  Around in '04.  Could have been '04.
18  2003, 2004, yes.
19      Q.  Do you remember how long, like, for how
20  many months or years you worked the first schedule
21  on here?
22      A.  No, ma'am.

40  (Pages 154 to 157)

William A.  Mack

Page 158

1    Q.  Do you know how long you worked the second
2  schedule, the Monday, Saturday, Sunday?
3    A.  Could have been when David King received
4  his promotion.
5    Q.  Do you know when that was?  I think I
6  already asked you that.
7    A.  He received his promotion in 2003.  2003.
8  Then we had two military guys, Otis Brooks and
9  Charles Sneed, they were part time, full time
10  military stationed at Bowling Air Force Base, and
11  they was part time on call at the Washington Post.
12  And I remember, and now when they went into training
13  to Korea, Roddy MacPherson got on Mr. Smith and said
14  why would you let two people go out of state for a
15  year and don't have the shift covered.  That's when
16  they started moving me around to cover shifts.
17    Q.  Okay.  Let me ask you another question.
18  You have on here that this first schedule is a total
19  of 40 hours?
20    A.  Yes.
21    Q.  I'm not seeing that.  Can you help me with
22  that?  It looks like it's eight and 8 and 16 to me.

Page 159

1    A.  Fridays.
2    Q.  Is that eight?
3    A.  Yes, eight.  And Saturday is eight, and
4  Sunday is 6:45, that is 6:45 a.m.  That's 32.
5  That's a total of 40, which is wrong.  It should be
6  32.
7    Q.  That's what I was trying to figure out.  I
8  was just trying to make sure I understood that.
9    A.  Yes, ma'am.
10    Q.  And the next one is also 32?
11    A.  Yes, ma'am.
12    Q.  So the number of hours it doesn't look
13  like changed?
14    A.  Yes.
15    Q.  And here it says, in the last paragraph on
16  this page it says that you were working at Jefferson
17  Condominiums on call on Tuesday, Wednesday,
18  Thursday, Friday?
19    A.  Right.
20    Q.  Is that accurate?
21    A.  Yes.
22    Q.  And then it says Carlton Condominiums; is

Page 160

1  that something different?
2    A.  That's different condominiums.  That is
3  located 4600 Four Mile Run Drive in Arlington,
4  Virginia.
5    Q.  And it says you were working there 8 p.m.
6  to 4 a.m. full time?
7    A.  Yes, 8 p.m. up until, yes.  That was after
8  I was terminated from the Washington Post.
9    Q.  Okay.  So is this the -- I'm sorry for
10  forgetting the name -- Personnel Resources job?
11    A.  Yes.
12    Q.  And you told me you worked at a
13  condominium with them.  Okay.  I see.  So that was,
14  but that was starting, like we talked about earlier,
15  in August, I'm sorry, in May of '06.  Okay.  What's
16  the significance of this last sentence where it
17  says, "So it wasn't my original choice to work the
18  slow days of the week, it was the shift given to
19  me"?
20    A.  Yes, 'cause Mr. Jackson always, made in
21  the statement to the Human Rights Commission
22  Mr. Mack worked the slow days of the week, 6:45 a.m.

Page 161

1  to 10:45 p.m. Mr. Jackson, Donald Jackson,
2  Mr. Smith, when they had to come in and work that
3  shift they always got off eight hours earlier, four
4  hours before the 16 hours 'cause they couldn't do
5  it.
6    Q.  So are you disputing that you did work the
7  slow days of the week?
8    A.  There wasn't no slow days at the
9  Washington Post.
10    Q.  Okay.  But am I right that these are the
11  days that you had, at least as of June of 2006, that
12  you had asked to work?
13    A.  The 2:45 p.m. to 10:45 a.m., because if I
14  did take them, they completely took me off the
15  schedule.  Ulysses Smith would completely take me
16  off the schedule if I didn't work them days.  They
17  wouldn't have worked me at all.
18    Q.  Now, Mr. Mack, I'm going to start to show
19  you a whole series of documents, and we'll go one at
20  a time, and take whatever time you need, and I have
21  a few questions about each one, and it will probably
22  be the same question about each one, but actually

41  (Pages 158 to 161)

William A.  Mack

Page 162

1  I'm sorry. Before I get there, I want to talk to
2  you a little bit, I think you said, I just want to
3  clarify this in my own mind. I think you said this
4  morning that you had steroid shots every other
5  month?
6      A.  Yes.
7      Q.  And that that's been pretty consistent
8  since you --
9      A.  Yes.
10     Q.  -- since you were diagnosed in 2001?
11     A.  Yes, ma'am.
12     Q.  And I think you also said your last shot
13  was in March of this year, week ago?
14     A.  Yes, March 5.
15     Q.  So is it fair to say that, if we track
16  back, if you had one in March of this year, that
17  means you had one in January of 2007, which is two
18  months prior to that? Does that sound right?
19     A.  In January, yes.
20     Q.  And then going back the last one before
21  that would have been in November of last year?
22     A.  Yes, unless I canceled one.

Page 163

1      Q.  Have you canceled them that you know of?
2      A.  As a matter of fact, I canceled one in
3  2001, and I canceled one that I had with my physical
4  therapist in 2002.
5      Q.  Other than those two, have you ever
6  canceled a steroid shot that you can remember?
7      A.  If I can't -- likely if I came home and
8  overslept. If I came home and overslept from
9  getting off in the morning, then, yes.
10     Q.  So you might have canceled -- would that
11  be something you would reschedule for a week or two
12  later?
13     A.  Yes, or I could go into after hours.
14     Q.  The urgent care kind of thing?
15     A.  Yes, ma'am. I could go to urgent care,
16  and they would give me a steroid shot.
17     Q.  So is it fair to say, though, that
18  basically every two months since you've been
19  diagnosed you've had a steroid shot?
20     A.  Yes, ma'am.
21     Q.  Within a week or so, depending on
22  scheduling?

Page 164

1      A.  Yes.
2      Q.  I'm going to have the court reporter mark
3  this document as Mack 3, and I'm going to have her
4  hand it to you, and, after you've had a chance to
5  look at it, I'm going to ask you if you can identify
6  it.
7          (Mack Exhibit No. 3, 6/5/02 Handwritten
8  Note, was marked for identification.)
9          THE WITNESS: Yes.
10  BY MS. HOLMES:
11     Q.  What is this?
12     A.  My son sprained his ankle.
13     Q.  In June of '02?
14     A.  Yes.
15     Q.  And you called out for your shift; is that
16  right?
17     A.  Vacation.
18     Q.  Right, but did you call off duty?
19     A.  Yes, ma'am.
20     Q.  Are you able to remember whether you were
21  at work when this happened or --
22     A.  No, I wasn't at work.

Page 165

1      Q.  -- due at work? When were you due at
2  work?
3      A.  I can't remember. It's 2002. I just
4  don't remember.
5      Q.  That's fair. Do you remember when you
6  called off?
7      A.  No, ma'am.
8      Q.  Are you able to remember when you called
9  off in relation to when your shift was?
10     A.  No, ma'am. But the Post always had an
11  eight-hour, eight-hour notice from me.
12     Q.  So you were supposed to give eight-hours'
13  notice?
14     A.  No, it's four hours.
15     Q.  I'm sorry. I misunderstood you.
16     A.  Washington Post policy is call in four
17  hours before your shift. I always gave the
18  Washington Post eight hours.
19     Q.  And let me ask you about the policy for a
20  minute. You were supposed to call in four hours
21  before your shift, and who were you supposed to talk
22  to?

42 (Pages 162 to 165)

William A.   Mack

Page 202

BY MS. HOLMES:

1    Q.   After you've had a moment to look at it,
2    if you can let me know whether or not you can
3    identify that document.
4    A.   Yes, it's my, Dr. Chu Ke.
5    Q.   That's your primary care physician?
6    A.   Yes, ma'am.
7    Q.   Are you able to see what you saw Dr. Chu
8    Ke for on April 30 of 2004?
9    A.   No, ma'am.
10   Q.   Is there anything on this document that
11   indicates that you saw him for sarcoid or any
12   sarcoid-related illness?
13   A.   I don't remember.
14   Q.   Is there anything on the document that
15   indicates that? I realize you don't remember what
16   you saw him for.
17   A.   No.
18   Q.   As far as you know, is this the document
19   you provided to the Post when you returned to work?
20   A.   Yes, ma'am.
21   Q.   It looks like he released you back to work

Page 203

1    the next day, May 1?
2    A.   Yes, ma'am.
3    Q.   Mr. Mack, I'm going to have the court
4    reporter mark as Mack 22 this next document.
5    And again I'm going to ask you to take a look at it,
6    and let me know whether or not you recognize it or
7    are able to identify it.
8        (Mack Exhibit No. 22, 1/31/05 Kaiser
9    Permanente Referral Form/Verification of Treatment,
10   was marked for identification.)
11       THE WITNESS: Yes, I had an infection. I
12   had an infection. I think it was my throat.
13   BY MS. HOLMES:
14   Q.   A throat infection?
15   A.   Yes, and they gave me medication, two; one
16   was Vicodin, and I remember, I don't remember the
17   other one. My lawyer have the documentation, the
18   medication I took.
19   Q.   And this is in January of 2005?
20   A.   Yes, ma'am.
21   Q.   And I take it this is not sarcoid related?
22   A.   No, ma'am.

Page 204

1    Q.   And, as far as you know, is this the
2    document that you provided to the Post when you
3    returned to work?
4    A.   Yes, ma'am.
5    Q.   And it looks like you were released to
6    return to work on January 17 of '05; is that
7    accurate?
8    A.   Yes, ma'am.
9    Q.   Thank you. I'm going to have marked as
10   Mack 23 this next document, and, again, I'm going to
11   ask you to look at it and tell me whether or not you
12   can identify it.
13       (Mack Exhibit No. 23, 1/26/05 Kaiser
14   Permanente Referral Form/Verification of Treatment,
15   was marked for identification.)
16       THE WITNESS: Yes, I remember this.
17   BY MS. HOLMES:
18   Q.   Okay. What is it?
19   A.   I had Tylenols. They gave me Tylenols and
20   told me do not drive, but I don't remember exactly
21   what it's for, but I know it don't have nothing to
22   do with sarcoidosis.

Page 205

1    Q.   Okay. And, as best you can tell, is this
2    the document that you provided to the Post upon your
3    return to work?
4    A.   Yes, ma'am.
5    Q.   And it looks like you were released to
6    return to work on January 31 of '05; is that right?
7    A.   Yes, and this is the one that Charles
8    Brown turned in. I sent it to his house. I told
9    you earlier. This is the one.
10   Q.   So this is the one you asked Mr. Brown to
11   turn in?
12   A.   Yes.
13   Q.   And, as far as you know, he did that?
14   A.   Yes, I know he did because they paid me.
15   Q.   So you got paid for the period of
16   January 26 to January 30, at least whatever shifts
17   in that period you were scheduled to work?
18   A.   Yes, ma'am. Mm-hmm.
19   Q.   Okay. I'm going to have marked as Mack 24
20   this next document.
21       (Mack Exhibit No. 24, 4/26/05 Kaiser
22   Permanente Referral Form/Verification of Treatment,

52  (Pages 202 to 205)

William A.  Mack

Page 206

1  was marked for identification.)
2  BY MS. HOLMES:
3      Q.  And I'm going to ask you to take a look at
4  it and let me know whether or not you can identify
5  it.
6      A.  Yes, I remember this.
7      Q.  Okay.  What is it?
8      A.  This is the one when I went to, if I'm
9  correct, went to Largo Town Center.  I saw
10  Dr. Howard, and a Registered Nurse was in there
11  'cause, if I'm correct, they gave me a steroid shot.
12  And Dr. Howard, she's a female.  She always wanted a
13  witness to be in there so nothing could come up
14  saying sexual harassment.
15      Q.  Anything on here to indicate you received
16  a steroid shot on this occasion?
17      A.  No, ma'am.
18      Q.  Is there anything on here that indicates
19  sarcoid or sarcoidosis?
20      A.  No, ma'am.
21      Q.  Looks like you were authorized to return
22  to work on April 29, which was the next day; is that

Page 207

1  right?
2      A.  Mm-hmm.  Yes, ma'am.
3      Q.  And, as far as you know, is this the
4  documentation that you provided to the Washington
5  Post upon your return to work?
6      A.  Yes, ma'am.
7      Q.  I'm going to have marked as Mack 25 the
8  next document, and again I'm going to have you take
9  a look at it and let me know whether or not you can
10  identify it.
11          (Mack Exhibit No. 25, 4/29/05 Kaiser
12  Permanente Referral Form/Verification of Treatment,
13  was marked for identification.)
14          THE WITNESS:  Yeah, I remember this.
15  BY MS. HOLMES:
16      Q.  Okay.  What is it?
17      A.  I went to the doctor.  I know they gave me
18  a prescription because I remember her writing on the
19  side.
20      Q.  Okay.  What did you go to the doctor for,
21  do you remember?
22      A.  If I'm correct I received a shot that

Page 208

1  night, 'cause that doctor was an Indian.  She was a
2  female Indian doctor.
3      Q.  What kind of shot?
4      A.  A steroid shot.
5      Q.  Can you take a quick look at 24?  It looks
6  to me like you had just received a steroid shot a
7  couple days before.
8      A.  That's true, 'cause the swelling come up
9  on my face.  I just got March 5, but, if the
10  swelling comes up on my face or my legs, I can go
11  into the after hours.  With Kaiser you always go
12  into after hours and show them the swelling, and the
13  advice nurse will tell you come on in now.  And, if
14  I go in and they see the redness around the
15  sarcoidosis shot, they will give me a shot.
16      Q.  So you got another shot?  Is that what you
17  are saying?
18      A.  Yes.
19      Q.  And do you remember why you were -- it
20  looks like this certified you off of work for a
21  couple days.  Do you remember why that was?
22      A.  I know she gave me medication.

Page 209

1      Q.  But you don't remember what kind?
2      A.  No.  My attorney have it.  I know I was
3  given medication.
4      Q.  And is there anything on here beyond your
5  recollection to indicate that you received a steroid
6  shot on this date?
7      A.  No, ma'am.
8      Q.  Is there anything on here that indicates
9  sarcoid or sarcoidosis?
10      A.  No, ma'am.
11      Q.  And, as far as you know, is this the
12  documentation you provided to the Washington Post
13  when you returned to work?
14      A.  Yes, ma'am.
15          (Discussion held off the record.)
16          (Whereupon, a short recess was taken from
17  2:25 to 2:37 p.m.)
18  BY MS. HOLMES:
19      Q.  Mr. Mack, I'm going to ask you to take a
20  look back at Exhibit Number 10, which you already
21  testified about.  I just want to ask you a couple
22  follow-up questions about that.

53 (Pages 206 to 209)

William A.  Mack

Page 210

1    A.  Yes.
2    Q.  Okay. Now, I think that you testified,
3  and correct me if I'm wrong, that this was a day you
4  think you got a steroid shot from Dr. Wittington?
5    A.  Yes, I did receive a steroid shot from Dr.
6  Wittington.
7    Q.  I think you also testified that, when you
8  saw Dr. Wittington, it was usually something that
9  was scheduled in advance?
10    A.  Yes.
11    Q.  And I also take it that you got this note
12  because you had to miss work to see Dr. Wittington;
13  is that fair?
14    A.  Yes.
15    Q.  Did you ever at any point tell Mr. Smith
16  or Mr. Jackson in advance that you had a medical
17  appointment that you had to go to?
18    A.  Yes.
19    Q.  How far in advance did you tell them?
20    A.  I would give them a two weeks' notice, two
21  weeks in advance. That's vacation. But I gave
22  Mr. Smith advance because he was aware in 2002 about

Page 211

1  my medical condition, sarcoidosis, side effects with
2  the sarcoidosis.
3    Q.  But my question is a little different than
4  that. My question is really, if you had an
5  appointment on February 27 of 2003 which is what
6  this document indicates, how far in advance did you
7  know about that usually, about a month?
8    A.  No, I would know sometimes, yeah, you're
9  right. Sometimes a month, I would know about a
10  month.
11    Q.  Did you ever tell Mr. Smith or Jackson,
12  hey, don't schedule me to work that day because I
13  got a medical appointment?
14    A.  No. When I go up to my medical
15  appointment up to the doctor to give me the shot,
16  okay, I'm going to send you back to work or you're
17  under my care. I never knew what came out of the
18  doctor's mouth.
19    Q.  But isn't it right you knew you weren't
20  going to be at work on the 27th because you had to
21  be at the doctor?
22    A.  No, I couldn't say that because I never

Page 212

1  know what the doctor -- whenever I saw Dr. Jeffrey
2  Wittington after he gave me a steroid shot, I never
3  knew if he was going to say you're under my care. I
4  never knew. If he say you're under my care, I can't
5  override what my doctor say. I can't say no, no, I
6  want to go back to work. I never knew.
7    Q.  But you knew you had the appointment?
8    A.  Yes, I knew I had the appointment.
9    Q.  So could you tell Smith I have a doctor's
10  appointment; don't schedule me for that day because
11  I've got a doctor's appointment?
12    A.  You couldn't tell Mr. Smith that. He make
13  the rules, and he would have to find someone to fill
14  that shift, which I'm a regular part time. And he
15  had two other part time on calls. You had only two
16  part time on call people. So it was up to -- so,
17  when I made my doctor's appointment, if I'm going to
18  see my doctor, he say you're under my care today.
19    Q.  Did the doctor ever send you back to work
20  the same day? I haven't seen one yet, but --
21    A.  I can't remember.
22    Q.  You can't remember him ever doing that you

Page 213

1  mean?
2    A.  No, but it's a lot of times that you all
3  don't have documentation I gave to my lawyer that I
4  took steroid shots on my days off. I had took close
5  to anywhere from six to seven steroid shots on my
6  days off.
7    Q.  During what time period, can you remember?
8    A.  Been between two thousand, anywhere from
9  2003 to 2005.
10    Q.  So over a two-year period there were maybe
11  six times when you did it on your days off?
12    A.  Yes.
13    Q.  And the rest of the time you did it when
14  you were supposed to be working for the Post?
15    A.  When my doctor scheduled my appointment.
16    Q.  But, when the doctor scheduled -- my
17  question really is, I think, pretty simple. When
18  your doctor scheduled you a month in advance for an
19  appointment, did you tell Mr. Jackson or Smith, hey,
20  I can't work that day because I'm going to go to the
21  doctor, got a doctor's appointment?
22    A.  Yes, I always tell Mr. Smith now I need

54  (Pages 210 to 213)

William A.   Mack

Page 214

1  time off because of my medical condition.  I always
2  told him can I have light duty.  He always told me
3  we don't have light duty.  But Mr. Smith and Mr.
4  Jackson allowed other Washington Post employees come
5  inside security and work light duty.
6       Q.  Now, you told me, you just said you told
7  Smith that you needed time off because you --
8       A.  Told Mr. Smith I needed time off because
9  of my medical condition when I found out, when I was
10  going to see my physical therapist in the year 2002,
11  'cause he called me in his office complaining about
12  why I'm not making my rounds.  Finish making my
13  rounds, and I told him that my leg stiffen up on me
14  because I have a medical condition called
15  sarcoidosis.  I showed him, took the makeup off my
16  face.  I showed him exactly the sarcoidosis on my
17  face, and I told him also I have it on my left and
18  right legs.
19       Q.  You told Smith this?
20       A.  Mr. Smith, Ulysses Smith.  He told me we
21  do not have light duty in security.
22       Q.  And that was in 2002?

Page 216

1       Q.  Okay.  I'll go through those one at a
2  time, but, okay.  So let me just ask you this
3  question.  So, as far as you know, you never told
4  Smith or Jackson not to schedule you for work
5  because you had a doctor's appointment scheduled; is
6  that a fair statement?
7       A.  If I had a doctor's appointment, whatever
8  my doctor say after that.  He can say go back to
9  work or he'll say you're under my care.
10       Q.  But you didn't tell Smith and Jackson in
11  advance; is that fair?
12       A.  No.
13       Q.  You said David King got light duty.  What
14  was his position at the Post, security officer?
15       A.  Yes, ma'am.
16       Q.  And what was the nature of his light duty?
17       A.  He had a cast, if I'm correct, on his
18  right leg.
19       Q.  What light duty was given?
20       A.  Sit-down post.
21       Q.  When?
22       A.  2003.

Page 215

1       A.  2002 and also 2003 on up through 2004,
2  too.
3       Q.  What do you mean it was also in 2003 and
4  2004?
5       A.  You had David King, 2003, light duty, but
6  I couldn't have light duty when I asked for it.
7  Beverly Wayne, they offered her, they gave her light
8  duty, 2003, cast on her leg.  She worked security,
9  light duty.  Melvin Pitt, press operator, they gave
10  him light duty.  They would not give me light duty.
11  Bruce Smith, general working supervisor, they gave
12  him light duty in security.  They would not give me
13  light duty.  Richard Monday, they gave him light
14  duty.  He's a utility mailer.  They would not give
15  me light duty.  Donna Horhoff, they gave her light
16  duty in the security department.  They would not
17  give me light duty.  I was always told we don't have
18  light duty.  Fred Hurd, utility mailer, they gave
19  him light duty.  I was always told by Ulysses Smith
20  we don't have light duty.  Tony Payne, general
21  worker, they gave him light duty.  It was, Mr. Mack,
22  myself, I was always told we do not have light duty.

Page 217

1       Q.  Any idea what conversations Mr. King had
2  with Smith or Jackson or anyone else at the Post
3  about his medical condition?
4       A.  He said he needed to work.  He needed to
5  work.  Can I get my post, sit-down post?  They let
6  him work.  They gave him a sit-down post.
7       Q.  Were you there when he said that?  You
8  seem to know what he said, so did you hear him say
9  that?
10       A.  David King was my relieving officer.  He
11  came on 11 to 7.
12       Q.  Okay.  And what I mean is I asked you if
13  you knew what conversations he had had with anyone
14  at the Post regarding his need for light duty, and
15  you gave me a pretty specific answer, and what I'm
16  asking you is were you there when he had the
17  conversations with the Post?
18       A.  No.
19       Q.  So how do you know what he said?
20       A.  Because he told me.
21       Q.  So you know what he told you?
22       A.  Yes.

55 (Pages 214 to 217)

William A.   Mack

Page 222

1  be on there.
2      Q.  And he's, he was also a utility mailer who
3  worked light duty in security?
4      A.  Yes, ma'am.
5      Q.  Got it.  Mr. Mack, I'm going to have
6  marked as Mack 26 the next document and have you
7  take a look at it, and let me know whether you can
8  identify it after you've taken a minute to look at
9  it.
10         (Mack Exhibit No. 26, 7/30/03 Kaiser
11  Permanente Referral Form/Verification of Treatment,
12  was marked for identification.)
13         THE WITNESS:  Yes.
14  BY MS. HOLMES:
15      Q.  What is it?
16      A.  I don't remember, but I did go to the
17  doctor for that date.
18      Q.  So you went to the doctor on July 30 of
19  '03?
20      A.  Yes, mm-hmm.
21      Q.  And you can't remember why; right?
22      A.  No, ma'am.

Page 223

1      Q.  Anything on this document to indicate that
2  you visited the doctor for sarcoid or a
3  sarcoid-related illness?
4      A.  No, but looking at that date, looking at
5  that date, it look like the date I came back from
6  Norfolk either taking or bringing my daughter back,
7  because that date is July --
8      Q.  30th.
9      A.  Yes, August.
10      Q.  July 30 of '03, and then you signed it,
11  and I was going to ask you about it next; looks like
12  you signed it on August 13 of '03?
13      A.  Mm-hmm.  That date, that July, that was
14  after hours.
15      Q.  But it isn't on here to indicate what this
16  was for other than just a general statement?
17      A.  I know it was for sarcoidosis, if it was
18  in July.  I know.
19      Q.  Okay.  Any idea why you didn't sign it
20  till the 13th?  It looked like previously most of
21  the days were signed the same day by the doctor?
22      A.  No, ma'am.

Page 224

1      Q.  Just can't remember?
2      A.  No, ma'am.
3      Q.  As far as you know, is this the
4  documentation that you provided to the Post when you
5  returned to work?
6      A.  Yes.
7      Q.  Mr. Mack, I'm going to have marked as
8  Number 27 the next document and ask you to take a
9  look at it, and let me know whether or not I can you
10  can identify it.
11         (Mack Exhibit No. 27, 5/2/05 Kaiser
12  Permanente Referral Form/Verification of Treatment,
13  was marked for identification.)
14         THE WITNESS:  Yeah, this is Dr. Chu Ke, my
15  primary physician.
16  BY MS. HOLMES:
17      Q.  And it looks like you went for back pain;
18  is that right?
19      A.  Yes.
20      Q.  And so, as best I can tell, this isn't
21  related to sarcoid or sarcoidosis; is that right?
22      A.  Yes.

Page 225

1      Q.  And looks like Dr. Chu Ke released you to
2  return to work on May 3?
3      A.  Yes, ma'am.
4      Q.  And, as far as you know, is this the
5  documentation that you provided to the Post upon
6  your return to work?
7      A.  Yes, ma'am.
8      Q.  Can I have that marked as Number 28, the
9  next document, and I ask you to take a look at it
10  and let me know whether or not you can identify it
11  after you've had a minute to look at it.
12         (Mack Exhibit No. 28, 5/6/05 Kaiser
13  Permanente Referral Form/Verification of Treatment,
14  was marked for identification.)
15         THE WITNESS:  Yes, I remember this.
16  BY MS. HOLMES:
17      Q.  Okay.  What is it?
18      A.  Yeah, Jack Harrison.  He's the car fan,
19  drove 1970 mustangs.  He gave me a steroid shot.
20  That was after hours.  I got there 7 p.m. and left
21  Sunday morning at 12:20 a.m.  He gave me a steroid
22  shot.

57 (Pages 222 to 225)

William A.   Mack

Page 226

1    Q.  And it says "hypertension evaluation"?
2    A.  Yes.  My hypertension value was, my
3 pressure was up.  Always went up, but it never went
4 over.
5    Q.  Anything on here to indicate that you
6 received a steroid shot other than your memory
7 because of which physician saw you?
8    A.  Only the physician.  That's how I know
9 that was a steroid shot.
10    Q.  Anything on here to indicate that this was
11 a sarcoid or sarcoidosis-related illness?
12    A.  No, ma'am.
13    Q.  And it looks like he returned, he released
14 you to return to work you said Sunday morning; is
15 that right?
16    A.  No.  That's Sunday a.m., let me see.  Yes,
17 you're right.  You're right.
18    Q.  And you said you thought you were there
19 Saturday night to early in the morning on Sunday
20 morning?
21    A.  Yeah.  I remember this.  I remember him.
22 That was a steroid shot.

Page 227

1    Q.  And, as best you can -- so, as best you
2 can tell, you missed your Saturday shift for this
3 appointment?
4    A.  I don't remember.
5    Q.  You don't remember whether you were
6 scheduled to work on that Saturday?
7    A.  I don't remember, yes.
8    Q.  Is this during a period where you were
9 normally scheduled to work on Saturday, Sunday and
10 Monday?
11    A.  Yes, yes.  I would say yes.  Mm-hmm.
12    Q.  And, as best you can recall, this is the
13 documentation you provided to the Washington Post
14 when you returned to work?
15    A.  Yes, ma'am.
16    Q.  And your recollection is that May the 6 of
17 '05 was a Saturday?
18    A.  Yes.
19    Q.  Is that your best recollection?
20    A.  Yes.
21    Q.  Okay.  I'm going to have this marked as
22 29.

Page 228

1        (Mack Exhibit No. 29, Forest Heights
2 Automotive invoice, was marked for identification.)
3 BY MS. HOLMES:
4    Q.  I'm going to ask you to take a look at it,
5 and let me know whether you can identify it after
6 you've had a minute to identify it.  Look at it.
7    A.  Yes, I remember this.
8    Q.  Let me go back quickly to the previous
9 exhibit.  I'm sorry.  Did you go back?  As best you
10 can recall, were you just out one day for this, or
11 did you stay out on Sunday?
12    A.  I don't remember.
13    Q.  Don't remember?
14    A.  Yes.
15    Q.  But the documentation looks like it only
16 certifies you to be out on the 6th; is that right?
17    A.  Yes.
18    Q.  Okay.  What is Exhibit 29, if you can tell
19 me?
20    A.  Exhibit 29, that was a, I know I was on
21 2:45, I was on the 2:45 p.m. to 10:45 p.m. shift.  I
22 know I went out that morning --

Page 229

1    Q.  Okay.
2    A.  -- to start the car and take my wife to
3 work, and it wouldn't move.  It was missing, and I
4 pushed the car down the hill to Forest Heights,
5 yeah.  Forest Heights.
6    Q.  Automotive?
7    A.  Yeah.  And they stated it was your plugs.
8 How long would they have it?  They said we don't
9 know, so I called Mr. Smith ahead of time and told
10 him I need to take emergency vacation.
11    Q.  You called him that morning in advance of
12 your 2:45 shift?
13    A.  Yes.
14    Q.  And I take that this is the documentation
15 that you provided to the Post upon your return to
16 work?
17    A.  Yes, ma'am.
18    Q.  And I take it this wasn't a health-related
19 issue?
20    A.  No, ma'am.
21    Q.  Okay.  I'm going to have marked as Mack 30
22 next in line and have you take a look at it, and let

58  (Pages 226 to 229)

William A.  Mack

| Page 230 | Page 232 |
|---|---|
| 1  me know whether or not you can identify it.<br>2  (Mack Exhibit No. 30, Handwritten Note<br>3  with attachment, was marked for identification.)<br>4  THE WITNESS: Yes, I can identify this.<br>5  BY MS. HOLMES:<br>6  Q.  What is it?<br>7  A.  Emergency vacation I requested,<br>8  approximately 12:45 that morning when I was telling<br>9  you earlier that my son was in a UUV car.  I gave<br>10  this information to the officer that called in that<br>11  I called off, and, when I returned in to work, I<br>12  gave it to Mr. Smith.  My son was a government<br>13  witness for this in D.C. Court.  Approximately 12:45<br>14  Q.  And so you requested emergency vacation<br>15  for the 30th of July; is that right, or the 29th of<br>16  July?<br>17  A.  This took place on 7/29.  Me and my wife<br>18  got home 12:30 a.m., which was the 30th. I called<br>19  at 12:40 telling them I need emergency vacation, and<br>20  I told them why.<br>21  Q.  And you were scheduled to work on the 30th<br>22  at 6:45 in the morning? | 1  Q.  Okay.  Can you identify Number 31, please?<br>2  A.  Yes, I can identify this.<br>3  Q.  What is it?<br>4  A.  They gave me some steroid cream.<br>5  Q.  Okay.  Is this when, it looks like you<br>6  went to urgent care; is that right?<br>7  A.  Yes, yes. That's the Indian lady, doctor,<br>8  Dr. Albus. Yes. She gave me a shot, too. Kenalog.<br>9  That's the steroid shot; that's what they call it.<br>10  K-E-N-A-L-O-G.<br>11  Q.  So that's the steroid shot?<br>12  A.  Yes.<br>13  Q.  So looks like you got a shot on this date?<br>14  A.  Yes.<br>15  Q.  And I'm not able to tell from this, so I'm<br>16  going to ask you if you remember when you were<br>17  released to return back to work?<br>18  A.  I don't remember. It's likely I had a<br>19  doctor's slip. Oh, maybe it was Dr. Jain.<br>20  Q.  Do you have any idea who wrote "Received<br>21  11/05" on there?<br>22  A.  No. One of the supervisors. |

| Page 231 | Page 233 |
|---|---|
| 1  A.  Yes, ma'am. Yes, ma'am.<br>2  Q.  Got it. And is this the documentation you<br>3  provided to the Post upon your return to work?<br>4  A.  Yes, ma'am.<br>5  Q.  And I take it this also was not a<br>6  health-related issue?<br>7  A.  No, ma'am.<br>8  Q.  Okay. I'm going to mark Number 31.<br>9  (Mack Exhibit No. 31, 11/6/05 Letter with<br>10  Medical Summary attachment, was marked for<br>11  identification.)<br>12  BY MS. HOLMES:<br>13  Q.  And I ask you to take a look at Number 31<br>14  and let me know whether or not you recognize it.<br>15  A.  Can I ask you one more thing before we go<br>16  to this?<br>17  Q.  I guess, sure.<br>18  A.  It will show you at the bottom. Put at<br>19  the bottom. "Don, please pass this with proof of<br>20  what I am saying to Smitty", and it shows you he<br>21  would never believe me, whatever I tell him. I just<br>22  constantly had to bring in proof of everything. | 1  Q.  At the Post?<br>2  A.  Yes.<br>3  Q.  Do you mean one of the supervisors or the<br>4  Health Center? I thought we talked about you gave<br>5  these documents to the Health Center.<br>6  A.  Yeah, one of the supervisors.<br>7  Q.  So, when you provided these documents,<br>8  maybe I misunderstood. I thought you provided them<br>9  to somebody at the Health Department?<br>10  A.  Yes, you give this to the health, which is<br>11  a supervisor.<br>12  Q.  Okay. I see. A supervisor in the Health<br>13  Department?<br>14  A.  Yes.<br>15  Q.  As distinguished from a security<br>16  department supervisor. Okay. I'm going to hand you<br>17  what's going to be marked as Number 32 and ask you<br>18  to take a look at it and let me know whether or not<br>19  you can identify it.<br>20  (Mack Exhibit No. 32, 12/4/05 Verification<br>21  of Treatment, was marked for identification.)<br>22  THE WITNESS: I remember this. |

59 (Pages 230 to 233)

William A.  Mack

Page 234

BY MS. HOLMES:

1    Q.  Okay.  What is it?
2    A.  I was, I was at work, and I was sick, and
3  I worked this shift, and I went home, and I went to
4  my other job, and I got sick.  I was still feeling
5  bad because I was taking, I was taking Pepto Bismol,
6  and I remember that calmed my stomach down.  Then I
7  went to my part-time job with Personnel Resources,
8  and I drunk a Sunkist soda.  My stomach already was
9  upset, the gas.  I thought it was, the soda was
10  tasting like gas, so I had a coworker, her name was
11  Linda Brown, I told her, I said taste this soda.  It
12  tastes like gas.  She said I'm not going to taste
13  it.  I called Kaiser Medical Center right then and
14  there, and the advice center I talked to, they said
15  come on in.  When I came in, I saw, they gave me
16  Mylanta, had me sit there for a couple of hours.
17    Q.  Did you miss work at the Post because of
18  that?
19    A.  Yes, they paid me, but then they turned
20  around, and I don't know, put something on the
21  documentation of excused of pay.

Page 235

1    Q.  So when you, so by December, in December
2  of 2005 were you already working for Personnel
3  Resources; is that right?
4    A.  Yes, mm-hmm.
5    Q.  And when did you start working for them?
6  I'm sorry.
7    A.  I started working for Personnel Resources
8  October the 15th.
9    Q.  Of 2005.  You did already tell me that.  I
10  apologize.  And I take it that this visit on the 4th
11  and this medical advice was not related to sarcoid
12  or sarcoidosis?
13    A.  No, ma'am.
14    Q.  Is that right?  And is this the
15  documentation that you provided to the Post upon
16  your return to work?
17    A.  Yes, ma'am.
18    MS. HOLMES:  Let's take a quick break.
19    (Whereupon, a short recess was taken from
20  3:04 to 3:10 p.m.)
21  BY MS. HOLMES:
22    Q.  Mr. Mack, I'm going to have marked a stack

Page 236

1  of documents that we're going to mark as Mack
2  Exhibit 33, and I'd like you to take a look at it,
3  and I'm going to ask you some real specific
4  questions about it, but you can feel free to look at
5  the whole thing if you would like to.  I'm going to
6  refer you to some real specific pages.
7    A.  Okay.
8    (Mack Exhibit No. 33, Handwritten Pass On
9  Log, was marked for identification.)
10    MR. PETERSON:  Before we begin, point of
11  clarification.  Is this, are all the pages of this
12  journal photocopied or just selective pages?
13    MS. HOLMES:  I believe it's all the pages.
14  That's what I tried to do, even though I'm only
15  going to ask him about specific pages.  Is that
16  right?
17    MS. OSBORN:  Yes, for the period covered.
18    MS. HOLMES:  Correct.  It starts at a
19  certain date and ends at a certain date, but
20  everything in between, it should all be there.
21    THE WITNESS:  Yes.
22  BY MS. HOLMES:

Page 237

1    Q.  Okay.  What is this document?  Can you
2  tell?
3    A.  This document in here is whenever a
4  security officer called off, security officer
5  sitting at that desk must say William Mack called
6  off and William Mack called off on January 1, 2, 3,
7  and they must contact Donald Jackson or Mr. Smith.
8    Q.  This is what's known as a Pass On Log; is
9  that term familiar?
10    A.  Yes.
11    Q.  I just want to go to, and I'm going to
12  refer you to, see the numbers on the bottom right
13  hand?  They say "Post" and numbers.  I'm going to
14  refer you to Post 000720, which is towards the, I'd
15  say towards the middle of the document.  If you can
16  find that.
17    A.  Mm-hmm.
18    Q.  Do you see that?  And do you see the
19  second entry up from the bottom indicates "William
20  Mack called out sick for a shift on 12/4/05"?
21    A.  Yes.
22    Q.  And is this related to --

60 (Pages 234 to 237)

William A.  Mack

Page 238

1    A.  Yes.
2    Q.  -- the absence that's --
3    A.  Yes, ma'am.  I'm sorry.
4    Q.  That's okay.  The absence that's referred
5  to in Mack Number 32?
6    A.  Yes.
7    Q.  If you could look at the next page, which
8  is 000721, it looks like you also called off for the
9  5th.  Does that look right?
10    A.  Yes.
11    Q.  And was that for the same incident?
12    A.  Yes, ma'am.
13    Q.  Had you been released to return to work on
14  the 5th?  I thought you had, but --
15    A.  You said at the bottom?
16    Q.  No, no.  I'm sorry.
17    A.  0721?
18    Q.  000721, it's about the middle of the page.
19  It says 10:20 p.m., "William Mack called off sick
20  for 3 to 11 shift."
21    A.  Yes.
22    Q.  Had you been released to return to work on

Page 239

1  the 5th after your illness on the 4th?
2    A.  I don't remember, but I have documentation
3  on that.
4    Q.  Is the documentation something other than
5  Mack 32?
6    A.  It's the same.
7    Q.  It's the same.  Okay.  It says what it
8  says.  Can you turn to 725, please?  In the third
9  entry from the top, 11:05 p.m., do you see that?
10    A.  Yes, it say, "William Mack called off sick
11  for a 7 a.m. to 3 p.m. shift", 11 to 7.
12    Q.  3/11/06?
13    A.  Yes.
14    Q.  Are you able to remember why you called
15  off sick on that date?
16    A.  No.  I was sick because one thing about
17  the Post, Washington Post policy, if I was sick in
18  January '05 going into that new year, they don't
19  hold, we was told by Ulysses Smith don't hold
20  nothing against you in 2005.  So this is March.
21    Q.  Of '06.
22    A.  March 11, '06.  So for that year that

Page 240

1  likely was the first time I took off, out sick.  So
2  whatever I did in January we was always told by
3  Mr. Smith they don't hold it against you.  That's a
4  whole new year.  Only thing they do is carry over
5  your sick leave.
6    Q.  I hear you.  That wasn't my question at
7  all.  Do you remember why you were sick that day?
8    A.  I don't know.  It didn't have to do with
9  sarcoidosis.
10    Q.  It didn't have to do with sarcoidosis?
11    A.  No, I just didn't feel good.
12    Q.  Can you turn to Post 000729?  And it looks
13  like about the middle of the page there under the
14  April 16 of '06 there's a question mark.  Do you see
15  that?
16    A.  Yes.  That's April the 17th.
17    Q.  Is it the 17th or the 16th?  I'm not sure
18  how to read that.  It looks like that's the last
19  entry under the 16th, but I might be wrong about
20  that.
21    A.  Three to 11 shift.  No, that was the 17th.
22    Q.  And it says --

Page 241

1    A.  "William Mack called off sick."
2    Q.  Any idea why you called off sick on that
3  date?
4    A.  No.  I wasn't feeling good, and that's
5  when they held my sick days.
6    Q.  But it didn't have to do with sarcoidosis?
7    A.  No, uh-huh.
8    Q.  And on the last page of the document,
9  which is 0731 it looks like this is from April 21 of
10  '06, although please correct me if I've got that
11  wrong, and there's an entry saying "William Mack
12  called off"?
13    A.  Yeah.  That was April 21.
14    Q.  Okay.
15    A.  Yes.
16    Q.  And why did you call off then, do you
17  know?
18    A.  Yes, my car broke down.  My car was broken
19  in.  I told you, and, as a matter of fact, the day
20  before the car was broken in, someone tried to break
21  in on the 20th.  And I told Donald Jackson to come
22  outside and I show you somebody messed my car up.

61  (Pages 238 to 241)

William A.  Mack

Page 242

1    And then that morning when I got home, it had to
2    happen right after I went in, somebody finished the
3    other side, and, as a matter of fact, I gave them,
4    you have the documentation right there.
5        Q.  I do, and I'm going to show it to you.  So
6    just to make sure I understand this, you called off
7    because someone broke into your car?
8        A.  I couldn't get inside the car doors.  I
9    couldn't get in.  On the documentation you have in
10   front of you you'll see both cylinders; one was
11   $169.01, and one was $149.
12       Q.  Okay.  I'll show you the document.  I
13   don't want you to, you don't have to guess.  It's
14   not a quiz.  Could you please mark that as
15   Exhibit 34?
16       (Mack Exhibit No. 34, Beltway Toyota
17   invoice, was marked for identification.)
18   BY MS. HOLMES:
19       Q.  And, Mr. Mack, I think you told me that
20   Exhibit 34 is the documentation you provided in
21   connection with your car having been broken into; is
22   that right?

Page 244

1    it.  One of the locks on the driver side opened up.
2    I drove the car.
3        Q.  So you got it open and drove it to the
4    dealer?
5        A.  Yes, me and my wife.
6        Q.  Any reason you didn't go to work at that
7    point?
8        A.  I already called in.  I called off
9    emergency vacation leave.  I had over 100 hours of
10   vacation leave.  It's hard for me to take vacation
11   because of my days off being off Tuesday through
12   Friday.  It's hard for me to take a complete week's
13   vacation.
14       Q.  Okay.  Just bear with me.  Mr. Mack, did
15   anyone at the Post ever talk to you about the number
16   of absences that you had and need to improve upon
17   that and have fewer absences?
18       A.  Mr. Smith always came and talked to me,
19   told me I was abusing my sick leave.
20       Q.  And when did Mr. Smith do that?
21       A.  The year 2003.  Correction.  2002, 2003,
22   and 2004 and 2005.

Page 243

1        A.  Mm-hmm.
2        Q.  Okay.  So is this what you provided to the
3    Post in connection with your absence on the 22nd --
4        A.  Yes, ma'am.  Mm-hmm.
5        Q.  -- of April of 2006?
6        A.  I'm sorry.
7        Q.  It's hard.  I know.
8        A.  Yes.
9        Q.  So I take it that the absence on that date
10   was not related to any illness or health issue?
11       A.  No, ma'am, I think this was emergency
12   vacation I called in for.
13       Q.  Okay.  And it looks like you took your car
14   to the Toyota dealer on that date?
15       A.  Yes, I took it on the 21st.  I took it on
16   the 22nd, and then, when I took it to the service
17   department, they say they don't have no mechanics
18   there to fix it, and I have to bring it back Monday,
19   and Monday was the 24th.
20       Q.  How did you get the car to the dealer?
21       A.  I finally got it open.  I pushed a
22   screwdriver with a hammer and turned it and broke

Page 245

1        Q.  So he, as best you can recall, told you
2    that every year?
3        A.  Yes.
4        Q.  Was there any particular time of year?
5    Did he tell you that in a performance evaluation or
6    did he just come up and tell you that or what?
7        A.  The years I was at the Washington Post
8    from 2002, from 2000 all the way up to 2004 I never
9    received a performance evaluation at the Washington
10   Post.  Only time I received a performance evaluation
11   was the year 2005.
12       Q.  Okay.  That wasn't quite my question.  My
13   question was when did Mr. Smith tell you that you
14   were abusing sick leave?
15       A.  In 2001.  I can remember it was the year
16   2001, and the reason I remember that same time going
17   up for promotion.  Every time I came up for
18   promotion, that's what came out of his mouth; you
19   abusing your sick leave.
20       Q.  So 2001 was, am I right that that was
21   before you were diagnosed with sarcoidosis?
22       A.  2001, I went in to see -- I was diagnosed

62  (Pages 242 to 245)

William A.   Mack

Page 258

1    A.  Yes.
2    Q.  Okay.  Did anyone ever tell you why
3  Mr. King got the job and not you?
4    A.  No.  They told me I didn't get the
5  position because I was abusing sick leave.
6    Q.  Who told you that?
7    A.  Mr. Smith.
8    Q.  Now, let me ask you something.  You say in
9  this memo, this is to Ms. Lequeux again.  You said
10  in this memo that Smith called you and told you you
11  didn't get the position, but you don't say he told
12  you you didn't get the position because you were
13  abusing sick leave.  Why did you let that off?
14    A.  Because Mr. Smith told me at a different
15  date.  He always called me to the office at a
16  different date, stop abusing your sick leave.  This
17  promotion took close to seven months.  It took them
18  seven months to make the decision until I called
19  downtown, and the young lady I spoke to, she say,
20  well, she had been on vacation, and she going to get
21  on it right now.
22    Q.  Okay.  So did -- I'm just trying to get

Page 259

1  clear in my mind, did Mr. Smith or did he not tell
2  you that you didn't get this position because you
3  were abusing sick leave?
4    A.  Yes, he told me this back on the feedback.
5    Q.  On the feedback.  I see, so you got
6  feedback from this?
7    A.  Yes.
8    Q.  Was there anything else in the feedback?
9    A.  That was it.  Told me they would ask me
10  questions about the job which, I mean, I had knew
11  everything at the Washington Post when it came to
12  security, how many cars was on the parking lot,
13  identify it -- I can identify your car, everybody's
14  car here in the parking lot, first and second car,
15  and they list everything I had to say when it came
16  to my job performance.  And then when it came to
17  Mr. Smith, he said, well, your sick leave, you take
18  off too many days sick.  But everything else went
19  great, but then it was the sick.
20    Q.  Now, did Mr. Smith, did Mr. Smith tell you
21  in connection with this promotion that it was a
22  close race, and you should try again?  I'm asking

Page 260

1  you that because that's what you relay to Ms.
2  Lequeux.
3    A.  He said it's a close race, try again, but
4  most people that don't get the position, they leave.
5    Q.  And you indicated that you did get
6  feedback from this; is that right?
7    A.  Yes, I did get feedback.
8    Q.  And the feedback indicated you needed to
9  use less sick time; is that right?
10    A.  Mm-hmm.
11    Q.  Okay.
12    A.  Yes, ma'am.
13    Q.  Thank you.  I'm going to have marked as 37
14  a document and ask you to take a look at it and let
15  me know if you can identify it, please.
16        (Mack Exhibit No. 37, Washington Post
17  Performance Review, was marked for identification.)
18        THE WITNESS:  Yes.
19  BY MS. HOLMES:
20    Q.  Okay.  What is it?
21    A.  This is the evaluation they gave me for
22  2005.

Page 261

1    Q.  And did you have a meeting with
2  Mr. Jackson and Mr. Smith in connection with this
3  performance review that you remember?
4    A.  Mr. Smith was there.  Mr. Jackson wasn't
5  there.  I don't remember Mr. Jackson being there.
6    Q.  Okay.  I didn't mean to imply that he was.
7    A.  Yeah, I don't remember him being there.
8    Q.  Mr. Mack, let me ask you just a basic
9  question.  Under "Job Title" it says "On Call
10  Security Guard"; is that what they put?
11    A.  That's what they put, but that isn't
12  what's on my pay stub.
13    Q.  Okay.  Do you know whether or not the Post
14  considered you to be an on call security guard?
15    A.  No, the Washington Post considered me
16  being a regular part time.
17    Q.  How about Mr. Smith?  Did he consider you
18  to be an on call security guard?
19    A.  Yes.
20    Q.  He did.  How about Mr. Jackson, do you
21  know?
22    A.  He considered everybody, all the part

66  (Pages 258 to 261)

William A.   Mack

Page 262

1  time, but I knew I was regular part time.
2      Q.  I see.  Let me get this straight in your
3  mind.  Mr. Smith considered you to be an on call
4  security guard; is that right?
5      A.  Yes.
6      Q.  How about Mr. Jackson?
7      A.  Same, too.
8      Q.  He did, too?
9      A.  Yes, ma'am.
10     Q.  How about, do you know what Mr. Corso
11 considered you to be?
12     A.  I don't know.
13     Q.  And what's the basis for you saying that
14 the Post didn't consider you to be?  What's on your
15 time card?
16     A.  The Post considered me as a part time.
17     Q.  Right.  And what's your basis for saying
18 that?
19     A.  What's on my time card and the letter they
20 gave me in 2001.
21     Q.  Okay.  Anything else?
22     A.  Yes.  And the print-out time card.  I'm

Page 263

1  talking about the print-out time card we get out of
2  the computer that says full time/part time, what you
3  are, and it says PT, part time.
4      Q.  Was there any space on the time card for
5  on call?
6      A.  No, Mr. Smith had his own time card where
7  we used to come in and write it on.  He had it
8  printed out, and on that one it has on call, but the
9  one that comes through the Washington Post, it says
10 part time.
11     Q.  Was there a space on the one that comes
12 from the Washington Post to indicate on call or not?
13     A.  No.
14     Q.  All right.  Now, it looks like for the
15 most -- well, it looks like on this performance
16 review you got needs improvement in a few areas; is
17 that right?
18     A.  Yes, but this performance isn't valid.
19     Q.  I'm sorry?
20     A.  This job performance isn't valid at all
21 because Mr. Smith, Donald Jackson and Belcher McNeil
22 during that year, Roddy MacPherson, well, Mr. Smith

Page 264

1  and Donald Jackson wasn't my supervisors.  They did
2  not work around me.  On Mondays my shift supervisor
3  was Bob Momani.  He was my supervisor.  On
4  Saturdays, Saturday morning my shift supervisor was
5  myself 'cause I was what they call HCL, high
6  classified level.  Whoever the officer had more
7  seniority, they put that person in charge of that
8  shift.  When it came to Sunday mornings, it was,
9  6:45 a.m. to 2:45 p.m. it was Bernard Carr or
10 myself.  When it came to 3 to 11, which is 2:45 p.m.
11 to 10:45 p.m., it was Otis Brooks.
12         This performance, Mr. Smith and Donald
13 Jackson should have never gave me this performance.
14 They never worked around me that year to give me
15 this performance.
16     Q.  What was Smith's title at the time?
17     A.  Security manager.
18     Q.  So was he in charge of all the security
19 guards?
20     A.  Yes.
21     Q.  Okay.  What was Jackson's title?
22     A.  He was overall security supervisor.

Page 265

1  Especially he would do the scheduling of the shifts.
2      Q.  Okay.  And was he in charge of all of the
3  security guards as well?
4      A.  Yes, doing the schedule, but, during the
5  shifts, they had assigned supervisors.  Now, if Bob
6  Momani's name is on there, Otis Brooks, Bernard
7  Carr, this would be valid, what they put, but
8  Mr. Smith, no, and Donald Jackson never worked with
9  me.
10     Q.  As the person who was in charge of
11 scheduling people on shift, would Mr. Jackson have
12 reason to know when you were not at work?
13     A.  Yes.
14     Q.  And, in fact, I think you told me earlier
15 that, when you called into the desk, the desk was
16 supposed to call Mr. Jackson and let him know; is
17 that right?
18     A.  Yes, that's procedure.
19     Q.  So Mr. Jackson would at least have
20 knowledge of how often you called out sick or how
21 much you called out for work?
22     A.  Yes, ma'am.

67  (Pages 262 to 265)

William A.  Mack

Page 266

1    Q.  And, when Mr. Jackson and Mr. Smith filled
2  out this review, whoever filled it out, I guess, it
3  said that they marked you as needing improvement in
4  the extent to which the employee is punctual,
5  observes prescribed work break/meal periods and has
6  acceptable overall attendance record"; isn't that
7  right?
8    A.  Never been late.  Never been late.  As a
9  matter of fact, we have what you call a, we have a
10  swipe card, and we would swipe that card reader,
11  swipe it in the door, show you exactly what time
12  that I get there and show you exactly what time,
13  what time, well, not the time I left, but exactly
14  what time I come in the door.
15    Q.  Okay.  That's not my question.  My
16  question is whether or not in this performance
17  review in 2005 you were marked as needing
18  improvement in the area of the extent to which you
19  were punctual, observes prescribed work break and
20  meal periods and has an acceptable overall
21  attendance record.  Looks to me like you were.  It's
22  on page two, if you can just confirm that.

Page 267

1    A.  Yes, that's what they put.
2    Q.  And I think you just told me Mr. Jackson
3  at least would have reason to know about your
4  attendance record as a whole; isn't that right?
5    A.  Yes, Mr. Jackson would.  But Mr. Jackson
6  wasn't at that meeting.  Only one there was Smitty.
7  And Roddy MacPherson wasn't there.  They just signed
8  off on that when they wasn't even there.
9  Mr. Jackson was not there.
10    Q.  Mr. Jackson's signature is on the
11  document?
12    A.  Yes, yes, but he was not there.
13    Q.  Okay.  I didn't ask that.  Got it.  Have
14  you ever been disciplined when working at the Post?
15    A.  No, ma'am.  Once.  I was disciplined, and
16  Mr. Smith accused me of letting an employee in the
17  employees' entrance, but witnesses was there and
18  gave me a written documentation that Mr. Mack was
19  not the one who let a former employee in the
20  employee entrance.  And the former employee tried
21  to -- I don't know; I couldn't say the word attack,
22  but former employee threatened Valerie Gaffney.

Page 268

1  And, two, the employee that left the former employee
2  in was David King.  Jessie Moore came across and
3  told Mr. Smith I heard David King when he came
4  across the radio and say I let the employee in.  And
5  Jeffrey Wiggins also told Mr. Smith Mr. Mack was not
6  the one that told me to escort this former employee
7  in.  It was David King, but Mr. Smith didn't want to
8  hear it.
9    Q.  And did Mr. Smith issue you some kind of a
10  warning letter in connection with that incident?
11    A.  Yes, he gave it to me, but he didn't want
12  to see the witnesses' information.
13    Q.  And was that letter signed by Mr. Smith,
14  if you can remember?
15    A.  Yes.
16    Q.  And was it signed in his capacity as the
17  security supervisor and the overall supervisor of
18  security guards?
19    A.  Manager.
20    Q.  I'm sorry?
21    A.  As the security manager.
22    Q.  Security manager.  Okay.  I'm going to

Page 269

1  show you another document which we're going to mark
2  as 38, have you take a look at it and let me know,
3  when you have had a chance to do that, whether or
4  not you can identify it.
5      (Mack Exhibit No. 39, 8/2/05 Letter, was
6  marked for identification.)
7      THE WITNESS:  Yes, I can identify this.
8  BY MS. HOLMES:
9    Q.  What is it?
10    A.  The Washington Post had this policy --
11  well, first off, when an employee, not employees,
12  when someone come in and pick up the application,
13  they would take it with them and bring it back and
14  fill it out.  I was always told by the shift
15  security officer, Debbie Brennan, Troy Brennan, Bob
16  Leman, whenever the person from outside is bringing
17  their application back, told us to sign the top of
18  it.  So I would put my initials on top saying that we receive
19  it.  So I would put my initials at the top saying I
20  received it.
21      Some people come from the outside who's
22  what they call inserters who don't speak English,

68  (Pages 266 to 269)

William A.  Mack

Page 270

1  and their writing is off.  They would ask me is this
2  right.  And then I'd say, yes, you filled this in
3  right.  You filled this in right.  But then our
4  employees would go by me being so kind to them, they
5  would say, well, Mr. Mack told me, recommended me
6  for this job, but Mr. Smith, they tried to say that
7  I was trying to forge their names just to get money
8  back from this program they had, which ain't true,
9  which, one, as a matter of fact, one Washington Post
10  employee who's a church member, Mr. Smith was,
11  brought him into the plant manager, they hired her
12  in the utility position.  Her name is Courtney
13  Williams, but they never paid me for that.
14      Q.  And were these, in fact, people who you
15  had referred to the Post for work?
16      A.  Yes, 'cause they come in and said is the
17  Washington Post hiring?  Yes, they are hiring.
18  Well, could you come in?  Well, can we come in?
19  Come on in and fill out an application.
20      Q.  Were these people you knew before they
21  came in and asked if the Post was hiring?
22      A.  No.

Page 271

1      Q.  So your view of referring somebody for the
2  job is if they come in and ask if the Post is hiring
3  and you say yes?
4      A.  Yes, they are hiring, and they would put
5  me down as the person who referred them.  I didn't
6  refer them.  I just tell them, yes, they are hiring,
7  and I show them how to fill out the application
8  properly.
9      Q.  Is it your testimony you had no idea that
10  they were putting your name down as a referral?
11      A.  I didn't know they were putting my name.
12  Can I put you down for character?  Yeah, go ahead,
13  but I can't guarantee that will give you a job.
14      Q.  And this letter is also from Mr. Smith;
15  isn't that right?
16      A.  Yes, I have documentation that will show
17  Mr. Smith didn't even want to listen to the
18  witnesses who said I had nothing to do with that.
19      Q.  That's the second one.  I'm sorry.  Just
20  talking about the first one.  That's signed by
21  Mr. Smith in his role as security supervisor?
22      A.  Yes, ma'am.

Page 272

1      Q.  I'm going to show you what we'll mark as
2  the next in line, which is Number 39.
3          (Mack Exhibit No. 39, Washington Post
4  Policies, was marked for identification.)
5  BY MS. HOLMES:
6      Q.  And I'm going to ask you just to look at
7  that and tell me if you can identify just the first
8  page of it, and then we'll keep going.
9      A.  No, I never seen this.
10      Q.  The first page?  You've never seen it?
11  You produced it to us.  I'm a little puzzled by
12  that.
13      A.  Yeah, this is the one the girl gave me,
14  Brenda Bailey.
15      Q.  Okay.  So you have seen that?
16      A.  Yes, Brenda Bailey gave me this, and I
17  gave it to Mr. -- yes.
18      Q.  Okay.  And that was in about 2001; is that
19  right?
20      A.  Yes, 2001.
21      Q.  And what's your understanding of what this
22  document is?

Page 273

1      A.  I didn't pull it, I didn't bring it back
2  up.  I put it up until I was terminated.
3      Q.  That's not my question.  My question is
4  what's your understanding as to what it is; what is
5  this document?
6      A.  I didn't read it.  I gave it to Mr. Nils.
7      Q.  So you don't know what it is?
8      A.  I never read it.  I gave it to Mr. Nils.
9      Q.  You told me earlier you gotten a policy on
10  family medical leave from this person?
11      A.  From Brenda Bailey in 2001.
12      Q.  And at the time she told you there was
13  this family medical leave law, and there was a
14  policy on it?
15      A.  Yes.
16      Q.  Is this the policy, as you understand it?
17      A.  Yes.
18      Q.  And you're telling me that you never read
19  it?
20      A.  I never did read it.
21      Q.  But you had it in your possession?
22      A.  Right.  Yes.

69 (Pages 270 to 273)

William A.  Mack

Page 286

1    A.  This document is all the people that have,
2   was aware of my medical disease, sarcoidosis.
3    Q.  Okay.  On the very last page of the
4   document it looks to me like you've signed it
5   swearing or affirming that the information contained
6   in here is true to the best of your knowledge; is
7   that right?
8    A.  Yes, ma'am.
9    Q.  And you reviewed this document before you
10   signed it?
11    A.  Yes, Mr. Nils, this is what I signed in
12   Mr. Nils' office.
13    Q.  Okay.  I'm going to ask you some questions
14   about all of the people that you've listed here as
15   people with knowledge.
16    A.  Yes.
17    Q.  And just to try to shortcut this a little
18   bit, if you've already told me at some other point
19   today all the knowledge that you think they have,
20   then just tell me that.  What I want to know is
21   whether or not there's something, some knowledge
22   that you think these folks have that's relevant to

Page 287

1   your case that you haven't already told me about,
2   because I don't want to go through all the
3   conversations we talked about already this morning.
4   So I'm just going to start with Mr. Smith who's
5   Number 1 and ask you to tell me whether Mr. Smith
6   has any knowledge about the case or that you think
7   is relevant to this case that you haven't already
8   told me about today?
9    A.  He have knowledge of this.
10    Q.  And what knowledge is that?
11    A.  That I have sarcoidosis.
12    Q.  I'm curious about that, because we spent a
13   long time this morning going through every
14   conversation that you had with anybody at the Post
15   about sarcoidosis, and we went through many, many,
16   many conversations, and none of them were with
17   Mr. Smith.  So how is that you think that Mr. Smith
18   has knowledge of sarcoidosis?
19    A.  Mr. Smith signed my, he approved all my
20   sick slips.  Every sick slip I got was approved, he
21   approved every sick day I was out, and the only way
22   he can approve my sick slip is he have to find out,

Page 288

1   get the documentation from the Health Center and
2   give it to him, and they also give it to Belcher
3   McNeil.
4    Q.  He knows about sarcoidosis from the
5   documentation at the Health Center?
6    A.  He know about sarcoidosis from the
7   documentation in the Health Center and also by
8   coming up to the front desk talking to me more than
9   once when he questioned me more than once about the
10   bump that's on my face.  And also he know about
11   sarcoidosis because he was walking around at the
12   same time with a limp, if I'm correct, in his left
13   or right leg, and, when I was limping, he said
14   what's wrong with you.  I told him this is from the
15   steroid shots I take.  I asked him what was his
16   injury.  He said it's an old injury.
17    Q.  The first thing you told me is the
18   documentation.  Is that all the documentation we've
19   looked at that's marked as Exhibits 3 through -- I
20   don't want to go over it all day -- 3 through 32
21   and then 34?  Is that the documentation you mean?
22   The documents you provided from your doctors to the

Page 289

1   Health Center?
2    A.  Right.
3    Q.  For all the absences?
4    A.  Right.
5    Q.  And those are the documents we've already
6   talked about?
7    A.  Yes.
8    Q.  So that's one source of his knowledge is
9   the documents?
10    A.  Yes.
11    Q.  You said the second source of his
12   knowledge is something about he noticed a bump on
13   your face?
14    A.  Right.  Left cheek.
15    Q.  And when was that?
16    A.  In 2002.
17    Q.  In response to that you told him you had
18   sarcoidosis?
19    A.  Yes, 'cause he always called me in his
20   office to talk to me about my sick leave.  I told
21   him I have sarcoidosis, but a lot of people is not
22   familiar with sarcoidosis, so, when I say the word

73  (Pages 286 to 289)

William A.  Mack

Page 290

1   "sarcoidosis", like what is that.  There ain't no
2   such thing as sarcoidosis.
3       Q.  So are those the conversations we've
4   already talked about where he told you you were
5   abusing sick leave?
6       A.  Yes.
7       Q.  And then you said there was a third
8   potential source of his knowledge which was he was
9   walking around with a limp in his leg?
10      A.  Left or right leg.
11      Q.  And he asked you what was wrong with you,
12  and you said steroid shots?
13      A.  Steroid shots and my leg stiffen up and
14  asked him what was wrong with his leg, and he told
15  me it was an old injury from years ago.
16      Q.  Anything else with regard to Mr. Smith?
17      A.  No, ma'am.
18      Q.  How about Mr. Jackson?  What is his
19  knowledge?
20      A.  Mr. Jackson, he was aware of my
21  sarcoidosis because every time I took off, when I
22  come back from the doctor's, my face would be

Page 291

1   swollen and my weight would gain, so he asked me you
2   picking up weight?  Yes, it's from the steroid shots
3   I take from the sarcoidosis.
4       Q.  And let me ask you this.  Can you remember
5   when this conversation happened?
6       A.  Yeah.  This conversation happened in, it
7   could have happened in 2004 'cause I remember I was
8   working a 3 to 11 shift with him.
9       Q.  Okay.  And he saw that your face was
10  swollen?
11      A.  Yes.
12      Q.  And you had gained weight, and he asked
13  you --
14      A.  You picking up weight, ain't you?  And I
15  said yes, sir.
16      Q.  And you told him it was from steroid
17  shots.  Is that all you told him?  Anything else?
18      A.  That's all I told him.
19      Q.  That it was from steroid shots?
20      A.  Yes.
21      Q.  Anything else about Mr. Jackson?  Any
22  other knowledge that you believe he has with

Page 292

1   relation to your claims in this case?
2       A.  The same knowledge from what Mr. Smith
3   gave me.
4       Q.  From what Mr. Smith gave you?
5       A.  The same knowledge I gave Mr. Smith.  Mr.
6   Smith always pass him the information.
7       Q.  I see.  So you think that Smith talked to
8   him?
9       A.  I know Smith talked to him.
10      Q.  You know.  How do you know?
11      A.  Because I can always tell when Smitty had
12  talked.  He always have a little meeting, and if
13  the other officers know about my disease, I have
14  sarcoidosis, that's because it came out the horse's
15  mouth, which is Mr. Smith and Donald Jackson.
16      Q.  Didn't you tell me earlier a bunch that
17  you had talked to a bunch of the other officers
18  about your condition?
19      A.  David King and Otis Brooks, and those,
20  they would say you're in the dog house, but I told
21  you Otis Brooks didn't know nothing about my
22  disease.

Page 293

1       Q.  That's right, and he said you're in the
2   dog house because you've been absent?
3       A.  Yes.
4       Q.  Not specific to you've been absent for
5   sarcoidosis or anything like that?
6       A.  No, ma'am.
7       Q.  So you're making the assumption that Smith
8   talked to Jackson.  I take it you weren't in any
9   conversations where Smith talked to Jackson in your
10  presence; is that right?
11      A.  Right.
12      Q.  Okay.  And Mary Powell I think we talked
13  about earlier, didn't we?
14      A.  Yes, ma'am.
15      Q.  Is there anything that she has knowledge
16  of related to this case that we haven't already
17  talked about?
18      A.  No.  She got documentation; she gave me
19  documentations on sarcoidosis.
20      Q.  How about Ms. Clark?
21      A.  Mary Clark was, she always talk about the
22  swelling in my face.

74  (Pages 290 to 293)

William A.  Mack

Page 306

1      A.  The same as with Ms. McGruder where I was
2  terminated.  He told me seen it in the book; he said
3  Mack was terminated, and he asked me why, and he
4  said the question was with the rest of the security
5  officers how can they terminate Mr. Mack for missing
6  18 when Ms. McGruder, Imani McGruder, missed 30 and
7  more within the same year?  Why she ain't
8  terminated?
9      Q.  And do you have any idea why that is?
10     A.  Favoritism.
11     Q.  Okay.  Favoritism based on what?
12     A.  Favoritism because she's a female.  They
13  let her take off when she was out sick.  When she
14  had to go to church meetings, they let Imani
15  McGruder put in emergency vacation.  Not emergency,
16  but vacation.  Sometimes she was running late at
17  night because she was coming out of church service,
18  and they would let her come to work with her
19  minister gown on and collar to change.
20     Q.  And you think that's because she was
21  female?  Is that what you are saying?
22     A.  And she worked very close with Gary up in

Page 307

1  Northwest.
2      Q.  She worked --
3      A.  She worked with Gary in Northwest.
4      Q.  So do you attribute what you are
5  suggesting is her, is favoritism to her to her
6  having worked closely with Mr. Corso before or to
7  her being female?
8      A.  Her being female.
9      Q.  Have we talked today about all the doctors
10  who've treated you for sarcoid or sarcoidosis?  I
11  think we have, but I just want to make sure.
12     A.  Yes.
13     Q.  Okay.  If you could look at page five of
14  this, please, and I want to go to the fourth entry
15  up from the bottom.  Starts with "In May 2006."
16     A.  Mm-hmm.
17     Q.  "One of the Washington Post nurses told
18  the Plaintiff that there is a law called the FMLA,
19  and the Plaintiff's supervisors can't do that.  They
20  will be breaking the law."  Who is that?  Who is
21  that referring to?
22     A.  We talked about that.  I told you she wore

Page 308

1  glasses.
2      Q.  You don't remember her name?
3      A.  Yes.
4      Q.  That's right.  I remember that.  Thank
5  you.  Now, Mr. Mack you have filed a charge with the
6  Fairfax County Commission on Human Rights; right?
7      A.  Yes.
8      Q.  And do you remember when you filed that
9  charge?
10     A.  Yes.
11     Q.  It's not a test.
12     A.  If I'm correct, it should be May the 11th.
13  It was quick.
14     Q.  May 11, 2006?
15     A.  Yes.
16     Q.  And what do you claim in that charge, can
17  you remember?
18     A.  I can't remember right now, but it's more
19  than one charge, though.
20     Q.  What do you mean it's more than one
21  charge?
22     A.  I had it amended.

Page 309

1      Q.  You amended it, okay.  And can you
2  remember anything about what's in it?
3      A.  Yes.  I know Imani McGruder.
4      Q.  That's the female that we talked about?
5      A.  Yes.  And I know religion, religion.
6      Q.  Okay.
7      A.  Race.
8      Q.  Okay.
9      A.  There's one more.  I don't know what, but
10  there's one more.
11     Q.  Disability?
12     A.  Yes, disabilities.
13     Q.  Okay.  Do you know what the status of that
14  charge is?  Do you have any idea?
15     A.  No.
16     Q.  Have you had any communications with the
17  Fairfax County Commission on Human Rights?
18     A.  Yes, ma'am.
19     Q.  And what communications are those?
20     A.  They took all my information, and, when I
21  first called, they took all -- let me get her name
22  right.

78  (Pages 306 to 309)

William A.  Mack

Page 310

```
1     Q.  Sure.
2     A.  Karen Carrera.
3     Q.  Carrera?
4     A.  Yes, and I had to tell her what happened,
5  and she took it to the supervisors to see if I had a
6  case, came back and said yes, you do have a case.
7  And then they assigned me to an investigator.  His
8  name was Hakim Biani.  He told me send him every
9  documentation that I have.
10    Q.  And did you do that?
11    A.  Yes.  The documentation you have I gave
12  him.
13    Q.  Right.  And can you remember when that
14  was, roughly?
15    A.  Yes.  It was a week later, that same --
16    Q.  So sometime in mid 2006?
17    A.  Yes, ma'am, of May.
18    Q.  And did you have any conversations with
19  Mr. Biani?
20    A.  No, he went through the information I sent
21  him, straight through to Mr. Nils if he have any
22  questions to ask me.
```

Page 311

```
1     Q.  I see.  Has he asked you any questions
2  that you know of?  Well, I'm sorry.  Obviously, no.
3  Has he asked you any questions?
4     A.  Yes.  He told me go to Kaiser and get all
5  my sick slips.
6     Q.  Okay.  And you did that; right?
7     A.  Yes, ma'am.
8     Q.  Any other questions he is asked you?
9     A.  No, ma'am.
10    Q.  Any other communications he's had with
11  you?
12    A.  No, he's no longer with the Human Rights
13  Commission.  My investigator now is Karen Carrera.
14    Q.  Karen Carrera?
15    A.  Carrera, yes.
16    Q.  Have you had any communications with Miss
17  Carrera?
18    A.  No, none whatsoever.
19    Q.  You said you amended the charge.  When did
20  you do that?
21    A.  It was a week after we had the mediation.
22    Q.  So that's sometime in November or December
```

Page 312

```
1  of '06?  Does that sound right?
2     A.  Whenever I had the mediation with you.
3     Q.  We can look it up.  It's not a quiz.  And
4  you haven't had any communications with Miss Carr
5  since that time?
6     A.  No, ma'am.
7     Q.  Have you provided her with any documents
8  or anything?
9     A.  Yes, ma'am.
10    Q.  What have you provided her with since
11  then?
12    A.  The information I gave you about Imani
13  McGruder, Vincent Townes, Debbie Brennan who --
14  Mr. Smith claimed that I missed, I turned down
15  18 shifts, and Debbie Brennan, she haven't worked a
16  night shift since I was at the Post of 2000, 1999.
17  She never worked nights, and I was told by Mr. Smith
18  you missed, you turned down 18 shifts.  And she
19  turned down six years, five-and-a-half years.
20    Q.  And how in your mind is that relevant to
21  your claim?
22    A.  With the Human Rights Commission?
```

Page 313

```
1     Q.  Mm-hmm.
2     A.  Race.
3     Q.  She's a different race than you, I take
4  it?
5     A.  She's white.
6     Q.  Okay.  Any other way it's relevant?
7     A.  No.
8     Q.  And are there -- I asked you about
9  documents.  I just want to make sure.  Are there
10  documents related to Ms. McGruder, Mr. Townes or Ms.
11  Brennan that you provided or is this information you
12  talked to them about?
13    A.  Yes, this is information I gave them.
14    Q.  That you talked to them about?
15    A.  Yes.
16    Q.  So there aren't any documents?
17    A.  Debbie Brennan through the Washington
18  Post.
19    Q.  Yes, but I'm asking if you gave them any
20  documents.  They can certainly ask the Post for
21  anything else.
22    A.  About Imani McGruder taking off the
```

79 (Pages 310 to 313)

William A. Mack

Page 314

1  30 days?
2      Q.  Yes.  Any documents like that that you
3  provided them?
4      A.  No.
5      Q.  That's what I'm asking you.  Okay.  Any
6  other communications with Fairfax County?
7      A.  No, ma'am.
8      Q.  I am going to have marked yet another
9  exhibit which is going to be 42.
10         (Mack Exhibit No. 42, Washington Post
11  Policy Acknowledgement Form, was marked for
12  identification.)
13  BY MS. HOLMES:
14      Q.  And feel free to look at the whole
15  document.  What I want to ask you about is the
16  third page, so once you get the document go ahead
17  and take a look at it, and let me know whether you
18  can identify it.
19      A.  Okay.  This is the same policy you gave
20  me.
21      Q.  And the third page, do you know what that
22  is?

Page 315

1      A.  Yes.
2      Q.  Okay.  What is it?
3      A.  This is the policy on drug and alcohol
4  use, policy on employment of relatives, policy on
5  family medical leave, policy on harassment, policy
6  on nondiscrimination, policy on parental leave for
7  school activities and policy on smoking.
8      Q.  Is that your signature at the bottom?
9      A.  Yes.
10      Q.  Were you able to remember when you signed
11  this?
12      A.  No.
13      Q.  Okay.  Did you sign this certifying that
14  you had received these policies?
15      A.  Yes.
16      Q.  And, as far as you know, you received
17  them; is that right?
18      A.  Yes.
19      Q.  And I assume that's at some point when you
20  were employed with the Post?  We know at least that
21  much.
22      A.  Yes.

Page 316

1      Q.  Any idea whether it was in 1999 or 2005,
2  any idea at all?
3      A.  No.  I don't know.
4         MS. HOLMES:  Let's take a quick break.
5         (Whereupon, a short recess was taken from
6  4:36 to 4:41 p.m.)
7         MS. HOLMES:  Mr. Mack, I just have a few
8  more questions.  Then I'll have you out of here.
9         (Discussion held off the record.)
10  BY MS. HOLMES:
11      Q.  Now, I just want to make sure I completely
12  understand you, Mr. Mack.  I think that you've
13  testified that you believe that it's Mr. Smith who
14  made the decision to terminate you and who
15  wrongfully terminated you; is that right?
16      A.  Yes, ma'am.  Yes, ma'am.
17      Q.  And is that as opposed to somebody else at
18  the Post?
19      A.  Yes, ma'am.
20      Q.  Now, you also testified earlier starting
21  in May of 2006 you got a full-time job working for
22  Personnel Resources; is that right?

Page 317

1      A.  Yes.
2      Q.  And that job pays $13 an hour; right?
3      A.  Yes, ma'am.
4      Q.  Do you still make that much, or have you
5  gotten a raise since that?
6      A.  No, I still make that much.
7      Q.  And am I right that your job at the Post
8  paid about $16 an hour?
9      A.  15.74 an hour.
10      Q.  Did it go up at any point like in 2005?
11      A.  At the Washington Post?
12      Q.  Yeah.
13      A.  No, they put a, they held the security
14  guards' pay raises supposed to receive in 2004, they
15  held it, and they gave us back pay in 2005.
16      Q.  Have you, since getting your job at
17  Personnel Resources, have you looked at any other
18  jobs that might pay more?
19      A.  No, because being a 46-year old African
20  American male I go look for job, what should I put,
21  resign or terminated?  Then I go to be questioned
22  why was you terminated.  What could I tell that

80 (Pages 314 to 317)

William A.  Mack

Page 318

1  person?
2      Q.  So the answer is you haven't; right?
3      A.  I haven't.
4      Q.  Mr. Mack, I'm going to mark one more
5  document.  I promise it's the last one, and it's
6  going to be Number 43.
7          (Mack Exhibit No. 43, 2006 Calendar, was
8  marked for identification.)
9  BY MS. HOLMES:
10      Q.  And I just want you to take a look at it
11  and identify it for me if you can, and I have only a
12  very few questions about it.
13      A.  Yes.  Yes, go ahead.
14      Q.  Okay.  What is this?
15      A.  This is a 2005 calendar.
16      Q.  Okay.  And is the handwriting on it yours?
17      A.  Every last bit of it.
18      Q.  So is this your calendar?
19      A.  Yes, this is my personal calendar, what I
20  do for the whole year.
21      Q.  And I see you've taken some notes on it;
22  is that right?

Page 319

1      A.  Yes, ma'am.
2      Q.  And on the first page I see you have a
3  note of a call from Mr. Corso or some kind of
4  communication with Mr. Corso; do you see that around
5  May 10?
6      A.  Yes, ma'am.
7      Q.  And I also see on the third page in the
8  upper right-hand corner by Monday it has some notes
9  about a communication with Smitty who's Mr. Smith;
10  right?  Is that who Smitty is?
11      A.  Yes.  That's Smitty.  Ulysses Smith, short
12  name.
13      Q.  And are you on the third page or second
14  page?
15      A.  I'm on the second.
16      Q.  Third page is what I, what I'm talking
17  about.  I want to make sure I understand what this
18  is.
19      A.  Yes, ma'am.
20      Q.  And there's some notes there about a
21  communication with Mr. Smith; is that right?
22      A.  Yes, ma'am.

Page 320

1      Q.  When you took notes in your calendar, was
2  it your practice to write down what was important
3  about the conversation you were having?
4      A.  I do that through the whole year.  Any
5  conversation I have with anybody, my doctor's
6  appointments.  On that whole calendar you have you
7  will see it start from January from doctor's
8  appointments during the following month.  You can
9  see on the front page, pastor's birthday party.
10  That's when I knew my pastor's birthday party was
11  coming up.  I always put things down so I knew what
12  I was doing.
13      Q.  When you wrote down from a conversation,
14  for example, you took some notes of a communication
15  with Mr. Corso and Smith, was it your practice to
16  sort of write down, you know, write down what
17  happened in the conversation?
18      A.  Yes.
19      Q.  And to record as accurately as you could
20  what happened in the conversation?
21      A.  Yes.
22      Q.  And I'm sorry.  I think I might have

Page 321

1  misunderstood you.  Is this from 2005 or 2006?
2      A.  This is from 2005 because I noticed it's a
3  Girl Scout calendar.  If I saw the front, either two
4  thousand --
5      Q.  I'm sorry.  The reason I'm asking --
6      A.  No, 2006.
7      Q.  2006?
8      A.  Yes, 2006 calendar, but I gave my attorney
9  a 2005, 2003 calendar.
10      Q.  You also gave him other years, but this is
11  '06?
12      A.  Yes.
13      Q.  This one I'm showing you?
14      A.  Yes.
15      Q.  Okay.
16      MS. HOLMES:  I appreciate your time and
17  your testimony.  I don't have any more questions
18  now.  I am going to be making a request, Nils.  I
19  know he testified that he obtained certain medical
20  records from Kaiser, but not all of them, and I
21  think our request was broader than, the request that
22  we made, in other words -- I'm sorry I'm not being

81 (Pages 318 to 321)

William A.    Mack

Page 322

1    clear. It's late.
2        Earlier Mr. Mack testified that he got
3    certain medical records from Kaiser, namely, the
4    late slips or, I'm sorry, the return to work slips,
5    but he didn't ask for things like doctor's notes and
6    progress notes, so I will be making a request for
7    those documents.
8        MR. PETERSON: You can subpoena them.
9        MS. HOLMES: I can or you can provide
10   them.  If I subpoena them, then I have to get a
11   release from you.
12       MR. PETERSON: You don't need a release to
13   subpoena them.
14       MS. HOLMES: Sure I do.  They won't give
15   them to me without a release.
16       MR. PETERSON: Most of the time they do.
17       THE WITNESS: When I went to Kaiser, they
18   said the only ones who can get this documentation is
19   if it's a Court Order.
20       MS. HOLMES: Okay. I can speed it up, but
21   my understanding --
22       MR. PETERSON: We'll work with you.

Page 323

1        MS. HOLMES: We'll talk about it. My only
2    point is I'm going to leave the deposition open just
3    in case there's something in those that I want to
4    bring him back and ask him about. I don't know that
5    there will be, but I'm not suggesting there will be
6    for sure, but I'm just going to leave it open for
7    that purpose so that we can get that straightened
8    out, and we'll talk about it. And, like I said,
9    we're happy to subpoena them, if it's appropriate.
10   Otherwise, thank you. I appreciate it.
11       MR. PETERSON: I got a few questions.
12       MS. HOLMES: Okay.
13   EXAMINATION BY COUNSEL FOR THE PLAINTIFF
14   BY MR. PETERSON:
15       Q.  Mr. Mack, did you tell Mr. Smith, you said
16   you testified that you told Mr. Smith that you had
17   the sarcoidosis. Did you tell him that you needed
18   injections every two months?
19       A.  Yes, ma'am. I'm sorry. Yes, sir.
20       Q.  And that you were going to be taking time
21   off for those injections if the doctor ordered
22   those; is that right?

Page 324

1        A.  Yes, sir.
2        Q.  Now, you testified as to Mr. Corso, your
3    testimony was that he said you were being terminated
4    because you took 18 days off.  What, if anything,
5    did he say about the sickness with respect to those
6    days? Did he say anything?
7        A.  None whatsoever.
8        Q.  Well, my question is did he mention in
9    that conversation, did he mention that the 18 days
10   were for sickness?
11       A.  Yes, yes, he did.
12       Q.  Did the sarcoidosis make the stomach virus
13   worse?  Or were they unrelated?
14       A.  They unrelated.
15       Q.  Now, I've seen that you were given a
16   couple days off most of the time when you got the
17   shots.  Could you have gone back to work the next
18   day, that is not needed two days off if you could
19   have gotten the light duty just sitting at a post
20   like some of the other employees?
21       A.  Yes, ma'am. Yes, sir. Yes, sir.
22       Q.  So, basically, the Post made you take

Page 325

1    extra days off by not allowing you to have the light
2    duty?
3        A.  Yes, sir.
4        MS. HOLMES: Objection. Leading.
5        MR. PETERSON: I got to earn my money
6    somehow.
7    BY MR. PETERSON:
8        Q.  Now, as part of your duties were you
9    training other officers, and, if so, how did that
10   go?
11       A.  I trained a lot of the summer climate. I
12   trained the contract security officers. I trained
13   them on the does and don'ts, what to look for at the
14   guard shack. I trained David King when he came.
15       Q.  Did you train some of the people who
16   eventually got to be full time?
17       A.  Yes.  They David King and Imani McGruder.
18       Q.  Now, did you, you talked a lot about
19   telling Mr. Ulysses Smith about your sarcoidosis.
20   Did you tell Mr. Jackson that you also had
21   sarcoidosis?
22       A.  Yes, yes, sir.

82  (Pages 322 to 325)

William A.  Mack

Page 330

1    Q.  To see your physical therapist?
2    A.  I need time off because my left leg was
3  stiffening up on me 'cause he complained about me
4  making my rounds.
5    Q.  And did that have any, did you tell him
6  anything about steroid shots?  I remember you
7  telling me this.
8    A.  Yes.
9    Q.  What specifically did you tell him about
10  that?
11    A.  I take steroid shots, and, when I take
12  steroid shots in my hip, my leg stiffen up.
13    Q.  You weren't telling him you needed time
14  off for the steroid shots.  You were telling him you
15  needed time off because your leg was stiffening up?
16    A.  I needed time off because of the steroid
17  shots, and he told me we do not have light duty.
18    Q.  Now, was it because your leg was
19  stiffening up or because of the steroid shots?
20    A.  Because of the steroid shots.
21    Q.  Okay.  So how did your leg stiffening up
22  have to do with that?  That's what you keep telling

Page 331

1  me when I asked you what you told him.
2    A.  From taking the steroid shots, the steroid
3  go through the nerve, the veins, and it weakens the
4  bone.  That's why my new doctor now, he won't give
5  me a steroid shot in my left hip no more, because he
6  say it caused a lot of side effects, so he give me
7  the steroid injections in my face or right on the
8  lesions that's on the other parts of my body.
9    Q.  So you told Smith you needed time off
10  because your leg was stiffening up?
11    A.  Yes.
12    Q.  Okay.  Got it.  You just testified a
13  minute ago something that was new to me, which is
14  that you said that Mr. Corso in your conversation
15  with him, when he told you that you weren't going to
16  be called any more, said that you had too many sick
17  days or something like that?
18    A.  Because you missed 18 sick days.
19    Q.  And you're confident that's what he said?
20    A.  Yes.
21    Q.  Not that you missed 18 days?
22    A.  That was on May the 8th.  He said we don't

Page 332

1  need people like you here no more.
2    Q.  I remember that, but I don't remember you
3  telling me you missed a certain number
4  of sick days.
5    A.  18.
6    Q.  Are you sure he said 18 sick days as
7  opposed to 18 days?
8    A.  18 sick days.
9    Q.  Did the letter he sent to you advising you
10  the Post wasn't going to call you any more specify
11  sick days?
12    A.  He gave me two letters.  First letter
13  Mr. Smith gave on April 28, and Gary sent me a
14  letter on, he had to send it out on that Friday,
15  which was the 6th or which was the 5th because
16  Sunday was the 7th.
17    Q.  As much as I hate to do this, I'm going to
18  mark as 44 one more exhibit and ask you to take a
19  look at it.
20      (Mack Exhibit No. 44, 5/8/06 Letter, was
21  marked for identification.)
22  BY MS. HOLMES:

Page 333

1    Q.  Just take a look at that and tell me
2  whether you can identify that.
3    A.  Yes, I can identify this.
4    Q.  What is it?
5    A.  It's the letter that Mr. Gary Corso sent
6  me.  This is the very first letter.
7    Q.  And it doesn't say anything about sick
8  time, does it?
9    A.  No, but, when he called me, he said sick
10  time, sick, because Mr. Smith gave me a letter again
11  on April 28 saying you missed 18 sick days.
12    Q.  I'm not asking you about that letter.  I'm
13  asking you about Mr. Corso 'cause you said that he
14  said sick, and I'm asking you, and it sounds like
15  his termination letter doesn't say sick; is that
16  right?  It just says 18 shifts?
17    A.  And 18 shifts add up to sick.
18    Q.  Okay.  But the word "sick" isn't in the
19  letter; right?  I'm just trying to simplify this.
20  Is that right?
21    A.  It's not in there.
22    Q.  Okay.  Give me two minutes.

84 (Pages 330 to 333)

Don

FROM: MACK

**The Washington Post**

1. Don. The days i work are great.

2. it's hard for me to work Tuesday. Wenesday Thursday and Friday.

3. Because i work 11:AM to 6:Pm them days

4. Saturday 3Pm to 11Pm Will be no problem

5. 16 HRS Saturday and Sunday Are okay to

by Mack
6/26/05

EXHIBIT
Mack 1
3/12/07    KV

010172

To Whom It May Concern:

Mr. Smith called a meeting for all regular part-time and part-time on call security guards. Mr. Smith told us on June 24ᵗʰ, 2005 to let him know what days we will be available to work. Mr. Smith said this would help him to know where to put the contract security guards on the schedule. **Donald Jackson and Mr. Smith** in the year of 2004 gave me the shift below. Donald Jackson and Mr. Smith knew I attended church services/meetings on Fridays, Saturdays and Sundays. They gave me this schedule so that I wouldn't be able to attend church.

My shift was:

**Friday – 2:45 p.m. to 10:45 p.m.**
**Saturday – 6:45 a.m. to 2:45 p.m.**
**Sunday – 6:45 a.m. to 10:45 p.m. – A total of forty (40) hours**

My Scheduled was changed to:

**Monday – 2:45 p.m. to 10:45 p.m.**
**Saturday – 6:45 a.m. to 2:45 p.m.**
**Sunday – 6:45 am to 10:45 a.m. – A total of (32) thirty two hours per week**

On June 26, 2005 I told Donald Jackson my schedule is fine the way it is because it's hard for me to work on Tuesday, Wednesday, Thursday and Friday of the week. The reason why is during that time I was working at the Jefferson House Condominiums on-call on Tuesday, Wednesday, Thursday, and Friday. I was also working at the Carlton Condominiums on the same days from 8:00 p.m. to 4:00 a.m. full time. Donald Jackson was aware of my work schedule and that's why he wouldn't schedule me to work on those days of the week. Charles Sneed, Otis Brooks, Bernard Carr and Charles Brown also worked on the weekends, but not two sixteen hour shifts like I did. So it wasn't my original choice to work "the slow is days of the week", it was the shift given to me.

Thank you,


William A. Mack



EXHIBIT

Mack 2

3|12|07    KV

000184

00223144

**KAISER PERMANENTE**

## OPL REFERRAL FORM / VERIFICATION OF TREATMENT

```
551051675
MACK, WILLIAM

M          A              11/16/1960
                              Patient Identification
```

**IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED, OR THE RESULT OF AN ACCIDENT?**  ☐ Yes ☐ No   Injury date 010205

The above named patient has: (circle all appropriate)

1. received medical treatment    treatment date(s) 1/13/05
2. received medical advice    advice date(s) _____

Physical Findings/Diagnosis _Upper Respitory infection_

Disability/Illness _____ Disability/Illness date from _____ to _____

**The patient:**

☑ Has been ill and unable to work from 1/13/05 to 1/16/05

☑ May resume regular work on 1/17/05

☐ May resume restricted work as follows _____

from (date) _____ until approximately _____

☐ Will need a follow-up appointment on or about _____

☐ Is able to participate in competitive sports

☐ May return to school on _____

☐ Should be excused from Physical Education until _____

☑ Is on _____ medication and should receive _____ dose(s):

At _____ and _____ for _____ days. Possible reaction _____

Special instructions _____

☐ Advice protocol _____

Signature and printed name _____    Provider # _____    Date 1/13/05

EXHIBIT
Mack   22
3/12/07   KV

I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND I AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.

Signature (patient) _____    Date 1/13/05

00223144

551051675
MACK, WILLIAM

A

11/16/1960

**KAISER PERMANENTE®**

## OPL REFERRAL FORM / VERIFICATION OF TREATMENT

Patient Identification  01.2005

**IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED, OR THE RESULT OF AN ACCIDENT?**    ☐ Yes  ☐ No    Injury date _____

The above named patient has: (circle all appropriate)

1. received medical treatment    treatment date(s) _01/26/05_
2. received medical advice    advice date(s) _01/26/05_

Physical Findings/Diagnosis _Office Visit_

Disability/Illness _as above_    Disability/Illness date from _01/26/05_ to _01/30/05_

The patient:

☐ Has been ill and unable to work from _____ to _____

☑ May resume regular work on _01/31/05_

☐ May resume restricted work as follows _____

**EXHIBIT**

Mack 23
3/12/07    KV

from (date) _____ until approximately _____

☐ Will need a follow-up appointment on or about _____

☐ Is able to participate in competitive sports _____

☐ May return to school on _____

☐ Should be excused from Physical Education until _____

☑ Is on _Tylenol with Cedex_ medication and should receive _____ dose(s).

At _____ and _____ for _____ days. Possible reaction _____

Special instructions _take every 4-6hrs - no driving while on med_

☐ Advice protocol _____

_Heyward Cruz_

Signature and printed name    Provider #    _01/26/05_  Date

I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND I AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.

000938

Signature (patient)    _1/26/05_  Date



**KAISER PERMANENTE®**

00223144

5510516 75 51675
MACK.WILLIAN

*Mack, William* 04-1960

Patient Identification

042805

## OPL REFERRAL FORM / VERIFICATION OF TREATMENT

**IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED, OR THE RESULT OF AN ACCIDENT?**  ☐ Yes  ☑ No    **Injury date** _____

The above named patient has: (circle all appropriate)

1. received medical treatment          treatment date(s) _4/26/05_
2. received medical advice             advice date(s) _____

Physical Findings/Diagnosis _medical illness_

Disability/Illness _____    Disability/Illness date from _4/28/05_ to _4/28/05_

### The patient:

☑ Has been ill and unable to work from _4/28/05_ to _4/28/05_
☑ May resume regular work on _4/29/05_
☐ May resume restricted work as follows _____

from (date) _____ until approximately _____
☐ Will need a follow-up appointment on or about _____
☐ Is able to participate in competitive sports.
☐ May return to school on _____
☐ Should be excused from Physical Education until _____
☐ Is on _____ medication and should receive _____ dose(s).
At _____ and _____ for _____ days. Possible reaction _____
Special instructions _____
☐ Advice protocol _____

**EXHIBIT**
Mack 24
3/12/07    KV

_MS. Hayward NP / Mary Collins, RN_    _# 3360_    _4/29/05_
signature and printed name                    Provider #        Date

**I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.**

000639

_William A. Mack_    _4/29/05_
signature (patient)                Date

## KAISER PERMANENTE.

55/05/675
Mack William

Patient Identification

# OPL REFERRAL FORM /
# VERIFICATION OF TREATMENT

**IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED, OR THE RESULT OF AN ACCIDENT?**  ☐ Yes ☐ No    **Injury date** _____

The above named patient has: (circle all appropriate)

1. received medical treatment       treatment date(s) _____
2. received medical advice          advice date(s) __4/29/05__

Physical Findings/Diagnosis _medical diagnosis_____

Disability/Illness _____ Disability/Illness date from _____ to _____

The patient:

☐ Has been ill and unable to work from __4/29/05__ to __5/1/05__
☐ May resume regular work on __5/2/05__
☐ May resume restricted work as follows _____

from (date) _____ until approximately _____
☐ Will need a follow-up appointment on or about _____
☐ Is able to participate in competitive sports
☐ May return to school on _____
☐ Should be excused from Physical Education until _____
☐ Is on _____ medication and should receive _____ dose(s).
At _____ and _____ for _____ days. Possible reaction _____
Special instructions _____
☐ Advice protocol _____

**EXHIBIT**
Mack 25
3/12/07    KV

_signature_ DR. R. Mathur    ETDS    4/29/05
signature and printed name        Provider #        Date

I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.    000840

_William A Mack_    5/30/05
signature (patient)        Date

Tracking # KP 1218126



**KAISER PERMANENTE.**

Mack, William
MRA 5510-516-75

## OPL REFERRAL FORM /
## VERIFICATION OF TREATMENT

**Patient Identification**

**IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED, OR THE RESULT OF AN ACCIDENT?** ☐ Yes ☑ No    **Injury date** _____

The above named patient has: (circle all appropriate)

1. received medical treatment                    treatment date(s) _____
2. received medical advice                        advice date(s) _____

Physical Findings/Diagnosis _____ Back Pain / Optic Visor _____

Disability/Illness _____    Disability/Illness date from _____ to _____

**The patient:**

☑ Has been ill and unable to work from _5-2-05_ to _5-2-05_
☑ May resume regular work on _5-3-05_
☐ May resume restricted work as follows _____

from (date) _____ until approximately _____
☑ Will need a follow-up appointment on or about _as needed_
☐ Is able to participate in competitive sports.
☐ May return to school on _____
☐ Should be excused from Physical Education until _____
☐ Is on _____ medication and should receive _____ dose(s).
   At _____ and _____ for _____ days. Possible reaction _____
   Special instructions _____
☐ Advice protocol _____

```
EXHIBIT
Mack 27
3/12/07        KV
```

Dr. J Clarke / Rice NP        5333        5-4-05

Signature and printed name        Provider #        Date

I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND I AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.

x _William A Mack_        5/4/05

Signature (patient)        Date



00223144

MACK, WILLIAM
551051675

**KAISER PERMANENTE.**

# OPL REFERRAL FORM /
## VERIFICATION OF TREATMENT

Patient Identification

**IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED, OR THE RESULT OF AN ACCIDENT?**  ☐ Yes  ☐ No    Injury date _____

The above named patient has: (circle all appropriate)

1. received medical treatment     treatment date(s) _____
2. received medical advice        advice date(s) _____

Physical Findings/Diagnosis _Hypertension evaluation_

Disability/Illness _____ Disability/Illness date from _____ to _____

The patient:

☑ Has been ill and unable to work from _5/06/05_ to _____

☑ May resume regular work on _Sunday am_

☐ May resume restricted work as follows _____

from (date) _____ until approximately _____

☐ Will need a follow-up appointment on or about _____

☐ Is able to participate in competitive sports.

☐ May return to school on _____

☐ Should be excused from Physical Education until _____

☐ Is on _____ medication and should receive _____ dose(s).

At _____ and _____ for _____ days. Possible reaction _____

Special instructions _____

☐ Advice protocol _____

<div style="border:2px solid black">

**EXHIBIT**

Mack 28

3/12/07          KV
</div>

_Jack Hurrion_ PAC                    2452          5/06/05
Signature and printed name              Provider #       Date

I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.

000683

X _Will A Mack_                    5/6/05
Signature (patient)                    Date

Smitty
Don gave me
Emergency Vacation
For this
Reason
on 6-13-06



EXHIBIT

Mack 29
3|12|07   KV

POST 000294

Estimate and Repair Order

6

## FOREST HEIGHTS AUTOMOTIVE
### 5601 Livingston Road
### Oxon Hill, MD 20745
### (301) 839-6360

Specializing in
Ignition, Brakes & Suspension
Parts & Service

| | Minimum Service Charge $5.50 |

NAME William Mack

PHONE 34-8342155   DATE 6-13-200

STREET 836 Neptune Ace

CITY Oxon Hill   WARRANTY

YEAR 90   MODEL Toyota   MAKE LE

SPEEDOMETER   WORK PERFORMED BY

WRITTEN ESTIMATE: ☐ Yes  ☐ No      PARTS RETURNED: ☐ Yes  ☐ No

| PARTS AND SERVICES | PARTS | LABOR |
|---|---|---|
| CHANGE OIL ☐   OIL FILTER ☐   *Misting* | | |
| LUBRICATION ☐   TRANSMISSION ☐ | | |
| ALIGNMENT ☐   *NEED spark plugs* | | |
| BRAKES ☐ | | |
| ENGINE ☐   *Wires on front Seat* | | |
| *Replace plug wires* | | 800 |
| *Check spark plug OK* | | 1850 |
| *Cust Parts* | | |

POST 000295

It is agreed to by purchaser that title to above listed property is held by Forest Heights Automotive until fully paid. Forest Heights Automotive shall have the right, without notice or demand, to take possession of the above property.

I hereby authorize the above repair work to be done along with the necessary materials. You and your employees may operate above vehicle for purposes of testing, inspections, or delivery at my risk. An express mechanics lien is acknowledged on above vehicle to secure the amount of repairs thereto. It is also understood that you will not be held responsible for loss or damage to cars or articles left in cars in case of fire, theft or any other cause beyond your control.

SIGNED: _____

TOTAL PARTS............... $ _____

TOTAL LABOR ............... $ 9850

TAX ....................... $ _____

STORAGE ..$ _____ per day $ _____

PAID

9850

Smitty and Don

On July 29th around 9Pm My sun.
William was A passenger in a strong
ARM Car Jack he was pick up then
Release Saturday morning around 8am
from The youth Deation Center
They held him because he was under
age to let go by his self because me
and my wife was at church Friday night
between 7Pm to 11Pm. thats why i called
off for Saturday morning shift, I would
appreciate if you pay me Vacation day
for Saturday thanks. Mack

Don please pass This with proof
off what i am saying to Smitty

**EXHIBIT**
Mack-30
3|12|07    KV

POST 000292

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### 500 Indiana Avenue, N. W.
### Washington, DC 20001

**IN THE MATTER OF:**

Jacket No. _____

Soc. File No. _2005 JSF 1542_

_William Williams_
**Respondent's name**

Date _7-29-05_

> Juanita Williams/William Mack
> 2315 Good Hope Rd, Se #301
> Washington, DC 20020

You are hereby requested to appear in the Superior Court, Juvenile Branch at the time and date indicated below. You are requested to bring the above named child with you for a hearing before the Court.

## YOU ARE TO REPORT

| TO: | DC Courthouse<br>John Marshall Level<br>Courtroom JM-16 | |
|---|---|---|
| **AT:** | Time<br>**9:00 AM** | Date<br>_8-10-05_ |
| **FOR:** | Type of Hearing<br>**Initial** | Alleged Violation<br>_UUV-Passenger_ |

Probation Officer is:
**Vivian Fulbright-Brock**

Pursuant to Section 16-2304, Public law 91-358.. the child is entitled to legal representation on this matter. If you are financially unable to obtain adequate representation, the child shall counsel appointed for him in accordance with Rules of the Superior Court.

I acknowledge the receipt of this notice and will appear in court as indicated above.

_____
_Respondent_

Form SS(2)-805/Jul 88
8-3823

_Juanita Williams_
_Parent/Guardian_

**POST 000293**



**KAISER PERMANENTE.**

Mid-Atlantic Permanente Medical group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.
2101 East Jefferson Street  Rockville, MD 20852

11/6/2005

William Mack                                                551051675
836 Neptune Ave
Oxon Hill, MD 20745

Mr. Mack seen in urgent care today on 11/6/05.

Sincerely,

*Sharada Jain*

SHARADA JAIN MD
Uc Cs Im
6104 Old Branch Avenue,
Temple Hills, MD 20748
Phone: 301-702-6100

*Received*
*11/7/05*

| EXHIBIT |
|---|
| Mack  31 |
| 3/12/07        KV |

POST 000613

After Visit Summary                                    William Mack (MR# 551051675)

## Visit Information

**Visit Information**

| Date | Time | Department | Provider | Encounter # |
|------|------|-----------|----------|-------------|
| 11/06/2005 | 7:30 PM | Uc Cs Im | SHARADA JAIN MD, MEDICAL DOCTOR | 63728261 |

## Visit Summary

**Diagnoses**

Visit Diagnosis
**SARCOIDOSIS [135B]**

**Vitals (Last Filed)**

BP
122/80

Temp (Src)
97.7 (Oral)

## Medications

**Medications Started This Visit**

Prescriptions
KENALOG 40 MG/ML SUSP FOR INJECTION

## Orders

**Orders Placed This Visit**

Orders
**TRIAMCINOLONE ACETONIDE INJ [J3301]**

**INTRAMUSCULAR INJECTION [90782D]**

## Instructions and Follow-Up

**Patient Instructions**

Topical steroid cream to the area he has at home and he will follow up with dermatology
Warm compress

Mack, William (MR # 551051675) Printed at 11/6/05  9:41 PM

POST 000614

William Mack
551051675

## VERIFICATION OF TREATMENT

The above named patient has received medical advice on 12.4.05
William Mack  - Has been ill and unable to work from 12.5.05

**Provider Signature** :  *Longfellow, RN*
Nancy J Longfellow Rn   12/5/2005   5:08 PM

Internal Med Camp Sp
6104 Old Branch Avenue,
Temple Hills, MD 20748
Phone: 301-702-6100
Fax: 301-702-6209

=================================================================
I certify that I have reviewed, understand and agree with the information above. I authorize the verification
of this VOT form by my  school, my employer, or any person or entity that may be responsible for payment
of services provided through Kaiser Permanente MidAtlantic States.

*William F. Mack*   12/5/05
Patient Signature                        Date

EXHIBIT

Mack 32

3/12/07              KV

000088

| Visit Information | | | | | |
|---|---|---|---|---|---|
| **Visit Information** | <u>Date</u><br>12/04/2005 | <u>Time</u><br>7:40 PM | <u>Department</u><br>Uc Cs Im | <u>Provider</u><br>AISHA PETERSON<br>MD, MEDICAL<br>DOCTOR | <u>Encounter #</u><br>64571893 |

## Visit Summary

**Diagnoses**

<u>Visit Diagnosis</u>
**ABDOMINAL BLOATING [787.3C]**

**Vitals (Last Filed)**

<u>BP</u>
126/86

<u>Temp</u>
98.2

## Medications

**Medications Started This Visit**

<u>Prescriptions</u>
MYLANTA DOUBLE-STRENGTH 400 MG-400 MG-40 MG/5 ML ORAL SUSP

## Instructions and Follow-Up

**Patient Instructions**

Use Mylanta over-the-counter medicine for relief of bloating and gas.



OLD PASS-ON

USE NEW ONE
WHEN NEEDED

**EXHIBIT**

Mack 33

3/12/07          KV

**POST 000700**

Start

7 / 24 / 84

→ 1·30·05

POST 000701

F.Y.I.
7-3 Shift (8/6/04)
payroll checks are in the safe

11-7 shift
8-6-04    All messages read. mc ~~~
6:05 AM. W. mack call in sick for 3-11 shift
8/6/04 DK 6:10 AM. Open circulation door
at McIlvaine Bld. Employee doughes

8-6-04    Messages Read ~~~
7-3
Shift F.Y.I. Thorton Const. Started work
in disaster area of McIlvaine
to make way for AC unit...
DSB    Per: Eric Brinkman

3-11 Shift
8/6/04    All Messages Read h/Jarka P.W.

6:50 pm    Freddy checked Robinson
Terminal's property area appears
secure. h/Jarka

8/6/04 All messages read DK. M
11-7

8/7/04 David King checked the Robinson Terminal
and the McIlvaine Bldg. Okay

POST 000702

9/30/04

3-11 Shift   Cont.

7-3 Shift FYI

Payroll Checks are in Safe. WJackson

11-7 All Messages read. MC

5:00 AM Employee transported to Inova Springfield by P. Kong. MC

6:00 AM William Mack called in for sick leave today 10/1/4 (3-11) shift. MC
Returned to the Plant at 6:25 AM

FRIDAY
10-01-04   Messages Read GW, DHOG

7-3
Shift R.F.Y.I   Gene Wingrat Snacked
Coke Machine near Maint. Elevators
Not Locked Properly  ..DHOG

3-11 Shift
10/1/04   Messages Read Jackson
4:00   Water leaking from bucket between
V-3 & V-4 Bruce Wilson notifie L. WJackson

POST 000703

10/1/04 11-7 SHIFT ALL MESSAGES READ DK. @

10/2/04 All MESSAGES READ DK. Jackson. WM
7-3 SHIFT

10/2/04 All MESSAGES Read. WM
3-11 shift

5ᴺ Pump house alarms activated.
System Failure and Engine running.
Building Engineer Larry Parker notified.
Also water gushing from pump house
overflow pipe.
Security Cameras # 6 & 9 out as
well as the lights in Collator
Ware house, and New loading dock. Turned
out electricians are repairing electrical
problems on loading dock.

6⁵⁵ Freddy Marquina called in
sick for 7-3 Shift Jackson
Wm Mack will work. Jackson

10/2/04 All MESSAGES READ DK.
11-7

6:03ᴬᵐ King informed base that all doors to McIlvey
Bldg are secured at this time. @WM

6:30 ·

POST 000704

3 to 11

1/6/05 All messages read BM. / AWC

4:05 Pm Imani called in Sick for 11-7 Shift —

tonight (1/6/05).

4:30 Pm Keys #103 issued to Continental Gas Co.
Returned

1/6/05
11-7 All messages Read JK H ....

1/7/05
7-3 All Message Read ... F.M. GW

7:08a William Mac call in sick for the 3-11 shift FM
8am Bob Momeni will be in For 3-11 Shift
9:55A Darrel Martin has Blazer Returned

Smitty Has Key #132 Returned

12 Pm Freddy opened Wrench Bldg for
Dominion Power Meter Reader.

3-11 Shift
1/7/04 All Messages Read /Dwf BM

3:35 Pm Imani called in sick for 11-7 Shift
(tonight 1/6/05)

POST 000705

11-7 SHIFT
11/7/05 All MESSAGES READ JK

7-3 Shift

1/8/05 All MESSAGES Read. WM  ~~Check~~ WM

3-11 Shift
1/8/05 All MESSAGES Read. WM

11-7
1/8/05 All MESSAGES READ JK. JM

7-3 Shift All MESSAGES Read. WM / BWC

10:30 AM DRIVER V.P. CORSILLO FOR DISTRIBUTOR HARRY
JAMES GIVEN TEMP PARKING PASS TO PARK
IN LOWER LOT (NO OTHER PARKING AVAILABLE)
WILL CONTACT HIS SUPV

3-11 SHIFT ALL MESSAGES READ / BWC, OHBTII

11-7
1/9/5 All Messages read. ua

12:30ᴬ Freddie called in for sick leave
3-11 shift 1/10/5.

POST 000706

1 00 pm DARRYL MARTIN OF Tech Services HAS
The BLAZER Returned.

1/13/05
3-11 All message Read — F.M. /BWC

6:05 PM G. WINGERT CALLED IN SICK FOR
7-3 SHIFT 01/14/05 FRI. SUPV D. JACKSON
NOTIFIED. F. MARQUINA WILL WORK

6:10 PM W. MACK WILL BE ON SICK LEAVE FOR 3-11 SHIFT
FRI 01/14/05 PER SUPV D. JACKSON

6:30 PM ANDY FROM HEALTH CTR TURNED IN LOST ID
P. TYRANE UTILITY MAILER

1/13/5 All MeBages read. MC Tk.

7-3 Shift Messages Phad ... DSB F.M.
1-14 05

11:03 am At This time Darryl Martin OF Tech service has The
BLAZER ~ Returned

1 13/p — Freddey Sms Security Blazers to
jumpstart Cantsen truck .. DSB

3 to 11
1/14/05 All messages read BM. F.M.

3:33 pm. At This Time Dennie Monnot Notified Security That an Employee
continue →

POST 000707

3 - 11 shift

1/14/05  Arnold Burdley is been suspended for two weeks
starting 1/16/05 — 1/30/05. ID deactivated

11-7 shift
1/14/05  All messages read
1/15/04
5:40 Am. Raymond watkins pick-up his
check at the desk.

1/15/05   All messages Read: OHB III / BWC
7-3

1/15/05
3-11 shift     All Messages Read InJarken

Michelle Marcellino-Jones. Of the
Hiring office Reported she lost her
ATM- Check card, but doubt it was
lost on lost property. hJarken

1-15/05
11-7 shift All messages Read JK.
Daryl martin has Blazer Return

01/16/05
7-3 shift All messages Read /BWC F.M.

0750  Partial electrical outtage in building due
to maintenance Performing switch gear operation
back on at 0805

POST 000708



OLD PASS-ON BOOK

POST 000709

START

1 - 29 - 0 5

END

10 - 1 - 0 5

POST 000710

36

3/24/05

3 to 11   All messages read BM.

3:35pm   Ardey Acterman, Utility mailer, reported he lost his wallet, if turned in please hold at security desk

3/24/05

11-7 SHIFT   All MESSAGES READ DK, JW

5:50⁺ William Mack called in for sick leave Today (3/25) 3-11 shift. mc

7-3 Shift   Messages Read _____ JW

3-25-05

9ᵃᵐ Don Jackson Notifies of vacancy on 3-11 Shift - Said "No Relief", "will work with 3 People".

3 to 11

3/25/05 All messages read BM. Jackson

11-7 SHIFT

3/25/05 All MESSAGES READ DK.

10:35 CEMARS down at McILVAINE DISASTER ROOM 2+2 COMMUNICATIONS LOST

5:25 OFFICER King Reported that he "smell" gas comeing FROM Two of the DISTRIBUTORS Vans # 0115 + 1518 CIRCulation was Notified    CB

POST 000711

60

4/29/05

11-7 SHIFT    ALL MESSAGES READ DK.

X PHONE FOUND iN MANS LOCKER ROOM

By PRESSROOM FORMAN 4/29/06 11:55 P.M.

X Cell Phone is belong to Al Johnson. EM.

4/30/05    All messages Read. cxtBiC  PWC BM.

7-3

0838    B. Carr noticed John Zarbaugh office door opened —
B Carr closed + secured office  cxtBiC

1:50PM Al Johnson P/U his cell Phone
BM.

3-11 Shift
4/30/05    Messages Read / hJackson

Wm. Mack will not be in Sunday.

11-7
4-30-05    Messages Read CB / PWC

7-3
5/1/05    Message Read / hJackson / PWC

12:46/am    B. McNeil Called unable to Work
tonight due to an emergency — Gene Winger
Will be in. hJackson

64

3:50ᴬ King reported the Trailblazer took 13.2 gallons of gas. Also pump 4 is not working Ernie Vasquez was notified by voice mail

5/6/05 6:4 AM Open J. Dohr office 7or Barry Coleman and Conf Room Bl.

7:3 Shift Messages Read (DK) JW

5-6-05
10³⁰ₐ - F.Y.I William Mack

3-11 Shift
5-6-05 Messages Read LJackson BM.

11-7 SHIFT
5/6/05 All MESSAGES READ DK.

11:00PM William Mack called in sick for his 6:45am shift in 5/7/05 (tomorrow).

5/7/05
7-3 SHIFT
ALL MESSAGES / BWC

5/7/05
3-11 SHIFT All MESSAGES READ DK. LJackson

11-7. Read all messages. (DW) JG

3:15Am Smell of smoke from the Pressroom. Check of the area revealed that a paper spot was caught on the machine. No further incident @ this time. DW The Spot was removed and replaced. DW

POST 000713

Pass- On Log
Start
10-1-05

End
4-1-06

POST 000714

START

10 - 1 - 05

—

4 - 1 - 06

END

POST 000715

7-3 Cont...

- F.Y.I Put a request in to
Smitty for NEW MOUSE PAD for
second computer. Coffee was
spilled on that one and it was
old to boot ... DStb

3-11 Shift
10/19/05     All Messages Read /Jackson DK

11-7 SHiFT   All MESSAGES READ DK
10/19/05 Immi' CAME iN AT 8:30 P.m C
DON GOT SiCK. DK

THir-   Messages Read Guy
10-20-05
7-3
10/20/05
3/1   Messages Read /W Jackson

11-7
10/20/5 All Messages read MC   PM
11-7   Mr. Brown called off / personal emergency. fM
11-7   Amankwah found a cell phone. actually
10/21/05 smeone turned the phone into Amankwah. Jm
     McNeil turned the phone over to base.

POST 000716

10/21/05

7-3        Messages Read (REM)
E. Wingert Pickup light box for Ann
Griffin. Returned


7:45ₐₘ  F.Y.I  WILLIAM MACK CALLED IN AND
SPOKE w/ MOMODU - SAID HAD AN EMERGENCY
AND HAD TO TAKE TOMORROW - SAT 7-3
SHIFT? ... DJ☺R


9:00 AM  ZEL MINOR HAS Key 136 Returned
9:10 AM  "AUDIBLE CIRCUIT" TROUBLE ALARM ACTIVATED
ON F/A PANEL (TWICE) BLDG. ENG. VAN
RESPONDED
10:30 AM - SEATECH OPERATOR CALLED SECURITY
TO REPORT TROUBLE INDICATOR IN BLDG 18 -
ENGINEER VAN NOTIFIED & WILL check out.
10:45 AM  VAN REPORTED THAT THELAND IS
WORKING ON AN EXHAUST FAN IN BLDG 18 -
WILL BE ON UNTIL 12 NOON


11ᴬ  F.Y.I  DON JACKSON WAS INFORMED
ABOUT CHARLIE BROWN & WILLIAM MACK
CALLING "OFF" FOR SHIFTS ... DJ☺R


3-11 Shift
10/21/05 - Messages Read /Wake DK
3:20  Jack Stone in to work on
"The Washington Post" sign near old
loading dock, eng. notified Jackson
                                    7/ext 13.

POST 000717

10/21/05
3-11 shift Cont
4ᵗʰ Key # 103 issued to Sujay of
Continental Tank line. (Jackson) Return
FYI
The lost Cell Phone belong to Khanh
Nguyen, Utility Mailer. h.Jackson

11-7    All MESSAGES READ. JM

10/22/05

10/22/05    Joe Feiler requested the GM Key to open
11-7    Gene Watford. office. JM

10/22/05    All messages Read: OH... h.Jackson
7-3 Shift

    Attn: 7-3 shift (10/24/05
    Please ask Carpenter to check
    front entrance outer, left door, it
    slams close. h.Jackson

10/22/05
3-11 Shift    Message Read CS

11pm-7am Read all messages (JM) JM

10/23/05 Wayne Green requested the G-key to
4:23AM Open the General Workers office. JM

10/23/05 Mark Gregory requested Key #21 tool box
11-7    for maintence tool cabinet. Mr. Charles Brown
    Escorted Mark. JM Mark borrowed the H.G.T. Drill.

POST 000718

12/1/05 All Messages Read JK.
11-7 Shift

12/2/05 Smitty called off sick. lm
11-7

7-3 Shift  Messages Read ... Drob  DW
8:00  Jones From Circulation stated Semi
(J.R. Trucking) Backed into 2 Employees
Vehicles - Deb is checking out situation
9:00am According to Deb - Employees & Trucker
will resolve the situation between them.
✱ Incident Report Filed.
9:30  Lost Cellphone Claimed By Darrel
Martin of Tech Services for Tom Brasley

F.Y.I We Shift: Concerning Incident
from 11-7 Shift last night - Bldg. Serv.
could Not Remove writing on wall.
Mike Garofalo the Carpenter will
paint over ... Drob ✱ David King will type one
11:30am Carpenter Has Spraypainted Wall  DW
3 to 11
12/2/05 All messages read BM./MC

3:30pm I. Magruder Called in Sick for 11-7 shift
Tonight 12/1/05 12/2/05 and Tomorrow Night
12/3/05 Brooks will work tonight and

POST 000719

12/2/05
3 tall cont......

Carr will work 12/3/05 11-7 shift. &
12/2/05.

5:25  Continental issued Key #103. Returned

11-7 Shift  All Messages Read / AWC  DK,

7-3 Shft  All Messges Read  Cy  OHBMS

3-11
Shift  All Messges Read  CCS Qacksn

7⁴⁰  Officer Jackson put 13.2 gals of gas
in Security Vehicle  Cy
mariamd-Jacksn  on 70k/61

12pm-7am  Read all messages. DK

12:30A  William Mack called out sick for his
7am-11pm shift for 12/4/05. He stated
that he got a soda from the machine
that was dated to expire in 1985.

1:30A  Fire Alarm activation. "Trouble Alarm" Zone
24, 2nd Flr, DD ACU 74. See report.

POST 000720

12/04/05
7-3 SHIFT ALL MESSAGES REID/BUC

12/4/05
5-11 Shift All messages Read/OHBUN

7:35pm Fire Alarm Activated in Zone 21
Roof System West I was able to
reset alarm after 15 seconds, see Report

10:20pm William Mace called off sick for 3-11 Shift
12/5/05 OHBUN

11-7
12/4/5 All Messages read. MC

1:25ᵃ Robert McBride of AVAYA arrived
to meet Robert McBride of the Information
Tech Dept.

7-3 Shift Messages Read... DSOB DUB

12-5-05
12:15/P F.Y.I. Glover Weagant will work
3-11 Shift this afternoon in place
of William Mace per. Smitty DSOB
GUARDS MACE W.C WORK in
PLACE OF Gove

POST 000721

2/11/06
3-11 SHiFT ALL MESSAGES READ DK. JK.

2/11/06 Messages Read
11-7

2/11/06 Wood has taken the vehicle to escort
11:02PM Nurse Pat Priest home because of weather. JM

2/12/06 Mr. Smitty reported the power is out
1:58AM in the McIlvaine bldg. The front door is
open. JM

2:15A  Pepco Called and stated that the power outage
is due to possible tree or tree limb down
in area of Bucklick Rd. 600 customers
w/o power. Stated they will send out a truck
to investigate. (squd # 348) JM

3:27A  Power back on at McIlvaine at this time according
to Smitty, who has been post @ bldg during
outage! JM

4:25A  Harvey (Bldg Serv) used gas card to fill
snow plow vehicle. Unable to pump gas
due to power outage. Power in that area
has gone back out again. JM

POST 000722

6:30AM Tony Briscoe called to inform Security the Robinson Terminal is powerless. All power is down. /WM

12/12/06
7-3 SHIFT  ALL MESSAGES READ /BWC

2/12/06    All messages Read: OHBW  /WM
3-11 Shift

11-7
2/12/6  All messages read. /WM

WM Mack will not Be in For The 3-11 Shift CB
(Power at home went out)

McNeil put 13 gls. gas in Blazer CB

Monday
02-13-06  Messages Read  /BWC  DDB
7-3

3-11 SHIFT
02/13/06  All MESSAGES READ OK.

11-7
2/13/6  All Messages read. /WM

POST 000723

THURS —
03-09-07       Messages Read GMS DSB
7-3

F.Y.I 7am #4 Tamper activated ...again
& again & again "Switch" is in
middle at present time ...DSB

3-11 Shift
3/9/06       Messages Read/ Jackson BM.

7-3 Shift (3-10-06)
R. Monroe, Guardmark, Will not be
in for your shift, Vincent Tairus Will
work. Jackson
3/9/06 Messages Read. JM JM SW

FRIDAY    Messages Read GMS DSB
03-10-06
7-3 * F.Y.I Completely OUT OF "VACATION
REQUEST forms at this time. Notified
Smitty & Couldn't even find 1 in
my Extra Form file ... Please DO NOT
let forms run out — Thank You — DSB
* I WAS ABLE TO WRITE OUT SOME "USED"
FORMS TO ASCERTAIN THOSE IN FILE ...DSB

12⁵⁰ₚ — F.Y.I DieBold Rep Cassandra in to
Work on Receipt probs w/ATM ...DSB

POST 000724

3-10-06

3-11 Shift            Messages Read/Date BM.

11pm-7am | Read all messages. OW

11:05pm | William Mack called off sick for 7am-3pm shift 3/11/06. OW Donald Jackson advised OW

3-11-06

7-3 | SHIFT All Messages Read CLS

0800 | False Fire Alarm - AGAIN - Duct detector in zone 21. Engineer checkout sys -- same results. (see Report # 560-06

0919 | Fire Trucks came over to Robinson Terminal - had left by time Seaways were out - tried calling to see if something had happen - there was no one At RT or alt. CLS

0930 | Officer Brown called in sick for Tonight and tomorrows nights 11-7 shift - cs

0940 | Office Bernard Cam called in sick for Sundays 12 MAR 7-3 shift. cls

3-11 SHIFT - All Messages Read CLS

11-7 | Messages read.

POST 000725



START NEW
PASS ON

0 73333 43460 6    Made in Brazil

POST 000726

Start.                    END

4- 1 - 0 6    —    10 - 8 - 06

4/

4,
(1-

4

4-2
3-1

4/:

MONi
04-
7-.

POST 000727

RM I

7$^{30}$n- Kmy #136 (ID machine Closet) issued to
Smitty ... DDB /Returned

3+011

4/14/06 All messages read BM. Jackson

9:45Pm D. Jackson Found water lick in Reelroom V1 B/enginer

and G./worker notified.

4/14/06 All MESSAGES READ. Pm

11-7

4/14/06 Wood reported a door open in bldg. 18 near
12:14Am Collator 4. employees were discarding cardboad
boxes. Pm

4/15/06        Messages Read /Pm

4/16/06 Messages Read: Offrd Mack
7-3        No Guardsmark Scheduled to work 7-3 Shift
Placed (2) Calls to Momodo to provide Guardsmark
security guard for 7-3 Shift -- did not get a response

9:54Pm HERP Smith Picked cellphone

POST 000728

Cont 4/16/06

11-7
4/16/6 All messages read. MC.

1:00 AM 1:00 A  Robinson Front Gate was
found open at this time by Wood.

4:15 SPS opened the Side Door of the Reel Room
to get equipment in the building. MC

?.  Wm Mack Call off sick 3-11 Shift

Monday
04-17-06  Messages Read GW (DroB)

7-3  8:30 AM  Bernard Carr  Accepted  Open 3-11
Shift For Today  — Smitty Notified

1:50 P — Key #72 (Jers Bd.) issued to Gran
Wingent  (DroB)

3 to 11
4/17/06 All messages read  BM. / AWC

11-7
4/17/06 All messages read. MC

POST 000729

F.Y.I

11$\frac{10}{n}$   OTIS BROOKS CALLED IN SICK FOR
SAT 7-3 AND SUN 3-11 ... Smitty
and Don will be notified ... DSJS

11$\frac{30}{n}$ — F.Y.I Employee transported to UMAC
by Gene ... DSJS / Reviewed

3 to 11

4/20/06 All messages read BM. Jackson

4:   East Roof door (in stairwell #5) will
not release using an ID, remote or exit
exit button— door put in unlock mode. Jake

11-7 All MESSAGES READ. JM

4/20/06

73 Shift Messages Read ... DSJS GWS
8$\frac{1\nu8}{AM}$ Smitty has Key 136 / Reviewed

3-11 shift
4/21/05   All Messages Read / Jackson BM.

F.Y.I. 3-11 + 11-7 shift
4$\frac{00}{PM}$ Three Cingular Sub-Contractors (Benjamin Gatlin,
Anthony Jones, + Tim Evans) With Radian
Tech. Working in Penthouse on cell site    next pg.

POST 000730

3-11 shift cont.
4/21/06

until approx. 11 pm or until work is completed. Their truck is parked in side lot near $CO_2$ tank. Jackson

$4^{31}$ Key #103, Gas pumps, issued to Continental driver Suley. Walker Returned

$7^{32}$ Willard Dickey, Gen Worker, alleged his wallet may have been lost/taken from locker room bench in front of his locker # around 2 pm. Jackson Incident report made.

11-7 All MESSAGES READ. JM

11-7 William Mack called off. JM

12:24am

7-3 shift All Messages Read ____ Jackson

3-11 shift
4/22/01 All Messages Read G Jackson

11-7 All MESSAGES READ. JM
4/23/06

POST 000731

*— handwritten notes at top left:*
*...car Broken into*
*...- 4/22/06*
*...spoke*
*With*





**TOYOTA GENUINE PARTS**

**TOYOTA GENUINE PARTS**

### TOYOTA
Bill C. Anderson
Certified Sales Consultant

Dealership: (301) 899-6000, Ext. 128
Fax: (301) 702-2905

**Beltway Toyota**
4600 Branch Avenue
Marlow Heights, MD 20748


Sales Society
**G O L D**

LIMITED WARRANTY FOR TOYOTA PARTS AND A...
WHAT IS COVERED: * TOYOTA * warrants that it will eith...
genuine or authorized TOYOTA parts. Except for those parts o...
COVERAGE OTHER THAN 12 MONTHS REGARDLESS OF M...
correct warranty coverage. YOU WILL RECEIVE AN OPTION I...
the prorated amount equal to the remaining warranty months.
TIRE LIMITED WARRANTY: * Tires are warranted independen...
WHAT IS NOT COVERED: * Damage to a TOYOTA part o...
"over-the-counter" is not covered. * Labor, parts and other
damage resulting from improper installation, removal, repair, r...
AS TELEPHONE CALLS. LOSS OF TIME, INCONVENIENCE, C...
OF THIS WRITTEN WARRANTY. * SOME STATES DO NOT...
LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO YOU.
UNDER THIS WARRANTY OR ANY IMPLIED WARRANTY. T...
warranty gives you specific legal rights, and you may also hav...
OWNER'S RESPONSIBILITIES: * To obtain this warranty cov...
from the date of purchase, it is recommended that you retai...
United States mainland.

...DAY 7AM-5PM
...manship. This warranty applies to new or remanufactured parts which are
...ase, whichever occurs first.
...n a prorated basis. Please look at the statement on your battery for the
...DURING THE FIRST TWELVE (12) MONTHS AFTER PURCHASE. Thereafter,
...ments and installation.
...or for removal from vehicle and reinstallation of a part or accessory sold
...ustments, such as calibration or alignments, are not covered. * Failures or
...warranty does not apply where the vehicle mileage cannot be determined,
...ACH OF THIS WRITTEN WARRANTY OR ANY IMPLIED WARRANTY (SUCH
...HANTABILITY OR FITNESS ARE LIMITED TO THE APPLICABLE DURATION
...IONS OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE
...S OR THE REPLACEMENT OF THE PART ARE THE EXCLUSIVE REMEDIES
...ITY IN CONNECTION WITH TOYOTA PARTS OR ACCESSORIES. * This
...because warranty coverage periods are calculated on a time or mileage basis
...U.S.A., Inc. (a California corporation), for the purpose of warranty in the

| DATE ENTERED | YOUR ORDER NO. | DATE SHIPPED | INVOICE DATE | INVOICE NUMBER | |
|---|---|---|---|---|---|
| 24 APR 06 | | 24 APR 06 | | Q99277 | 09:46 |

**\*\*QUOTE\*\***

ACCOUNT NO. P99                                  PAGE 1 OF 1

SOLD TO    RETAIL CASH

SHIP TO

| SHIP VIA | SLSM. G3905 | B/L NO. | TERMS | F.O.B. POINT |
|---|---|---|---|---|
| | | | RETAIL CUSTOMER CA | MARLOW HEIGHTS, |

| ORD. | SHIP | B.O. | PART NO. | DESCRIPTION | LIST | NET | AMOUNT | |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 0 | 01170-03010 *Park Light* | ~~HEADLAMP U~~ | ~~170.55~~ | ~~170.55~~ 60.00 | ~~170.55~~ | 197.50 *Labor* |
| 1 | 1 | 0 | 69052-32080 | CYLINDER & | 92.20 | 92.20 | 92.20 | |
| 1 | 1 | 0 | 69051-32070 AD04F1 | CYLINDER & | 62.99 | 62.99 | 62.99 | 197.50 *Labor* |
| | | | \*\*\*\* I N V O I C E  Q U O T E - | | DO NOT | PAY \*\*\*\* | | |

*(handwritten)* And The Manager

*(handwritten)* = 610.19
+ TAX

*Thank You For Your Business!*



**BELTWAY TOYOTA**
BRANCH AVENUE
MARLOW HEIGHTS, MD

*"All roads lead to Beltway Toyota"*

**Anthony Jones**
*Assistant Service Manager*
*Lane Supervisor*

4600 Branch Avenue
Marlow Heights
Maryland 20748-4698

Ph (301) 899-6000
Fax (301) 702-2904
Shuttle Pick-Up (240) 375-3968
www.beltwaytoyota.com

ALL OF US AT BELTWAY TOYOTA
THANK YOU FOR YOUR PATRONAGE!
All returned items must be in
original packaging and saleable
condition. Thank you!

| TOTALS | |
|---|---|
| PARTS | 333.74 |
| SUBLET | |
| FREIGHT | 0.00 |
| SALES TAX | 16.69 |
| TOTAL | $350.43 |

CUSTOMER'S SIGNATURE
X

**EXHIBIT**
Mack 34
3/12/07    KV

**PARTS RETURN POLICY**
ALL CLAIMS AND RETURNED MDSE. MUST BE ACCOMPANIED BY THIS INVOICE.
NO RETURNS ON ELECTRICAL MERCHANDISE. NO RETURN ON SPECIAL ORDER ITEMS.
PARTS MUST BE NEW AND SALEABLE CONDITION. THERE WILL BE A 20% CHARGE ON RETURNED MDSE.
NO RETURNS AFTER 30 DAYS

000138

# The Washington Post

## Production Department
# PERFORMANCE REVIEW
### (Exempt)

| | |
|---|---|
| **Name:** William Mack | **Date:** September 9, 2005 |
| **Job Title:** On-Call Security Guard | **Reviewer:** Donald Jackson/ Ulysses Smith Jr. |

**Period Review Dates: Annual Review**

## Assessment Scale

The following assessment scale is designed to assist the reviewer in the evaluation of different skills. Provide comments as required for further explanation or clarification.

**EXCEEDS** — Employee routinely exceeds expectations.

**MEETS** — Employee meets expectations.

**NEEDS IMPROVEMENT** — Employee does not meet expectations and/or is at risk in terms of performance. May be a novice in the job and still learning how to apply the skill. Requires further feedback and guidance for success.

**N/A** — Not Applicable

### Results/Accomplishments

| | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Quality – The extent to which an employee's work is accurate, thorough and neat. | ☐ | ☒ | ☐ | ☐ |
| The extent to which an employee produces a significant volume of work efficiently in a specified period of time | ☐ | ☐ | ☒ | ☐ |
| Does the employee possess the practical/technical knowledge required on the job? | ☐ | ☒ | ☐ | ☐ |

Comment: We need all incidents regardless of how small or apparently insignificant they may be documented on the incident database.

### Production Policies/Procedures

| | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Ensures that Production Department policies and procedures are followed (Safety, PPE, Quality) | ☐ | ☒ | ☐ | ☐ |
| Ensures that TWP policies and procedures are followed (Code of Business Conduct, Respect in the Workplace) | ☐ | ☒ | ☐ | ☐ |
| Holds employees accountable for their actions | ☐ | ☒ | ☐ | ☐ |

Comments:

**EXHIBIT**

Mack 37

3/12/07    KV

William Mack.doc

**Teamwork**

| | Exceeds | Meets | Needs improvement | N/A |
|---|:---:|:---:|:---:|:---:|
| ▪ Promotes cooperation and collaboration with work unit | ☐ | ☒ | ☐ | ☐ |
| ▪ Promotes collaboration between employees of work unit and other Production employees | ☐ | ☒ | ☐ | ☐ |
| ▪ Demonstrates a professional and courteous demeanor to employees and peers | ☐ | ☒ | ☐ | ☐ |
| ▪ Builds a strong sense of teamwork and purpose | ☐ | ☒ | ☐ | ☐ |
| ▪ Resolves team conflicts with diplomacy and tact | ☐ | ☐ | ☒ | ☐ |

Comments: When you have problems, they should be brought to your supervisior or the department head, not discussed among employees.

---

**Employee Development**

| | Exceeds | Meets | Needs improvement | N/A |
|---|:---:|:---:|:---:|:---:|
| ▪ The extent to which an employee seeks out new assignment and assumes additional duties when necessary | ☐ | ☒ | ☐ | ☐ |
| ▪ The extent to which an employee can be relied upon regarding task completion and follow-up | ☐ | ☒ | ☐ | ☐ |
| ▪ The extent to which an employee performs work with little or no supervision. | ☐ | ☒ | ☐ | ☐ |
| ▪ The extent, to which an employee is punctual, observes prescribed work break/meal periods and has an acceptable overall attendance record. | ☐ | ☐ | ☒ | ☐ |

Comments:

---

**Communications**

| | Exceeds | Meets | Needs improvement | N/A |
|---|:---:|:---:|:---:|:---:|
| ▪ Provides timely information to others | ☐ | ☒ | ☐ | ☐ |
| ▪ Communicates good ideas and insights frequently | ☐ | ☒ | ☐ | ☐ |
| ▪ Contributes effectively in meetings and group discussions | ☐ | ☐ | ☒ | ☐ |

Comments: When in group meetings and discussions you must present thoughtful and pertinent dialog.

2

POST 000339

**Leadership**

| | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Direct and truthful in all interactions with management, peers and employees/team | ☐ | ☒ | ☐ | ☐ |
| Demonstrates care and respect with individuals | ☐ | ☒ | ☐ | ☐ |

Comments:

---

**Driven Decision Making**

| | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Recognizes issues, problems or opportunities and determines appropriate action to take. | ☐ | ☒ | ☐ | ☐ |
| Identifies the need for and collects information to better understand issues, problems and opportunities. | ☐ | ☒ | ☐ | ☐ |
| Formulates clear decision criteria; evaluates options by considering implications and consequences. | ☐ | ☐ | ☒ | ☐ |

Comments:   To add your name to turn-in applications questioned your decision-making.   I hope you understand the implications of your actions and this will not occur again.

---

## SUMMARY

William, overall you have performed well this past year. Take some time to review the assessment and comments above, then we may discuss this.

## GOALS AND OBJECTIVES FOR COMING YEAR

I would like to see more incident reports, parking violations and safety issue reports filled during you shift next year..

## EMPLOYEE COMMENTS

## SIGNATURES

| | | |
|---|---|---|
| Employee | *William R Mack* | Date: 10 / 3 / 05 |
| Supervisor | *[signature]* | Date: 10 / 3 / 05 |
| Manager | *[signature]* | Date: 10 / 3 / 05 |
| | *[signature]* | Date: 11 / 14 / 05 |

3

POST 000340

# PERSONNEL ACTION FORM
PERSONAL AND CONFIDENTIAL

Report ID:  PERGN011

As Of:  03/09/2005

| EMPLOYEE NAME | EMPLOYEE ID | EMPL RCD | SSN | PAYROLL ID | CO. | PRINT DATE | EMPL. STATUS |
|---|---|---|---|---|---|---|---|
| Mack,William A | 000002072 | 0 | 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 | | 500 | 03/09/2005 | A |

**DEPARTMENT DATA**

| DEPT. ID | DEPARTMENT NAME | ENTRY DATE | LOCATION | LOCATION NAME | DEPT. GROUP | REPORTS TO |
|---|---|---|---|---|---|---|
| P60374 | Prod VA Security | 11/21/1999 | 52000 | Post Springfield | P6030 | 00001081 Smith Jr,Ulysses S |

**JOB DATA**

| JOB CODE | JOB TITLE | ENTRY DATE | OFFICER CODE | POSITION # | FLSA | EEO-1 | JOB FAMILY | SALARY EQUIVALENTS | |
|---|---|---|---|---|---|---|---|---|---|
| 680137 | Security Guard | 11/21/1999 | N | 00007967 | N | 9 | 680000 | H | 15.735 |
| | | | | | | | | W | 0.00 |

**GRADE/STEP DATA I**

| SAL. PLAN | SIT. CODE | PRIORITY DATE | SIT. DATE | WKLY. PREM. PAY | EXPER. LEVEL | COMP RATE CD. | NEXT EXPER. INCR. DATE | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0 | NAHRLY | | B | 0.00 |
| | | | | | | | | S | 0.00 |

**GRADE/STEP DATA II**

| SAL. PLAN | GRADE | GRADE ENTRY DATE | MINIMUM | MIDPOINT | MAXIMUM | STEP | STEP ENTRY DATE | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | M | 0.00 |
| | | | | | | | | A | 0.00 |

**COMPENSATION DATA** / **LAST ACTION DATA**

| COMP. RATE | FREQ. | STD. HRS. | PAY GROUP | ACCT. # | ACTION | REASON | EFF. DATE | ACTION DATE |
|---|---|---|---|---|---|---|---|---|
| 15.735 | H | | B2 | P4674037 | DTA | CNV / Conversion | 02/16/2005 | 02/16/2005 |

**EMPLOYMENT DATA**

| ORIG. HIRE DATE | HIRE DATE | REHIRE DATE | SERVICE DATE | EXPECTED RETURN DATE | TERMINATION DATE | LAST WORKED DATE | EXPECTED END DATE | LEAVE ACCR. DATE | UNION | R/T | F/P | EMPL. CLASS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/18/1996 | 09/18/1996 | 11/21/1999 | 09/18/1996 | | | | | 11/21/1999 | 00 | R | P | O |

**PERFORMANCE REVIEW DATA**

| TYPE | DATE | RATING | TYPE | DATE | RATING | TYPE | DATE | RATING | NEXT REVIEW DATE | WORK GROUP | TASK PROFILE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PSCRTPT | P4674037 |

**TAS DATA**

**CHRONOLOGICAL JOB HISTORY DATA**

| EFF. DATE | SEQ. | ACTN. | REASON/DESCR. | ACTN. DATE | COMP. RATE | FREQ. | CHG. AMT. | CHG. % | JOB CODE/TITLE | DEPT. ID/NAME |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/16/2005 | 0 | DTA | CNV / Conversion | 02/16/2005 | 15.735 | H | | | 680137 / Security Guard | P60374 / Prod VA Security |
| 09/30/2004 | 0 | DTA | OTH / Other | 09/30/2004 | 15.735 | H | | | 680137 / Security Guard | P60374 / Prod VA Security |
| 09/30/2003 | 0 | DTA | OTH / Other | 10/05/2003 | 15.735 | H | | | 680137 / Security Guard | P60374 / Prod VA Security |
| 01/01/2002 | 0 | DTA | PFR / PT Flex Rate Change | 10/06/2001 | 15.735 | H | | | 680137 / Security Guard | P60374 / Prod VA Security |
| 11/26/2001 | 0 | PAY | ATB / Across-The-Board | 12/27/2001 | 15.735 | H | 0.421 | 2.75 | 680137 / Security Guard | P60374 / Prod VA Security |

**PERSONAL DATA** / **EMERGENCY CONTACT DATA**

| SEX | BIRTHDATE | MARITAL STATUS | EDU. LVL. | HOME PHONE | CONTACT #1 | RELATIONSHIP |
|---|---|---|---|---|---|---|
| M | 11/16/1960 | M | C | 301/839-6528 | Juanita Mack | Spouse |

| STREET 1 | | | | WORK PHONE | STREET 1 | HOME PHONE |
|---|---|---|---|---|---|---|
| 5300 Deal Drive | | | | 703-916-2220 | 5300 Deal Drive | 301/839-6528 |

| STREET 2 | | | | CELL PHONE | CITY | STATE | ZIP | WORK PHONE |
|---|---|---|---|---|---|---|---|---|
| | | | | | Oxon Hill | MD | 20745 | 202/319-5515 |

| CITY | STATE | COUNTY | ZIP | COUNTRY | CONTACT #2 | RELATIONSHIP | PHONE |
|---|---|---|---|---|---|---|---|
| Oxon Hill | MD | Prince Georges | 20745 | USA | Jean Marie Young | Other | 301/336-0563 |

**FOR DEPARTMENTAL COMMENTS/USE**

Increase $0.48 per hour (3%) effective 4/1/2005
New hourly rate = $16.21

**AUTHORIZATIONS**

| DEPT. MGR. | DATE | HR/COMP | DATE | BENEFITS/AUTHORIZATION 1 | DATE |
|---|---|---|---|---|---|
| J. Rymarzck | 12/7/05 | | | | |

| PRESIDENT / PUBLISHER / VP | DATE | HRIS / RECORDS | DATE | PAYROLL/AUTHORIZATION 2 | DATE |
|---|---|---|---|---|---|
| | | | | | |

COPIES TO:  ___ P/R  ___ T/A  ___ OTHER

POST 000341

# The Washington Post

1150 15TH STREET. N. W.

WASHINGTON. D.C. 20071

(202) 334-6000

SPRINGFIELD PLANT
7171 WIMSATT ROAD
SPRINGFIELD, VIRGINIA 22151

WRITER'S DIRECT TELEPHONE NUMBER

_____

August 2, 2005

Mr. William A. Mack
5300 Deal Drive
Oxon Hill, MD  20745

Dear Mr. Mack:

The purpose of this letter is to document the conversation we had on July 11, 2005.  Roddy MacPherson, Assistant Plant Manager, and I had a discussion with you in reference to receiving several employment applications that identified you as the person who had referred the applicant to The Washington Post.  After further discussion with you it was learned that you had never met these individuals before they walked in the door with an application.

The Employee Referral Program is intended as an incentive to Washington Post employees to refer individuals whose work and character they know to be excellent (as a result of first hand knowledge), to be considered for employment at the Post.  To achieve this result and for current employees to receive credit under this program, the guidelines require that the referring employee "shall submit a candidate's resume and/or employee application with all of the following information attached: referrer's name; work location and telephone number; relationship to candidate; and the position for which the candidate is applying".  The program guidelines also say that "potential candidates may not be solicited by any means" and if the application was obtained by these means, "the referrer would immediately be disqualified from participation".

William, you acknowledged to me that you had not followed the program's prescribed guidelines.  I am, therefore, attaching a copy of the Utility Mailer Employee Referral Program, and expect that you will, in the future, follow the process outlined by the referral program.  Further inappropriate use of your position and your name on an application will result in disciplinary action.

Sincerely,

*Ulysses S Smith Jr*

Ulysses S. Smith, Jr.
Security Supervisor

```
EXHIBIT

Mack  38
3|12|07       KV
```

USS:may
Cc:   Jenny Rymarcsuk
      Roddy MacPherson

Jan Doll
Employee Records

# The Washington Post

1150 15TH STREET, N.W.

WASHINGTON, D.C. 20071

(202) 334-6000

SPRINGFIELD PLANT

7171 WIMSATT ROAD

SPRINGFIELD, VIRGINIA 22151

WRITER'S DIRECT TELEPHONE NUMBER

October 14, 2002

Mr. William Mack
Security Guard
5300 Deal Drive
Oxon Hill, MD 20745

Dear Mr. Mack:

This letter is written to document my concern about your role in an incident on September 25, 2002 at approximately 6:15 a.m., involving a Mailroom employee, Obediah Egekwu, who had been discharged on September 24, 2002. At the time of discharge, Mr. Egekwu's identification card was taken, and he was escorted off the premises. A termination notice was posted at all guard stations and the incident was documented in the pass-on book for incoming shifts to read.

In spite of the decision made, and the actions taken, Mr. Egekwu, accompanied by a Mailroom employee, reported for work to the office of Valerie Gaffney (Mailroom Assistant Superintendent) and asked where he was supposed to work. This could have been a difficult situation for Ms. Gaffney since she was the manager who gave Mr. Egekwu the decision that he was discharged.

Upon investigating this matter you stated to me that Mr. Egekwu entered the employee entrance in the warehouse without an identification card and that you told him he could not enter the building. Then he showed you his work schedule and said he was supposed to work that morning. Present was David King who had not yet relieved you, standing in the doorway. You stated that "I told David this guy does not have his ID card' and added that it was then that David spoke with Egekwu and asked a mailer to take him upstairs. I spoke to Mailer Jeff Wiggins and he confirmed that he was asked to take Mr. Egekwu to a supervisor but that he was in such a hurry that he did not remember which guard asked him.

The first issue I have with this is that you were the guard assigned to the post and you let another guard who was not on duty make a decision that you should have made. The decision should have been made to deny him access to the building. Furthermore, posted on the glass in the employee entrance there is a posting and a picture of Egekwu indicating that he was terminated. You told me that you could not recognize him from the picture on the posting. I looked at the picture and Egekwu can be recognized from this photo. Additional sources of information were a notice placed in the pass-on book that documented Egekwu's termination and his photo (his original ID card) was in the suspension and termination book which you should have read when you signed in to work at 10:45 p.m.. The shift report for that night indicated that you were assigned to the front desk, so you had ample time to check the pass-on book before 6:15 a.m.

We have two different versions of what occurred but the over-riding point to this is that we had a serious disregard of the Security Department procedures. The policy of not allowing anyone in the back entrances without an ID card was written to avoid this type of incident. We in the Security Department have a responsibility for the safety of the employees of the Plant; this incident gravely compromised our security efforts and the safety of an employee. This must never happen again.

Your work in the Security Department has been good. You come to work early and do whatever is asked of you. However, in this matter there was a total neglect of the Security Department policy. We have changed our focus in the department and we are expecting consistency in following the department procedure. Any further infractions may result in disciplinary action.

Sincerely,

Ulysses S Smith Jr

Ulysses S. Smith, Jr.
Security Supervisor

USS:may
Cc:    Roddy MacPherson
       Jenny Rymarcsuk
       Jim Coley
       Personnel Records

POST 000086

# The Washington Post

## POLICY ON "FAMILY and MEDICAL LEAVE"

Under the federal and the District of Columbia Family and Medical Leave Acts, employees who have worked at least 12 months and 1,250 hours (in the case of federal law) or 1,000 hours (in the case of D.C. law) have a right to unpaid leave for the following reasons:

**(1) the birth of a child or placement of a child for adoption or foster care with the employee,**
**(2) care for a family member with a serious health condition, or**
**(3) a serious health condition that renders the employee unable to perform the job.**

Federal law and D.C. law provide different amounts of leave. Under federal law, the employee has a right to take up to a total of 12 weeks of unpaid leave in a 12-month period. Under D.C. law, the employee has a right to take up to 16 weeks of unpaid leave in a 24-month period for the first two reasons (child birth/adoption/foster care or care for seriously ill family member) and up to 16 weeks of unpaid leave in a 24-month period for the third reason (an employee's serious illness). The 12-month and 24-month periods for determining how much leave an employee is entitled to are the 12-month and 24-month periods immediately preceding the date on which the leave is to begin.

Health benefits will be maintained during the leave period under the same conditions as if the employee continued to work. Upon return from leave, the employee has a right to be reinstated to the same or an equivalent job with the same pay, benefits and terms and conditions of employment to which the employee would have been entitled had s/he continued to work.

To qualify for this leave time, the employee must notify his or her **supervisor and benefits administrator** of the reasons why leave is needed at least 30 days in advance, if the need for leave is foreseeable, or as soon as practicable, if the need for leave is not foreseeable. Failure to meet these notification requirements may result in delay or denial of leave. If the employee is seeking intermittent leave that is foreseeable, the employee must make a reasonable effort not to unduly disrupt the employer's operation. If intermittent leave is needed, an employee should consult his or her supervisor to discuss a schedule that suits the needs of both the employee and the employer. If the reason for the leave is a serious health condition of the employee or a family member or the birth of a child, the employee may be required to provide certification by a medical professional. If the reason for leave is adoption, adoption certification must be provided. If leave is taken because of an employee's serious health condition, s/he may be required to provide certification of fitness to return to duty.

Although family and medical leave is unpaid, the employee may elect to concurrently use available vacation or personal leave. The Post will require concurrent use of any available sick leave, salary continuation, accident and sickness benefits, workers' compensation, and paid parental leave if applicable.

03/97

EXHIBIT

Mack 39

3/12/07   KV

1

# The Washington Post Springfield Plant

## SECURITY DEPARTMENT EMPLOYEE WORK RULES AND GUIDELINES

In your position as Security Officers of the Washington Post Springfield Plant, you hold a position of special trust and responsibility. In this position, you are granted unique access to The Post building and to its employees. It is your responsibility both to protect The Washington Post Springfield Plant premises and its employees. For many visitors, you are their first contact with The Washington Post. This dual responsibility requires you to walk a fine line between ensuring that all guests are treated with the utmost courtesy while, at the same time, not risking the security of Post premises or its employees.

All Security Officers of the Washington Post Springfield Plant are expected to comply fully with these Rules and Guidelines. Failure to comply may result in disciplinary action up to and including termination. The Rules and Guidelines address the situation that arise most frequently; they do not cover every circumstance of transgression that could lead to discipline.

In situations not expressly covered by these Rules and Guidelines, Officers are expected to seek guidance from a Security Supervisor or Manager. In the event that supervisory management in not available, the Officer is expected to exercise common sense in determining what the best course of action is. At all times, Officers should keep in mind the responsibilities that come with their position and exercise sound judgement accordingly.

Compliance with these specific Rules and Guidelines coupled with the use of common sense in general will enhance the relationship between Security Department employees, their superiors, and The Washington Post Springfield Plant as a whole. Officers also are required to follow other applicable Post policies, rules, and guidelines and to comply with federal and local laws.

The specific Rules and Guidelines that follow are listed in alphabetical order and not in order of importance.

0..010a

*[handwritten: The policy did FF push was to amend consecutive consecutive to 3 days]*

## ABSENCES

Any officer who is unable to report to work for any reason must call and speak with the Shift Supervisor on duty at least 4 hours prior to the start of the scheduled work shift.

Although the Manager may request a verifiable medical certificate at any absence, any officer who is absent from work due to illness or disability for 2 consecutive days / shifts must submit a verifiable medical certificate indicating he/she was under medical care and unable to report to work. We will still allow officer to take six (6) days, one day at a time, of sick leave before a mandatory medical certificate for all absences are required. Non-excused, repeated, or excessive absenteeism will not be tolerated.

## ACCIDENTS:

All workplace accidents and or personal injuries must be reported immediately to the Shift Supervisor and the Manager. Any non-workplace accidents and or personal injuries that will affect an officer's job performance should also be reported to the Shift Supervisor as soon as possible.

## BREAKS:

The lunch period is 30 minutes, although it may be shortened if Shift Supervisor determines that staffing needs require it. Officers are to carry their two-way radios with them during lunch and any other breaks so as to be accessible in the event of an emergency or other urgent matter.

## CHANGE OF ADDRESS:

All officers must submit any changes to their address or contact telephone number within 5 days of change.

## CLEAN-UP

All officers shall clean their workstations 10 minutes prior to the end of their shift.

# The Washington Post

## POLICY ACKNOWLEDGEMENT FORM

I have received the following *Washington Post* policies and by my signature below acknowledge that I have read and understand these policies.  I also understand that this **Policy Acknowledgement Form** will be placed in my Personnel File and that I am expected to comply with these policies.

- ◆ Policy on *"Drug and Alcohol Use"*
- ◆ Policy on *"Employment of Relatives"*
- ◆ Policy on *"Family and Medical Leave"*
- ◆ Policy on *"Prohibition of Workplace Harassment"*
- ◆ Policy on *"Prohibition of Discrimination"*
- ◆ Policy on *"Parental Leave for School-Related Activities"*
- ◆ Policy on *"Smoking"*
- ◆ Policy on *"Military Leave"*
- ◆ *"Code of Business Conduct"*

_____
Employee Signature

_____
Date



EXHIBIT

Mack 42
3/12/07   KV

**POST 000352**

# The Washington Post

## POLICY ON "FAMILY and MEDICAL LEAVE"

Under the federal and the District of Columbia Family and Medical Leave Acts, employees who have worked at least 12 months and 1,250 hours (in the case of federal law) or 1,000 hours (in the case of D.C. law) have a right to unpaid leave for the following reasons:

**(1) the birth of a child or placement of a child for adoption or foster care with the employee,**
**(2) care for a family member with a serious health condition, or**
**(3) a serious health condition that renders the employee unable to perform the job.**

Federal law and D.C. law provide different amounts of leave. Under federal law, the employee has a right to take up to a total of 12 weeks of unpaid leave in a 12-month period. Under D.C. law, the employee has a right to take up to 16 weeks of unpaid leave in a 24-month period for the first two reasons (child birth/adoption/foster care or care for seriously ill family member) and up to 16 weeks of unpaid leave in a 24-month period for the third reason (an employee's serious illness). The 12-month and 24-month periods for determining how much leave an employee is entitled to are the 12-month and 24-month periods immediately preceding the date on which the leave is to begin.

Health benefits will be maintained during the leave period under the same conditions as if the employee continued to work. Upon return from leave, the employee has a right to be reinstated to the same or an equivalent job with the same pay, benefits and terms and conditions of employment to which the employee would have been entitled had s/he continued to work.

To qualify for this leave time, the employee must notify his or her **supervisor and benefits administrator** of the reasons why leave is needed at least 30 days in advance, if the need for leave is foreseeable, or as soon as practicable, if the need for leave is not foreseeable. Failure to meet these notification requirements may result in delay or denial of leave. If the employee is seeking intermittent leave that is foreseeable, the employee must make a reasonable effort not to unduly disrupt the employer's operation. If intermittent leave is needed, an employee should consult his or her supervisor to discuss a schedule that suits the needs of both the employee and the employer. If the reason for the leave is a serious health condition of the employee or a family member or the birth of a child, the employee may be required to provide certification by a medical professional. If the reason for leave is adoption, adoption certification must be provided. If leave is taken because of an employee's serious health condition, s/he may be required to provide certification of fitness to return to duty.

Although family and medical leave is unpaid, the employee may elect to concurrently use available vacation or personal leave. The Post will require concurrent use of any available sick leave, salary continuation, accident and sickness benefits, workers' compensation, and paid parental leave if applicable.

03/97

POST 000353

# The Washington Post

## POLICY ACKNOWLEDGEMENT FORM

I have received the following *Washington Post* policies and by my signature below acknowledge that I have read and understand these policies.  I also understand that this **Policy Acknowledgement Form** will be placed in my Personnel File and that I am expected to comply with these policies.

- Policy on *"Drug and Alcohol Use"*
- Policy on *"Employment of Relatives"*
- Policy on *"Family and Medical Leave"*
- Policy on *"Harassment"*
- Policy on *"Non-Discrimination"*
- Policy on *"Parental Leave for School-Related Activities"*
- Policy on *"Smoking"*

_____
Employee Signature

_____
Date



# Ma

EXHIBIT

Marck 43
3/12/07    KY

SPLITTING MONEY OWNERS                         Apr

**Monday**

WWW.Nolo.com

**Tuesday**

Keeping 5: Corporate status
Corporations must ① hold

**Wednesday** Annual shareholders meetings

**Thursday and Friday**

② keep minutes of shareholders
and directors major decisions

③ make sure that corporate officers sign
documents in the
name of the corporation

**Saturday**

④ maintain separate banks accounts
and from their owners

**Sunday**

⑤ File a 3 separate corporate income
tax return

National Arbor Day

| April | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |

| March | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | 1 | 2 | 3 | 4 |

| May | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 | 4 | 5 |

217

Ma

**Monday** Smithy call and Spoke you'd
Deng terminated for being a 18 Twee
Shspes Lost year /MR.CORJ YW M...
/ 18 teen Spirits

**Tuesday**

**Wednesday** I saw pay will (Rene said Ian
not in the system Sems TERMinated MS D
Booth also said she have nothing she 1350
to check with gary Loren MS Booth said...

**Thursday** los or may 8th year TERMinated

TRene    Pay and you are TERminated
Knipp coil me and you will Recieve your L...

**Friday**

**Saturday**

**Sunday** 7:40 am Inrani, McGruder
Signed in the Books it say you
were Terminated may the 8th

| June | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 |

| May | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |

| April | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |

---

3) we are payed a salary and
possibly Bonuses like any other
.y employee

**Monday**

**Tuesday**

**Wednesday**

**Thursday**

**Friday**

**Saturday**

**Sunday**

v   218

| June | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |

| May | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |

| April | | | | | |
|---|---|---|---|---|---|
| T | W | T | F | S |
| | | | | 1 |
| 4 | 5 | 6 | 7 | 8 |
| 11 | 12 | 13 | 14 | 15 |



# The Washington Post

1150 15ᵗʰ STREET, N.W

WASHINGTON, D.C. 20071

(202) 334-6000

May 8, 2006

Mr. William Mack
5300 Deal Drive
Oxon Hill, Maryland 20745

Dear Mr. Mack:

This letter is to advise you that since January 1, 2005, you have been unavailable for work when called for 18 shifts. The Washington Post places a great deal of emphasis on the safety and security of our employees and requires that all part time on call security personnel be able to work when required by their respective managers. Because you have not been able to work, we are removing your name from the employment rolls of The Washington Post effective May 31, 2006. If you need any additional information or have any questions, please contact me at 202-334-7894.

Sincerely,

Gary Corso
Director
Security and Administration
The Washington Post
202-334-7894



EXHIBIT

Mack 44

3/12/07      KV

000128