# EXHIBIT B

William A. Mack  vs.  The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.  Tuesday, March 20, 2007

---

Page 1

```
 1          UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3
 4   WILLIAM A. MACK,         )
 5        Plaintiff,          )
 6   vs.                      ) C.A. 06-1144
 7   THE WASHINGTON POST COMPANY, )
 8        Defendant.          )
 9   *   *   *   *   *
10
11
12
13
14
15
16        The deposition of ULYSSES S. SMITH, JR.,
17   was taken on Tuesday, March 20, 2007, commencing
18   at 9:52 a.m., at the Law Offices of Nils Peterson,
19   2009 North 14th Street, Suite 708, Arlington,
20   Virginia, before Paula L. Lowery, Notary Public.
21
22   *   *   *   *   *
```

Page 2

```
 1              APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        NILS PETERSON, ESQUIRE
 5        Law Offices of Nils Peterson
 6        2009 North 14th Street
 7        Suite 708
 8        Arlington, Virginia  22201
 9        (703) 241-0076
10
11   ON BEHALF OF THE DEFENDANT:
12        TONYA OSBORNE, ESQUIRE
13        Jones, Day, Reavis & Pogue
14        51 Louisiana Avenue, N.W.
15        Washington, D.C.  20001
16        (202) 879-3939
17        (202) 626-1700 - fax
18
19
20
21
22   (Appearances continued on the next page.)
```

Page 3

```
 1   APPEARANCES (continued):
 2
 3   ON BEHALF OF THE DEFENDANT:
 4        JOHN B. KENNEDY, ESQUIRE
 5        The Washington Post
 6        1150 15th Street, N.W.
 7        Washington, D.C.  20071
 8        (202) 334-7869
 9        (202) 334-5075 - fax
```

Page 4

```
 1                  I N D E X
 2        DEPOSITION OF ULYSSES S. SMITH, JR.
 3              MARCH 20, 2007
 4
 5   EXAMINATION BY:              PAGE
 6   Mr. Peterson                  5
 7
 8   SMITH DEPOSITION EXHIBITS:    PAGE
 9   No. 1                         69
10   No. 2                         72
11   No. 3                         73
12   No. 4                         75
13   No. 5                         76
14   No. 6                         78
15   No. 7                         79
16   No. 8                         80
17   No. 9                         82
18   No. 10                        83
19   No. 11                        85
20   No. 12                        87
21   No. 13                        89
22   No. 14                        94
```

1 (Pages 1 to 4)

Case 1:06-cv-01144-PLF   Document 13-6   Filed 06/07/2007   Page 3 of 8

William A. Mack vs. The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.   Tuesday, March 20, 2007

Page 37

1  Q. When you say an employee has to have an
2  emergency for himself or his family, what does
3  that mean to your mind, sir?
4  A. To my mind, the gentleman that was
5  requesting the Family Leave Act, his wife was
6  pregnant, and he wanted time off because there was
7  some type of problem with the pregnancy. He
8  wanted to spend that time with her.
9  Q. And that, to your mind, was an emergency,
10 or you just didn't know?
11 A. That was something that's why I called.
12 He wanted to know would that fall under his Family
13 Leave Act.
14 Q. Okay.
15 A. So from what I know, I said yes, and I
16 called downtown, and they gave me the information.
17 Q. Concerning Mr. Mack, what did Mr. Mack
18 take time off for for sick leave, sir?
19 A. The majority of the time, I don't know.
20 Q. Did you ever ask him?
21 A. We had one conversation that he said that
22 he had a problem that he'd seen a dermatologist

Page 38

1  for.
2  Q. What was that problem?
3  A. I don't know.
4  Q. Did he say how it affected him?
5  A. He said that he got an injection from the
6  dermatologist that made him sleepy, and he had to
7  take the day off, and he did not know when he was
8  going to get these injections. That the doctor
9  called him in and told him to come in and take his
10 injection.
11 Q. Now, did he get more -- did these
12 injections -- were they required more than one
13 time?
14 A. I don't know.
15 Q. You said "injections." You used the
16 plural, sir.
17 A. I used what he used.
18 Q. Did he tell you he had injections?
19 A. Yes.
20 Q. So did he tell you this happened to him
21 more than once?
22 A. He just said injections.

Page 39

1  Q. Did you ever talk with the health
2  department at The Washington Post about Mr. Mack's
3  leave?
4  A. I told the nurse that I was going to ask
5  Mack to come over and sign a release form so he
6  could check on his illness -- check to verify that
7  we know everything is okay.
8  Q. Which nurse did you talk to?
9  A. Ann Griffin.
10 Q. What did you talk to Ms. Griffin about?
11 Mr. Mack's illness?
12 A. Just what I said.
13 Q. Did you get the release form for Mr. Mack
14 to sign?
15 A. He refused.
16 Q. Approximately when was this, sir?
17 A. I cannot give you a date.
18 Q. Well, did Ms. Griffin know about
19 Mr. Mack's illness?
20     MS. OSBORNE: Objection. Foundation.
21     BY MR. PETERSON:
22 Q. Other than wanting to know about

Page 40

1  Mr. Mack's illness -- well, why were you going to
2  the nurse to ask about a release form for
3  Mr. Mack's illness?
4  A. If we have any employee that uses leave
5  and say they have a medical problem, to work with
6  that employee, what we do is we get the nurse to
7  verify it so we can make sure it's justified.
8  Q. Did Ms. Griffin give you a release form
9  for Mr. Mack to sign?
10 A. No.
11 Q. How do you know that Mr. Mack refused to
12 sign it?
13 A. He told me.
14 Q. So he had a conversation with
15 Ms. Griffin?
16 A. No, he told me that he refuses. That he
17 does not want to tell the nurse his private
18 business because they might tell everyone in the
19 building. I told him the nurses cannot do that,
20 that they would lose their license if they went
21 around the building telling people what condition
22 that someone else has. He still said he refused.

10 (Pages 37 to 40)

M.A.R. Reporting Group, LLC        Professional Stenotype Reporters        Toll Free (888) 534-1225
Platt & Dawson                     www.mar-reporting.com                   (703) 534-1225

Page 41

1  Q. Did Mr. Mack ever talk to you -- you
2  indicated that after the injection, Mr. Mack
3  became weak; is that correct?
4      MS. OSBORNE: Objection.
5  Mischaracterizes the testimony.
6      BY MR. PETERSON:
7  Q. I'm sorry. What did you say Mr. Mack
8  told you about how he felt after the injection?
9  A. Made him sleepy.
10 Q. Sleepy. Did Mr. Mack ever say anything
11 about any weakness in his legs or anything like
12 that?
13 A. No.
14 Q. Did Mr. Mack ever ask you for light duty
15 after he would have the medical appointments?
16 A. No.
17 Q. Did you notice Mr. Mack ever having any
18 bloating; that is, he got heavier after injections
19 or after medical treatment?
20 A. I wouldn't know when he got the shots.
21 Q. Would you ever see Mr. Mack's face be
22 very puffy?

Page 42

1  A. No.
2  Q. Would you ever see any lesions on
3  Mr. Mack's face?
4  A. No.
5  Q. Let me go back to light duty. Did
6  Mr. Mack ever ask you for light duty, sir?
7      MS. OSBORNE: Objection. Asked and
8  answered.
9      BY MR. PETERSON:
10 Q. You can answer, sir.
11 A. No.
12 Q. Did anyone else ask you for light duty?
13 A. Yes.
14 Q. How many people approximately?
15 A. I can't give you a number. There's been
16 a number.
17 Q. Did you accommodate those people, sir?
18 A. Yes.
19 Q. So there was light duty available at The
20 Washington Post?
21 A. Yes.
22 Q. And that involved sitting at a post?

Page 43

1  A. Yes.
2  Q. We've been talking about Mr. Mack for a
3  while. Do you have a remembrance of when he came
4  to work at the security department?
5  A. No, I don't.
6  Q. He was working part-time, correct?
7  A. Part-time on-call.
8  Q. Did he ever try to become full-time?
9  A. Yes.
10 Q. And he didn't make it; is that correct?
11 A. Yeah.
12 Q. Do you have any knowledge as to why he
13 wasn't selected to be a full-time employee?
14 A. He wasn't the best candidate.
15 Q. Approximately how many hours a week did
16 Mr. Mack work on average?
17 A. I can't tell you that, you know, he's a
18 part-time on-call. A part-time on-call can work
19 anywhere from 24 to 32 on a regular basis.
20 Sometimes he may even work 5, but I can't give you
21 a number on an average.
22 Q. Did Mr. Mack ever work more than 40 hours

Page 44

1  in a week?
2  A. Could be possible.
3  Q. When Mr. Mack is on the schedule, he's
4  given a certain time to arrive and a certain time
5  to leave usually; is that correct?
6  A. Yes.
7  Q. How was Mr. Mack's timeliness in terms of
8  meeting -- when he did come meeting the scheduled
9  time, sir?
10 A. I would say most of the time -- he had
11 some lates, but most of the time he was on time.
12 Q. He was average or better than average in
13 terms of timeliness?
14 A. Average.
15 Q. Average. Okay.
16     During Mr. Mack's shift, was he given a
17 lunch period?
18 A. Yes.
19 Q. How long is an employee given for a lunch
20 period?
21 A. Half an hour.
22 Q. Did Mr. Mack stay within that half an

11 (Pages 41 to 44)

Case 1:06-cv-01144-PLF   Document 13-6   Filed 06/07/2007   Page 5 of 8

William A. Mack                                vs.                The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                  Tuesday, March 20, 2007

Page 45

1  hour?
2     A.  I do not remember getting any reports
3  that he didn't. When I worked with him on the
4  evening shift, he I was there, he stayed within
5  the time limit.
6     Q.  So as far as you know, he didn't abuse
7  his lunch times in any way.
8     A.  That's what I think right now.
9     Q.  In terms of calling off or notifying you
10 concerning the vacation times and vacation
11 periods, did Mr. Mack give proper notification for
12 taking vacation, sir?
13    A.  Not all the time, no.
14    Q.  Did he give you proper notification for
15 some of the time?
16    A.  The majority of the time, no.
17    Q.  So he didn't give you the week or so that
18 was required; is that correct?
19    A.  Right.
20    Q.  So the Post would have paperwork where he
21 didn't give proper notice about wanting vacation?
22 Well, we'll break vacation into long-term -- that

Page 46

1  is, a week or more -- and then into short-term.
2  In terms of long-term vacation, did Mr. Mack give
3  proper notice?
4     A.  Yes.
5     Q.  Always?
6     A.  I can't say always because I don't
7  remember.
8     Q.  But for the most part?
9     A.  You're still asking me to guess. I don't
10 remember.
11    Q.  Do you know of any time where he tried to
12 get a week's vacation at the last minute, sir?
13    A.  Same thing.
14    Q.  You don't remember?
15    A.  Right.
16    Q.  But as far as you know, for the most part
17 he gave proper notification for a long-term
18 vacation.
19    A.  For a long-term, yes.
20    Q.  Let's go to emergency vacation. Did he
21 give proper notice for emergency vacation?
22    A.  Emergency vacation is emergency vacation.

Page 47

1  There is not a proper time frame. But when he
2  asked for vacation, it's usually one day of
3  vacation -- it's basically at the last minute.
4  He's due in at 3:00, sometimes at 12:00; depends
5  on what shift he's on. He always had some type of
6  emergency going on.
7     Q.  What is the procedure, sir, for -- how
8  far in advance does one have to call or should one
9  call for emergency vacation?
10    A.  It's emergency vacation.
11    Q.  Is there any rule or standard in your
12 department, sir?
13    A.  Let's say we have someone off on the
14 shift, and we've got three guards and we have one
15 person off. So we're going to be short-handed if
16 somebody else calls in, but if this person needs
17 to take that time off -- I have an emergency, I
18 have to take care of this -- then we will try to
19 accommodate him to do that. But if it's not an
20 emergency, we just deny it. You cannot do that.
21    Q.  Okay. Back to my question. Are security
22 officers in your department told that for

Page 48

1  emergency vacation, you're required to give us X
2  hours of notice?
3     A.  No.
4     Q.  Has Mr. Mack ever requested emergency
5  vacation that you've denied, sir?
6     A.  We've never denied emergency vacation.
7     Q.  For Mr. Mack?
8     A.  For anyone.
9     Q.  For anyone. Okay.
10       In terms of sickness, how far in advance
11 does an employee have to call in notifying the
12 department that they can't come to work because of
13 illness?
14    A.  There was an unwritten rule, if you're
15 working the midnight shift, which is considered
16 11:00 to 7:00, or you're working the day shift,
17 which is a better example, you don't call in at
18 5:00 to say, I'm sick, because it's hard to find
19 somebody.
20       You normally know by the time you go to
21 bed that you're feeling bad, or you may wake up
22 feeling bad. We would like four or five hours to

12 (Pages 45 to 48)

M.A.R. Reporting Group, LLC          Professional Stenotype Reporters          Toll Free (888) 534-1225
Platt & Dawson                          www.mar-reporting.com                    (703) 534-1225

Case 1:06-cv-01144-PLF   Document 13-6   Filed 06/07/2007   Page 6 of 8

William A. Mack                                    vs.            The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                    Tuesday, March 20, 2007

**Page 57**

1 terminated, were there any repercussions for
2 Mr. Mack having too much time off?
3     A.  No.
4     Q.  Do you have any knowledge as to how
5 Mr. Mack's termination occurred?
6     A.  Yes.
7     Q.  Can you tell me about that, sir?
8     A.  I was discussing with Gary Corso, which
9 was at that time the -- we were changing over to a
10 new department head, which was Gary Corso. I was
11 giving him an overview of the operations at the
12 Springfield plant.
13        During that overview, I was discussing
14 each employee with him, and there were some
15 employees that, you know, we need to take a look
16 at because of their performance.
17    Q.  Were you talking on the phone? Meeting
18 with Mr. Corso in person?
19    A.  In my office.
20    Q.  In your office. Okay.
21        What did you tell Mr. Corso about
22 Mr. Mack?

**Page 58**

1     A.  That he was an employee that seemed to
2 call off on a lot of shifts. That he's had a few
3 problems with employees. He's had a problem with
4 falsifying documents.
5     Q.  Anything else, sir?
6     A.  And this was a part-time on-call guy.
7     Q.  Did you tell Mr. Corso how many times
8 Mr. Mack called off?
9     A.  I gave Gary everyone's attendance record
10 to show him how we at Springfield kept account of
11 attendance for the whole department.
12    Q.  When you say the "attendance record,"
13 what do you mean by that, sir?
14    A.  It's a software program that you have
15 that when an employee calls in for vacation, sick
16 time, unexcused absence, work on a holiday, late,
17 or left early that you can record for a year.
18    Q.  For how long?
19    A.  A year.
20    Q.  Okay. So you gave Mr. Corso a copy of
21 that?
22    A.  Yes, of everyone's.

**Page 59**

1     Q.  What time period did you give Mr. Corso
2 that for Mr. Mack and the other employees?
3     A.  What do you mean, "time frame"?
4     Q.  What time period? How long a period did
5 you give this attendance record to Mr. Corso?
6     A.  Oh, I gave it to him the day we were
7 talking about the department.
8     Q.  But how long --
9     A.  It was for the year.
10    Q.  It was for a one-year period, sir?
11    A.  Yes.
12    Q.  Do you remember how many days Mr. Mack
13 had called off for that one-year period?
14    A.  No.
15    Q.  You said it also showed whether Mr. Mack
16 was late or left early; is that correct?
17    A.  The program will show that if any
18 employee left early or late.
19    Q.  Did the information you provided to
20 Mr. Corso show that Mr. Mack was late or left
21 early?
22    A.  I don't remember.

**Page 60**

1     Q.  Did Mr. Corso ask you whether any of the
2 employees you were talking about should be
3 retained or terminated?
4     A.  No, we didn't talk about that.
5     Q.  Did you provide Mr. Corso with any
6 documents about Mr. Mack having problems with
7 other employees?
8     A.  No.
9     Q.  Did you provide Mr. Corso with any
10 documents concerning Mr. Mack falsifying anything?
11    A.  No.
12    Q.  You just told him about that?
13    A.  Yes.
14    Q.  How long did you talk to Mr. Corso about
15 Mr. Mack?
16    A.  I can't give you a time because we were
17 talking about other employees also. It wasn't
18 specifically William Mack.
19    Q.  So you don't remember how long in the
20 conversation you talked about Mr. Mack?
21    A.  No.
22    Q.  Do you remember how long you talked with

15 (Pages 57 to 60)

M.A.R. Reporting Group, LLC         Professional Stenotype Reporters        Toll Free (888) 534-1225
Platt & Dawson                           www.mar-reporting.com                    (703) 534-1225

Case 1:06-cv-01144-PLF   Document 13-6   Filed 06/07/2007   Page 7 of 8

William A. Mack                                    vs.                    The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                       Tuesday, March 20, 2007

Page 61

1  Mr. Corso that day at all in total?
2      A.  Probably about an hour or so.
3      Q.  Did Mr. Corso ask you if you thought any
4  employees should be terminated?
5      A.  No.
6      Q.  Besides this one-year attendance record,
7  how many sheets of paper was that attendance
8  record on, sir?
9      A.  It depends on how much time a person took
10 off.
11     Q.  Well, for Mr. Mack, was it several
12 sheets? One sheet?
13     A.  I don't know.
14     Q.  Where in the performance spectrum did you
15 tell Mr. Corso that Mr. Mack was?
16     A.  I think he was below average.
17     Q.  Were there any employees that were worse
18 than Mr. Mack?
19     A.  No.
20     Q.  Were there any employees that had as
21 serious a problem as Mr. Mack?
22     A.  No.

Page 62

1      Q.  Which was Mr. Mack's principal problem or
2  largest problem, sir?
3      A.  One, he liked to instigate problems. On
4  one of the reviews that I remember, we requested
5  if he has any problem, that he needs to talk to
6  us. He had a habit of going around the building
7  and talking about a little bit of everything when
8  he should be doing his job. He would tell things
9  that, basically, were not true to employees.
10         One being he told this one young lady
11 that the Corvette in the parking lot was his, and
12 that he leaves it there sometimes to catch a ride
13 home with somebody else. The Corvette in the
14 parking lot was mine.
15     Q.  Did you take offense at that, sir?
16     A.  I told him about it, and he laughed and
17 wanted to know how I found out. I said, you know,
18 If the young lady got upset with you over
19 something and did something to my car, that would
20 not be funny.
21     Q.  I understand.
22         When was the first time that you knew

Page 63

1  Mr. Mack was going to be terminated from the Post?
2      A.  I can't give you a date.
3      Q.  Was it before Mr. Corso wrote him a
4  letter?
5      A.  Gary called me and said that, We're going
6  to terminate Mr. Mack, but I can't give you what
7  date that was.
8      Q.  Well, did he tell you why he was going to
9  terminate Mr. Mack?
10     A.  Because of his attendance and the
11 problems that he had.
12     Q.  Well, as best you can remember, what are
13 the exact words that Mr. Corso told you about why
14 he was going to terminate Mr. Mack?
15     A.  That's it. I mean, I can't give you
16 verbatim conversation. We're talking about
17 something over a year ago.
18     Q.  As best you can, sir.
19     A.  Because of, you know, his attendance
20 record, the problems, and we're going to -- you
21 know, we're going to terminate him.
22     Q.  Did Mr. Corso ask about Mr. Mack? Did

Page 64

1  you tell Mr. Corso about Mr. Mack having
2  injections?
3      A.  No.
4      Q.  Did you know of any other health problems
5  that Mr. Mack had besides the injections?
6      A.  No.
7      Q.  At some point Mr. Mack failed the
8  breathing test; is that correct?
9      A.  I don't know.
10     Q.  The breathing test for masks and things?
11 You wouldn't be informed about that?
12     A.  I don't remember anybody informing me
13 that he failed the test. I mean, I failed the
14 test once myself and had to take it again. So I
15 don't remember him not going through the training.
16     Q.  When Mr. Corso called you and told you he
17 was going to terminate Mr. Mack, did you protest
18 in any way?
19     A.  No.
20     Q.  Did you agree with him?
21     A.  According to his record, I said, Yes,
22 that's fine.

16 (Pages 61 to 64)

Case 1:06-cv-01144-PLF    Document 13-6    Filed 06/07/2007    Page 8 of 8

William A. Mack                                vs.                    The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                         Tuesday, March 20, 2007

Page 65

1  Q. Well, you said he mentioned Mr. Mack's
2  attendance record.
3  A. And the problems he had in the
4  department.
5  Q. When you were telling Mr. Corso -- how
6  long between your meeting with Mr. Corso where you
7  told him about the various employees and him
8  calling you telling you he was going to terminate
9  Mr. Mack?
10  A. I don't know. Maybe -- I don't know. It
11  wasn't like he went downtown, turned around and
12  called me back. I know it wasn't like that. I
13  don't know how many days it was.
14  Q. When you were meeting with Mr. Corso and
15  talking about Mr. Mack's attendance record, were
16  you focusing on his sick leave when he called off,
17  or what were you focusing on, sir?
18  A. I was talking about everyone's record,
19  not just Mr. Mack's.
20  Q. But when you talked about Mr. Mack in
21  particular, what were you telling Mr. Corso about?
22  A. We were talking about his attendance, his

Page 66

1  call-off times on shift, his not taking shifts,
2  the trouble that he sometimes instigates with
3  starting confusion in the department, as in -- you
4  know, he made this big deal about not being paid
5  for a shift. You know, they're trying to cheat me
6  out of, you know, eight hours and on and on and
7  on.
8       Come to find out when we pulled out his
9  time cards after two weeks, he didn't sign his
10  time card, but he's told everyone in the
11  department and anyone who'd listen that the Post
12  was trying to cheat him.
13  Q. You just said something about Mr. Mack
14  not taking shifts. What does that mean, sir?
15  A. Sometimes if you call him -- Don Jackson
16  would call him and ask him, you know, We have an
17  extra shift outside of what you may have, or can
18  you work this shift, because I need somebody here.
19  He would turn it down.
20       The reason that comes to mind is because
21  he made a big issue about it because one time he
22  went to Roddy and told Roddy that we were cutting

Page 67

1  on his shifts. When Roddy told me about it, I
2  talked to Don and Don said, He turned it down. He
3  didn't want to work the shifts I want to give him,
4  so I couldn't put him anyplace else.
5  Q. When you're trying to fill a shift, sir,
6  when someone else calls off and you're looking
7  around for somebody, Mr. Mack is a candidate for
8  filling other shifts; is that correct?
9  A. Sure.
10  Q. Would Mr. Jackson always be the one
11  calling, or would other people call trying to fill
12  shifts?
13  A. Sometimes it would be the shift
14  supervisor. Sometimes it may be me. Depends on
15  what time the shift was. Sometimes it would be
16  Don or maybe another employee that we might say,
17  you know, We need to fill this shift. Can you do
18  this for us to fill it?
19  Q. So the shift supervisor would be able to
20  call and fill a shift? He would have that
21  authority, or she would have that authority?
22  A. Yes.

Page 68

1  Q. Going back to the records, did you
2  prepare anything else other than that attendance
3  record that you talked about with Mr. Corso where
4  you would keep track of people missing shifts and
5  taking time off and such?
6  A. No, that's the only one.
7  Q. Would it be a, for lack of a better
8  phrase, a pass-on log that was maintained at The
9  Washington Post security desk?
10  A. Yes.
11  Q. Those are in composition books; is that
12  correct?
13  A. Yes.
14  Q. Black and white covers, about a hundred
15  pages each?
16  A. Some of them were a husband, some of them
17  were 50 or 90.
18  Q. Well, just approximately.
19  A. Yes.
20  Q. I'm not trying to trick you in any way.
21       Was something written in those books
22  every day?

17 (Pages 65 to 68)