# EXHIBIT C

William A. Mack                              vs.                    The Washington Post Company
Deposition of DONALD L. JACKSON                                     Tuesday, March 20, 2007

Page 1

```
 1       UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF COLUMBIA
 3
 4   WILLIAM A. MACK,         )
 5       Plaintiff,    )
 6   vs.              ) C.A. 06-1144
 7   THE WASHINGTON POST COMPANY,  )
 8       Defendant.    )
 9         *   *   *   *   *
10
11
12
13
14
15
16       The deposition of DONALD L. JACKSON was
17   taken on Tuesday, March 20, 2007, commencing
18   at 2:07 p.m., at the Law Offices of Nils Peterson,
19   2009 North 14th Street, Suite 708, Arlington,
20   Virginia, before Paula L. Lowery, Notary Public.
21
22         *   *   *   *   *
```

Page 2

```
 1              APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       NILS PETERSON, ESQUIRE
 5       Law Offices of Nils Peterson
 6       2009 North 14th Street
 7       Suite 708
 8       Arlington, Virginia 22201
 9       (703) 241-0076
10
11   ON BEHALF OF THE DEFENDANT:
12       TONYA OSBORNE, ESQUIRE
13       Jones, Day, Reavis & Pogue
14       51 Louisiana Avenue, N.W.
15       Washington, D.C. 20001
16       (202) 879-3939
17       (202) 626-1700 - fax
18
19
20
21
22   (Appearances continued on the next page.)
```

Page 3

```
 1   APPEARANCES (continued):
 2
 3   ON BEHALF OF THE DEFENDANT:
 4       JOHN B. KENNEDY, ESQUIRE
 5       The Washington Post
 6       1150 15th Street, N.W.
 7       Washington, D.C. 20071
 8       (202) 334-7869
 9       (202) 334-5075 - fax
```

Page 4

```
 1              INDEX
 2       DEPOSITION OF DONALD L. JACKSON
 3             MARCH 20, 2007
 4
 5   EXAMINATION BY:                PAGE
 6   Mr. Peterson                    5
 7
 8   JACKSON DEPOSITION EXHIBITS:   PAGE
 9   No. 1                           50
10   No. 2                           54
11   No. 3                           56
12   No. 4                           57
13   No. 5                           60
14   No. 6                           61
15   No. 7                           62
```

1 (Pages 1 to 4)

M.A.R. Reporting Group, LLC         Professional Stenotype Reporters       Toll Free (888) 534-1225
Platt & Dawson                      www.mar-reporting.com                  (703) 534-1225

Page 17

1  permanent schedule, sir?
2     A.  Three.
3     Q.  Who would those be?
4     A.  Bernard Carr, Charles Snead and Otis
5  Brooks.
6     Q.  Did Mr. Mack ever have a permanent
7  schedule?
8     A.  Yes.
9     Q.  For what period, sir?
10    A.  For what period? As in --
11    Q.  Yes, beginning when and ending when?
12    A.  Usually his schedule started on Friday
13 through Monday.
14    Q.  I'm asking a little different question.
15 When did Mr. Mack start having a permanent
16 schedule?
17    A.  I don't know the exact --
18    Q.  Approximately. Are we talking about 2006
19 or 2004 or sometime before that?
20    A.  Before that.
21    Q.  Okay. And when did Mr. Mack stop having
22 a permanent schedule?

Page 18

1     A.  May 2006.
2     Q.  That's when he was terminated; is that
3  correct?
4     A.  Yes.
5     Q.  So there were four part-timers who had
6  permanent schedules: Mr. Carr, Mr. Snead,
7  Mr. Brooks and Mr. Mack?
8     A.  Yes.
9     Q.  You said that you made sure everybody was
10 on time on the 3:00 to 11:00 shift; is that
11 correct?
12    A.  Yes.
13    Q.  How did you go and keep track of when an
14 employee came in and was on time or not? Did you
15 keep any records? How was that documented?
16    A.  They would all meet at the security
17 center and get their assigned duties.
18    Q.  Okay. At the end of the 11:00 shift, who
19 became the site supervisor for the 11:00 to 7:00
20 shift, sir?
21    A.  We did not have a site supervisor.
22    Q.  Well, with respect to Mr. Mack, you were

Page 19

1  his supervisor at times. He worked the 3:00 to
2  11:00 shift at times; is that correct?
3     A.  Yes.
4     Q.  How was his timeliness for showing up on
5  time for his shift?
6     A.  He was on time.
7     Q.  Always on time, sir?
8     A.  Yes.
9     Q.  During the shift employees are given a
10 lunch break; is that correct?
11    A.  Yes.
12    Q.  Approximately how long a lunch break was
13 the employee given?
14    A.  30 minutes.
15    Q.  Is that break -- are you free to take
16 that where you want, or how does that work, sir?
17    A.  We ask that you take it on the property
18 in the event something happened and we need you.
19    Q.  Certainly. And was there a lunch room
20 where employees took their lunch break?
21    A.  Yes, there was a lunch room.
22    Q.  Did all the security officers take the

Page 20

1  lunch break in the lunch room? How did that work,
2  sir?
3     A.  I'm not sure.
4     Q.  Well, did any of the employees work
5  through lunch; that is, sit at a station and just
6  eat their lunch while they're off duty?
7     A.  Yes.
8     Q.  How did that come about, sir?
9     A.  It was their choice. Sometimes it was
10 their choice to take their lunch while they was at
11 their station.
12    Q.  Was that because there was no relief for
13 them that day, or what happened?
14    A.  Occasionally sometimes they would be
15 asked to work through their lunch.
16    Q.  And when an employee works through their
17 lunch, are they paid for that lunch period or it
18 still gets deducted?
19    A.  They get paid for the lunch.
20    Q.  That's reflected on their time card?
21    A.  Yes.
22    Q.  Did Mr. Mack work through his lunch from

5 (Pages 17 to 20)

M.A.R. Reporting Group, LLC        Professional Stenotype Reporters        Toll Free (888) 534-1225
Platt & Dawson                     www.mar-reporting.com                   (703) 534-1225

Page 29

1    MS. OSBORNE: Objection. Foundation.
2    BY MR. PETERSON:
3    Q. Whether you know -- whether you've seen
4    Mr. Smith read it.
5    A. No, I've not seen it.
6    Q. Okay. Does the employee start back to
7    work on giving you that note, or do they have to
8    wait until they're cleared by the health center?
9    How does that work?
10   A. They have to settle with -- make the
11   determination they're clear.
12   Q. Okay. And when the health center makes
13   that determination, does the employee go to the
14   health center? Or does someone else receive a
15   call from the health center?
16   A. We receive a notice from the health
17   center.
18   Q. Is that a written or oral notice?
19   A. A written notice.
20   Q. Mr. Mack had some absences for medical
21   reasons; is that correct?
22   A. Yes.

Page 30

1    Q. Do you have any knowledge of what reason
2    he was taking time off for medical reasons?
3    A. No.
4    Q. You never discussed that with him?
5    A. No.
6    Q. He never told you anything about having
7    any medical conditions?
8    A. Yes.
9    Q. He did tell you?
10   A. Yes.
11   Q. What did he tell you, sir, to your
12   remembrance?
13   A. We discussed high blood pressure.
14   Q. Did Mr. Mack have high blood pressure?
15   A. He said he did.
16   Q. Okay. Anything else he talked about with
17   you?
18   A. No.
19   Q. Did he mention ever receiving any
20   injections?
21   A. No.
22   Q. Did he ever mention having a skin

Page 31

1    disease?
2    A. No.
3    Q. Did he ever mention having something
4    called sarcoidosis?
5    A. No.
6    Q. Did anyone at the health center tell you
7    that Mr. Mack had a health condition?
8    A. No.
9    Q. Did anyone at The Washington Post tell
10   you Mr. Mack had a health condition?
11   A. No.
12   Q. Did you notice Mr. Mack ever limping?
13   A. No.
14   Q. Did you notice Mr. Mack's face ever being
15   puffy?
16   A. No.
17   Q. Or having any lesions on his face?
18   A. No.
19   Q. You talked about none of that with any
20   other employee at The Washington Post?
21   A. No.
22   Q. When Mr. Mack was absent, would he always

Page 32

1    bring back the appropriate health form when he had
2    an absence that he said was due to sickness?
3    A. No.
4    Q. How often would he not bring back the
5    proper form?
6    A. I don't know.
7    Q. Well, what would happen if Mr. Mack
8    didn't bring back the proper form?
9    A. It would be up to Mr. Smith to make the
10   determination what to do.
11   Q. Did you have any discussions with
12   Mr. Smith about Mr. Mack not bringing back the
13   proper form?
14   A. No.
15   Q. How many times did Mr. Mack not bring
16   back the proper form concerning sickness to your
17   knowledge?
18   A. I don't know.
19   Q. Are we talking about less than five?
20   More than five?
21   MS. OSBORNE: Objection. Calls for
22   speculation.

8 (Pages 29 to 32)

M.A.R. Reporting Group, LLC        Professional Stenotype Reporters        Toll Free (888) 534-1225
Platt & Dawson                           www.mar-reporting.com                    (703) 534-1225

William A. Mack                                         vs.       The Washington Post Company
Deposition of DONALD L. JACKSON                                   Tuesday, March 20, 2007

Page 33

1   BY MR. PETERSON:
2   Q. To the extent you know, sir.
3   A. No.
4   Q. How did you know Mr. Mack didn't bring
5   back the proper form? Did you ask him for a form
6   when he came back, or was it you had heard from
7   Mr. Smith that Mr. Mack didn't bring back the
8   proper form?
9   A. Mr. Smith.
10  Q. Did Mr. Smith say anything else to you?
11  A. No.
12  Q. Do you know how any of that was resolved?
13  A. No.
14  Q. During, let's say, the years 2005 and
15  2006, while Mr. Mack worked for The Washington
16  Post, do you know how many times he was out
17  concerning sickness?
18  A. No.
19  Q. Have you seen any documentation on that,
20  sir?
21  A. Yes.
22  Q. What have you seen?

Page 34

1   A. An absentee form.
2   Q. How did you come to see that?
3   A. It was shown to me.
4   Q. By whom, sir?
5   A. Mr. Smith.
6   Q. Did Mr. Smith show you any other
7   employee's absentee forms?
8   A. Yes.
9   Q. Who else did you see absentee forms for?
10  A. Bernard Carr, Charles Snead, Otis Brooks,
11  Debbie Brennan, myself, Jean Winger. I can't
12  remember all of them.
13  Q. Did Mr. Smith just show you the forms, or
14  did he go over them with you? How did that work?
15  A. He just showed it to me.
16  Q. Did he leave them with you, or just show
17  you he had them?
18  A. Showed me that he had them.
19  Q. Did he make any comments about any
20  particular employee?
21  A. No.
22  Q. Approximately when did Mr. Smith show you

Page 35

1   these forms?
2   A. I don't know the exact date.
3   MS. OSBORNE: Objection. Calls for
4   speculation.
5   BY MR. PETERSON:
6   Q. Was it sometime in 2006?
7   A. Yes.
8   Q. Do you remember approximately when in
9   2006?
10  A. No.
11  Q. At The Washington Post, is there
12  something called light duty in the security
13  department?
14  A. No.
15  Q. Is there any restricted duty in the
16  security department?
17  A. No.
18  Q. Does every officer have to do the
19  activities -- if she's working, or he's working --
20  of every other officer?
21  A. Yes.
22  Q. So there's no desk jobs available at The

Page 36

1   Washington Post in the security department.
2   A. Yes.
3   Q. There are?
4   A. Yes.
5   Q. Can you tell me about that, sir.
6   A. We have assigned posts that we work
7   security set-up. We have three fixed posts, and
8   we have a roving post.
9   Q. Okay. Well, does each employee who is
10  assigned -- who works, can they only sit at a desk
11  during an entire day, let's say?
12  A. No.
13  Q. All right. Going on to the Family
14  Medical Leave Act, are you familiar with the
15  Family Medical Leave Act, sir? Have you heard of
16  that?
17  A. Yes.
18  Q. Where did you hear of that?
19  A. Through The Washington Post and on the
20  news.
21  Q. Okay. Well, let's concentrate on The
22  Washington Post. How have you received

9 (Pages 33 to 36)

## Washington Post Springfield Pl
## Absence Detail Report

See Summary for Parameters

| Employee | Absence Type | Absence Date | Hours |
|---|---|---|---|
| Springfield Virginia | | | |
| Security Department | | | |
| Mack, William | | | |
| | S Ilness - Self | 01/07/2005 | 8.00 |
| | S Ilness - Self | 01/14/2005 | 8.00 |
| | S Ilness - Self | 01/15/2005 | 8.00 |
| | S Ilness - Self | 01/16/2005 | 8.00 |
| | S Ilness - Self | 01/17/2005 | 8.00 |
| | V Vacation | 01/21/2005 | 8.00 |
| | V Vacation | 01/22/2005 | 8.00 |
| | V Vacation | 01/23/2005 | 8.00 |
| | V Vacation | 01/24/2005 | 8.00 |
| | S Ilness - Self | 01/28/2005 | 8.00 |
| | S Ilness - Self | 01/29/2005 | 8.00 |
| | S Ilness - Self | 01/30/2005 | 8.00 |
| | S Ilness - Self | 01/31/2005 | 8.00 |
| | S Ilness - Self | 03/25/2005 | 8.00 |
| | S Ilness - Self | 04/29/2005 | 8.00 |
| | S Ilness - Self | 04/30/2005 | 8.00 |
| | S Ilness - Self | 05/01/2005 | 8.00 |
| | S Ilness - Self | 05/02/2005 | 8.00 |
| | S Ilness - Self | 05/06/2005 | 8.00 |
| | S Ilness - Self | 05/07/2005 | 8.00 |
| | V Vacation | 05/21/2005 | 8.00 |
| | V Vacation | 06/13/2005 | 8.00 |
| | V Vacation | 06/18/2005 | 8.00 |
| | V Vacation | 07/30/2005 | 8.00 |
| | V Vacation | 08/13/2005 | 8.00 |
| | V Vacation | 10/03/2005 | 8.00 |
| | V Vacation | 10/22/2005 | 8.00 |
| | U Unexcused | 12/03/2005 | 8.00 |
| | U Unexcused | 12/04/2005 | 8.00 |
| | U Unexcused | 12/05/2005 | 8.00 |
| | V Vacation | 01/23/2006 | 8.00 |
| | V Vacation | 02/04/2006 | 8.00 |
| | V Vacation | 02/13/2006 | 8.00 |
| | V Vacation | 03/04/2006 | 8.00 |
| | S Ilness - Self | 03/11/2006 | 8.00 |
| | V Vacation | 03/25/2006 | 8.00 |
| | V Vacation | 04/08/2006 | 8.00 |
| | V Vacation | 04/15/2006 | 8.00 |
| | S Ilness - Self | 04/17/2006 | 8.00 |
| | | **Absence Total** | **312.00** |

**Count in Department Security Department: 1**

4/28/2006

1

EXHIBIT
Jackson 2 3/20/07
PENGAD 800-631-6989

0.0092

## Washington Post Springfield Plant
## Absence Detail Report

See Summary for Parameters

| Employee | Absence Type | Absence Date | Hours |
|---|---|---|---|
| **Springfield Virginia** | | | |
| **Security Department** | | | |
| **Mack, William** | | | |
| | V Vacation | 01/23/2002 | 8.00 |
| | G Illness - Self | 02/11/2002 | 8.00 |
| | V Vacation | 02/12/2002 | 8.00 |
| | V Vacation | 03/07/2002 | 8.00 |
| | G Illness - Self | 03/11/2002 | 8.00 |
| | G Illness - Self | 03/08/2002 | 8.00 |
| | V Vacation | 04/22/2002 | 8.00 |
| | V Vacation | 04/23/2002 | 8.00 |
| | V Vacation | 04/29/2002 | 8.00 |
| | G Illness - Self | 05/15/2002 | 8.00 |
| | V Vacation | 06/03/2002 | 8.00 |
| | G Illness - Self | 06/20/2002 | 8.00 |
| | G Illness - Self | 07/08/2002 | 8.00 |
| | V Vacation | 07/17/2002 | 8.00 |
| | V Vacation | 07/18/2002 | 8.00 |
| | G Illness - Self | 08/13/2002 | 8.00 |
| | V Vacation | 08/14/2002 | 8.00 |
| | V Vacation | 08/15/2002 | 8.00 |
| | G Illness - Self | 09/09/2002 | 8.00 |
| | G Illness - Self | 10/07/2002 | 8.00 |
| | V Vacation | 10/15/2002 | 8.00 |
| | G Illness - Self | 10/16/2002 | 8.00 |
| | G Illness - Self | 10/28/2002 | 8.00 |
| | G Illness - Self | 12/16/2002 | 8.00 |
| | | **Absence Total** | **192.00** |

**Count in Department Security Department: 1**

**Count in Location Springfield Virginia: 1**

**Total Count: 1**

Employees: Active
Hire Range: All
Include: Full Time Part Time
Group on: Location Department
From 01/01/2002 through 12/23/2002

000987

Mack
This is the date
you was in Snotty
office

12/23/2002