```
              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF COLUMBIA

WILLIAM A. MACK                    )
                                   )
     Plaintiff,                    )
v.                                 )   CA 06-1144 (PLF)
                                   )
WP COMPANY LLC, INC., dba          )
THE WASHINGTON POST                )
                                   )
     Defendant.                    )
```

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE**

Plaintiff's list of disputed material facts is set forth below. This list is divided into (1) undisputed facts and disputed facts not considered by Defendant and (2) facts which defendant claims are undisputed but which claim are in dispute.

    A.   Facts Not Considered by Defendant and/or Additional Disputed Facts

1. Mack testified at deposition that his disease, sarcoidosis, manifests itself in various ways including tiredness, stiffness, inability to walk, hypertension, muscle spasms, swelling of face and breathing difficulty (Exhibit 1 at 13-15). Sarcoidosis is a little known disease that affects individuals differently (Exhibit 6). Mack failed the OSHA breathing test at the Post in 2004 (Exhibit 6 at bates 624).

2. The Post's medical records show that Mack brought doctor's notes indicating that Mack was suffering from sarcoidosis and required regular injections and the handwritten notes show the medical forms were returned to supervisors. (Exhibit 4 at bates 608, 614, and 637 (medical note of Post nurse dated 7/10/02 states

"sarcoidosis - gets steroid inj (shot) Q 3 mos for this - lesions wax/wane").

3. Mack told his supervisor, Smith, about his disease and the need for injections (Mack deposition, Exhibit 1 at 287-88, 323, 330). (Smith deposition, Exhibit 2 at 38). Donald Jackson was also told of the sarcoidosis (Mack Deposition at 290-91).

4. Mack told various officials of the post about his disease, and that Smith was harassing him for taking sick time (Mack at 92-94, 95-96).

5. Mack told Corso that he had the disease sarcoidosis on April 3 and April 25, 2006, that he needed time off for injections and that Smith was harassing him for taking medical leave (Mack at 96, 101-04 ); Corso fired Mack on May 8, 2006 less than a month after he was told about the harassing conduct of Smith and Mack's need for time off for medical care. (Exhibit 2, deposition of Smith at Exhibit 9). Mack asked Corso to speak to Smith (Id. at 101-02).

6. When Mack spoke to Corso about being terminated Corso told Mack he was terminated for taking 18 days off for sickness (Exhibit 1 at 324). Corso's letter to Mack referenced 18 absences, the exact number of sick days shown on the print out of the Post (Smith deposition exhibits nos. 9 and 11).

7. After being diagnosed with sarcoidosis in 2001, Mack received steroid shots for the disease every two months (Mack deposition at 16, 162). Of all the sick leave taken by Mack since being diagnosed with sarcoidosis, only about two absences were not related to the effects of sarcoidosis (Mack deposition at 41-42). Mack was not allowed time off for his illness unless he presented

a doctor's slip (Id at 276). Mack asked Smith for time off for physical therapy for his leg stiffness but Smith denied this because Mack did not have a doctors slip (Id at 275). When Mack had appointments with his dermatologist, it was up to the doctor to decide if Mack would receive a steroid injection and Mack never knew beforehand what the doctor would decide (Id at 210-12).

8. The Post's health department received various medical records from Mack indicating he had sarcoidosis (Exhibit 4 at bates 608, 637). The Post's medical records show that he was required to bring the Post a medical report each time he took sick leave. Mack also spoke to the nursing staff at the Post about his sarcoidosis (Mack deposition at 77, 141, 298). Mack was rushed from the Post to the Hospital because of high blood pressure (Id at 36). The doctor diagnosed Mack's high blood pressure as a side effect of the steroid shots mack received for sarcoidosis (Id at 39). One of the Nurses at the Post gave Mack cream for the sarcoidosis (Id at 60).

9. Other employees at the Post were criticized for using sick leave by supervisors including King, Carr, McGruder (Smith deposition at 93, Mack deposition at 328, Jackson at 48-50). During the period where Mack had 18 absences for sickness and was terminated, McGruder was out for illness about 30 days (Mack deposition at 140, Exhibit 5 (pass on log showing when McGruder called off), Smith deposition at 97). McGruder had almost as many individual sick days as Mack (Exhibit 5) and had several weeks off sick for operations (Smith deposition at 97). After Mack was terminated for sick day usage, Mcgruder was warned it would not be a good time to take off for illness (Mack at 304). None of McGruder's time off

3

for operations was classified as time off for FMLA since Smith testified that no one in his department had ever used FMLA. (Smith at 32).  Smith and Jackson thought that the Post had forms for using FMLA but neither had seen such a form (Smith at 34, Jackson at 38).  Neither Smith or Jackson was familiar with the term "intermittent leave" (Smith at 100, Jackson at 39).  Jackson did not know if employees were told of FMLA (Jackson deposition at 39). Jackson knew that Mack had high blood pressure which is a serious medical condition itself (Jackson at 30).

10. Mack only learned about the availability of FMLA when he was told be a nurse at the Post (Mack at 141, 326-27).  Mack testified that Smith never asked him to tell Smith about medical appointments beforehand (Id at 326).  While Smith denies knowing about Mack's sarcoidosis, he testified that Mack told him about the "injections" (Smith at 38).  The supervisors would see the medical records brought in by employees including Mack (Jackson at 27-28, Exhibit 4 shows the medical reports being returned to the supervisors).

11. Because the steroid shots made Mack tired and he had muscle soreness, he requested that he be allowed to work light duty at times.  This light duty was denied by Smith (Mack deposition at 32, 324-26, 330) although other employees were allowed light duty (Smith deposition at 97  and Mack at 215, 217).  Smith testified that Mack never requested light duty (Id at  41).  Mack was never offered FMLA leave for time off or any light duty (Mack at 273-74, 324-325).

12. Mack was told repeatedly by Smith that he was abusing his sick leave (Mack at 82, 244, 246, 252-53).

4

13.  Smith indicated on Mack's performance evaluation that he was using too much sick leave (Smith at 55 and deposition exhibit No. 13).  Smith also provided Mack with a print out showing his use of 18 days of sick leave (Smith at 52, and deposition exhibit 11) and brought to Mack's attention his use of sick leave 4 or 5 times (Smith at 50-51).  Smith testified that he would read Mack's doctors' notes when he was ill (Smith at 78-79).  Smith testified that he did not tell Corso that Mack was not available for 18 shifts (Id at 83).  Smith testified that long term vacation was not considered a call off (Id at 84).

14.  When requested by the Post, Mack signed an authorization allowing the Post to obtain his medical records (Mack at 87).

   B.  The Following Are Material Facts of Defendant That Plaintiff Asserts are Disputed (The numbers correspond to Defendant's points)

1.  Mr. Mack was not working on-call, rather he was a part-time employee who was regularly in the schedule (See Mack deposition at 261).

2.  Part time employees like Mr. Mack had a regular schedule that they worked.

5.  Mack was a part-time employee, not on call.

8.  Part-time employees such as Mack had sick and vacation leave that they were allowed to take as long as they followed the regulations.  One employee, Imani McGruder, missed more sick time than Mr. Mack during the period January 2005 to May 2006 and other employees had attendance problems but were not disciplined (Smith deposition at 93).

10.  Emergency vacation was permitted on short notice (Smith

deposition at 23-24).

12. While the Post referred to the FMLA policy, it effectively had no policy since even Mack's supervisors had no knowledge of FMLA, no forms for employees to request FMLA and no concept of what intermittent leave was (Smith deposition at 100). Mack was not aware of his right to FMLA until a nurse working for the Post told him that the Post was violating the law by the way it was treating him. No one in the security department had ever taken FMLA leave according to Smith (Deposition at 32). The one employee who took asked about FMLA did not take it (Id.).

14. Mack took steroid shots am average of once every two months when his doctor decided to inject him. Mack also took various prescription medicines and physical therapy for his disease.

15. Mack's injections' effects lasted for a number of days and induced effects such as tiredness. (Mack deposition at 13-15). Mack could have worked on some of the days he was off after injections if he was allowed to have light duty (Id at 324-5). Mack's supervisors denied him the ability to take light duty which was provided to numerous other employees. (Id at 32, 215, 217).

16. Mack had shots approximately six times per year since the time he was diagnosed with his disease (Id at 41-42).

17. Mack had steroid shots about once every two months during his employment with the Post after 2001.

18. Mack chose this schedule when he was told that he could no longer work during the week.

19. The sarcoidosis affected different parts of Mack's body at different times including his lungs. The absence in late January

6

2005 was related to his disease (Id at 13-15).

20. Mack always brought doctor's notes to the Post after an illness and such doctors notes were reviewed by the Post's health center. Mack had frequently brought doctors notes to the Post indicating he was absent for his disease (See Attachment 4, Post medical records). No one at the Post counseled Mack that he was entitled to FMLA or sought a certificate from Mack's doctors certifying that his disease qualified under FMLA or he required intermittent leave. The Post failed to keep the required FMLA records for a three year period simply because no FMLA records were ever created for Mack. Seemingly, when Imani McGruder missed weeks of work time for a foot operation according to Smith's testimony no FMLA paperwork was ever prepared for her absence since Smith as supervisor was had never seen FMLA paperwork at the Post and was not sure such forms even existed (Smith at 34).

21. Mack testified that he had steroid shots once very two months.

22. Mack testified that the back spasms were a result of his disease.

23. Hypertension is a serious medical condition itself under FMLA and a side effect of Mack's disease.

24. Mack is allowed emergency vacation which was granted on this date.

29. Mack was threatened with termination because of his use of sick leave for his disease. When Mack complained to Corso in April 2006 about the harassment of Smith concerning Mack's use of sick leave for his disease, Corso terminated Mack within a month. Corso told Mack that he as fired for taking sick leave (Mack at 96-103).

7

30. Mack told his supervisor Smith about his disease and need for injections. Mack requested light duty after the injections as provided to other employees but was denied. Smith knew Mack received "injections" for his illness (Smith at 38). Smith or the Post's health department never provided Mack with the forms necessary for intermittent FMLA leave; Smith testified that he never knew such forms existed. Mack only found out the Post was violating the FMLA when a nurse in the Post's health department told him in 2006 that the Post was violating the FMLA in the way it was treating him. Mack complied with the only notice provision concerning illness that he was made aware of at the Post, call in prior to the shift that an employee can not work because of illness. There was no FMLA policy at the Post telling employees of their duties when using intermittent leave. Smith testified at deposition that he did not know what intermittent leave meant. (Smith at 100).

31. Mack provided the Post with medical documents and Smith knew Mack received injections. The Post never provided Mack with the required notice of FMLA procedures.

32. Mack told Smith that he was receiving injections for his disease (Smith at 38). Smith was unsure whether he saw the doctor's note that he provided to the Post that referenced Sarcoidosis. (Id at 78-81). Smith did not provide Mack with any information on intermittent FMLA leave, only the need to call in prior to being absent and bring a note from mack's health care provider.

33. Mack also told the plant manager and assistant manager of his

8

disease and need for time off (Mack at 92-96). When Mack told Corso in April 2006 about being harassed by Smith for taking sick leave for his disease, Corso terminated Mack's employment within the month.

34. Muscle spasms and high blood pressure were part of Mack's sarcoidosis (Mack at 13-15).

36. Smith told Mack that he was taking too much sick leave. (Smith at 50-55).

37. Mack's sick leave was related almost entirely to his disease which manifested itself in various ways (Mack 41-2).

44. Mack in April 2006 told Corso of his disease and Smith's harassment for using sick leave for the disease. Corso terminated Mack within a month of such conversation. Corso told Mack that he was terminated because he used too much sick leave (Id at 96-104, 125).

45. Mack told Corso that he has sarcoidosis in April 2006 and that Smith was harassing him for taking sick leave for his disease. Corso stated to Mack that the reason he was terminated was due to Mack's use of sick leave. (Mack at 96-104, 125).

47. Mack's use of sick leave during this period was almost exclusively related to his disease. Corso told Mack his termination was for use of sick leave.

48. Corso told Mack he was terminated for using sick leave. Corso's letter stated that mack was terminated for his 18 absences, the exact number of sick leave absences during the period. Corso's letter states that Mack was not available when called 18 times; Smith testified that Mack was on the schedule so he was not on-

9

call.

49. Mack increased his hours at Personnel Resources and after a period of time he became eligible for health care. The benefits at personnel resources are not as good as at the Post.

51. Mack, because of his illness, cannot afford to be without benefits that would occur if he started a new job.

Respectfully submitted,

William A. Mack
By Counsel

_____s_____
Nils G. Peterson
D.C. Bar No. 295261
2009 N. 14th Street, Suite 708
Arlington, VA  22201
(703) 527-9900

Certificate of Service

I hereby certify that on the 21st of June, 2007 I served Defendant with a copy of the foregoing by electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

_____-s-_____
Nils G. Peterson

10