Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF COLUMBIA

 3  ------------------------------X

    WILLIAM A. MACK,                  :

 4                                    :

             Plaintiff               :   Case No:   06-1144

 5                                    :   (PLF)

                -vs-                  :

 6                                    :   Pages 1 - 338

    WP COMPANY, L.L.C., dba THE       :

 7  WASHINGTON POST,                  :

                                      :

 8           Defendant.               :

    ------------------------------X

 9

10

11           Deposition of William A. Mack

12                  Washington, D.C.

13            Tuesday, March 13, 2007

14

15

16

17

18

19

20

21  Reported by:  Kathleen M. Vaglica, RMR

22  Job No:  179711
```

William Mack

Page 10

1 we say, and what's important about that is really
2 two things.  First, I would ask you to please let me
3 finish my question before you answer it so that
4 we're not talking over each other on the transcript.
5    A.    Yes.
6    Q.    That makes it a lot easier for her, and,
7 secondly, if I ask you a question that calls for a
8 yes or no answer, you need to actually say yes or no
9 as opposed to nodding your head or shaking your
10 head.  The nods of the head and the shaking of the
11 head don't show up on the transcript, so, if you
12 could answer verbally, that would be great.
13    A.    Yes.
14    Q.    Any questions at this point?
15    A.    No, ma'am.
16    Q.    Okay.  Mr. Mack, what did you do to
17 prepare for your deposition today, if anything?
18    A.    I didn't do nothing to prepare myself.
19    Q.    Did you look at any documents?
20    A.    Yes, over the website, see how deposition
21 goes.
22    Q.    And those are just something you found on

Page 11

1 your own?
2    A.    On the same thing you said, on the
3 website.
4    Q.    Good.  At least I'm getting it right so
5 far.
6         MR. PETERSON:  I'll represent that
7 Mr. Mack looked at some of the documents that you
8 produced in discovery in my office.
9         MS. HOLMES:  That was going to be my next
10 question.
11 BY MS. HOLMES:
12    Q.    Did you meet with your lawyer?
13    A.    Yes.
14    Q.    When was that?
15    A.    Yesterday.
16    Q.    About for how long did you meet with him?
17    A.    A good hour.
18    Q.    Was there anybody else present?
19    A.    No.
20    Q.    And did you look at any documents when you
21 met with him?
22    A.    Yes.

Page 12

1    Q.    Are you able to remember what those
2 documents were just as best you remember?
3    A.    Yes, about Jerome Carter, another
4 employee.  Washington Post claimed they let him go
5 for taking sick days.
6    Q.    Anything else --
7    A.    No, ma'am.
8    Q.    -- that you can remember?
9    A.    No, ma'am.
10    Q.    Have you talked about your deposition with
11 anybody other than your lawyer?
12    A.    No.
13    Q.    I'm just going to ask you a couple
14 questions I need to ask you to make sure we're all
15 clear on just a couple things.  Are you taking any
16 medication today that would affect your ability to
17 testify accurately at this deposition?
18    A.    No, ma'am.
19    Q.    Any reason you can think of today that you
20 can't -- I'm sorry.  Is there anything going on in
21 your life or anything else that would prevent you
22 from testifying accurately and completely in this

Page 13

1 deposition today?
2    A.    No, ma'am.
3    Q.    Have you ever testified under oath before?
4 I asked you about a deposition, but I didn't ask you
5 about anything else.
6    A.    Yes.
7    Q.    And what were the circumstances of that?
8    A.    The year was, if I'm correct, 1983 at
9 Woodies downtown, Woodward & Lothrop, from an
10 employee that was accused of shoplifting.  I was his
11 witness.
12    Q.    You were his witness?
13    A.    Yes.
14    Q.    Did you work for Woodward & Lothrop at
15 that time?
16    A.    Yes, ma'am.
17    Q.    And what was your job?
18    A.    I was stock keeper.
19    Q.    Mr. Mack, am I right that you've been
20 diagnosed with sarcoidosis?
21    A.    Yes, ma'am.
22    Q.    What is sarcoidosis, as best you can

4 (Pages 10 to 13)

Page 14

1 explain it?

2     A.   It's a tissue, a tissue that's in my skin
3 could start growing and moving around, and once you
4 take sarcoidosis, only one way they can treat it,
5 treat it through steroid shots and they will give
6 you a face cream, and also they can give you pills,
7 but, once they give you that steroid shot, give it
8 to you in certain place right on the sarcoidosis or
9 they can give it to you in your hip where it go can
10 through the veins in your body to treat it wherever
11 it's at.

12     Q.   Now, when you say it's a tissue, could you
13 tell me what you mean by that?

14     A.   My doctor always told me a tissue.  Only
15 thing he ever told me; it's a tissue that's inside
16 the skin.

17     Q.   How does it manifest in you?  Like, what
18 symptoms do you have when you get sarcoidosis?

19     A.   The symptoms I have is weight gain.
20 Symptoms I have also is acne.  The symptoms I have
21 is side effects when it comes to back pains.  The
22 symptoms I have is out of breath and stiffness of

Page 15

1 joints in my body.

2     Q.   Okay.  Anything else that you can recall
3 as a symptom that you've experienced from sarcoid?

4     A.   Swelling of the face.  Whenever I get the
5 shot, swelling in the face and also weight gain.  I
6 can gain anywhere from five pounds to ten pounds
7 within one month after the shot.

8     Q.   Let me ask you a question about that.  Is
9 the weight gain a symptom of the sarcoidosis or is
10 it from the treatment?

11     A.   The symptoms is from the treatment.
12 Whenever I get the shot, that means getting the
13 steroid shots, when it goes through my body, my
14 weight goes up, and it also cause hypertension, so
15 I'm always, have to keep, I watch what I eat.  Eat
16 more healthier.

17     Q.   Okay.  So the weight gain, just to make
18 sure I'm clear on this, the weight gain is not a
19 symptom of the sarcoidosis itself, but a symptom of
20 the steroid shots you get to treat it?

21     A.   Symptoms of the sarcoidosis.  It's a
22 symptom of the sarcoidosis and of the steroid shot

Page 16

1 because your weight constantly goes up.

2     Q.   So, even if you weren't getting steroid
3 shots, weight gain would be a symptom of
4 sarcoidosis?

5     A.   Yes, 'cause the reason is the sarcoidosis,
6 the steroid shot is, stays, the medication they give
7 me stay in the body from anywhere two months, but
8 really it's one or two months.  That's why I get it,
9 like, I got a shot this month on March the 5th.  The
10 next shot would go into May 'cause the steroids is
11 still in my body the following month in April.
12 Medication still working inside my body, so from the
13 time I took it on March the 5th my weight can
14 constantly go up.  My blood pressure constantly go
15 up.  Side effects will take place, but I don't know
16 when the side effects will come.

17     Q.   But they come because of the shot?  That's
18 my question.

19     A.   Yes, ma'am.  Yes, ma'am.

20     Q.   And not because of the sarcoidosis itself?

21     A.   It's from both.

22     Q.   Do you see the distinction I'm making?

Page 17

1     A.   Yes, I understand.  It's both.

2     Q.   Even if you didn't get the shots, your
3 doctors have told you you could get weight get from
4 --

5     A.   Yes, ma'am.

6     Q.   Okay.  I'm sorry.  This goes back to what
7 I said earlier.  I know you're eager to answer my
8 questions, and I appreciate that.  And I'm always
9 eager to get more questions out.  Let's try, both of
10 us, to do be better about waiting before we say
11 anything.

12     A.   Yes.  Yes.

13     Q.   The next symptom you mentioned to me was
14 acne?

15     A.   Yes.

16     Q.   Is the acne a symptom of sarcoidosis?

17     A.   Yes, ma'am.

18     Q.   And how does it affect you?

19     A.   It comes up all over my face, and I have
20 medication for it.

21     Q.   Does the acne interfere with your ability
22 to do, to do things in your daily life or to do your

5 (Pages 14 to 17)

**William Mack**

Page 30

1    A.    Yes.

2    Q.    And tell me if this is right.  The

3 stiffness in your leg shows up after you get the

4 shot?

5    A.    Majority of the time, yes, ma'am.

6    Q.    And how long does it typically last?

7    A.    It could last a week.

8    Q.    And, when you have the stiffness in your

9 leg, does that prevent you from working?

10    A.    Yes, it will.

11    Q.    Does it always prevent you from working?

12    A.    Yes, ma'am.

13    Q.    So do you have to take time off of work?

14    A.    My employer I work with now is Personnel

15 Resources, name Valerie Welch.  Whenever I have

16 stiffness in my leg, I inform her, and she tell me

17 when I know the stiffness is there, tell me to sit

18 down for an hour, whatever I need, then continue my

19 rounds.

20    Q.    So it sounds like right now you're able to

21 work because you're able to sit down for some period

22 of time when it shows up?

Page 31

1    A.    Yes, ma'am.  Yes, ma'am.

2    Q.    Is that right?  Okay.  Does it affect --

3 let me ask the question this way.  When you are, you

4 know, as you've been working since November of 2001

5 and you've been getting these shots every two

6 months, have you ever taken time off of work because

7 of the stiffness in your leg, just specifically

8 that?

9    A.    Yes.

10    Q.    Okay.  And what were the circumstances of

11 that?  Has that happened once or more than once?

12    A.    More than once.

13    Q.    Okay.  And can you tell me, can you tell

14 me when that's happened?

15    A.    There's so many dates.  There's so many

16 dates from 2001 to the time I was at the Washington

17 Post.  There's so many dates.

18    Q.    About how often?  Is it something that

19 happens every month or something that happens every

20 couple months?  Again, I'm just referring to the

21 stiffness in your leg to be clear.  I'm not

22 referring to the whole banner of symptoms, and we'll

Page 32

1 go through them all, but just for the stiffness in

2 your leg can you tell me about how often that

3 requires you to take time off work?

4    A.    Right now with my new employer or with the

5 Washington Post?

6    Q.    I'm going back not just with the

7 Washington Post.  If you want to go employer by

8 employer, if that's easier, I'm happy to do it that

9 way.

10    A.    The stiffness always in my leg once I take

11 a shot.  The stiffness can come, but I never know

12 when it's going to come.  The Washington Post never

13 let me take off.  I asked.  They wouldn't let me

14 take off.  Wouldn't even give me a sit-down post

15 like they gave ten other employees that have medical

16 conditions.  Never give it to me.  I was always told

17 you do your job.  I done my job to the best of my

18 ability with the stiffness in my leg.

19    Q.    Are you saying you never took time off at

20 the Post for the stiffness in the leg?

21    A.    When I was under doctor's care.

22    Q.    And what does that mean?

Page 33

1    A.    When I was under my doctor's care and had

2 to state medical illness, gave me a shot; I had

3 stiffness in my leg or some type of pain from the

4 sarcoidosis from the steroid shot.

5    Q.    I'm not trying to be difficult.

6    A.    I understand.

7    Q.    I am just trying to make sure I

8 understand.  So, when you were working with the

9 Washington Post, you did or you didn't take time off

10 from work because of the stiffness in your leg?

11    A.    I took time off, but it wasn't, the

12 Washington Post didn't offer me the time.  They

13 didn't give me the time off, but I went to my

14 doctor.  He'd say you're under my care today, so

15 that was the time I took off.

16    Q.    So you would go to the doctor, the doctor

17 would say you need to be out today, and you were

18 out; is that right?

19    A.    Yes, ma'am.  Yes, ma'am.

20    Q.    Do you know again, just specifically for

21 now referring to your employment with the Washington

22 Post, how often that happened with respect to the

9 (Pages 30 to 33)

William Mack

Page 34

1 stiffness in your leg?  Again, I'm trying to sort of
2 keep this --
3     A.    I couldn't tell you.  It's been so long.
4 I couldn't tell.
5     Q.    Do you have a feel if it was 25 times or
6 five times or any kind of a range?
7     A.    No, ma'am.
8     Q.    And, when you went to the doctor and got
9 the doctor's note, were you, was that accepted by
10 the Post?
11    A.    Yes, it was accepted by the Post.
12    Q.    When I first asked you about the symptoms
13 you experience, you said stiffness in joints.  Were
14 you referring to just the stiffness in your leg or
15 is there some other stiffness in other joints that
16 we didn't focus on?
17    A.    My left arm.
18    Q.    Your arm?
19    A.    My left arm.
20    Q.    And when does that manifest itself?
21    A.    It manifests on December the 17th I was
22 rushed to Virginia Hospital Center for stiffness in

Page 35

1 my arm.
2     Q.    December 17 of what year?
3     A.    Of this year.
4     Q.    2006; is that right?
5     A.    Two thousand --
6     Q.    'Cause we're in seven now.
7     A.    2007.
8     Q.    But we're not to December yet.  You said
9 December the 17.
10    A.    December just passed.
11    Q.    2006?
12    A.    Yes.  Yes.  I'm sorry.  I'm sorry.
13    Q.    I am not trying to trick you.  I'm just
14 trying to figure this out.
15    A.    I understand.
16    Q.    So is that the first time you had ever had
17 stiffness in your arm?
18    A.    Yes, ma'am.
19    Q.    And you weren't working for the Post at
20 that time; right?
21    A.    No, ma'am.
22    Q.    What --

Page 36

1     A.    Correct.
2     Q.    Sure.
3     A.    2003 I had a stiffness in my left arm.
4 The Washington Post nurse, male, his name is Andy, I
5 walked from lower parking lot straight into the
6 front door of the Washington Post, went straight to
7 the Health Service.  The male nurse, Andy, he took
8 my blood pressure.  He said I got to get you out of
9 here.  He rushed me to Fairfax Center Hospital.
10    Q.    Okay.  Do you know roughly when in 2003
11 that happened?
12    A.    No, ma'am.
13    Q.    That's fine.  Now, you are saying, you
14 were at work at the time, I take it, at the Post?
15    A.    Yes, ma'am.
16    Q.    And you started to experience some
17 stiffness in your left arm?
18    A.    Yes.
19    Q.    So you went to the Health Center?
20    A.    Yes.
21    Q.    Was this the beginning of your shift,
22 middle of your shift, after your shift, end of your

Page 37

1 shift?  Do you remember?
2     A.    Before my shift because I was on my way to
3 work coming across the Woodrow Wilson Bridge.
4     Q.    And you said you went to the nurse?
5     A.    Yes.
6     Q.    He took your blood pressure?
7     A.    He took my blood pressure.
8     Q.    And said I have to get you out of here?
9     A.    He said you need to get out of here.
10    Q.    Do you know why he said that?
11    A.    My pressure was up so high.  He said you
12 need to get out of here.
13    Q.    So what happened next?
14    A.    They called the paramedics.  They came,
15 and they, I don't know what type of tests they ran,
16 but they did what they had to do and took me out of
17 there.  And they kept me in Fairfax County Hospital
18 from the time of 11 p.m. and, if I'm correct, it
19 could have been 2 p.m. when I left.
20    Q.    2 a.m. or p.m.?
21    A.    2 a.m. in the morning.  I'm sorry.  Yes,
22 ma'am.

10 (Pages 34 to 37)

# William Mack

## Page 38

1    Q.    And did anyone at Fairfax County tell you
2 what was wrong at that point?
3    A.    No, they just said the pressure was up,
4 and they didn't know here the stiffness in the arm
5 came from.
6    Q.    Did you ever find out from any doctor --
7 well, did you visit your own doctor after that about
8 that issue?
9    A.    Yes, six days after that they told me
10 don't go back to work until you see your physician.
11    Q.    And you went six days later?
12    A.    That's when the doctor scheduled the
13 appointment.
14    Q.    And in between that time you were off of
15 work; is that right?
16    A.    Yes, ma'am.
17    Q.    Were you off of work -- when you worked
18 for the Post, just so I'm clear about this, you had
19 other jobs, too; is that right?
20    A.    In 2003 I only worked at the Washington
21 Post.
22    Q.    Fair enough.  So you were out of work for

## Page 39

1 six days at that point while you were waiting to see
2 your doctor?
3    A.    Yes, ma'am.
4    Q.    And did you consult with your doctor about
5 what had happened with the high blood pressure?
6    A.    Doctor diagnosed hypertension.  The
7 pressure was up.
8    Q.    The doctor, did the doctor talk to you at
9 all about what the cause of the hypertension was?
10    A.    Yes.
11    Q.    And what were you told?
12    A.    Take the steroid shots, one of the side
13 effects.
14    Q.    Are you able to recall how recently you
15 had had the steroid shot?
16    A.    March the 5th.
17    Q.    Yes.  That wasn't a good question.  How
18 recently you had the steroid shot before this
19 incident in 2003?  In other words, how much in time
20 before you had this stiffness in your arm and the
21 high blood pressure?
22    A.    I don't remember exact date.

## Page 40

1    Q.    Do you remember if it was, like, three
2 days before or a month before or two months before?
3    A.    I don't remember.
4    Q.    And did the doctor explain to you anything
5 about the cause of the stiffness in your arm?
6    A.    Pressure is up.
7    Q.    I see, so he thought that your arm was
8 stiff because you had high blood pressure at that
9 time?
10    A.    Yes, ma'am.
11    Q.    Did the doctor tell you anything else
12 about the hypertension or prescribe any treatment
13 for it?
14    A.    No, never put me on high blood pressure
15 pills.
16    Q.    Did the doctor release you to return to
17 work?
18    A.    Yes, ma'am.
19    Q.    And did you return to work?
20    A.    Yes, ma'am.
21    Q.    Did you have any other issues with
22 hypertension at that point?

## Page 41

1    A.    No, ma'am.
2    Q.    Okay.  How about since then?
3    A.    After that date?  2003?
4    Q.    Yeah.  Yeah.
5    A.    I can't remember.
6    Q.    Okay.  So you can only remember,
7 basically, one incident of hypertension from 2003 on
8 where the doctors told you about, talked to you
9 about hypertension?
10    A.    Yes.
11    Q.    Did you continue to have your blood
12 pressure checked or anything like that?
13    A.    Every time I go to the doctor they check
14 my pressure.
15    Q.    And did you make any special appointments
16 to have it checked or it's just every time you go?
17    A.    The doctors make the appointment.
18 Whenever I see them, they make the next appointment.
19    Q.    And were the appointments also for
20 receiving your steroid shots?
21    A.    Yes, ma'am.  Yes, ma'am.  Only one
22 appointment, only one appointment since I was at the

11 (Pages 38 to 41)

William Mack

Page 42

1 Washington Post, two I didn't go for steroid shots.
2 I went to Louis Jennings, and that's when I had a
3 stomach virus, and that was December 2006 I also had
4 a stomach virus.
5     Q.    And you said there were two times?
6     A.    Yes.
7     Q.    And is that one time or the both times?
8     A.    Different, 2003 and then 2006.
9     Q.    And both times you had a stomach virus?
10    A.    Stomach virus.
11    Q.    And was that related in any way to your
12 sarcoidosis?
13    A.    I couldn't say.
14    Q.    Bad question.  Did the doctors ever tell
15 you that it was?
16    A.    No, ma'am.  Excuse me, but they did say
17 the stomach virus there for three days, and I
18 figured it would go away, but by me going to work,
19 drinking a soda, that's what react, made it react.
20    Q.    Okay.  I just want to make sure what
21 you're trying to tell me.  Was this in 2003 or 2006?
22    A.    2003 and 2006.

Page 43

1     Q.    Both times?
2     A.    Yes, ma'am.
3     Q.    You thought it would go away, but you
4 drank a soda.  I'm trying to understand.
5     A.    My stomach was aching.  The average person
6 have a stomach virus, you take your home remedies,
7 so you feel a little better, but it's still there.
8 So I went to work, and by me drinking a soda
9 thinking I could belch it and also gas on
10 my stomach at the time, so, when I went to my doctor
11 after hours, he said it was a stomach virus, gave me
12 Mylanta, take over the counter.  I was informed to
13 take over-the-counter medicine, two or three days
14 take off because your muscles from your stomach have
15 to go back down.
16    Q.    I see.  So is what you're telling me is
17 drinking the soda sort of made the stomach worse?
18    A.    Yes, ma'am.
19    Q.    And then you had to go to the doctor and
20 get additional medication for that?
21    A.    Yes, ma'am.
22    Q.    And that happened both in 2003 and 2006?

Page 44

1     A.    No.  One happened in 2003.  That's when I
2 saw Dr. Louis Jennings, and the other one happened
3 in 2006 of December.  It was the 4th and 5th.
4     Q.    And were -- okay.  December of 2006, you
5 weren't working for the Post at that time?
6     A.    It should have been December 4th and 5th
7 of 2005.
8     Q.    So you were working with the Post still?
9     A.    Yes, ma'am.
10    Q.    And I'm just trying to get this clear in
11 my head.  I'm sorry if I'm being dense.  In 2003,
12 was that when the soda made it worse or was that in
13 2005?
14    A.    2005.
15    Q.    And 2003 you know you had a stomach virus,
16 and you missed work?
17    A.    Yes, my stomach was feeling bad, and I
18 went to the doctor.
19    Q.    Okay.  I'm going to go back to some of
20 those symptoms that you mentioned to me of
21 sarcoidosis.  One of the symptoms that you mentioned
22 was that you experienced back pain; is that right?

Page 45

1     A.    Yes.
2     Q.    Can you explain to me how that manifested
3 itself?
4     A.    It was kind of funny.  I was picking up a
5 roll of toilet paper, and my back went out, and I
6 sat home on my days off; I was at the Washington
7 Post.  My hours was Monday, 2:45 to 10:45.  Then I
8 was off Tuesday, Wednesday, Thursday and Friday.  I
9 worked Saturday, 6:45 a.m. to 10:45 p.m., and I
10 worked Sunday at the Washington Post from 6:45 a.m.
11 in the morning not getting off until 10:45 p.m.  So
12 the days that I was off, Tuesday, Wednesday,
13 Thursday, Friday, I just sat home taking Advil until
14 it got so bad I went to the doctor that Friday
15 afternoon, and he say you have a muscle spasm, and
16 they put me on two medications.
17    Q.    Okay.  When was this, what year?  If you
18 remember.
19    A.    The year of this, yes, I remember.  It was
20 January.  It was the month of January.
21    Q.    Okay.
22    A.    2005 because employee, Charles Brown, he

12 (Pages 42 to 45)

# William Mack

Page 50

1    A.    Yes.  Mr. Brown worked 11 to 7.  He worked
2 11 to 7 shift at the Washington Post.
3    Q.    11 p.m. to 7 a.m.?
4    A.    Yes, ma'am.
5    Q.    And, as best you can recall, and I'm sure
6 we have it here and we'll get to it, how long did
7 the doctor suggest you needed to be off work for
8 this?
9    A.    I don't remember.
10    Q.    Did you at any point call the Post or
11 anyone at the Post and tell them that you weren't
12 going to be in?
13    A.    Yes.
14    Q.    When was that, if you can remember?
15    A.    I called right after I left, once I got
16 home and left Kaiser Medical Center.
17    Q.    So sometime on Saturday afternoon or
18 Saturday?
19    A.    Probably Saturday morning.
20    Q.    Saturday morning, okay.
21    A.    Yes.
22    Q.    Had you called them previously to tell

Page 51

1 them you wouldn't be in for your 6:45 shift on
2 Saturday?
3    A.    Yes.  When I'm out sick?
4    Q.    That day.
5    A.    Yes.
6    Q.    As best you can remember.
7    A.    Not that day.
8    Q.    Not that day?
9    A.    Not that day.  But that one time once I
10 left the doctor's office.
11    Q.    So, at some point in the morning after
12 your shift started, you called and told them you
13 wouldn't be off?
14    A.    Before my shift.
15    Q.    It was at 6:45?
16    A.    So it had to happen that Saturday.  It had
17 to happen either that Saturday or Friday because I
18 know my shift wasn't, I wasn't even on duty, and I
19 know I had to turn the doctor's slip in, so, when I
20 turned the doctor slip in, I called -- correction.
21 Let me correct myself.  I called off sick.  Then I
22 went to the doctor, and Mr. Brown turned my doctor's

Page 52

1 slip in for me.
2    Q.    I see.  Okay.
3    A.    There you go.
4    Q.    So, as best you can recall, you called off
5 sick at some point on Saturday morning before you
6 went to the doctor?
7    A.    It could have been, like, five in the
8 morning I'm sure, because I'm always calling in.
9 Always give them anywhere from eight to four hours'
10 notice.
11    Q.    Any -- is that the only incidence of back
12 pain or muscle spasms that you've experienced since
13 you've been diagnosed with sarcoid?
14    A.    No, I experienced another time, but I
15 don't remember the exact date, but I was given
16 Flexeril.
17    Q.    Flexeril?
18    A.    Yes, Flexeril,
19    Q.    I have back issues myself.  And, actually,
20 that brings up a good point.  Let me just try to
21 follow up on one point.  In connection with this,
22 with the back incident in January of 2005, what

Page 53

1 medication did the doctor prescribe, if you can
2 remember?
3    A.    I don't remember that.  I don't know what
4 I have.
5    Q.    That's fine.  So you say there was another
6 incident where you were prescribed Flexeril; right?
7    A.    Yes.
8    Q.    And when about when did that occur?
9    A.    I don't remember, but the first incident I
10 experienced a muscle spasm he gave me some extra
11 medication, and then, when the next, when the next
12 back pain came, I was at work, but I just took the
13 medication so I didn't have to worry about taking
14 off.
15    Q.    So you think this next incident was after
16 the January 2005 incident?
17    A.    No, before.
18    Q.    Before?
19    A.    Yeah, it was before.  It should have been
20 in 2005 when I had the next incident with my back,
21 but I was already at work, so I just went into my
22 bag and took the medication.

14 (Pages 50 to 53)

Page 54

1    Q.    So it was sometime in 2005?

2    A.    Yes, but I was at work.

3    Q.    And were you at work at the Washington

4 Post or somewhere else?

5    A.    Yes, Washington Post.

6    Q.    Did you take any time off from work

7 because of this incident?

8    A.    No.

9    Q.    Did you see the doctor or anything like

10 that?

11    A.    No, only in January because I remember,

12 since the plant manager, Roddy MacPherson, came to

13 the desk, and he said, yeah, I experienced muscle

14 spasm before, too, and also Donald Jackson, the

15 scheduling supervisor, he experienced back pain at

16 the same time.

17    Q.    I just want to ask you a little bit more

18 about that.  This is in connection with the

19 January 2005 incident; right?  That's what we're

20 talking about?

21    A.    Yeah.

22    Q.    And you said Roddy MacPherson who you said

Page 55

1 was the assistant plant manager.  Did you have a

2 conversation with him?

3    A.    Yes, when I came back.  I was at the front

4 desk because I was the first officer assigned to the

5 front desk in the lobby.  When he came back, he said

6 I heard you was out sick with a muscle spasm.  I

7 said, yes, sir.  He says he experienced them before,

8 so he know what I was going through.

9    Q.    Was there anything else to the

10 conversation or was that it?

11    A.    No, ma'am.

12    Q.    And then you said you had a conversation

13 with Mr. Jackson?

14    A.    Donald Jackson.  He said he experienced

15 them, too.

16    Q.    And who is Mr. Jackson?

17    A.    He's a shift, he's a scheduling

18 supervisor.  He scheduled everybody's schedule,

19 every officer's schedule at the Washington Post in

20 the Springfield plant when it comes to the security

21 officers.

22    Q.    Any other incidence of back pain or muscle

Page 56

1 spasms or anything else that you experienced since

2 you've been diagnosed with sarcoid?

3    A.    Not that I can remember, Miss.

4    Q.    Another symptom you mentioned to me was

5 swelling of your face?

6    A.    Yes, ma'am.

7    Q.    Does that ring a bell?  And can you tell

8 me how that affects you when you get the swelling of

9 the face?

10    A.    The face gets so bloated and, well, most

11 of the time I wouldn't even notice it until another

12 employee coming up and say, Mary Clark, the nurse at

13 the Washington Post, Springfield plant, she's a part

14 time nurse and also works full time with Lockheed

15 Martin, and I will go in to see her once before I

16 make my rounds, and she always would state you just

17 got your steroid shot, and yes, how can you tell?

18 Because your face is so bloated.

19    Q.    So is this another thing that you

20 experienced because you get the steroid shots?

21    A.    Yes, ma'am.

22    Q.    And you said Mary Clock?

Page 57

1    A.    Mary Clark, C-L-A-R-K.

2    Q.    Clark?

3    A.    Yes, ma'am.

4    Q.    And she would see this and say something

5 to you?

6    A.    Yes, ma'am.

7    Q.    And were you visiting her before your

8 rounds because she was a friend of yours, or were

9 you in the health place to get medical attention or

10 what was it?

11    A.    No, I'm a friend to everybody at the

12 Washington Post when it came to the nurses.  Every

13 employee, every nurse know I'm here today and make

14 the comment on the swelling in my face, and I was

15 always jumping on the scale.

16    Q.    You were jumping on the scale?

17    A.    To see if my weight went down, but I was

18 weighing 232.  I put myself on the diet, but my

19 weight went all the way up to 259, and I'm still

20 eating healthy.

21    Q.    So you had those weight gain issues that

22 we've already talked about?

15 (Pages 54 to 57)

William Mack

Page 58

1   A.   Yes, ma'am.

2   Q.   How often do you experience the swelling
3 of your face?

4   A.   After I get the shot.  Because I just had
5 a shot on March the 5th, and my face was so swollen
6 the doctor had to cut, you can see on the left side
7 of my cheek my face was completely cut.  He wanted
8 to cut tissue out of there.

9   Q.   Was that --

10   A.   Take the swelling out of my face, but it's
11 still swollen on the left side.

12   Q.   Okay.  I got it.  And, when you
13 experienced the swelling of the face, does it make
14 you unable to work, or are you still able to work?

15   A.   No, I can still work with the swelling in
16 the face, but it's the other side effects that will
17 come when I'm on certain medication that they gave
18 me was the drowsiness or if they gave me and said
19 don't drive; then I wouldn't drive.

20   Q.   And drowsiness is not something I think
21 you've mentioned so far, so I'll ask you some more
22 about that.  Was drowsiness the symptom of the

Page 59

1 sarcoidosis or from some other medication?

2   A.   Some of the medication they gave me for
3 sarcoidosis.

4   Q.   What medication was that?

5   A.   I don't know right off, but I -- I will
6 give to my attorney.

7   Q.   So, in addition to getting steroid shots
8 to treat the sarcoidosis, you also take medicine; is
9 that what I understand?

10   A.   Yes, I take pills.

11   Q.   And you just can't remember what those
12 are?

13   A.   I just got them.  My lawyer have them.

14   Q.   That's fine.  When you say you just got
15 them, what do you mean by that?  Have you not been
16 taking them very long?

17   A.   No.  When I went to the new doctor, Dr.
18 Golomb, he put me on pills.  I have to take two
19 pills twice a day.

20   Q.   And that's been since August of 2006?

21   A.   Yes, ma'am.  Yes, ma'am.

22   Q.   That's when you told me you started seeing

Page 60

1 him.  So, while you were working for the Washington
2 Post, you were not taking this medication?

3   A.   No, every doctor treat me in a different
4 way.

5   Q.   I know how that is.  So, while you were
6 working with the Washington Post at least, the way
7 that your sarcoid was being treated was with the
8 steroid shots?

9   A.   Yes.

10   Q.   And no pills?

11   A.   No.  They was giving me a face cream
12 called Hydroxy, if I'm correct, because the
13 Washington Post nurse, Andy, he gave me Hydroxy II,
14 and he asked me why Hydroxy II, and I said 'cause
15 they said Hydroxy II is stronger than Hydroxy I, and
16 it's a face cream you put on the area where the
17 lesion is.  The word "lesion" is another name they
18 call it when it's swelling up spots from the
19 sarcoidosis pop up on the face.  They call it
20 lesions.  So you stick it on the lesion, tries to
21 help bring some of the swelling down.

22   Q.   Are the lesions what you call acne before

Page 61

1 or something else?

2   A.   No, it's the sarcoidosis which is on my
3 left side of my cheek, right side of my leg, right
4 side behind my leg.  I got one just grew on my left
5 side of my leg and I have two on my left side of the
6 leg, and one just grew on my right side of the leg.
7 I have a total of three.

8   Q.   And what are they?  Some kind of --

9   A.   It look like a cyst.

10   Q.   Okay.

11   A.   That's what it look like, a cyst.

12   Q.   And do they, do these cysts or lesions
13 affect your ability to do your job or go to work or
14 anything like that?

15   A.   Only time it affects me is when I bump up
16 into something, and then, once it starts growing,
17 once it grow, I can feel the growth of it.  If I
18 bump into something with my leg, rub my leg, touch
19 my face a certain way, like I told my doctor, I
20 don't know what it's like to give birth, the pain
21 women say they go through, but just touching it is
22 painful.

16 (Pages 58 to 61)

William Mack

Page 62

1   Q.   So they are painful to touch?

2   A.   Yes.

3   Q.   Beyond being painful to touch, do they

4 affect your ability to do your job as a security

5 guard?

6   A.   Yes, because sarcoidosis dealing also

7 with, like, again my breathing, my health, walking.

8   Q.   And I get that.  I'm trying to sort of

9 figure this out sort of piece by piece.  I'm just

10 talking about the lesions themselves.  Do they have

11 any impact on your ability to do your job just

12 having the lesions?

13   A.   Yes, because the lesions have to do with

14 my breathing and walking.

15   Q.   I see.  So is the walking something

16 different than we've already talked about?

17   A.   Walking have to do with the sarcoidosis.

18   Q.   Right, but is it what we already talked

19 about in terms of the stiffness in your leg?

20   A.   Yeah, 'cause the lesions is another name

21 they call for the sarcoidosis.  It's another name

22 doctors, another term they use.  Some doctors say

Page 63

1 sarcoidosis; some doctors say lesions, because a

2 lesion, if they give me a shot here, it breaks off

3 and become one, two, three or four.  Give me a shot

4 in my left leg, it breaks off, so they say you have

5 a lesion popping up.  You have another lesion

6 popping up.  That's why they call it lesion.

7   Q.   And I've got that, and I've got you have

8 these lesions and that's part of the sarcoidosis.

9   A.   Yes.

10   Q.   And we already talked about you having

11 stiffness in the leg and that affecting your

12 walking.

13   A.   Yes, ma'am.

14   Q.   And what I'm trying to get at, are you,

15 when you say you have trouble walking in connection

16 with sarcoidosis, are you talking about what we

17 already talked about?

18   A.   Yes, ma'am.

19   Q.   Or are you talking about something

20 different?

21   A.   It's the same.

22   Q.   Okay.  I am just trying to not go through

Page 64

1 all that again.

2   A.   I understand.

3   Q.   The breathing we hadn't yet gotten to.

4 You say that you have issues breathing; is that

5 right?

6   A.   Yes.

7   Q.   And how does that manifest itself?

8   A.   Well, the Washington Post gave me a test.

9 I don't remember exactly what year, and they asked

10 me, I had to blow into a tube and see how my

11 breathing is, and I failed the test twice, and I

12 told her the reason I know I failed the test because

13 I take steroid shots, and it's hard for me when I'm

14 walking, my breath lose, I lose breath a lot.

15   Q.   Okay.  And have you consulted with your

16 doctor about this issue?

17   A.   Yes.  They told me just keep my eating

18 healthier and keep my weight down.

19   Q.   And it sounds to me like this is another

20 thing that's a result of the steroid shots; is that

21 right?

22   A.   Yes, ma'am.

Page 65

1   Q.   Any other symptoms that we haven't already

2 talked about that you experience as a result of the

3 sarcoidosis?

4   A.   No, ma'am.

5   Q.   Since you were diagnosed with sarcoidosis

6 in September of 2001, did you tell anyone at the

7 Washington Post that you had sarcoidosis?

8   A.   Yes.

9   Q.   Did you tell one person or more than one

10 person?

11   A.   More than one.

12   Q.   I'd like to go back, if you can, to the

13 first time you told somebody you had sarcoidosis.

14 Just try to go back there in your mind, and I'll ask

15 you some questions about that.  Can we do that?

16   A.   Yes, the first person I told was Belcher

17 McNeil.  Belcher, B-E-L-C-H-E-R, McNeil.

18   Q.   And who's Mr. McNeil?

19   A.   He's the 10:45 to 6:45 p.m. shift

20 supervisor.

21   Q.   10:45 p.m. to 6:45 a.m.?

22   A.   I'm sorry.  Yes.

17 (Pages 62 to 65)

William Mack

Page 66

1    Q.    I want to make sure we're speaking the
2 same language here.  I think we are.
3    A.    Yes.
4    Q.    And you were on that shift at least some
5 of the time; is that right?
6    A.    Yes, ma'am, I was on that shift with him.
7    Q.    When were you on that shift?
8    A.    That was in the year of 2001, 2002 and
9 2003.
10    Q.    And can you remember about when you told
11 him?
12    A.    Yes, I can remember.  It was anywhere
13 between, well, had to be after 11 p.m. because he
14 was always sitting in there with me.
15    Q.    Do you remember when in terms of 2001,
16 2002, 2003?
17    A.    2002.
18    Q.    Do you know when in 2002?
19    A.    It was the month of October.
20    Q.    And was there something that happened that
21 prompted you to tell him about this?
22    A.    Yes, because I was taking, going to see a

Page 67

1 physical therapist for the stiffness in my leg.
2    Q.    And when was the recommendation made to
3 you that you see a physical therapist?
4    A.    Had to be the month before, if I went in
5 October, had to be a month before October.  It was a
6 month before that.
7    Q.    So sometime in September, somewhere in
8 there?
9    A.    Yes.
10    Q.    And are you able to remember what you said
11 to Mr. McNeil?
12    A.    Yes, I told him I have a skin disease
13 called sarcoidosis, and I told him, I told him I had
14 a skin disease called sarcoidosis, and he said what
15 is that.  It's like a tissue that grows, because he
16 was asking me about making my rounds, and I said
17 this sarcoidosis is giving me a hard time to walk
18 because I have a lot of stiffness in my leg.  He
19 said okay.  Just do the best you can.  Do the best
20 you can do.
21    Q.    All right.  Anything else that he said to
22 you or that you said to him in this conversation?

Page 68

1    A.    No, ma'am.  No, ma'am.
2    Q.    Nothing else?
3    A.    No.
4    Q.    Did you talk to him about needing time off
5 to go to physical therapy or anything like that?
6    A.    Yes, I did.
7    Q.    Okay.  Same conversation?
8    A.    Yes, same conversation, yes.
9    Q.    And what did you tell him about that?
10    A.    Well, I told him eventually I'll need time
11 off.  This stiffens my leg.  He said okay, that as
12 long as I bring a doctor slip back.  And the policy
13 was bring a doctor slip back after you out sick for
14 two days.
15    Q.    Did you have any other conversation --
16 well, let me just wrap up this one.  Is that the
17 total conversation, as best you can remember it,
18 with Mr. McNeil at that time?
19    A.    Yes, ma'am.  Yes, ma'am.
20    Q.    Let me try to get my questions out, and
21 then you can answer me.  Did you have any other
22 conversations with Mr. McNeil at any point about

Page 69

1 sarcoidosis?
2    A.    No.
3    Q.    Did you have any conversations with
4 Mr. McNeil at any point about needing to be out
5 sick?
6    A.    No, 'cause he always told me bring your
7 doctor's slip, and you're covered.
8    Q.    And were you, in fact, out sick -- well,
9 Mr. McNeil was your supervisor; right?
10    A.    Yes, ma'am.
11    Q.    And were you, in fact, out sick while he
12 was your supervisor?
13    A.    Yes, I was.
14    Q.    Were you out sick for sarcoidosis?
15    A.    Yes, I was.
16    Q.    Did you bring in doctor's slips?
17    A.    Yes, ma'am.
18    Q.    And were the absences approved?
19    A.    Yes, ma'am.  Mr. Smith -- I'm sorry.  Not
20 Mr. Smith.  Mr. McNeil is the submitter, and the
21 submitter at the Washington Post is once you look,
22 once he look at the doctor slip, he pass it on to

18 (Pages 66 to 69)

William Mack

Page 70

1 Mr. Smith, but I'm sorry. Go farther back. When I
2 come back off from being sick, I cannot go to my
3 department unless Health Service clear me. Once
4 Health Service look at my doctor slip, they keep a
5 copy. They put, they xerox a copy and give it to
6 the shift supervisor, security manager, which is
7 Mr. Smith. I couldn't go to my department unless
8 the nurses clear you, which is Ann Griffin or
9 whoever staff is working that night.
10    Q.    Just to make sure I understand this, I
11 think I do, but you come back from being off sick
12 for whatever reason?
13    A.    Yes, ma'am.
14    Q.    You come back, give your doctor's slips to
15 the Health Services Office?
16    A.    Yes.
17    Q.    They clear you to return to work?
18    A.    To that department.
19    Q.    To whatever department you're assigned to?
20    A.    Yes, ma'am.
21    Q.    And they send, as far as you know, they
22 keep a copy of your doctor's slip and send a copy to

Page 71

1 somebody in your department?
2    A.    Belcher McNeil.
3    Q.    Mr. McNeil?
4    A.    Look at it, approve it 'cause they approve
5 it and give it to Mr. Smith.
6    Q.    And did you typically get paid for your
7 absences?
8    A.    Yes, ma'am.
9    Q.    Okay. After the conversation with
10 Mr. McNeil which you told me was the first
11 conversation you could remember about sarcoidosis,
12 who else did you talk to -- I want to go to the next
13 conversation that you had that you can remember with
14 anybody at the Post about sarcoidosis, and I'd like
15 you to tell me about that, if you remember.
16    A.    Mr. King.
17    Q.    Who is Mr. King?
18    A.    David King, right now he was a security
19 officer. He's a shift supervisor on the 11 p.m.
20 shift, 11 p.m. to 7 a.m. shift.
21    Q.    Okay. He was a security officer, and now
22 he's a shift supervisor?

Page 72

1    A.    Yes, ma'am.
2    Q.    When did you have a conversation with
3 Mr. King?
4    A.    It could have been 2004, if I'm correct.
5    Q.    And was he, at that time, was he a shift
6 supervisor or security officer?
7    A.    Security officer.
8    Q.    So he was one of your peers sort of,
9 somebody you worked with?
10    A.    Yes, I worked with his sister at Riggs
11 National Bank years ago.
12    Q.    And, at this point, you were working with
13 him at the Post?
14    A.    Yes, ma'am.
15    Q.    What was the nature of your conversation
16 with Mr. King?
17    A.    The nature of the conversation was I told
18 him I have sarcoidosis, and I was informing him how
19 the bumps grow up on your skin because only if I'm
20 correct on his right side of his face he had a bump
21 that looked like sarcoidosis, and I said you should
22 have it checked out because it might be sarcoidosis

Page 73

1 because my doctor's giving me this cream called
2 Treadmill, if I'm correct, and I say this cream
3 works pretty, is working right now for me. So he
4 said bring it and let me see it. I showed it to him
5 and why don't you go to your doctor.
6    Q.    Anything else in that conversation?
7    A.    Yes. The following year of 2005 David
8 King was sitting in there with me, and Maurice
9 Turner, who worked as a paper handler, he came in
10 and said, "Damn, what's wrong with your face?"
11    Q.    To you?
12    A.    Yes. I said, "What you mean? He said,
13 "Did your wife beat you up?" My left side of my
14 face was swollen. I said, "No, I have a skin
15 disease called sarcoidosis." Sarcoidosis? What is
16 that? Same thing that Bernie Mac have, the actor.
17    Q.    And did you, you told him that or --
18    A.    Yes, I told him; I said, same skin disease
19 as Bernie Mac have I have.
20    Q.    Now, at the time of this conversation,
21 which you said was in 2005, was King a security
22 officer or shift supervisor?

19 (Pages 70 to 73)

William Mack

Page 74

1   A.   King was a security officer at the time.

2   Q.   And the two of you were, were you on a

3 break or what?

4   A.   Yes, I came in from making my rounds

5 because he was at the desk.

6   Q.   So you were standing at the security desk?

7   A.   Yes, I came in, came into the security

8 office, yes.

9   Q.   And Mr. Turner is a paper handler at the

10 Post?

11   A.   No, his name is Maurice -- I'm sorry --

12 Maurice Cosby.

13   Q.   Cosby?

14   A.   Carsby.

15   Q.   C-A-R-S-B-Y, something like that?

16   A.   Yes, ma'am.

17   Q.   So you were just having a casual

18 conversation with him, and he asked you what was

19 wrong with your face?

20   A.   Yes, he was coming on duty.

21   Q.   Any other conversations about sarcoidosis

22 which Mr. King was present that you can recall?

Page 75

1   A.   No.

2   Q.   Any other conversations about sarcoidosis

3 with Mr. Carsby that you can recall?

4   A.   No, ma'am.

5   Q.   Okay.  I'd like to sort of take you -- are

6 there any other conversations you've had with

7 anybody at the Post about sarcoidosis?   .

8   A.   Yes, ma'am.

9   Q.   Can we go to the next --

10   A.   Mary Powell.

11   Q.   Mary Powell?

12   A.   Yes, ma'am.

13   Q.   And who's that?

14   A.   She's a Registered Nurse in the Health

15 Center at the Washington Post, and she also was

16 working the 6:45 a.m. to 10:45 p.m. shift.

17 Correction.  She's working -- yes, 6:45 a.m. to

18 2:45 p.m. shift.

19   Q.   2:45?

20   A.   Yes, ma'am.

21   Q.   Any particular day or just --

22   A.   It was a Saturday.

Page 76

1   Q.   Saturday.  And are you able to remember

2 what month or what year you had the conversation

3 with her about?

4   A.   No, ma'am.

5   Q.   Okay.  Are you able to remember whether it

6 was before or after your conversation with Mr. King

7 that we just talked about?

8   A.   It was after.

9   Q.   So sometime after?

10   A.   Yes.

11   Q.   Okay.  And what was the nature of your

12 conversation with Miss Powell?

13   A.   Well, I told her to check could she define

14 the word for me and give me some research on

15 sarcoidosis, so she went into Health Center because,

16 if I'm correct, she's a nurse also at the time for

17 the United States Army.  And she went into her

18 office and did research and told me what sarcoidosis

19 was.

20   Q.   Are you able to remember what she told

21 you?

22   A.   No, but she gave me all the papers.

Page 77

1 That's what I can remember.

2   Q.   She gave you some documents you mean?

3   A.   Documents, yes, ma'am.

4   Q.   Lawyer's word for paper.  Do you still

5 have that, what she gave you?

6   A.   No, ma'am.  But I have so much

7 documentation my doctors gave me after that.

8   Q.   Do you remember what the documentation

9 said?

10   A.   It talked about what sarcoidosis comes

11 from.

12   Q.   What causes it you mean?

13   A.   Yes.  Average African male between the age

14 of 30 and 40, they get it, but that's all I can

15 remember.

16   Q.   So the purpose of your conversation, you

17 were trying to get information from Miss Powell?

18   A.   Yes.  She give me a little history on

19 sarcoidosis.

20   Q.   Were you asking her to approve any time

21 off or anything like that in this conversation?

22   A.   No, she can't approve no time off.  She's

20 (Pages 74 to 77)

William Mack

Page 78

1 a nurse, not my immediate supervisor.

2     Q.    Anyone else at the Post who you have had

3 conversations with about sarcoidosis?

4     A.    Mary Hurst.

5     Q.    H-U-R-S-T?

6     A.    Yes.

7     Q.    And who's that?

8     A.    She's a Registered Nurse at the Washington

9 Post.

10    Q.    And what was -- well, when was the

11 conversation with Miss Hurst, as best you can

12 remember?

13    A.    On a Saturday.

14    Q.    And was it after, some point in time after

15 your conversation with Miss Powell?

16    A.    Yes, could have been after or before

17 because I always talk to the nurses.

18    Q.    Do you remember what year it was by any

19 chance, approximately?

20    A.    I'd say the end of 2004, going into 2005,

21 yes.

22    Q.    Do you remember what shift you were

Page 79

1 working by any chance?

2     A.    Yes.  It was the morning shift.

3     Q.    6:45 a.m. --

4     A.    Yes.

5     Q.    -- to 2:45, is that the morning shift?

6     A.    Yes, 6:45 a.m. to 2:45 p.m.

7     Q.    What was the nature of your conversation

8 with Miss Hurst?

9     A.    Well, I stepped in; I always step in

10 before I make my rounds, and she said, always just

11 joke with the nurses, say, well, where you been at.

12 I said I've been out sick, been out sick.  What's

13 wrong, and I told her.  And she said, oh, you have

14 sarcoidosis.  I said yes.  She said you know what; I

15 have worked with a doctor, and he have, she said she

16 had a friend with sarcoidosis on her leg, and she

17 said she uses healing cream, and I also gave her

18 some healing lotion.  She said I'm going to bring

19 you some.  I want you to try it, and from this day I

20 still have the healing cream and lotion, and she

21 gave me a brochure on it.

22    Q.    What kind of cream was it?

Page 80

1     A.    A healing cream, you rub it on; you rub it

2 on the lesions.

3     Q.    Did it help?

4     A.    No, 'cause she said some people it help,

5 and some people it don't.

6     Q.    Anything else?  Any other part of your

7 conversation with Miss Hurst?

8     A.    No, the swelling of the face, she said I

9 can always tell when you have took that shot because

10 your face don't look like -- it make me feel down

11 'cause my face is so bloated.

12    Q.    Anything else?

13    A.    No, that's it.

14    Q.    Any other conversations with Miss Hurst

15 about sarcoidosis?

16    A.    No, ma'am.

17    Q.    Any other conversations with anybody else

18 at the Post about sarcoidosis?

19    A.    The nurse, Ann Griffin.

20    Q.    Ann Griffin?  Who's Ms. Griffin?

21    A.    She's the supervisor in the Health Center,

22 the overall supervisor of all the nurses.

Page 81

1     Q.    As far as you know, she's a nurse?

2     A.    Yes.

3     Q.    And when did you talk to her, if you can

4 remember?

5     A.    Well, I had to talk to her very first time

6 I started turning in documentations.

7     Q.    When was that?

8     A.    It been so long I don't remember, 'cause I

9 can't come back to work unless I give the health

10 nurses all the information, and by her being the

11 shift supervisor, the supervisor of all of the

12 nurses, you have to look at all of the

13 documentation.

14    Q.    So are we talking, this was back in 2002

15 or was this in 2005?  Just trying to get a feel for

16 this.

17    A.    I remember she approaching me about it,

18 the sarcoidosis, and it could have been 2003, yes,

19 ma'am.  That was the first time she ever say

20 anything about it.

21    Q.    And what was the nature of the

22 conversation with her?

21 (Pages 78 to 81)

William Mack

Page 82

1  A.   She came to the desk because I remember
2 Mr. Smith was telling me he was going to terminate
3 me.  I said why you going to terminate me.  He said
4 you abusing the sick leave.  I said I cannot abuse
5 the sick leave.  I have 170 hours on the books, and
6 I always bring you a doctor's slip, and I said you
7 can call Kaiser, get them an authorization sheet to
8 call Kaiser to check.
9      Q.   And so how did Ms. Griffin come into this?
10 I mean, you're talking about talking to Smith.
11     A.   She was standing there.
12     Q.   She was there.  I see.  And you think this
13 was in 2003?
14     A.   Yes, ma'am.
15     Q.   Did she say anything?
16     A.   She accepted, gave me release form that I
17 could fill out so they can call Kaiser to check.
18     Q.   Did you fill out that form?
19     A.   Mm-hmm.
20     Q.   Did you give it to anybody?
21     A.   Yeah, Ann Griffin.
22     Q.   Had you provided Ms. Griffin with some

Page 83

1 kind of medical documentation that caused her to
2 give you this release form?  I'm just trying to
3 figure out what happened, why is she in this
4 conversation at all.
5      A.   By her being the, 'cause I told her if you
6 want to you can call Kaiser, and that's when she
7 said, well, she can't call Kaiser unless I give
8 authorization.  I said, okay, no problem.
9      Q.   What caused her to be in this conversation
10 at all?
11     A.   Mr. Smith.
12     Q.   So Smith called her you think?
13     A.   Mr. Smith, yes.
14     Q.   And who's Mr. Smith?
15     A.   He's, Mr. Smith is the security manager.
16     Q.   And again you think this was in 2003?
17     A.   Yeah, 2003.  Yeah.
18     Q.   Before Smith called Ms. Griffin, were you
19 having a conversation with him?
20     A.   Yes.
21     Q.   Okay.
22     A.   He was at the front desk.

Page 84

1      Q.   And what prompted the conversation?
2      A.   I don't know, Miss.  Mr. Smith was always
3 on me about sick leave.  I just don't know.  I just
4 never knew when I come to work when would he call me
5 or leave me a note on my time card about sick leave.
6 I just don't know.
7      Q.   I asked a bad question.  I'm not asking
8 you to get into his head.  What I'm saying is did he
9 talk to you when you came into work or something?
10 What happened that you started to have this
11 conversation with him?
12     A.   He just came up and asked me about sick
13 leave.
14     Q.   And what did he ask you specifically, as
15 best you can remember?
16     A.   He said he's sick and tired of me taking
17 sick leave.  I said I'll give you a doctor's slip
18 when I come back.
19     Q.   Can we try to pin down a little better
20 about when this was?  I know you said 2003.  Do you
21 remember whether it was summertime, wintertime,
22 fall, anything like that you can remember?

Page 85

1      A.   I don't remember.
2      Q.   Had you just gotten to work?  Is that --
3 again, as best you can remember, I know it was a
4 while ago?
5      A.   No, because Mr. Smith was already at work.
6      Q.   He was at work?
7      A.   I know it was a 3 to 11 shift because he
8 was there; Mr. Smith was there.
9      Q.   And he came up to you?
10     A.   Yes.
11     Q.   You were just going about your normal job
12 duties?
13     A.   I was at the front desk.
14     Q.   Front desk?
15     A.   In the lobby at the security post.
16     Q.   And were you working the front desk?
17     A.   Yes, ma'am.
18     Q.   And he came up to you and said that he was
19 sick and tired of you taking sick leave?
20     A.   Yes, ma'am.
21     Q.   And what was your response?
22     A.   I said I bring a doctor's slip every time

22 (Pages 82 to 85)

William Mack

Page 86

1  I come back.

2      Q.    What did he say?

3      A.    Well, I'm sick and tired of you taking

4  sick leave.

5      Q.    And then what did you say?

6      A.    I said I don't know what to tell you. If

7  you think I'm lying to you, call my doctors.  I'll

8  fill out an authorization form so you can call them.

9      Q.    And at what point -- was Ms. Griffin there

10  the whole time?

11     A.    No, ma'am.

12     Q.    When did she come into the conversation?

13     A.    After he went into the office to get the

14  form.

15     Q.    So you said call my doctor if you don't

16  believe me.  He said okay, I'll go get the form?

17     A.    I don't know if that was his exact words.

18     Q.    Right.  I understand that.  I'm just

19  trying to figure out what the sequence was.  And she

20  came back out with him?

21     A.    Yes, with the form to give to me.

22     Q.    She gave you the form.  Did you sign it

Page 87

1  right then and return it to her?

2      A.    No, ma'am.

3      Q.    Do you know when you signed it?

4      A.    Probably before the night was out, yes.

5      Q.    And then what did you do, take it back to

6  Health Services?

7      A.    No, she came back past the desk before she

8  got off, and I gave it to her.

9      Q.    In this conversation, and if there are

10  more, we'll get to them, but in this conversation

11  did Smith say anything else to you?

12     A.    No.  One thing he did, and it rings a

13  bell, it was another female at the Washington Post

14  before I was hired by the Washington Post, and she

15  took I think it was a whole year she was bringing

16  doctor's slips, and they found out that she was

17  forging doctor's slips.  So I can't sit here and say

18  that's why he was harassing me because I was taking,

19  because of this female was taking a whole year and

20  they terminated, the Post found out and terminated

21  her because for a whole year she was bringing

22  doctor's slips, and they found out she was bringing

Page 88

1  in fake documentation.

2      Q.    Did he mention that to you in this

3  conversation, or did you just know that, and you're

4  kind of thinking that maybe that's why he talked to

5  you?

6      A.    No, no, no, because I remember him telling

7  me it was somebody else bringing in doctor's slips,

8  there was somebody else, and then I asked Bernard

9  Carr.  He said it was somebody else bringing

10  doctor's slips.  And that's when Mr. Carr told me

11  the female's name, and I said that's probably why

12  he's on me.

13     Q.    So in this conversation that we're talking

14  about --

15     A.    Yes.

16     Q.    -- Smith said to you somebody else was

17  bringing in these doctor's slips?

18     A.    Right.  It was a female.  I remember that.

19     Q.    And what else, did he tell you anything

20  else about that?

21     A.    No, uh-uh.  He didn't say nothing.

22     Q.    Did he say we caught the person, and she's

Page 89

1  going to get fired or anything like that?

2      A.    No.  I know Bernard Carr told me that

3  information.

4      Q.    And I'll get to that.  I'm just talking

5  about Smith.  He said out of the blue somebody else

6  has been bringing in doctor's slips?

7      A.    Yes, another person bringing in doctor's

8  slips, and he found out she was forging doctor's

9  slips.

10     Q.    He said something like this, and I

11  understand you may not remember his exact words, but

12  we found out she had been forging them?

13     A.    Yes.

14     Q.    So, did you respond to that?

15     A.    No, I didn't have to respond.  It wasn't

16  really none of my business about her because I was

17  just worried about myself.

18     Q.    Did you take that as him accusing you?

19     A.    Yes, ma'am.  Tell you the truth, yes,

20  ma'am.

21     Q.    Did you say anything about that to him?

22     A.    No, ma'am, because I know my slips was the

23 (Pages 86 to 89)

William Mack

Page 90

1  truth.

2      Q.    So you just didn't take him out on that?
3  You just let it go?

4      A.    Like I did everything else for all the
5  years with the Post when it came to Mr. Smith.

6      Q.    Anything else about the conversation with
7  Smith?

8      A.    No, ma'am.

9      Q.    And you said that after that you talked to
10 Mr. Carr.  Who's that?

11     A.    Bernard Carr was another shift supervisor
12 who worked midnight shifts because he was part time.
13 He was a part time on call, but I don't know if he
14 was part time regular or part time, but I know I
15 worked with him, and I happened to ask him about it.
16 Yes, there was a female here, and she was coming in
17 calling off sick, and we found out for a whole year
18 that she was bringing, forging her doctor's slips.

19     Q.    Okay.  Now, I sort of started this
20 question with whether you had any conversations with
21 anybody about sarcoidosis, and you told me Ms.
22 Griffin, and that's how we kind of got into this.

Page 91

1  Do you remember telling Ms. Griffin or Mr. Smith in
2  this conversation that you have sarcoidosis --

3      A.    Yes, ma'am.

4      Q.    -- or anything about sarcoidosis?  What
5  did you tell them about it specifically?

6      A.    I told Ms. Griffin, her first name was
7  Ann, last name Griffin, I have a skin disease called
8  sarcoidosis, okay.  Well, fill out this
9  authorization for release so they can contact my
10 doctor and check whenever I bring a doctor's slip
11 in.

12     Q.    And did, was Mr. Smith there present for
13 that part of the conversation?

14     A.    No, 'cause I know he went to the men's
15 room.

16     Q.    So you think he wasn't there --

17     A.    I know he wasn't there.

18     Q.    -- when you told Mr. Smith?  Okay.  Fine.
19 Anything else that you talked to Ms. Griffin about
20 with regard to sarcoidosis?

21     A.    No, ma'am.  That was it.

22     Q.    Any other, was that the only conversation

Page 92

1  you ever had with her about sarcoidosis?

2      A.    Yes, ma'am.

3      Q.    Any other conversations besides the ones
4  we've already talked about that you had with anybody
5  at the Washington Post regarding sarcoidosis?

6      A.    Roddy MacPherson.

7      Q.    And he's the assistant plant manager;
8  right?

9      A.    Yes, ma'am.

10     Q.    Finally a name I recognize.  And when did
11 you talk to him about sarcoidosis?

12     A.    It was March the 29th, 2003, afternoon
13 shift.

14     Q.    You seem to remember that really
15 specifically.  Why do you remember that date?

16     A.    I was taking a training course on new
17 computers and monitors Washington Post was
18 installing by CIS Security Technology, if I'm
19 correct.

20     Q.    And what was the nature of your
21 conversation with Mr. MacPherson?

22     A.    If I'm correct, I was in B1 conference

Page 93

1  room, the first person in there.  Mr. MacPherson
2  came in said, hello, Mr. Mack, how are you doing.
3  Is everything all right?  Not so good.  What's the
4  problem?  Mr. Smith keep harassing me about sick
5  leave.  Every time I come back, he said bring doctor
6  slip.  He said Mr. Smith make the policies and the
7  rules in that department, so you need to work that
8  out with him.

9      Q.    Did you mention sarcoidosis specifically
10 in this conversation, or was it just about what you
11 believed to be Mr. Smith's harassment?

12     A.    Harassment of the sick leave, yes, ma'am,
13 but that's the only time I was out was for the
14 sarcoidosis.

15     Q.    And we'll definitely get there.  I'm just
16 trying to figure out the conversation.  So, as best
17 you can remember, you didn't specifically mention
18 sarcoidosis to MacPherson?

19     A.    No.

20     Q.    Any other conversations --

21     A.    As a matter of fact, 2003 I went up for a
22 promotion, and we have two interviews by the system

24 (Pages 90 to 93)

William Mack

Page 94

1 plant manager, which is Roddy MacPherson, and the
2 other one was Mr. Smith had talked to -- yeah,
3 because, okay, I talked to him before the interview,
4 and he called me in his office, and he asked me a
5 little bit about the position, about the full-time
6 position, and he said then he went on to tell me
7 what could hold me back from getting this promotion,
8 and he said Mr. Smith might look at the days you've
9 been out sick, and that could hold you back from
10 getting this promotion.
11      Q.    And was sarcoidosis specifically mentioned
12 in that conversation?
13      A.    Yes, ma'am.  Yes, ma'am.
14      Q.    How?  What happened?  Did you respond?
15      A.    Yes, ma'am.  Yes, I did.
16      Q.    What did you say?
17      A.    The reason I be out sick, I said I have a
18 skin disease called sarcoidosis, and I have side
19 effects from this skin disease whenever I get a
20 steroid shot.  He said, well, I understand he said,
21 but Mr. Smith going to make that last decision.
22      Q.    Anything else to that conversation with

Page 95

1 MacPherson?
2      A.    No, ma'am.
3      Q.    Any other conversations with MacPherson
4 that you can remember where sarcoidosis was
5 mentioned?
6      A.    No, ma'am.
7      Q.    Anybody else at the Washington Post that
8 you talked to regarding sarcoidosis?
9      A.    Jan Doll, J-A-N, D-O-L-L.
10     Q.    Who's Ms. Doll?
11     A.    She's a personnel manager, personnel
12 manager at the Springfield plant.
13     Q.    Okay.  And when did you talk to her?
14     A.    And that was October the 29th, 2003.
15     Q.    What was the nature of your conversation
16 with Ms. Doll?
17     A.    I remember me going to her office because
18 I was asking about, because they took, like, it was
19 two people for them to make the decision of who get
20 the promotion of the full-time position, and we was
21 always told that they was going to let the security
22 supervisor, which was Belcher McNeil and Bernard

Page 96

1 Carr, to make the final decision who get the
2 position.  So, when I was me, myself, William Mack
3 and David King was the last two there, they had to
4 see who had the most experience.  And then Mr. Smith
5 got involved with it, and he say he don't want
6 William Mack because he challenged me in 2000 on the
7 sick leave policy, and I talked to Jan Doll about
8 that.
9      Q.    And you talked to her about this situation
10 with the promotion?
11     A.    Yes.
12     Q.    And about how you felt like you didn't get
13 the promotion for reasons that were unfair; is that
14 a fair way to put it?
15     A.    Kept bringing up sick.  Roddy MacPherson
16 and Mr. Smith kept bringing up sick.
17     Q.    How much you were out sick?
18     A.    Yep, it came up.
19     Q.    Okay.  What did you say to Ms. Doll about
20 sarcoidosis, if anything?
21     A.    I told Ms. Doll, I said the reason I'm out
22 sick is because I have sarcoidosis, and I take

Page 97

1 medication, and, when I take it, when I take the
2 medication, which is the steroid shot, I have side
3 effects from it.
4      Q.    And did you tell her that the side effects
5 made you miss work?  Is that fair?
6      A.    Yes, yes, yes, ma'am.  Yes, ma'am.
7      Q.    Anything else that you talked to Ms. Doll
8 about specific to sarcoidosis?
9      A.    Yes.  March the 20th, 2005.
10     Q.    Okay.  What was the nature of your
11 conversation with Ms. Doll?
12     A.    The nature of my conversation is I wrote
13 an employee up for using abusive language, kept
14 going out of the emergency exit door.
15     Q.    Okay.
16     A.    So I did a security report.  She had to
17 question me about what I put in the report, had to
18 hear my side of the story.
19     Q.    Did that conversation focus on the
20 incident with the employee or did you talk about
21 sarcoidosis in that conversation?
22     A.    The employee.  Then she said, well, how

25 (Pages 94 to 97)

William Mack

Page 98

1 are you doing, and that's when I said not so good.

2 Why?  Mr. Smith keep harassing me about my sick

3 leave.  And, Ms. Doll, I have a skin disease.  I

4 told you once about sarcoidosis, and, at that time,

5 I was wearing makeup on my face.  A lot of times

6 when the swelling comes up on my face I would put

7 makeup on, so I took the makeup off, and she said

8 yes, I can see it, and she said, well, I will talk

9 to Mr. Smith.

10     Q.    Anything else in that conversation about

11 sarcoidosis?

12     A.    That was it.

13     Q.    Any other conversations with Ms. Doll

14 about sarcoidosis?

15     A.    Yes.

16     Q.    Okay.  When?

17     A.    That date was May the 8th when they

18 terminated me.

19     Q.    Of 2006; right?

20     A.    Yes.

21          MS. HOLMES:  Do we need to take a break?

22 Let's take a quick break.

Page 99

1          (Whereupon, a short recess was taken from

2 11:13 to 11:19 a.m.)

3 BY MS. HOLMES:

4     Q.    Okay.  Mr. Mack, before the break we were

5 talking about a conversation you had with Ms. Doll

6 on the 8th of May 2006.  Are you able to tell me

7 what you talked to her about on that date?

8     A.    I told her Mr. Smith was harassing me

9 about sick leave.  I'm tired of Mr. Smith harassing

10 me about the sick leave when I bring him

11 documentation.  I went on to tell her and told her I

12 had a skin disease.  I told her again, and I took

13 the makeup off my face, and she said, well, I'll

14 talk to Mr. Smith.

15     Q.    She said she had talked to him?

16     A.    She said she's going to.  No, she said

17 she's going to do an investigation and also talk to

18 Mr. Smith.

19     Q.    Anything else to the conversation?

20     A.    No, ma'am.

21     Q.    Do you know whether or not she ever did an

22 investigation?

Page 100

1     A.    She did not do it.

2     Q.    On May 8, am I right that's the day you

3 were notified that the Post wouldn't be calling you

4 anymore?

5     A.    No, ma'am.  That is not the date.

6     Q.    I'm sorry.  Okay.  What date was that?

7     A.    It was April 28.

8     Q.    April the 28th is the day you talked to

9 Ms. Doll?

10     A.    No, April the 28th is the day I talked to

11 Mr. Smith on the phone.

12     Q.    I see.

13     A.    And he told me he was going to terminate

14 me, and I asked him why, and he said you take too

15 much time off.  You abuse the sick leave.  Sir, I am

16 not abusing my sick leave.  He said, well, I have

17 the information right in front of me.  I'm looking

18 at it.  So I said okay.  So I hung up.  I turned

19 around, called him back.  I said, Mr. Smith, can you

20 fax me what you have.  He said yes, sir.  He faxed

21 it to my wife's job, Catholic University.  He said

22 I'm going to terminate you because you missed

Page 101

1 18 days, and he faxed it to her.

2     Q.    Okay.  So you talked to Smith on the 28th,

3 and then you talked to Ms. Doll on May 8?

4     A.    Mm-hmm.

5     Q.    And asked her to do an investigation?

6     A.    Way before May 8 I talked to Gary Corso.

7 I talked to Gary Corso April 25th.  Excuse me.

8 I talked to Gary Corso April the 3rd.  I called him

9 approximately 10:32 a.m., and he called me back.  I

10 said yes, Mr. Corso, this is Mr. Mack.  I got my

11 e-mail that you are the new security director 'cause

12 he e-mailed me back on March 30.

13          So, when I called him on April 3, I said I

14 have a complaint.  What's your complaint?  Mr. Smith

15 been harassing me for sick leave for the longest

16 time, and I notice you're the new security

17 director.  Can you talk to him?  I tell you what.

18 Bring it up at the meeting, and I told him, went on

19 to tell him when is the meeting going to be.  Within

20 the next week or two.

21          I gave my lawyer the information to, the

22 e-mail he gave me, and the meeting came up on April

26 (Pages 98 to 101)

William Mack

Page 102

1 the 9th. That was the same day that I was to go in
2 to Kaiser to get a shot, so I said, since this
3 meeting is mandatory, let me reschedule this
4 meeting. And I rescheduled my meeting to see the
5 doctor, and it was set for May the 15th. And Gary,
6 when we got to the meeting, Devlin, D-E-L-V-I-N,
7 Woods brought up to Gary about the sick leave
8 policy.
9    Q.    I'm sorry to interrupt you. I just didn't
10 get the name of that person.
11    A.    Delvin Woods.
12    Q.    Delvin Woods?
13    A.    Yes.
14    Q.    Okay.
15    A.    Before I brought it up, he brought sick
16 leave up. He brought it in, what is the sick leave
17 procedure, because every time I take off you all
18 make me feel like I'm doing something wrong, but he
19 answered the question. He gave Gary the question I
20 was going to ask and have nothing else to say, and
21 Gary just went on and start talking about security
22 officers in Northwest, how we give them tee-shirts,

Page 103

1 so then I talked to Gary again on April the 25th.
2    Q.    Let's go back to the, let's just sort of
3 go back in time first to April 3. You said you
4 called Mr. Corso?
5    A.    Yes.
6    Q.    Told him you had a complaint?
7    A.    Yes.
8    Q.    He told you to bring it up in the meeting
9 on April 9?
10    A.    Yes, but I told him what the complaint
11 was. He said to bring it up again at the meeting on
12 April 9.
13    Q.    And the complaint was that Smith was
14 harassing you for taking sick leave?
15    A.    Sick leave.
16    Q.    Did you mention sarcoidosis to Mr. Corso
17 in this meeting?
18    A.    Yes, I mentioned it to him on April
19 the 3rd and April the 25th.
20    Q.    Let's stick with April the 3rd so we can
21 go in order. Otherwise, we'll be here forever.
22 What did you say to him on April 3?

Page 104

1    A.    I told him I'm tired of Mr. Smith
2 harassing me about the sick leave. I have a skin
3 disease called sarcoidosis, and, whenever I get a
4 shot, I take off. The doctor puts me under his
5 care. I'm always bringing a doctor's slip. I
6 always give anywhere from eight-hour notice when I'm
7 going to be out.
8    Q.    Let me ask you this. You said that you
9 told him that when you got a shot you would take
10 off; is that right?
11    A.    Yes, that's true.
12    Q.    How many days would you take off each time
13 you got a shot?
14    A.    The doctors give me the days. I don't
15 take it. When they fill the form out, this is when
16 I want you to go back to work. I look and say okay.
17    Q.    I get that. I get you don't make the
18 decision necessarily, but how many was it typically?
19 Was it a day, two days?
20    A.    That day or --
21    Q.    Let's say you go to the doctor and get a
22 shot.

Page 105

1    A.    You know what? It would be three days,
2 but what Mr. Smith was looking at, okay, William
3 Mack is already off Tuesday, Wednesday, Thursday,
4 Friday. I was sick on my days off and when I, if I
5 go to the doctor appointment on Friday, okay, I want
6 you off this weekend, don't go back until Tuesday,
7 then Mr. Smith feel like he already been off all
8 those days under doctor care; he thought I was
9 joining everything together.
10    Q.    I'm not asking you to get into his head.
11 My question really is a lot simpler than that. How
12 many days typically did you take off when you got a
13 shot? How many did you need to take off until you
14 were ready to work again?
15    A.    All depends on the doctor, two days, three
16 days, four. It was up to the doctor. It wasn't up
17 to me.
18    Q.    Right. Two to four; is that fair?
19 Sometimes it was two, three or four?
20    A.    Two, three or four. It was up to the
21 doctor, yes, ma'am.
22    Q.    Ever more than four?

27 (Pages 102 to 105)

William Mack

Page 106

1    A.    I think, yes, it was four when I had the
2  muscle spasm back in January. .That could have been,
3  like, a week.
4        Q.    Right, but I thought -- okay.  But I'm
5  talking about when you got your shots and needed to
6  take time off because you had just gotten a steroid
7  shot and all the symptoms we've already talked
8  about.  In those instances did you typically take --
9        A.    Two days.
10       Q.    -- two days?
11       A.    And the reason it was two days because,
12  again, I was off Tuesday, Wednesday, Thursday,
13  Friday.  If I was scheduled to work Saturday and
14  Sunday, Mr. Smith would consider Saturday one day,
15  and 16 hours Sunday, he would consider that two
16  days.
17       Q.    So you would take off Saturday and
18  Sunday --
19       A.    Right.
20       Q.    -- if you got the shot on a Friday?
21       A.    Right.
22       Q.    Did you ever get the shot on, like, a

Page 107

1  Monday and take days off from your other employers
2  because you had another job, right, on Monday,
3  Tuesday, Wednesday, Thursday?  Is that right?
4        A.    Yes, I take, as a matter of fact, job I
5  have now, the job I have now, if my pressure is up,
6  I'll call off sick, and she just have me call the
7  other security offer.  Okay.  Make sure, you just do
8  all the coverage and everything.  As long as I have
9  a body there, she said I understand, Mack.
10       Q.    I think I'm not asking this question very
11  well.  Did you ever, during the time you worked at
12  the Post --
13       A.    Yes.
14       Q.    -- did you ever have your steroid shots on
15  a Monday or a Tuesday or a Wednesday or a Thursday?
16  Or was it always on a Friday?
17       A.    No, I had them all different days, even on
18  the days I have off.
19       Q.    And did you ever take time off from your
20  other employer after getting a shot?
21       A.    No, because I wasn't with no other
22  employer until in May.  That's when I started

Page 108

1  working for Jefferson House Condominiums, but I was
2  on call.  But they never called me on, so that's
3  when I picked up a new part-time job at Personnel
4  Resources.  I was doing three jobs at one time.
5        Q.    Right.  I got that, and that's what I'm
6  trying to figure out.  When you were -- let's take
7  2001, which is when you were diagnosed.  How many
8  jobs were you working at that time?  I know you were
9  working at the Post; right?
10       A.    Right.  I worked Potomac Job Corps from
11  1996 all the way up to 2001.  Going into 2001 I was
12  at the Washington Post; I was still with Potomac Job
13  Corps.
14       Q.    And are you able to remember what hours
15  you typically worked at the Post in 2001?
16       A.    Yes, I worked 11 to 7 shift.
17       Q.    11 p.m. to 7 a.m.?
18       A.    Yes.
19       Q.    How many days a week?
20       A.    It was so much overtime could have been,
21  like, 32 to 40.
22       Q.    32 to 40 hours a week?

Page 109

1        A.    Yes, it was a lot of overtime back then,
2  if I'm correct.
3        Q.    And how many hours a week -- do you
4  remember what days you worked for the Post or did it
5  change around in 2001?
6        A.    It changed.  I can't really -- I know it
7  was nights.  I was always on nights.
8        Q.    And what was your work schedule with
9  Potomac Job Corps in 2001?
10       A.    My work schedule was 3 to 11, yes, but by
11  me having to be at the Post at 10:45 we always have
12  got an hour for lunch break or half an hour, so I
13  was close to the Woodrow Wilson Bridge because I was
14  down Southwest by the police academy, so it was easy
15  for me to get to the Beltway and get to the Post.
16       Q.    So you were able to --
17       A.    Right.
18       Q.    -- even though you had a 3 to 11 shift,
19  you were able to skip your lunch to get to the Post
20  on time?
21       A.    Right, so it was really slow by then;
22  supervisor let me go ahead.

28 (Pages 106 to 109)

William Mack

Page 118

```
1    Q.   And are those family benefits?
2    A.   Yes.  No, it's just for me.
3    Q.   Single coverage?
4    A.   Just for me, yes.
5    Q.   Do you know how much you pay for that, if
6 you can remember?
7    A.   No.  What I have, talking about for
8 Personnel Resources?
9    Q.   Yes.
10    A.   What I have is -- as a matter of fact, I
11 have it on me.  I have what you call a Master debit
12 card, and what she would do, put $1,000 on this card
13 every month, and, when I go to the doctor, it pay
14 for medication and everything off this card.
15    Q.   Do you pay any kind of premium out of your
16 paycheck for that?
17    A.   No, everything come off this card.
18    Q.   Okay.  Got it.  I want to go back to the,
19 you said there was a meeting on April 9; is that
20 right?
21    A.   Yes, ma'am.
22    Q.   And I apologize for skipping around with
```

Page 119

```
1 you sometimes.  It makes sense to me, believe it or
2 not.  And you said that at that meeting, is that the
3 meeting where Mr. Corso had instructed you to bring
4 up your complaint about Mr. Smith or about sick
5 leave?
6    A.   About sick leave, yes.
7    Q.   And I think what you said is that
8 Mr. Woods brought up a complaint about it?
9    A.   Yes.
10    Q.   And what did Mr. Woods say?
11    A.   He said he want to know what is the sick
12 leave policy, because every time he out sick he said
13 the department make him feel like he's doing
14 something wrong.
15    Q.   Okay.  And did you say anything at this
16 meeting about sick leave?
17    A.   He answered the question.
18    Q.   I'm sorry?
19    A.   He gave the, what I was going to say.
20 Mr. Woods said exactly what I was going to say, so I
21 didn't have to say nothing.
22    Q.   You didn't say anything?
```

Page 120

```
1    A.   I didn't have to.
2    Q.   Did Mr. Corso respond to Mr. Woods'
3 concern?
4    A.   No.  Mr. Smith jumped in and start talking
5 about the policy.
6    Q.   What did Smith say?
7    A.   Well, Mr. Smith told Mr. Woods exactly
8 what he told me.  That you earn -- no, he said we
9 give you sick leave, which we receive sick leave by
10 the hours that we work.  We earned that.  And they
11 was always saying that we give it to you.
12    Q.   So Smith said that?
13    A.   Yes.
14    Q.   And did anybody respond to that?
15    A.   No, everybody look, because Mr. Smith is
16 always making up the policies.  And I don't blame
17 him 'cause Lisa Martin downtown have told me when I
18 called about the sick leave policy, every management
19 at the Washington Post in every department make up
20 their own policies.  So every department had a
21 different policy when it came to sick, vacation.
22    Q.   Did you have an understanding as to what
```

Page 121

```
1 the policy was for the security department?
2    A.   Yes, I had a very good understanding what
3 the policy was.
4    Q.   What was it?
5    A.   The policy was, whenever you are out sick
6 more than two days, you must, they will allow you
7 two days off, but you are allowed to take six days
8 here and six days there before the security manager
9 can ask you to bring in sick certification.
10    Q.   Okay.  Let me make sure I understand it.
11 You probably understand it better than I do.
12 Whenever you're out sick more than two days, you
13 need a doctor's note?
14    A.   Yes, but we'll still allow you to take a
15 day here and day there before it's mandatory to
16 bring in a sick certification slip.
17    Q.   So, if you're out one day, you don't have
18 to bring in one?
19    A.   Right.
20    Q.   And, if you're out one day up to six
21 times, you don't have to bring one.  Is that what
22 the six days is?
```

31 (Pages 118 to 121)

William Mack

Page 122

1    A.    Right.  They have to be like that.  It was

2 so confusing.  It was so confusing.

3    Q.    Well, what did you think you were supposed

4 to do?

5    A.    The policy is, if you are out one day, you

6 don't have to bring a slip, but, if you are out two

7 days, you must bring a doctor's slip.  Right, if the

8 management asks you.  But, when I was out two days,

9 I was always bringing in doctor's slips, so they

10 never made it mandatory for me to bring in a

11 doctor's slip.  I was bringing them anyway out of

12 courtesy.  If my doctor gave me one, I would turn it

13 in.

14    Q.    Okay.  Now, did Smith explain the policy

15 at this meeting or no?

16    A.    No, he didn't.

17    Q.    He just said we give you sick leave?

18    A.    Yes.  He said we give you all sick leave.

19    Q.    Did he say anything else?

20    A.    No.

21    Q.    Did you say anything else?

22    A.    I didn't say nothing else, but likely

Page 123

1 Mr. Smith did, was speaking to Mr. Woods, but I

2 didn't say nothing else.

3    Q.    Anybody else in the meeting say anything

4 about sick leave?

5    A.    No.  No, ma'am.

6    Q.    Now, is there any mention in this meeting

7 of sarcoidosis?  I take it not, but --

8    A.    No, because when it comes to me talking

9 about my personal problems with the disease, I mean,

10 the officers didn't need to know.

11    Q.    Sure.  I'm just making sure that's right.

12    A.    Only my superiors.

13    Q.    Now, after the meeting on the 9th, you

14 said you had another conversation with Mr. Corso on

15 April 25; is that right?

16    A.    Yes.

17    Q.    What was the content of that conversation?

18    A.    The content was I was out sick before the

19 25th one day, and, when I called off that morning,

20 and, when I mean that morning, it could have been,

21 like, 12 a.m., Imani McGruder informed me that, she

22 said, wow, she said Otis Brooks just called off.  I

Page 124

1 said, oh, yeah.  Well, you need to called Donald

2 Jackson.  If I'm correct, she said, Donald Jackson

3 just left.  I said you need to call him.  And I

4 don't know if she called him.  Likely she did, but

5 once I got my paycheck they didn't pay me for sick

6 leave, and I asked Mr. Jackson why didn't you pay

7 for sick leave.  He said you need to see, talk to

8 Mr. Smith.  But Mr. Smith is on vacation.  And he

9 said, well, Mr. Smith will be back Tuesday.  You

10 need to talk to him.  So I called Gary.  And, when I

11 contacted Gary, I told him, I said I'm tired.  He

12 said what are you tired of.  I said I'm sick and

13 tired of Mr. Smith harassing me about sick leave.  I

14 said I have 177 hours of sick leave on the books,

15 and they won't pay me sick leave.  He said, well,

16 you need to see Mr. Smith.  I said, well, Mr. Smith

17 won't be back to Tuesday.  He said, no, he said

18 Mr. Smith will be back Friday, but he might not come

19 in 'til Tuesday.

20        So I called Mr. Smith and left a message

21 on his voice mail, and that's when Mr. Smith called

22 me on April the 23rd and told me I'm going to

Page 125

1 terminate you.  I said for what.  He said you keep

2 abusing your sick leave, and I'm sick of it.

3    Q.    That was April 28?  You just said the

4 23rd.  I want to make sure.

5    A.    It was April the 28th.  Yes, ma'am.

6    Q.    So the conversation with Corso on the 25th

7 was I didn't get paid for this; I'm sick of Smith

8 for harassing me about sick leave?

9    A.    Yes, for harassing me about sick leave.

10    Q.    Anything else --

11    A.    That was it.

12    Q.    -- in that conversation?  What did

13 Mr. Corso say in response to that?

14    A.    Well, you need to talk to Mr. Smith.

15    Q.    Just work it out with Mr. Smith?

16    A.    No, talk to Mr. Smith.  I said, I told him

17 this man know I have a skin disease.  He have every

18 documentation there is, but I feel like Gary, he's

19 the new security director.  He should have said,

20 well, let me check.  This is the second time this

21 guy is bringing it up.  Let me check his records.

22    Q.    Did you ask him to do that, or that's just

32 (Pages 122 to 125)

William Mack

Page 126

1  what you thought?

2      A.    He should have as the security director.

3      Q.    Did you ask him, though?

4      A.    No, I shouldn't have to ask him.

5      Q.    I'm just making sure I understand.  Any

6  other conversations with Corso where sick leave or

7  sarcoidosis were mentioned that you had with him?

8      A.    It was mentioned to Jan Doll on the 26th,

9  and I went on to tell Jan Doll I want to have a

10  meeting with you.  And she said you want a meeting,

11  and I said, yes, I want to have a meeting with you.

12  Yes, ma'am, because I'm sick and tired of Mr. Smith

13  harassing me about this sick leave.  She said,

14  Mr. Mack, I'm going to set a meeting up with you and

15  Mr. Smith on May the 1st.  I said okay.

16          May the 1st came, which was a Monday.  I

17  got to work at 2:45.  Ms. Doll walked past the desk

18  at 3:30.  She didn't say hi, good evening, nothing.

19  She came back past going back towards her office.

20  She said, hello, Mr. Mack.  Hello.  She came back

21  past 3:40.  She didn't say nothing about the

22  meeting, nothing whatsoever, and Mr. Smith came and

Page 127

1  said, oh, I'm going to go ahead and pay you for your

2  sick leave.  And what about my emergency vacation

3  that I took?  It was during that same period.

4          The reason I took emergency vacation, and

5  I gave Mr. Smith all the scoop.  My 18-year-old, no,

6  my 16-year-old son at the time was on his way home,

7  and a young lady that he was with, a female school

8  mate he was with, the young lady knew somebody

9  driving a car, and he said where are you going.  My

10  younger son said, well, I'm going, the female with

11  my son said I'm going home; I'm going to Southeast,

12  home.  He said I'm going that way.  Y'all want a

13  ride.  So the young girl said yes.  She told my son

14  he's her friend.

15          I found out that the car that my son was

16  in, my son didn't know, was in a strong-armed

17  holdup, strong arm robbery holdup.  So me and my

18  wife was at church on Friday night, so, when my

19  teenager, 16-year-old son, called me, my wife and I

20  were in church.  Cell phone is off in church, so we

21  didn't get home 'til, like, 12:30 a.m.  And that's

22  when the D.C. police called and said they have my

Page 128

1  young son in juvenile.  They said he's not in no

2  trouble.  He was just a passenger in a UV car, and

3  we went and got him that morning.

4          That's when I called off.  I explained to

5  the person at the front desk.  I said, look, I won't

6  be in.  I'm on emergency vacation, and tole them

7  why.  I said I have to pick up my son.  I picked my

8  son up that morning, and I called off.  As a matter

9  of fact, I got the call at 12:30 a.m.  I called up

10  12:40 a.m., and I went and picked up my son, and

11  that's my sick leave, emergency vacation.

12      Q.    Okay.  I gotcha.  I'm trying to kinda go

13  through this, and we're going to get to all this.

14  So I'm trying to go through this in some order, and

15  what I'm trying to ask you is whether, other than

16  the conversations we've talked about focusing on

17  Mr. Corso, whether you had any other conversations

18  with Mr. Corso about sick leave or sarcoidosis that

19  we haven't already talked about?

20      A.    Yes.  May the 8th.  I pleaded with that

21  man.

22      Q.    And on May the 8th did he call you or did

Page 129

1  you call him?

2      A.    I called him.

3      Q.    And what happened in that conversation?

4      A.    I told him Mr. Smith just called me and

5  told me I got terminated, and I pleaded with him,

6  no, keep my job.  He said we don't want people like

7  you here no more.

8      Q.    Okay.  And did you say anything in

9  response to that?

10      A.    No, he just said we don't want people here

11  like you no more.

12      Q.    That's what he said?

13      A.    Yes, because you took off 18 days, and so

14  I hung up.  I said okay.  So I called my wife and

15  told her.

16      Q.    Okay.

17      A.    Give me a minute, please.

18      Q.    Sure.  You want to take another break?

19  I'm happy to do it.

20      A.    No.  I called my wife and called him back,

21  called Gary back and let him know that I have a kid

22  going to college.  I can't lose my job.  He just

33 (Pages 126 to 129)

## William Mack

**Page 130**

1 said we don't need you no more. So I called Jan
2 Doll, and I pleaded to her. I said please. She
3 said don't call there no more. Any business you
4 have take it up with down Northwest. I said I what
5 about my employer ID? Don't send it down here.
6 Send it to Northwest.
7    Q. And, when she said Northwest, did you take
8 that to mean the Washington Post headquarters here
9 in D.C.?
10    A. Yes, ma'am.
11    Q. Anything else in the conversation with Jan
12 Doll?
13    A. That was it.
14    Q. Any other conversations with Corso that
15 you can remember just focusing on that?
16    A. No, ma'am.
17    Q. Are you sure you don't need a minute to
18 take a break?
19    A. No, ma'am.
20    Q. Any conversations with anybody else? And
21 I'm talking about conversations we haven't already
22 talked about with anybody else at the Washington

**Page 131**

1 Post --
2    A. Yes, ma'am.
3    Q. -- regarding sarcoidosis or sick leave?
4    A. Yes. I talked to, well, I talked to Irene
5 Nipps in payroll.
6    Q. Irene Nebs?
7    A. Nipps.
8    A. Nipps.
9    A. And the way I got to know her is I was
10 always calling to check on, see if I got paid for
11 sick leave, and she got to know me through that way.
12    Q. Can you remember when you talked to her?
13    A. Yes, I remember it was May after I got
14 terminated. It was the 14th.
15    Q. May 14 of 2006?
16    A. Yes. I told her I was terminated, and she
17 said why, and I said they said I was abusing my sick
18 leave, and she went on to say, well, let me check.
19 Well, I don't have no documentations to show that
20 you were terminated. So she said, well, you need to
21 call Human Resources, Mrs. Booth, B-O-O-T-H.
22    Q. Okay.

**Page 132**

1    A. So, when I called Mrs. Booth, Mrs. Booth
2 said -- I talked to her secretary, Celeste, Celene,
3 something, and she said let me find out what is,
4 what is Gary doing. I'm going to call you back.
5 She said I don't have nothing. When she called Gary
6 back, she must have called Gary, and, when she
7 called me back, she said, yes. Mr. Mack, your
8 termination date was May the 8th, and I said thank
9 you.
10    Q. So you mentioned to Ms. Nipps on this
11 conversation on May 14 that you had a skin disease?
12    A. Yes. Yes.
13    Q. Did you ever mention to Ms. Booth that you
14 had a skin disease?
15    A. No. I didn't mention it to Ms. Booth. I
16 told her I was terminated. And she said she didn't
17 have no information on why I was terminated
18 whatsoever.
19    Q. Any other conversation with Ms. Nipps
20 about sarcoidosis?
21    A. No, ma'am.
22    Q. Any conversations with anyone else at the

**Page 133**

1 Washington Post that we haven't already talked about
2 regarding sarcoidosis?
3    A. I called, after Ms. Booth, I talked,
4 called Mrs. Martha Lequeux, Lequeux. Something --
5    Q. Lequeux.
6    Q. You know who I'm talking about?
7    Q. Yes. Martha Lequeux is how you say it.
8 L-E-Q-U-E-U-X.
9    A. I called her office, and I picked up the
10 voice mail, and that was my second time complaining
11 to her about Mr. Smith.
12    Q. Okay. When did you call her office?
13    A. I called her office the same day that I
14 talked to, had to be the same day I talked to Mrs.
15 Booth or the next day after.
16    Q. So sometime around mid-May?
17    A. Yes, mid-May.
18    Q. You said you left her a voice mail?
19    A. Yes.
20    Q. What did you say in your voice mail, as
21 best you can remember?
22    A. I complained to her about Mr. Smith.

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

Page 142

1    A.    And I asked her could I see my records,
2 and she said what you looking for: I want to see
3 all of the doctor's slips that I have turned in.
4 And I think that's when she said she couldn't find
5 them all. They transferred them to Northwest, but
6 she said what's the problem, and I started telling
7 her I was off because I had a skin disease,
8 sarcoidosis. And she said, if you have a skin
9 disease called sarcoidosis, whenever you need a time
10 off, you fall under Family Medical Leave Act, and
11 that was my first time hearing anything about the
12 family medical leave. She said, yeah, go on the
13 website, and I forget what else she told me to go
14 on. It's there. You qualify for that.
15    Q.    Okay. And in response to that did you go
16 to wherever she told you to go, the website?
17    A.    Yes, and it was there.
18    Q.    What was there?
19    A.    About the family leave, how your
20 supervisors can give you time off.
21    Q.    Was this, was she telling you to go to a
22 Washington Post website or a different website like

Page 143

1 for the government or something?
2    A.    It probably was the Washington Post policy
3 covers, it's the same policy.
4    Q.    Yes.
5    A.    It's nothing different. It's still
6 covered by Human Rights Commission or whoever,
7 Department of Labor. It still covers it, but she
8 told me to go to the website.
9    Q.    That's what I'm asking you. Was she
10 telling you to go to a Washington Post website to
11 look up the Post policy or the law somewhere?
12    A.    The law, but I have the Post policy. I
13 gave it to my attorney.
14    Q.    And just to make sure I understand, this
15 conversation was in April of 2006?
16    A.    Yes.
17    Q.    Had you received the Post policy at some
18 point prior to that?
19    A.    Yeah, I received it back in, someone gave
20 it to me back in -- her name was Brenda Bailey. She
21 used to work in Building Services, and, if I'm
22 correct, she gave it to me the year of 2001. And

Page 144

1 the reason she gave it to me is 'cause I was telling
2 her about the skin disease and how I was not
3 promoted because of my sickness. She said they
4 can't do that. She said there's a policy called,
5 it's a law called Family Medical Leave Act. And I
6 said what's that, and she gave me the paper. I'm
7 going to bring you the paper tomorrow, and that's
8 the same paper I had for years and I gave my
9 attorney.
10    Q.    And Brenda Bailey, who was Miss Bailey?
11    A.    She work in Building Services. Her
12 supervisor was Norma Brown.
13    Q.    So do you know what her job was?
14    A.    Yeah, she was Building Services.
15    Q.    Okay. I got it. So she gave you a paper
16 about the FMLA. Did you do anything with that
17 paper? Did you talk to anybody about the FMLA?
18    A.    No, I just looked at it, and I held it all
19 these years.
20    Q.    What was your understanding of the Post's
21 FMLA policy?
22    A.    When she gave it to me, I really didn't,

Page 145

1 when she gave me and I was reading it, I know it
2 said you can take time off.
3    Q.    Okay.
4    A.    You know, but I put it up. And I didn't
5 bring it, I didn't pull it out again until after the
6 Post let me go. When I called the Human Rights, I
7 contacted the Human Rights Commission when I filed a
8 claim, and they brought the word up family, FMLA.
9 And I said wait a minute. I have something on that
10 from the Post, because I always kept all of the
11 Washington Post documentation when it came to sick
12 leave policy, harassment. I have a copy of
13 everything.
14    Q.    Okay. I got it. Let me ask you a couple
15 quick questions, and then I think it will probably
16 be a good time for a lunch break. When you get your
17 steroid shots --
18    A.    Mm-hmm.
19    Q.    -- are those shots, are they scheduled,
20 like, you make an appointment, you get one and you
21 make an appointment at that time for the next one?
22    A.    When I make an appointment to see my

37 (Pages 142 to 145)

William Mack

**Page 158**

1 Q. Do you know how long you worked the second
2 schedule, the Monday, Saturday, Sunday?
3 A. Could have been when David King received
4 his promotion.
5 Q. Do you know when that was? I think I
6 already asked you that.
7 A. He received his promotion in 2003. 2003.
8 Then we had two military guys, Otis Brooks and
9 Charles Sneed, they were part time, full time
10 military stationed at Bowling Air Force Base, and
11 they was part time on call at the Washington Post.
12 And I remember, and now when they went into training
13 to Korea, Roddy MacPherson got on Mr. Smith and said
14 why would you let two people go out of state for a
15 year and don't have the shift covered. That's when
16 they started moving me around to cover shifts.
17 Q. Okay. Let me ask you another question.
18 You have on here that this first schedule is a total
19 of 40 hours?
20 A. Yes.
21 Q. I'm not seeing that. Can you help me with
22 that? It looks like it's eight and 8 and 16 to me.

**Page 159**

1 A. Fridays.
2 Q. Is that eight?
3 A. Yes, eight. And Saturday is eight, and
4 Sunday is 6:45, that is 6:45 a.m. That's 32.
5 That's a total of 40, which is wrong. It should be
6 32.
7 Q. That's what I was trying to figure out. I
8 was just trying to make sure I understood that.
9 A. Yes, ma'am.
10 Q. And the next one is also 32?
11 A. Yes, ma'am.
12 Q. So the number of hours it doesn't look
13 like changed?
14 A. Yes.
15 Q. And here it says, in the last paragraph on
16 this page it says that you were working at Jefferson
17 Condominiums on call on Tuesday, Wednesday,
18 Thursday, Friday?
19 A. Right.
20 Q. Is that accurate?
21 A. Yes.
22 Q. And then it says Carlton Condominiums; is

**Page 160**

1 that something different?
2 A. That's different condominiums. That is
3 located 4600 Four Mile Run Drive in Arlington,
4 Virginia.
5 Q. And it says you were working there 8 p.m.
6 to 4 a.m. full time?
7 A. Yes, 8 p.m. up until, yes. That was after
8 I was terminated from the Washington Post.
9 Q. Okay. So is this the -- I'm sorry for
10 forgetting the name -- Personnel Resources job?
11 A. Yes.
12 Q. And you told me you worked at a
13 condominium with them. Okay. I see. So that was,
14 but that was starting, like we talked about earlier,
15 in August, I'm sorry, in May of '06. Okay. What's
16 the significance of this last sentence where it
17 says, "So it wasn't my original choice to work the
18 slow days of the week, it was the shift given to
19 me"?
20 A. Yes, 'cause Mr. Jackson always, made in
21 the statement to the Human Rights Commission
22 Mr. Mack worked the slow days of the week, 6:45 a.m.

**Page 161**

1 to 10:45 p.m. Mr. Jackson, Donald Jackson,
2 Mr. Smith, when they had to come in and work that
3 shift they always got off eight hours earlier, four
4 hours before the 16 hours 'cause they couldn't do
5 it.
6 Q. So are you disputing that you did work the
7 slow days of the week?
8 A. There wasn't no slow days at the
9 Washington Post.
10 Q. Okay. But am I right that these are the
11 days that you had, at least as of June of 2006, that
12 you had asked to work?
13 A. The 2:45 p.m. to 10:45 a.m., because if I
14 did take them, they completely took me off the
15 schedule. Ulysses Smith would completely take me
16 off the schedule if I didn't work them days. They
17 wouldn't have worked me at all.
18 Q. Now, Mr. Mack, I'm going to start to show
19 you a whole series of documents, and we'll go one at
20 a time, and take whatever time you need, and I have
21 a few questions about each one, and it will probably
22 be the same question about each one, but actually

41 (Pages 158 to 161)

Page 162

1 I'm sorry.  Before I get there, I want to talk to
2 you a little bit, I think you said, I just want to
3 clarify this in my own mind.  I think you said this
4 morning that you had steroid shots every other
5 month?
6    A.   Yes.
7    Q.   And that that's been pretty consistent
8 since you --
9    A.   Yes.
10    Q.   -- since you were diagnosed in 2001?
11    A.   Yes, ma'am.
12    Q.   And I think you also said your last shot
13 was in March of this year, week ago?
14    A.   Yes, March 5.
15    Q.   So is it fair to say that, if we track
16 back, if you had one in March of this year, that
17 means you had one in January of 2007, which is two
18 months prior to that?  Does that sound right?
19    A.   In January, yes.
20    Q.   And then going back the last one before
21 that would have been in November of last year?
22    A.   Yes, unless I canceled one.

Page 163

1    Q.   Have you canceled them that you know of?
2    A.   As a matter of fact, I canceled one in
3 2001, and I canceled one that I had with my physical
4 therapist in 2002.
5    Q.   Other than those two, have you ever
6 canceled a steroid shot that you can remember?
7    A.   If I can't -- likely if I came home and
8 overslept.  If I came home and overslept from
9 getting off in the morning, then, yes.
10    Q.   So you might have canceled -- would that
11 be something you would reschedule for a week or two
12 later?
13    A.   Yes, or I could go into after hours.
14    Q.   The urgent care kind of thing?
15    A.   Yes, ma'am.  I could go to urgent care,
16 and they would give me a steroid shot.
17    Q.   So is it fair to say, though, that
18 basically every two months since you've been
19 diagnosed you've had a steroid shot?
20    A.   Yes, ma'am.
21    Q.   Within a week or so, depending on
22 scheduling?

Page 164

1    A.   Yes.
2    Q.   I'm going to have the court reporter mark
3 this document as Mack 3, and I'm going to have her
4 hand it to you, and, after you've had a chance to
5 look at it, I'm going to ask you if you can identify
6 it.
7         (Mack Exhibit No. 3, 6/5/02 Handwritten
8 Note, was marked for identification.)
9         THE WITNESS:  Yes.
10 BY MS. HOLMES:
11    Q.   What is this?
12    A.   My son sprained his ankle.
13    Q.   In June of '02?
14    A.   Yes.
15    Q.   And you called out for your shift; is that
16 right?
17    A.   Vacation.
18    Q.   Right, but did you call off duty?
19    A.   Yes, ma'am.
20    Q.   Are you able to remember whether you were
21 at work when this happened or --
22    A.   No, I wasn't at work.

Page 165

1    Q.   -- due at work?  When were you due at
2 work?
3    A.   I can't remember.  It's 2002.  I just
4 don't remember.
5    Q.   That's fair.  Do you remember when you
6 called off?
7    A.   No, ma'am.
8    Q.   Are you able to remember when you called
9 off in relation to when your shift was?
10    A.   No, ma'am.  But the Post always had an
11 eight-hour, eight-hour notice from me.
12    Q.   So you were supposed to give eight-hours'
13 notice?
14    A.   No, it's four hours.
15    Q.   I'm sorry.  I misunderstood you.
16    A.   Washington Post policy is call in four
17 hours before your shift.  I always gave the
18 Washington Post eight hours.
19    Q.   And let me ask you about the policy for a
20 minute.  You were supposed to call in four hours
21 before your shift, and who were you supposed to talk
22 to?

42 (Pages 162 to 165)

William Mack

Page 166

1    A.    Whoever answered the phone, scheduled to
2 work the front desk at that time.
3        Q.    And how did you come to that understanding
4 of the policy?
5        A.    Donald Jackson.  They said, when you call
6 off, you have to speak to someone at the front desk,
7 and whoever you speak to at the front desk, only
8 thing you have to say is I'm going to need emergency
9 vacation or I'm out sick, and the person at the
10 front desk will contact Donald Jackson.  We don't
11 have no home numbers to no supervisors.
12       Q.    And this absence on the 3rd of June or at
13 least that you called off on the 3rd of June related
14 to your son, it didn't relate to your own medical
15 condition; is that right?
16       A.    No.
17            MS. HOLMES:  I'm going to have this next
18 one marked Mack 4.
19            (Mack Exhibit No. 4, 7/8/02 Kaiser
20 Permanente Referral Form/Verification of Treatment,
21 was marked for identification.)
22 BY MS. HOLMES:

Page 167

1        Q.    Same thing, Mr. Mack.  I'm going to ask
2 you to take a look at it and tell me whether or not
3 you can identify it.
4        A.    Yep.
5        Q.    What is it?
6        A.    Jeffrey Wittington.  Jeff Wittington,
7 dermatologist.
8        Q.    It's a note from Mr. Wittington -- I'm
9 sorry -- Dr. Wittington?
10       A.    Yes, Jeff Wittington.
11       Q.    That's his signature?  You're better than
12 I am.  Is that how you can tell?
13       A.    No, by his number, 8499.
14       Q.    So I see he was Provider 8499 at Kaiser?
15       A.    Yes.
16       Q.    And this is an appointment on July 8 of
17 2002?
18       A.    Yep, and I remember that's the day when he
19 told me I'd be going into long-term treatment and
20 told me what my side effects would be.
21       Q.    And did you have a steroid shot on this
22 date, can you remember?

Page 168

1        A.    Yes, ma'am.
2        Q.    And it indicates you can resume your
3 regular work the next day; is that right?
4        A.    Yes.
5        Q.    And the reason given for this is clinic
6 appointment; is that right?
7        A.    Yes.
8        Q.    Any mention on here of sarcoid or
9 sarcoidosis?
10       A.    My lawyer have it.
11       Q.    I mean on this document.
12       A.    No, but he have it.  That's the only time
13 I go see a dermatologist is for steroid shots.
14 There's nothing else.
15       Q.    My question is just whether there's
16 anything on this document that says that.  I didn't
17 see it, and I'm just confirming it.
18       A.    There's another document attached, and my
19 lawyer have it.
20       Q.    Okay.  I'll check on that.  But there's
21 nothing on this piece of paper?
22       A.    That's what the doctor tell me.

Page 169

1        Q.    Yeah, I got you.  I'm not questioning
2 that.  I'm trying, just trying to get an answer.
3 And is this, as best you can remember, is this the
4 document that you turned in when you returned to
5 work and came to the Post?
6        A.    It's the only document.  Only way I can
7 get paid.
8        Q.    But this is the document you turned in?
9        A.    Yes.
10       Q.    And, as best you can remember, did you
11 follow the procedure we talked about before when you
12 turned it into the health department?
13       A.    Always turn it into health.  Go to health.
14 You cannot go to your department until the Health
15 Center see it.  They the ones that approved you back
16 to your department.  They the only ones.
17       Q.    Okay.
18            MS. HOLMES:  I'm going to have marked as
19 the next in line this next document.  I'm sure it
20 will come as a big surprise to you that I'm going to
21 ask you to identify it.
22            THE WITNESS:  No problem.  I understand.

43 (Pages 166 to 169)

Page 178

1    A.   No, ma'am.  My attorney have documentation
2 of that.
3    Q.   That's fine, and I know it was a long time
4 ago.  It's not intended to be a quiz.  And this is
5 not Dr. Wittington; is that right?
6    A.   No.
7    Q.   This is, it looks like it's a nurse?
8    A.   Lynn Robinson.
9    Q.   And is there anything on here that says
10 sarcoid or sarcoidosis?
11   A.   No, this wasn't sarcoidosis.
12   Q.   It wasn't?
13   A.   No, ma'am.
14   Q.   And, as far as you know, is this the
15 document that you gave to the Post when you returned
16 to work?
17   A.   Yes, ma'am.
18        (Mack Exhibit No. 10, 2/27/03 Kaiser
19 Permanente Referral Form/Verification of Treatment,
20 was marked for identification.)
21 BY MS. HOLMES:
22   Q.   I'm going to have the court reporter hand

Page 179

1 you what she's marking as Mack 10, and I'm going to
2 ask you if you can identify that document after
3 you've had a chance to look at it.
4    A.   Yes, ma'am.
5    Q.   What is this?
6    A.   Jeff Wittington, 8499, steroid shot.
7    Q.   And is this another situation where you
8 know it was a steroid shot because it's Dr.
9 Wittington?
10   A.   Yes, only dermatologist.
11   Q.   It doesn't say steroid shot on here
12 anywhere; right?
13   A.   No, ma'am.
14   Q.   And it doesn't say sarcoid or sarcoidosis
15 anywhere?
16   A.   No, ma'am, but in his records it would say
17 that.
18   Q.   As far as you know, is this the document
19 you gave to the Post when you returned to work?
20   A.   Yes, ma'am.
21   Q.   It looks like it releases you to return to
22 work the very next day after the shot; is that

Page 180

1 correct?
2    A.   Yes, ma'am.
3    Q.   Mr. Mack, I'm going to have the court
4 reporter mark Mack 11.  And, after you've had a
5 moment to look at it, I'm going to ask you whether
6 or not you recognize it and can identify it.
7        (Mack Exhibit No. 11, 3/20/03 Washington
8 Post Release to Work Slip with Attachments, was
9 marked for identification.)
10        THE WITNESS:  Yes, I can identify this.
11 BY MS. HOLMES:
12   Q.   What is it?
13   A.   I was opening up a package at home.  My
14 son bought tennis shoes, and I thought it was
15 something my wife bought, and I opened it up, and I
16 had a copper razor, and, when I went for it, here
17 you go, I cut my hand.  So I was living at 1111
18 Shago Drive across from the fire department, and I
19 ran over there, and, when I opened the towel, the
20 blood burst out.  They said you need to be seen at
21 Washington Hospital Center.  I remember because
22 that's the same, that was the same day or after my

Page 181

1 daughter went back to college.  She was home.  I
2 remember she was home.
3    Q.   So I take it this particular injury wasn't
4 sarcoid or sarcoid related?
5    A.   No, ma'am.  No, ma'am.
6    Q.   And let me ask you about the first page of
7 this just because we're here.
8    A.   Yes.
9    Q.   Is this the Release to Work that the nurse
10 at the Post fills out?
11   A.   Yes, ma'am.  Yes, ma'am.
12   Q.   I know you're just trying to get this
13 done, but I think we're about to set the court
14 reporter off.  She's crazy.  And is this Andy at the
15 bottom, is that the nurse you talked about earlier?
16   A.   Andy somebody, and you couldn't remember
17   Q.   Andy somebody, and you couldn't remember
18 his name.  So, if you want to know, that's him.
19 And, as far as you can tell, is this the
20 documentation you gave to the Post when you returned
21 to work?
22   A.   Yes, ma'am.

46 (Pages 178 to 181)

William Mack

Page 182

1     Q.   I'll mark another document as Mack 12.

2          (Mack Exhibit No. 12, 8/12/03 Washington

3 Post Release to Work Slip with Attachments, was

4 marked for identification.)

5 BY MS. HOLMES:

6     Q.   And, again, I'm going to ask you to take a

7 look at it and let me know whether you can identify

8 it once you've had a moment to identify it.

9     A.   Yes, ma'am.

10    Q.   And what is it?

11    A.   I went in for a steroid shot.  It was

12 after hours.

13    Q.   And you're just able to remember that from

14 looking at this?

15    A.   Yes, because most time the nurses, if they

16 were RN's at night, most time Dr. Wittington,

17 different names of the nurses if it was at night

18 when I went to the after hours.

19    Q.   And I take it from the fact that you, as

20 far as you know, you provided this to the Post;

21 right?

22    A.   Yes, ma'am.

Page 183

1     Q.   So I take it from the fact that you

2 provided this that you had to miss a work shift on

3 the 13th of August of 2003 to go in after hours and

4 get the shot?

5     A.   Yes, ma'am.

6     Q.   Is that fair?

7     A.   Mm-hmm.  Yes.

8     Q.   And it looks like they released you to

9 return to work on August the 14th?

10    A.   Yes.

11    Q.   Can you tell me why you didn't go to Dr.

12 Wittington during regular hours as you normally do?

13    A.   Because Dr. Wittington doesn't work after

14 hours care.  If it's serious, I feel like it's

15 serious, up to me to go into after hours.  When I

16 call Kaiser, I need to make an appointment to see my

17 doctor, and they may just say March, March the 5th,

18 what I will receive from Kaiser is he's all booked

19 up for March.  The next available appointment is in

20 April.  So I take it upon myself to go into the

21 after hours, but I went to them after hours, I could

22 get there, like, 6:45 p.m., and I was sitting there

Page 184

1 till 12 a.m. until they see me.

2     Q.   Right.  So it's your sense that this was

3 not a regularly scheduled shot.  Is that what you're

4 telling me?

5     A.   Yes.

6     Q.   That this is one you were feeling

7 symptoms, and you had to go?

8     A.   Yes.

9     Q.   I don't think we talked about that

10 earlier.  Is that true that sometimes you would get

11 to the point where your symptoms would intensify,

12 and you would go get a shot that wasn't scheduled?

13    A.   Yes.

14    Q.   How often did that happen?

15    A.   I couldn't tell you.  It would happen

16 often.

17    Q.   Like, twice a year, five times a year, ten

18 times a year?

19    A.   I couldn't tell you.  I couldn't tell you.

20    Q.   No?  And now is there anything on this

21 document that indicates that it's a steroid shot?  I

22 realize you remember that it was, but is there

Page 185

1 anything on the document itself that indicates that?

2     A.   No, ma'am.

3     Q.   Anything on the document that indicates

4 sarcoid or sarcoidosis?

5     A.   No.

6     Q.   And, as far as you know, is this the

7 document you provided to the Post when you returned

8 to work?

9     A.   Yes, ma'am.

10    Q.   I'm going to hand you -- I'm sorry.  I'm

11 going to have the court reporter mark and then hand

12 you Mack 13.  If you could take a look at it and

13 tell me if you can identify it after you've had a

14 moment to look at it.

15         (Mack Exhibit No. 13, 5/6/03 Washington

16 Post Release to Work Slip with Attachments, was

17 marked for identification.)

18         THE WITNESS:  Yes.

19 BY MS. HOLMES:

20    Q.   What is it?

21    A.   Karen Turner, Registered Nurse.

22    Q.   And this is on May 6 of '03?

47 (Pages 182 to 185)

## William Mack

Page 190

1 wasn't for sarcoidosis, and my wife went to pick up
2 my slip 'cause I went into the doctor on the 30th.
3 Yes, I remember. I went to the doctor on the 30th,
4 and I stayed home. My wife said, when they called
5 to say your doctor slip is ready, my wife said
6 she'll go pick it up. That's why she signed her
7 name.
8    Q.    Do you remember what the illness was? You
9 said it wasn't sarcoidosis I know, but do you
10 remember what it was?
11    A.    No, ma'am. They put me on medication for
12 this. I was on medication for this.
13    Q.    And, but you don't remember what it was?
14    A.    No.
15    Q.    You just remember being on medication?
16    A.    My attorney have the information.
17    Q.    And it looks like they returned you to
18 work on August 2, 2003? Does that seem right?
19    A.    Yes.
20    Q.    And, as far as you know, is this the
21 document that you provided to the Washington Post in
22 response --

Page 191

1    A.    Yes, ma'am.
2    Q.    Please, please, please, let me finish. I
3 know you know what I'm asking.
4    A.    Oh.
5    Q.    But she really is going to go crazy.
6    A.    I'm sorry.
7    Q.    I know it's difficult, and I know also
8 especially when I'm asking the same questions over
9 and over and you know what's coming and you're
10 anxious to get it done, and I certainly understand
11 that. I'm going to hand you two documents together,
12 and I'm going to have them marked as Mack 16 and
13 Mack 17, and I'd like you again to take a look at
14 them and then let me know, after you've done that,
15 whether you can identify them. And I'll represent
16 to you the reason I'm handing them to you together
17 is they both seem to be dated August 13 of 2003, so
18 I'm putting them together for that reason.
19         (Mack Exhibit Nos. 16 and 17, Fairfax
20 Hospital Discharge Instructions of 8/13/03 and
21 8/13/03 Kaiser Permanente Referral Form/Verification
22 of Treatment, were marked for identification.)

Page 192

1         THE WITNESS: Yes, I remember this.
2 BY MS. HOLMES:
3    Q.    Okay. You're looking at 16; right?
4         MR. PETERSON: Can you tell me which Bates
5 stamp is which, please?
6         MS. HOLMES: I think that 16 is 645. It's
7 a Post Bates stamp 645, and then 17 is your Bates
8 stamp of, I believe, 987, although the numbers are a
9 little unclear to me.
10 BY MS. HOLMES:
11    Q.    So let's just take the first one. Can you
12 tell if these two documents are related? Did they
13 relate to the same incident or not? It wasn't clear
14 to me.
15    A.    Yes, because the only time I went to
16 Fairfax County Hospital is when I told you earlier.
17    Q.    The chest pain?
18    A.    Yes. My arm, the stiffness of the arm and
19 when Andy rushed me to the Fairfax County Hospital.
20 That's his name at the bottom.
21    Q.    That's Andy's name or is that the doctor
22 who saw you at Fairfax County?

Page 193

1    A.    Yes. That's the only time I went.
2    Q.    Is there anything on this document that
3 indicates that the issue was sarcoid or sarcoidosis?
4    A.    No, ma'am. Yes, yes, it is. I'm sorry.
5 Correction. Yes, it is. Breathing. That's one of
6 the side effects I was having.
7    Q.    So the word "breathing" is on here?
8    A.    Yes.
9    Q.    But you would have to know breathing was
10 an effect from sarcoidosis?
11    A.    I know it is.
12    Q.    I know you know that. Okay. Other than
13 the word "breathing", is there anything on here that
14 indicates sarcoidosis?
15    A.    No, ma'am.
16    Q.    And then what's Number 17?
17    A.    This is when I was under my doctor's care.
18 They told me don't go back to work until I see my
19 physician, and 17 had something to do with 16
20 because my doctor told me, Fairfax County Hospital
21 physician told me don't go back to work until you
22 see a doctor, and when, that's what the doctor gave

49 (Pages 190 to 193)

Page 210

1    A.    Yes.

2    Q.    Okay.  Now, I think that you testified,
3 and correct me if I'm wrong, that this was a day you
4 think you got a steroid shot from Dr. Wittington?

5    A.    Yes, I did receive a steroid shot from Dr.
6 Wittington.

7    Q.    I think you also testified that, when you
8 saw Dr. Wittington, it was usually something that
9 was scheduled in advance?

10    A.    Yes.

11    Q.    And I also take it that you got this note
12 because you had to miss work to see Dr. Wittington;
13 is that fair?

14    A.    Yes.

15    Q.    Did you ever at any point tell Mr. Smith
16 or Mr. Jackson in advance that you had a medical
17 appointment that you had to go to?

18    A.    Yes.

19    Q.    How far in advance did you tell them?

20    A.    I would give them a two weeks' notice, two
21 weeks in advance.  That's vacation.  But I gave
22 Mr. Smith advance because he was aware in 2002 about

Page 211

1 my medical condition, sarcoidosis, side effects with
2 the sarcoidosis.

3    Q.    But my question is a little different than
4 that.  My question is really, if you had an
5 appointment on February 27 of 2003 which is what
6 this document indicates, how far in advance did you
7 know about that usually, about a month?

8    A.    No, I would know sometimes, yeah, you're
9 right.  Sometimes a month, I would know about a
10 month.

11    Q.    Did you ever tell Mr. Smith or Jackson,
12 hey, don't schedule me to work that day because I
13 got a medical appointment?

14    A.    No.  When I go up to my medical
15 appointment up to the doctor to give me the shot,
16 okay, I'm going to send you back to work or you're
17 under my care.  I never knew what came out of the
18 doctor's mouth.

19    Q.    But isn't it right you knew you weren't
20 going to be at work on the 27th because you had to
21 be at the doctor?

22    A.    No, I couldn't say that because I never

Page 212

1 know what the doctor -- whenever I saw Dr. Jeffrey
2 Wittington after he gave me a steroid shot, I never
3 knew if he was going to say you're under my care.  I
4 never knew.  If he say you're under my care, I can't
5 override what my doctor say.  I can't say no, no, I
6 want to go back to work.  I never knew.

7    Q.    But you knew you had the appointment?

8    A.    Yes, I knew I had the appointment.

9    Q.    So could you tell Smith I have a doctor's
10 appointment; don't schedule me for that day because
11 I've got a doctor's appointment?

12    A.    You couldn't tell Mr. Smith that.  He make
13 the rules, and he would have to find someone to fill
14 that shift, which I'm a regular part time.  And he
15 had two other part time on calls.  You had only two
16 part time on call people.  So it was up to -- so,
17 when I made my doctor's appointment, if I'm going to
18 see my doctor, he say you're under my care today.

19    Q.    Did the doctor ever send you back to work
20 the same day?  I haven't seen one yet, but --

21    A.    I can't remember.

22    Q.    You can't remember him ever doing that you

Page 213

1 mean?

2    A.    No, but it's a lot of times that you all
3 don't have documentation I gave to my lawyer that I
4 took steroid shots on my days off.  I had took close
5 to anywhere from six to seven steroid shots on my
6 days off.

7    Q.    During what time period, can you remember?

8    A.    Been between two thousand, anywhere from
9 2003 to 2005.

10    Q.    So over a two-year period there were maybe
11 six times when you did it on your days off?

12    A.    Yes.

13    Q.    And the rest of the time you did it when
14 you were supposed to be working for the Post?

15    A.    When my doctor scheduled my appointment.

16    Q.    But, when the doctor scheduled -- my
17 question really is, I think, pretty simple.  When
18 your doctor scheduled you a month in advance for an
19 appointment, did you tell Mr. Jackson or Smith, hey,
20 I can't work that day because I'm going to go to the
21 doctor, got a doctor's appointment?

22    A.    Yes, I always tell Mr. Smith now I need

54 (Pages 210 to 213)

William Mack

Page 214

1 time off because of my medical condition.  I always
2 told him can I have light duty.  He always told me
3 we don't have light duty.  But Mr. Smith and Mr.
4 Jackson allowed other Washington Post employees come
5 inside security and work light duty.
6      Q.    Now, you told me, you just said you told
7 Smith that you needed time off because you --
8      A.    Told Mr. Smith I needed time off because
9 of my medical condition when I found out, when I was
10 going to see my physical therapist in the year 2002,
11 'cause he called me in his office complaining about
12 why I'm not making my rounds.  Finish making my
13 rounds, and I told him that my leg stiffen up on me
14 because I have a medical condition called
15 sarcoidosis.  I showed him, took the makeup off my
16 face.  I showed him exactly the sarcoidosis on my
17 face, and I told him also I have it on my left and
18 right legs.
19      Q.    You told Smith this?
20      A.    Mr. Smith, Ulysses Smith.  He told me we
21 do not have light duty in security.
22      Q.    And that was in 2002?

Page 215

1      A.    2002 and also 2003 on up through 2004,
2 too.
3      Q.    What do you mean it was also in 2003 and
4 2004?
5      A.    You had David King, 2003, light duty, but
6 I couldn't have light duty when I asked for it.
7 Beverly Wayne, they offered her, they gave her light
8 duty, 2003, cast on her leg.  She worked security,
9 light duty.  Melvin Pitt, press operator, they gave
10 him light duty.  They would not give me light duty.
11 Bruce Smith, general working supervisor, they gave
12 him light duty in security.  They would not give me
13 light duty.  Richard Monday, they gave him light
14 duty.  He's a utility mailer.  They would not give
15 me light duty.  Donna Horhoff, they gave her light
16 duty in the security department.  They would not
17 give me light duty.  I was always told we don't have
18 light duty.  Fred Hurd, utility mailer, they gave
19 him light duty.  I was always told by Ulysses Smith
20 we don't have light duty.  Tony Payne, general
21 worker, they gave him light duty.  It was, Mr. Mack,
22 myself, I was always told we do not have light duty.

Page 216

1      Q.    Okay.  I'll go through those one at a
2 time, but, okay.  So let me just ask you this
3 question.  So, as far as you know, you never told
4 Smith or Jackson not to schedule you for work
5 because you had a doctor's appointment scheduled; is
6 that a fair statement?
7      A.    If I had a doctor's appointment, whatever
8 my doctor say after that.  He can say go back to
9 work or he'll say you're under my care.
10      Q.    But you didn't tell Smith and Jackson in
11 advance; is that fair?
12      A.    No.
13      Q.    You said David King got light duty.  What
14 was his position at the Post, security officer?
15      A.    Yes, ma'am.
16      Q.    And what was the nature of his light duty?
17      A.    He had a cast, if I'm correct, on his
18 right leg.
19      Q.    What light duty was he given?
20      A.    Sit-down post.
21      Q.    When?
22      A.    2003.

Page 217

1      Q.    Any idea what conversations Mr. King had
2 with Smith or Jackson or anyone else at the Post
3 about his medical condition?
4      A.    He said he needed to work.  He needed to
5 work.  Can I get my post, sit-down post?  They let
6 him work.  They gave him a sit-down post.
7      Q.    Were you there when he said that?  You
8 seem to know what he said, so did you hear him say
9 that?
10      A.    David King was my relieving officer.  He
11 came on 11 to 7.
12      Q.    Okay.  And what I mean is I asked you if
13 you knew what conversations he had had with anyone
14 at the Post regarding his need for light duty, and
15 you gave me a pretty specific answer, and what I'm
16 asking you is were you there when he had the
17 conversations with the Post?
18      A.    No.
19      Q.    So how do you know what he said?
20      A.    Because he told me.
21      Q.    So you know what he told you?
22      A.    Yes.

55 (Pages 214 to 217)

William Mack

Page 222

1 be on there.

2    Q.    And he's, he was also a utility mailer who

3 worked light duty in security?

4    A.    Yes, ma'am.

5    Q.    Got it.  Mr. Mack, I'm going to have

6 marked as Mack 26 the next document and have you

7 take a look at it, and let me know whether you can

8 identify it after you've taken a minute to look at

9 it.

10        (Mack Exhibit No. 26, 7/30/03 Kaiser

11 Permanente Referral Form/Verification of Treatment,

12 was marked for identification.)

13        THE WITNESS:  Yes.

14 BY MS. HOLMES:

15    Q.    What is it?

16    A.    I don't remember, but I did go to the

17 doctor for that date.

18    Q.    So you went to the doctor on July 30 of

19 '03?

20    A.    Yes, mm-hmm.

21    Q.    And you can't remember why; right?

22    A.    No, ma'am.

Page 223

1    Q.    Anything on this document to indicate that

2 you visited the doctor for sarcoid or a

3 sarcoid-related illness?

4    A.    No, but looking at that date, looking at

5 that date, it look like the date I came back from

6 Norfolk either taking or bringing my daughter back,

7 because that date is July --

8    Q.    30th.

9    A.    Yes, August.

10    Q.    July 30 of '03, and then you signed it,

11 and I was going to ask you about it next; looks like

12 you signed it on August 13 of '03?

13    A.    Mm-hmm.  That date, that July, that was

14 after hours.

15    Q.    But it isn't on here to indicate what this

16 was for other than just a general statement?

17    A.    I know it was for sarcoidosis, if it was

18 in July.  I know.

19    Q.    Okay.  Any idea why you didn't sign it

20 till the 13th?  It looked like previously most of

21 the days were signed the same day by the doctor?

22    A.    No, ma'am.

Page 224

1    Q.    Just can't remember?

2    A.    No, ma'am.

3    Q.    As far as you know, is this the

4 documentation that you provided to the Post when you

5 returned to work?

6    A.    Yes.

7    Q.    Mr. Mack, I'm going to have marked as

8 Number 27 the next document and ask you to take a

9 look at it, and let me know whether or not I can you

10 can identify it.

11        (Mack Exhibit No. 27, 5/2/05 Kaiser

12 Permanente Referral Form/Verification of Treatment,

13 was marked for identification.)

14        THE WITNESS:  Yeah, this is Dr. Chu Ke, my

15 primary physician.

16 BY MS. HOLMES:

17    Q.    And it looks like you went for back pain;

18 is that right?

19    A.    Yes.

20    Q.    And so, as best I can tell, this isn't

21 related to sarcoid or sarcoidosis; is that right?

22    A.    Yes.

Page 225

1    Q.    And looks like Dr. Chu Ke released you to

2 return to work on May 3?

3    A.    Yes, ma'am.

4    Q.    And, as far as you know, is this the

5 documentation that you provided to the Post upon

6 your return to work?

7    A.    Yes, ma'am.

8    Q.    Can I have that marked as Number 28, the

9 next document, and I ask you to take a look at it

10 and let me know whether or not you can identify it

11 after you've had a minute to look at it.

12        (Mack Exhibit No. 28, 5/6/05 Kaiser

13 Permanente Referral Form/Verification of Treatment,

14 was marked for identification.)

15        THE WITNESS:  Yes, I remember this.

16 BY MS. HOLMES:

17    Q.    Okay.  What is it?

18    A.    Yeah, Jack Harrison.  He's the car fan,

19 drove 1970 mustangs.  He gave me a steroid shot.

20 That was after hours.  I got there 7 p.m. and left

21 Sunday morning at 12:20 a.m.  He gave me a steroid

22 shot.

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

# William Mack

Page 238

1    A.    Yes.

2    Q.    -- the absence that's --

3    A.    Yes, ma'am.  I'm sorry.

4    Q.    That's okay.  The absence that's referred
5 to in Mack Number 32?

6    A.    Yes.

7    Q.    If you could look at the next page, which
8 is 000721, it looks like you also called off for the
9 5th.  Does that look right?

10   A.    Yes.

11   Q.    And was that for the same incident?

12   A.    Yes, ma'am.

13   Q.    Had you been released to return to work on
14 the 5th?  I thought you had, but --

15   A.    You said at the bottom.

16   Q.    No, no.  I'm sorry.

17   A.    0721?

18   Q.    000721, it's about the middle of the page.
19 It says 10:20 p.m., "William Mack called off sick
20 for 3 to 11 shift."

21   A.    Yes.

22   Q.    Had you been released to return to work on

---

Page 239

1 the 5th after your illness on the 4th?

2    A.    I don't remember, but I have documentation
3 on that.

4    Q.    Is the documentation something other than
5 Mack 32?

6    A.    It's the same.

7    Q.    It's the same.  Okay.  It says what it
8 says.  Can you turn to 725, please?  In the third
9 entry from the top, 11:05 p.m., do you see that?

10   A.    Yes, it say, "William Mack called off sick
11 for a 7 a.m. to 3 p.m. shift", 11 to 7.

12   Q.    3/11/06?

13   A.    Yes.

14   Q.    Are you able to remember why you called
15 off sick on that date?

16   A.    No.  I was sick because one thing about
17 the Post, Washington Post policy, if I was sick in
18 January '05 going into that new year, they don't
19 hold, we was told by Ulysses Smith don't hold
20 nothing against you in 2005.  So this is March.

21   Q.    Of '06.

22   A.    March 11, '06.  So for that year that

---

Page 240

1 likely was the first time I took off, out sick.  So
2 whatever I did in January we was always told by
3 Mr. Smith they don't hold it against you.  That's a
4 whole new year.  Only thing they do is carry over
5 your sick leave.

6    Q.    I hear you.  That wasn't my question at
7 all.  Do you remember why you were sick that day?

8    A.    I don't know.  It didn't have to do with
9 sarcoidosis.

10   Q.    It didn't have to do with sarcoidosis?

11   A.    No, I just didn't feel good.

12   Q.    Can you turn to Post 000729?  And it looks
13 like about the middle of the page there under the
14 April 16 of '06 there's a question mark.  Do you see
15 that?

16   A.    Yes.  That's April the 17th.

17   Q.    Is it the 17th or the 16th?  I'm not sure
18 how to read that.  It looks like that's the last
19 entry under the 16th, but I might be wrong about
20 that.

21   A.    Three to 11 shift.  No, that was the 17th.

22   Q.    And it says --

---

Page 241

1    A.    "William Mack called off sick."

2    Q.    Any idea why you called off sick on that
3 date?

4    A.    No.  I wasn't feeling good, and that's
5 when they held my sick days.

6    Q.    But it didn't have to do with sarcoidosis?

7    A.    No, uh-huh.

8    Q.    And on the last page of the document,
9 which is 0731 it looks like this is from April 21 of
10 '06, although please correct me if I've got that
11 wrong, and there's an entry saying "William Mack
12 called off"?

13   A.    Yeah.  That was April 21.

14   Q.    Okay.

15   A.    Yes.

16   Q.    And why did you call off then, do you
17 know?

18   A.    Yes, my car broke down.  My car was broken
19 in.  I told you, and, as a matter of fact, the day
20 before the car was broken in, someone tried to break
21 in on the 20th.  And I told Donald Jackson to come
22 outside and I show you somebody messed my car up.

61 (Pages 238 to 241)

William Mack

Page 242

1 And then that morning when I got home, it had to
2 happen right after I went in, somebody finished the
3 other side, and, as a matter of fact, I gave them,
4 you have the documentation right there.
5     Q.   I do, and I'm going to show it to you.  So
6 just to make sure I understand this, you called off
7 because someone broke into your car?
8     A.   I couldn't get inside the car doors.  I
9 couldn't get in.  On the documentation you have in
10 front of you you'll see both cylinders; one was
11 $169.01, and one was $149.
12     Q.   Okay.  I'll show you the document.  I
13 don't want you to, you don't have to guess.  It's
14 not a quiz.  Could you please mark that as
15 Exhibit 34?
16         (Mack Exhibit No. 34, Beltway Toyota
17 invoice, was marked for identification.)
18 BY MS. HOLMES:
19     Q.   And, Mr. Mack, I think you told me that
20 Exhibit 34 is the documentation you provided in
21 connection with your car having been broken into; is
22 that right?

Page 243

1     A.   Mm-hmm.
2     Q.   Okay.  So is this what you provided to the
3 Post in connection with your absence on the 22nd --
4     A.   Yes, ma'am.  Mm-hmm.
5     Q.   -- of April of 2006?
6     A.   I'm sorry.
7     Q.   It's hard.  I know.
8     A.   Yes.
9     Q.   So I take it that the absence on that date
10 was not related to any illness or health issue?
11     A.   No, ma'am.  I think this was emergency
12 vacation I called in for.
13     Q.   Okay.  And it looks like you took your car
14 to the Toyota dealer on that date?
15     A.   Yes, I took it on the 21st.  I took it on
16 the 22nd, and then, when I took it to the service
17 department, they say they don't have no mechanics
18 there to fix it, and I have to bring it back Monday,
19 and Monday was the 24th.
20     Q.   How did you get the car to the dealer?
21     A.   I finally got it open.  I pushed a
22 screwdriver with a hammer and turned it and broke

Page 244

1 it.  One of the locks on the driver side opened up.
2 I drove the car.
3     Q.   So you got it open and drove it to the
4 dealer?
5     A.   Yes, me and my wife.
6     Q.   Any reason you didn't go to work at that
7 point?
8     A.   I already called in.  I called off
9 emergency vacation leave.  I had over 100 hours of
10 vacation leave.  It's hard for me to take vacation
11 because of my days off being off Tuesday through
12 Friday.  It's hard for me to take a complete week's
13 vacation.
14     Q.   Okay.  Just bear with me.  Mr. Mack, did
15 anyone at the Post ever talk to you about the number
16 of absences that you had and need to improve upon
17 that and have fewer absences?
18     A.   Mr. Smith always came and talked to me,
19 told me I was abusing my sick leave.
20     Q.   And when did Mr. Smith do that?
21     A.   The year 2003.  Correction.  2002, 2003,
22 and 2004 and 2005.

Page 245

1     Q.   So he, as best you can recall, told you
2 that every year?
3     A.   Yes.
4     Q.   Was there any particular time of year?
5 Did he tell you that in a performance evaluation or
6 did he just come up and tell you that or what?
7     A.   The years I was at the Washington Post
8 from 2002, from 2000 all the way up to 2004 I never
9 received a performance evaluation at the Washington
10 Post.  Only time I received a performance evaluation
11 was the year 2005.
12     Q.   Okay.  That wasn't quite my question.  My
13 question was when did Mr. Smith tell you that you
14 were abusing sick leave?
15     A.   In 2001.  I can remember it was the year
16 2001, and the reason I remember that same time going
17 up for promotion.  Every time I came up for
18 promotion, that's what came out of his mouth; you
19 abusing your sick leave.
20     Q.   So 2001 was, am I right that that was
21 before you were diagnosed with sarcoidosis?
22     A.   2001, I went in to see -- I was diagnosed

62 (Pages 242 to 245)

William Mack

Page 246

1 with sarcoidosis in the month of November in 2001.

2    Q.    Isn't November late in the year?

3    A.    I'm sorry.  I'm thinking about the date.
4 I'm sorry.

5    Q.    Okay.  So did he tell you this before you
6 were diagnosed with sarcoidosis that you were
7 abusing your sick leave?

8    A.    No, right after.

9    Q.    Right after?

10    A.    No, it was after that.

11    Q.    And you said it was when you were going up
12 for a promotion?

13    A.    Yes.

14    Q.    When did you apply for the promotion?

15    A.    It been so long 'cause it was, it was
16 completely seven months before they made a decision.
17 It was seven months.  Seven months.

18    Q.    Okay.  But you know it was in 2001?

19    A.    Yes.

20    Q.    And when was the decision made, can you
21 remember?

22    A.    It was seven months later because

Page 247

1 everybody was wanting -- 'cause Belcher McNeil told
2 me that Smitty took it personal when you asked him
3 about the sick leave policy.  He said I picked you
4 for the position, and Bernard Carr picked you.  Then
5 Smitty said no, I don't want Mack because he
6 challenged me on the sick leave policy.

7    Q.    I'm going to mark as Exhibit 35 -- is that
8 what we're up to -- a document and ask you to take a
9 look at it and ask you if you can identify it.

10          (Mack Exhibit No. 35, 10/24/00 Letter, was
11 marked for identification.)

12          THE WITNESS:  Yes, ma'am.

13 BY MS. HOLMES:

14    Q.    What is this?

15    A.    This is when I went up for promotion.

16    Q.    Is this the promotion you were just
17 talking about?

18    A.    Yes.

19    Q.    It looks like this was in October of 2000;
20 does that sound right?

21    A.    Yes.

22    Q.    So it was before 2001; is that right?

Page 248

1    A.    Yep.

2    Q.    And this is, I take it, tell me if I'm
3 wrong, this is a memo you wrote to Ms. Lequeux at
4 the Post?

5    A.    Yes, ma'am.

6    Q.    And what was the basic complaint your
7 trying to convey to Ms. Lequeux?

8    A.    I was discriminated against because I went
9 in, when I was told about full-time position,
10 Mr. Smith was saying it was because of seniority,
11 but, if you see in their memo, the memo that I sent
12 to Ms. Lequeux, it couldn't have been about
13 seniority because Mr. Smith interviewed James
14 Schell, who was a press operator, but before he was
15 a press operator he was a security guard at the
16 Northwest plant, if I'm correct, Mr. Schell told me
17 for 13 years or so many years, so it wasn't about
18 seniority.

19    Q.    Who was selected for this position?

20    A.    Jessie Moore.  Mrs. Moore.

21    Q.    And did Ms. Moore have more seniority than
22 you or less?

Page 249

1    A.    Ms. Moore had more hours at the Washington
2 Post, more years at the Washington Post than me, but
3 I had more hours working the night shift, working
4 the night, because Ms. Moore never worked at night.
5 She worked on the 3 to 11 shift.

6    Q.    She worked at the Post longer than you
7 had, not just on that shift?

8    A.    Yes.

9    Q.    Okay.  Did you get any response to this
10 memo from Ms. Lequeux or anybody else at the Post?

11    A.    When I talked to Ms. Lequeux, she said she
12 told Charles Bagwell to get this straight.

13    Q.    Who's Charles Bagwell?

14    A.    He was the Human Resources Manager at that
15 time.

16    Q.    Okay.  And did you ask her what that meant
17 or did she tell you any more about what that meant?

18    A.    No, she said Charles Bagwell is going to
19 call you.

20    Q.    Did he?

21    A.    He said I'm sorry about the position, but
22 seniority plays a role.  But then after that I

63 (Pages 246 to 249)

# William Mack

Page 250

1 talked to James Schell, and he said, well, who got
2 the position, and I said Jessie Moore. He said,
3 well, why did she get it? What reason? Seniority.
4 How did they give it to her for seniority and I was
5 a security officer at the Northwest plant for years?
6 I have more years of security experience than her.
7    Q.   Was Ms. Moore currently a security guard?
8    A.   Yes.
9    Q.   Is that right? I'm just trying to make
10 sure I understand.
11   A.   She was a security guard part time and
12 applied for the full time.
13   Q.   And the other individual whose name I keep
14 forgetting, Mr. Schell, he was, he was currently a
15 press operator; is that right?
16   A.   Yes, ma'am.
17   Q.   And it looks like, if you could look at
18 the page that's numbered 188 in the bottom right or
19 page three at the top, it looks like it says he had
20 19 months of security experience with the Washington
21 Post. Does that seem right?
22   A.   Yes.

Page 251

1    Q.   How many years of experience did Ms. Moore
2 have in security with the Washington Post?
3    A.   I don't know, but he had, like I say,
4 Bagwell said it goes by seniority, who have the time
5 in at the Post. 19 years, 19 years' experience he
6 had as press operator before he was security, after he was
7 security. He had more years at the Post --
8    Q.   He had 19 months of security experience;
9 is that right?
10   A.   Yes.
11   Q.   And did Mr. Bagwell ever get back to you
12 or interview you about this?
13   A.   No, ma'am.
14   Q.   Did you ever hear anything else about this
15 complaint?
16   A.   No, ma'am.
17   Q.   And was it about the time that you were up
18 for this promotion or that you had applied for this
19 promotion --
20   A.   I applied for it.
21   Q.   -- that you say that Mr. Smith told you
22 that you were abusing sick leave?

Page 252

1    A.   Yep, and he also told me I was abusing
2 sick leave.
3    Q.   And this is about a year before you were
4 diagnosed with sarcoidosis; is that right?
5    A.   Yes, ma'am.
6    Q.   Now, you said that Mr. Smith also, in
7 addition to telling you that you were abusing sick
8 leave around the time you were up for this
9 promotion, you said that he also told you that on
10 some other times; is that right?
11   A.   Yes.
12   Q.   And when was that, if you can remember?
13 Take the next one, if you can remember.
14   A.   2003.
15   Q.   What were the circumstances there?
16   A.   Abusing your sick leave.
17   Q.   What caused him -- I'm not asking you to
18 get in his head, but what were the circumstances
19 surrounding him telling you that? What was the
20 conversation? What was going on?
21   A.   Because he would always call me in and
22 give me, like, a report of the sick days, and he

Page 253

1 said you need to stop abusing your sick leave, and I
2 said I'm not abusing my sick leave, and I went on to
3 tell him I know how much sick leave I have because
4 every two weeks we get paid, and on my pay stubs it
5 will show me how much sick leave I took and how much
6 I had left. So I was, always had knowledge of how
7 much sick leave I had.
8    Q.   Okay. And what did he say in response
9 when you said I'm not abusing my sick leave?
10   A.   You just need to stop abusing your sick
11 leave. I keep telling you.
12   Q.   And what did you do in response to that,
13 if anything?
14   A.   What could I say? Nothing.
15   Q.   Did you ask him for any more details about
16 why you were abusing your sick leave or anything
17 like that?
18   A.   He said you're just abusing it.
19   Q.   Do you remember when in 2003 this
20 conversation happened?
21   A.   No, ma'am.
22   Q.   Any other conversations with Mr. Smith in

64 (Pages 250 to 253)

## William Mack

Page 258

1    A.    Yes.

2    Q.    Okay.  Did anyone ever tell you why

3 Mr. King got the job and not you?

4    A.    No.  They told me I didn't get the

5 position because I was abusing sick leave.

6    Q.    Who told you that?

7    A.    Mr. Smith.

8    Q.    Now, let me ask you something.  You say in

9 this memo, this is to Ms. Lequeux again.  You said

10 in this memo that Smith called you and told you you

11 didn't get the position, but you don't say he told

12 you you didn't get the position because you were

13 abusing sick leave.  Why did you let that off?

14    A.    Because Mr. Smith told me at a different

15 date.  He always called me to the office at a

16 different date, stop abusing your sick leave.  This

17 promotion took close to seven months.  It took them

18 seven months to make the decision until I called

19 downtown, and the young lady I spoke to, she say,

20 well, she had been on vacation, and she going to get

21 on it right now.

22    Q.    Okay.  So did -- I'm just trying to get

Page 259

1 clear in my mind, did Mr. Smith or did he not tell

2 you that you didn't get this position because you

3 were abusing sick leave?

4    A.    Yes, he told me this back on the feedback.

5    Q.    On the feedback.  I see, so you got

6 feedback from this?

7    A.    Yes.

8    Q.    Was there anything else in the feedback?

9    A.    That was it.  Told me they would ask me

10 questions about the job which, I mean, I had knew

11 everything at the Washington Post when it came to

12 security, how many cars was on the parking lot,

13 identify it -- I can identify your car, everybody's

14 car here in the parking lot, first and second car,

15 and they list everything I had to say when it came

16 to my job performance.  And then when it came to

17 Mr. Smith, he said, well, your sick leave, you take

18 off too many days sick.  But everything else went

19 great, but then it was the sick.

20    Q.    Now, did Mr. Smith, did Mr. Smith tell you

21 in connection with this promotion that it was a

22 close race, and you should try again?  I'm asking

Page 260

1 you that because that's what you relay to Ms.

2 Lequeux.

3    A.    He said it's a close race, try again, but

4 most people that don't get the position, they leave.

5    Q.    And you indicated that you did get

6 feedback from this; is that right?

7    A.    Yes, I did get feedback.

8    Q.    And the feedback indicated you needed to

9 use less sick time; is that right?

10    A.    Mm-hmm.

11    Q.    Okay.

12    A.    Yes, ma'am.

13    Q.    Thank you.  I'm going to have marked as 37

14 a document and ask you to take a look at it and let

15 me know if you can identify it, please.

16       (Mack Exhibit No. 37, Washington Post

17 Performance Review, was marked for identification.)

18       THE WITNESS:  Yes.

19 BY MS. HOLMES:

20    Q.    Okay.  What is it?

21    A.    This is the evaluation they gave me for

22 2005.

Page 261

1    Q.    And did you have a meeting with

2 Mr. Jackson and Mr. Smith in connection with this

3 performance review that you remember?

4    A.    Mr. Smith was there.  Mr. Jackson wasn't

5 there.  I don't remember Mr. Jackson being there.

6    Q.    Okay.  I didn't mean to imply that he was.

7    A.    Yeah, I don't remember him being there.

8    Q.    Mr. Mack, let me ask you just a basic

9 question.  Under "Job Title" it says "On Call

10 Security Guard"; is that what they put?

11    A.    That's what they put, but that isn't

12 what's on my pay stub.

13    Q.    Okay.  Do you know whether or not the Post

14 considered you to be an on call security guard?

15    A.    No, the Washington Post considered me

16 being a regular part time.

17    Q.    How about Mr. Smith?  Did he consider you

18 to be an on call security guard?

19    A.    Yes.

20    Q.    He did.  How about Mr. Jackson, do you

21 know?

22    A.    He considered everybody, all the part

William Mack

Page 270

1 and their writing is off. They would ask me is this
2 right. And then I'd say, yes, you filled this in
3 right. You filled this in right. But then our
4 employees would go by me being so kind to them, they
5 would say, well, Mr. Mack told me, recommended me
6 for this job, but Mr. Smith, they tried to say that
7 I was trying to forge their names just to get money
8 back from this program they had, which ain't true,
9 which, one, as a matter of fact, one Washington Post
10 employee who's a church member, Mr. Smith was,
11 brought him into the plant manager, they hired her
12 in the utility position. Her name is Courtney
13 Williams, but they never paid me for that.
14      Q.   And were these, in fact, people who you
15 had referred to the Post for work?
16      A.   Yes, 'cause they come in and said is the
17 Washington Post hiring? Yes, they are hiring.
18 Well, could you come in? Well, can we come in?
19 Come on in and fill out an application.
20      Q.   Were these people you knew before they
21 came in and asked if the Post was hiring?
22      A.   No.

Page 271

1      Q.   So your view of referring somebody for the
2 job is if they come in and ask if the Post is hiring
3 and you say yes?
4      A.   Yes, they are hiring, and they would put
5 me down as the person who referred them. I didn't
6 refer them. I just tell them, yes, they are hiring,
7 and I show them how to fill out the application
8 properly.
9      Q.   Is it your testimony you had no idea that
10 they were putting your name down as a referral?
11      A.   I didn't know they were putting my name.
12 Can I put you down for character? Yeah, go ahead,
13 but I can't guarantee that will give you a job.
14      Q.   And this letter is also from Mr. Smith;
15 isn't that right?
16      A.   Yes, I have documentation that will show
17 Mr. Smith didn't even want to listen to the
18 witnesses who said I had nothing to do with that.
19      Q.   That's the second one. I'm sorry. Just
20 talking about the first one. That's signed by
21 Mr. Smith in his role as security supervisor?
22      A.   Yes, ma'am.

Page 272

1      Q.   I'm going to show you what we'll mark as
2 the next in line, which is Number 39.
3           (Mack Exhibit No. 39, Washington Post
4 Policies, was marked for identification.)
5 BY MS. HOLMES:
6      Q.   And I'm going to ask you just to look at
7 that and tell me if you can identify just the first
8 page of it, and then we'll keep going.
9      A.   No, I never seen this.
10      Q.   The first page? You've never seen it?
11 You produced it to us. I'm a little puzzled by
12 that.
13      A.   Yeah, this is the one the girl gave me,
14 Brenda Bailey.
15      Q.   Okay. So you have seen that?
16      A.   Yes, Brenda Bailey gave me this, and I
17 gave it to Mr. -- yes.
18      Q.   Okay. And that was in about 2001; is that
19 right?
20      A.   Yes, 2001.
21      Q.   And what's your understanding of what this
22 document is?

Page 273

1      A.   I didn't pull it, I didn't bring it back
2 up. I put it up until I was terminated.
3      Q.   That's not my question. My question is
4 what's your understanding as to what it is; what is
5 this document?
6      A.   I didn't read it. I gave it to Mr. Nils.
7      Q.   So you don't know what it is?
8      A.   I never read it. I gave it to Mr. Nils.
9      Q.   You told me earlier you gotten a policy on
10 family medical leave from this person?
11      A.   From Brenda Bailey in 2001.
12      Q.   And at the time she told you there was
13 this family medical leave law, and there was a
14 policy on it?
15      A.   Yes.
16      Q.   Is this the policy, as you understand it?
17      A.   Yes.
18      Q.   And you're telling me that you never read
19 it?
20      A.   I never did read it.
21      Q.   But you had it in your possession?
22      A.   Right. Yes.

69 (Pages 270 to 273)

William Mack

Page 274

1    Q.    Have you read it since that time?

2    A.    I read it after I was terminated.

3    Q.    And what, what's your understanding of

4 what it says?

5    A.    My understanding is the law require my

6 supervisors now to give me time off for medical

7 conditions, but they never offered me the Family

8 Medical Leave Act.  They never.  I asked them could

9 I have time off.  They said no.  I asked them for

10 light duty.  They said no.

11    Q.    Okay.  Do you have any understanding from

12 reading this document as to whether -- let me ask

13 you this way.  On the fourth paragraph down it says

14 "To qualify for this leave time."  Do you see that?

15    A.    Yes.

16    Q.    Do you see that sentence?

17    A.    Mm-hmm.

18    Q.    "The employee must notify his or her

19 supervisor and benefits administrator of the reasons

20 why leave is needed at least 30 days in advance."

21 Do you see that?

22    A.    Yes.

Page 275

1    Q.    Did you ever do that?

2    A.    Yes.

3    Q.    You did?

4    A.    Yes.

5    Q.    Okay.  When did you notify somebody of the

6 need for leave at least 30 days in advance?

7    A.    It was October of 2002 when I was seeing

8 the physical therapist.

9    Q.    And what did you tell --

10    A.    I talked to Donald Jackson and Mr. Smith.

11    Q.    Okay.  And what did you tell them?

12    A.    I told them I need time off.  They asked

13 me why, and I informed them the reason I need time

14 off because my leg stiffen up because I have a

15 medical disease called sarcoidosis, and I'm taking

16 medication.  They told me we cannot give you time

17 off.

18    Q.    So is it your testimony that you didn't

19 get any time off in 2002 for sarcoidosis?

20    A.    The only time I took off is I had, when I

21 went to the doctor and they put me under my doctor's

22 care, but it was not time off by the Washington

Page 276

1 Post.

2    Q.    What do you mean by that?

3    A.    Mr. Smith never came to me, when I said I

4 need time off, he didn't say, okay, I'm going to

5 grant you time off.  He never.  The only way I could

6 take time off is when I went to my doctor and they

7 said, Mr. Mack, I'm going to put you under my care

8 then.

9    Q.    When you went to the doctor and were put

10 under care, you got the time off; right?

11    A.    Yes.

12    Q.    I'm going to skip a sentence, and I'd like

13 to get to the sentence that says, it starts with "if

14 the."  It's the fourth line down on that same

15 paragraph, fourth line down all the way to the

16 right.  Do you see the words "if the"?

17    A.    "If the reason"?

18    Q.    No.  It says "if the employee."

19    A.    Okay.

20    Q.    See it?  Thank you, Nils.  "If the

21 employee is seeking intermittent leave that is

22 foreseeable, the employee must make a reasonable

Page 277

1 effort not to unduly disrupt the employer's

2 operation."

3    A.    Yes.

4    Q.    Do you understand what that means?

5    A.    Yes.

6    Q.    Okay.  Do you feel like you made an effort

7 to not disrupt the Post's operation in taking leave?

8    A.    Yes, ma'am.

9    Q.    How?

10    A.    Because when I took, when I asked to take

11 off, we didn't have no gentleman, no one that was

12 part time overseas and military.  The only time it

13 would have been disrupting of the procedures and

14 policies, the procedures and the Post security

15 policy would have been in 2004 and 2005 when both

16 Charles Sneed and Otis Brooks was in training class

17 in Korea.  That left the security department real

18 short.

19    Q.    Did you take time off in 2004 and 2005?

20    A.    When my doctor told me to take off.  And

21 that's another reason why they was so upset, because

22 I already had two employees in training for a year.

70 (Pages 274 to 277)

Page 286

1    A.    This document is all the people that have,
2  was aware of my medical disease, sarcoidosis.
3        Q.    Okay.  On the very last page of the
4  document it looks to me like you've signed it
5  swearing or affirming that the information contained
6  in here is true to the best of your knowledge; is
7  that right?
8    A.    Yes, ma'am.
9        Q.    And you reviewed this document before you
10  signed it?
11    A.    Yes, Mr. Nils, this is what I signed in
12  Mr. Nils' office.
13        Q.    Okay.  I'm going to ask you some questions
14  about all of the people that you've listed here as
15  people with knowledge.
16    A.    Yes.
17        Q.    And just to try to shortcut this a little
18  bit, if you've already told me at some other point
19  today all the knowledge that you think they have,
20  then just tell me that.  What I want to know is
21  whether or not there's something, some knowledge
22  that you think these folks have that's relevant to

Page 287

1  your case that you haven't already told me about,
2  because I don't want to go through all the
3  conversations we talked about already this morning.
4  So I'm just going to start with Mr. Smith who's
5  Number 1 and ask you to tell me whether Mr. Smith
6  has any knowledge about the case or that you think
7  is relevant to this case that you haven't already
8  told me about today?
9    A.    He have knowledge of this.
10        Q.    And what knowledge is that?
11    A.    That I have sarcoidosis.
12        Q.    I'm curious about that, because we spent a
13  long time this morning going through every
14  conversation that you had with anybody at the Post
15  about sarcoidosis, and we went through many, many,
16  many conversations, and none of them were with
17  Mr. Smith.  So how is that you think that Mr. Smith
18  has knowledge of sarcoidosis?
19    A.    Mr. Smith signed my, he approved all my
20  sick slips.  Every sick slip I got was approved, he
21  approved every sick day I was out, and the only way
22  he can approve my sick slip is he have to find out,

Page 288

1  get the documentation from the Health Center and
2  give it to him, and they also give it to Belcher
3  McNeil.
4        Q.    He knows about sarcoidosis from the
5  documentation at the Health Center?
6    A.    He know about sarcoidosis from the
7  documentation in the Health Center and also by
8  coming up to the front desk talking to me more than
9  once when he questioned me more than once about the
10  bump that's on my face.  And also he know about
11  sarcoidosis because he was walking around at the
12  same time with a limp, if I'm correct, in his left
13  or right leg, and, when I was limping, he said
14  what's wrong with you.  I told him this is from the
15  steroid shots I take.  I asked him what was his
16  injury.  He said it's an old injury.
17        Q.    The first thing you told me is the
18  documentation.  Is that all the documentation we've
19  looked at that's marked as Exhibits 3 through -- I
20  don't want to go over it all day -- 3 through 32
21  and then 34?  Is that the documentation you mean?
22  The documents you provided from your doctors to the

Page 289

1  Health Center?
2    A.    Right.
3        Q.    For all the absences?
4    A.    Right.
5        Q.    And those are the documents we've already
6  talked about?
7    A.    Yes.
8        Q.    So that's one source of his knowledge is
9  the documents?
10    A.    Yes.
11        Q.    You said the second source of his
12  knowledge is something about he noticed a bump on
13  your face?
14    A.    Right.  Left cheek.
15        Q.    And when was that?
16    A.    In 2002.
17        Q.    In response to that you told him you had
18  sarcoidosis?
19    A.    Yes, 'cause he always called me in his
20  office to talk to me about my sick leave.  I told
21  him I have sarcoidosis, but a lot of people is not
22  familiar with sarcoidosis, so, when I say the word

73 (Pages 286 to 289)

**William Mack**

Page 290

1 "sarcoidosis", like what is that. There ain't no

2 such thing as sarcoidosis.

3    Q.    So are those the conversations we've

4 already talked about where he told you you were

5 abusing sick leave?

6    A.    Yes.

7    Q.    And then you said there was a third

8 potential source of his knowledge which was he was

9 walking around with a limp in his leg?

10    A.    Left or right leg.

11    Q.    And he asked you what was wrong with you,

12 and you said steroid shots?

13    A.    Steroid shots and my leg stiffen up and

14 asked him what was wrong with his leg, and he told

15 me it was an old injury from years ago.

16    Q.    Anything else with regard to Mr. Smith?

17    A.    No, ma'am.

18    Q.    How about Mr. Jackson? What is his

19 knowledge?

20    A.    Mr. Jackson, he was aware of my

21 sarcoidosis because every time I took off, when I

22 come back from the doctor's, my face would be

Page 291

1 swollen and my weight would gain, so he asked me you

2 picking up weight? Yes, it's from the steroid shots

3 I take from the sarcoidosis.

4    Q.    And let me ask you this. Can you remember

5 when this conversation happened?

6    A.    Yeah. This conversation happened in, it

7 could have happened in 2004 'cause I remember I was

8 working a 3 to 11 shift with him.

9    Q.    Okay. And he saw that your face was

10 swollen?

11    A.    Yes.

12    Q.    And you had gained weight, and he asked

13 you --

14    A.    You picking up weight, ain't you? And I

15 said yes, sir.

16    Q.    And you told him it was from steroid

17 shots. Is that all you told him? Anything else?

18    A.    That's all I told him.

19    Q.    That it was from steroid shots?

20    A.    Yes.

21    Q.    Anything else about Mr. Jackson? Any

22 other knowledge that you believe he has with

Page 292

1 relation to your claims in this case?

2    A.    The same knowledge from what Mr. Smith

3 gave me.

4    Q.    From what Mr. Smith gave you?

5    A.    The same knowledge I gave Mr. Smith. Mr.

6 Smith always pass him the information.

7    Q.    I see. So you think that Smith talked to

8 him?

9    A.    I know Smith talked to him.

10    Q.    You know. How do you know?

11    A.    Because I can always tell when Smitty had

12 talked. He always have a little meeting, and, if

13 the other officers know about my disease, I have

14 sarcoidosis, that's because it came out the horse's

15 mouth, which is Mr. Smith and Donald Jackson.

16    Q.    Didn't you tell me earlier a bunch that

17 you had talked to a bunch of the other officers

18 about your condition?

19    A.    David King and Otis Brooks, and those,

20 they would say you're in the dog house, but I told

21 you Otis Brooks didn't know nothing about my

22 disease.

Page 293

1    Q.    That's right, and he said you're in the

2 dog house because you've been absent?

3    A.    Yes.

4    Q.    Not specific to you've been absent for

5 sarcoidosis or anything like that?

6    A.    No, ma'am.

7    Q.    So you're making the assumption that Smith

8 talked to Jackson. I take it you weren't in any

9 conversations where Smith talked to Jackson in your

10 presence; is that right?

11    A.    Right.

12    Q.    Okay. And Mary Powell I think we talked

13 about earlier, didn't we?

14    A.    Yes, ma'am.

15    Q.    Is there anything that she has knowledge

16 of related to this case that we haven't already

17 talked about?

18    A.    No. She got documentation; she gave me

19 documentations on sarcoidosis.

20    Q.    How about Ms. Clark?

21    A.    Mary Clark was, she always talk about the

22 swelling in my face.

74 (Pages 290 to 293)

Page 298

1 won't. Right now I have four different types of
2 creams for my face.
3    Q.   Any other knowledge that this gentleman
4 has that's relevant to your claims in this case that
5 we haven't already talked about?
6    A.   No, ma'am.
7    Q.   How about Miss Cummings?
8    A.   She is another Health Service nurse. I
9 call her Geeka. I remember her, and she will always
10 check my blood pressure.
11    Q.   So, I'm sorry --
12    A.   She was always checking my blood pressure
13 and just tell me your blood pressure is up, but she
14 just tell me, you know, give me that support, keep
15 it down. This is what you need to do.
16    Q.   And what knowledge does Miss Cummings have
17 that's relevant to your claims in this case? Just
18 that she would check your blood pressure?
19    A.   Yes, ma'am. Yes, ma'am.
20    Q.   Anything else?
21    A.   No, nothing else, Miss.
22    Q.   Okay. Mr. McNeil, his name has come up?

Page 299

1    A.   Yes.
2    Q.   What knowledge does he have in your view
3 that's relevant to your claims in this case?
4    A.   He knew, Mr. McNeil knew that I was always
5 out sick, and he told me, say just stick by the
6 policy. When you're out, just bring your doctor's
7 slip like they told you to, and you shouldn't have
8 no problem. But he was, he was really, he was open.
9 He was really open about my sarcoidosis, about my
10 medical illness. He was very open about it and
11 never harassing. Just stick by the policy. Just
12 bring your doctor's slip in, and you'll be okay.
13    Q.   At some point, was your supervisor?
14    A.   Yes.
15    Q.   When?
16    A.   McNeil was my supervisor in 2001 when I
17 worked 11 to 7 shift, the nights that I did. I know
18 he was in 2002 and some of 2003, yes.
19    Q.   Am I right he hasn't been your supervisor
20 since 2003?
21    A.   No, ma'am.
22    Q.   Is there anybody who's not on this list

Page 300

1 who you believe has information relevant to your
2 claims in this case?
3    A.   No, that's it.
4    Q.   That's it. I'm going to turn you to the
5 next page, page two, which asks you to identify
6 everybody other than your lawyer with whom you've
7 discussed your claims, and I want to go through
8 them. It looks like you've discussed your claims
9 with Mr. Townes?
10    A.   Yes.
11    Q.   And what's the nature of your discussions
12 with Mr. Townes?
13    A.   First off, I discussed it with Mr. Townes
14 because I haven't seen him in a long time in church,
15 and that's when I asked him is he still at the Post,
16 and he said no, he's been let go, and I asked him
17 when, and he said May; I let go May the 8th, so that
18 weekend or whatever. I'm not sure, and he said they
19 let him go because he told the supervisor he wanted
20 days off to go to church because of religious
21 beliefs, and I said, well, you know, they wouldn't
22 let me take off for my religious beliefs, so he

Page 301

1 filed a claim against the Post.
2    Q.   He told you that?
3    A.   Yes.
4    Q.   Do you know where he filed it?
5    A.   In Virginia Human Rights Commission.
6    Q.   And did you talk to him about the fact
7 that you had filed a claim as well?
8    A.   Yes, ma'am.
9    Q.   And what did you tell him about that?
10    A.   I told him I filed a claim with the Human
11 Rights Commission, too.
12    Q.   Did you tell him that you had also filed a
13 lawsuit?
14    A.   Yes.
15    Q.   And what did you tell him about the
16 lawsuit, if anything?
17    A.   I told him I was wrongfully terminated by
18 Mr. Smith.
19    Q.   Okay. Let me ask you a little bit about
20 that. You say you were wrongfully terminated by
21 Mr. Smith. What do you think was wrong about what
22 Mr. Smith did?

76 (Pages 298 to 301)

William Mack

Page 302

1    A.    What Mr. Smith did is he held a grudge for
2  all these years just 'cause an employee asked him
3  about the sick leave policy.
4    Q.    Okay.
5    A.    And I feel like Mr. Smith should have just
6  put the policy out, because I can say from that date
7  that sick leave policy is not out.
8    Q.    What do you mean it's not out?
9    A.    Not out where the employees and security
10 officer can just go to it read it at night.
11   Q.    You mean it's not posted?  Is that what
12 you mean?
13   A.    Yes, it's not posted.  You have to get it
14 out of Mr. Smith's office, tell anyone that want to
15 see to go in his office at that time because he's
16 not there now.
17   Q.    Right.  What you're claiming is that he,
18 he held a grudge against you because you asked about
19 the sick leave policy?
20   A.    All them years, yes.
21   Q.    And that I take it you believe that he
22 ultimately made the decision to terminate you

Page 303

1  because you had asked about the sick leave policy?
2    A.    No, he terminated me because he put in a
3  statement on April the 28th that I took too many
4  days off.
5    Q.    Okay.  That's what he told you, that you
6  took too many days off?
7    A.    Yes, too many sick days off.
8    Q.    Was it sick days?
9    A.    It was sick.  A total of 18, and he faxed
10 it to Catholic University of America to my wife, and
11 she gave me a copy of the date, the time that it
12 came in to her.
13   Q.    Okay.  Any other way in which you think
14 Mr. Smith treated you unfairly or wrongfully
15 terminated you?
16   A.    Yeah, he treated me unfairly when he gave
17 me that evaluation 'cause, I mean, because, if your
18 supervisor give you an evaluation and you never seen
19 him, would you think that's fair?  If you never saw
20 this person your whole year you worked and he gave
21 you, and you saw it was John Smith's signature on
22 there and he said this about you and that about you,

Page 304

1  would you say that's fair?
2    Q.    Okay.  So I want to understand what you're
3  saying.  That because you felt like he hadn't seen
4  you or hadn't worked with you --
5    A.    Worked with me.
6    Q.    -- you thought it was unfair to evaluate
7  you?
8    A.    It was not fair.  It was not fair for them
9  to give me an evaluation.
10   Q.    Okay.  I got it.  Anything else?
11   A.    No, ma'am.
12   Q.    Okay.  Now Ms. McGruder is another person
13 you indicate you've talked to about your claims in
14 this lawsuit?
15   A.    Yes.
16   Q.    And what have you talked to her about?
17   A.    Well, Ms. McGruder, I called her on March
18 the 14th, 4:55 a.m., and that's when she told me she
19 just got back, and she said I read in the book that
20 you was terminated.  What was going on, and I said I
21 don't know because she said, if they let you go that
22 you was missing 18 shifts, she said, well, I'm

Page 305

1  getting ready to go out again, and Ann Griffin told
2  her this might not be a nice time for you to go out
3  because they just let Mack go for taking 18 shifts.
4    Q.    Anything else?
5    A.    No, ma'am.
6    Q.    So was there anything about your claims,
7  or was it just her asking you what had happened?
8    A.    No, because I'm close to Ms. McGruder, her
9  and her husband.
10   Q.    Have you talked to her since that time?
11   A.    No, ma'am, because the Washington Post put
12 a gag order on all the security officers, told them
13 don't talk to Mack about nothing.
14   Q.    How do you know that?
15   A.    Charles Brown told me, a close friend of
16 mine.
17   Q.    He's the next on the list, might as well
18 get to him.  You've talked to Mr. Brown about your
19 claims in this lawsuit?
20   A.    Yes.
21   Q.    And what has been the nature of your
22 conversations with him?

77 (Pages 302 to 305)

William Mack

Page 306

1  A.  The same as with Ms. McGruder where I was
2 terminated. He told me seen it in the book; he said
3 Mack was terminated, and he asked me why, and he
4 said the question was with the rest of the security
5 officers how can they terminate Mr. Mack for missing
6 18 when Ms. McGruder, Imani McGruder, missed 30 and
7 more within the same year? Why she ain't
8 terminated?
9  Q.  And do you have any idea why that is?
10  A.  Favoritism.
11  Q.  Okay. Favoritism based on what?
12  A.  Favoritism because she's a female. They
13 let her take off when she was out sick. When she
14 had to go to church meetings, they let Imani
15 McGruder put in emergency vacation. Not emergency,
16 but vacation. Sometimes she was running late at
17 night because she was coming out of church service,
18 and they would let her come to work with her
19 minister gown on and collar to change.
20  Q.  And you think that's because she was
21 female? Is that what you are saying?
22  A.  And she worked very close with Gary up in

Page 307

1 Northwest.
2  Q.  She worked --
3  A.  She worked with Gary in Northwest.
4  Q.  So do you attribute what you are
5 suggesting is her, is favoritism to her to her
6 having worked closely with Mr. Corso before or to
7 her being female?
8  A.  Her being female.
9  Q.  Have we talked today about all the doctors
10 who've treated you for sarcoid or sarcoidosis? I
11 think we have, but I just want to make sure.
12  A.  Yes.
13  Q.  Okay. If you could look at page five of
14 this, please, and I want to go to the fourth entry
15 up from the bottom. Starts with "In May 2006."
16  A.  Mm-hmm.
17  Q.  "One of the Washington Post nurses told
18 the Plaintiff that there is a law called the FMLA,
19 and what Plaintiff's supervisors can't do that. They
20 will be breaking the law." Who is that? Who is
21 that referring to?
22  A.  We talked about that. I told you she wore

Page 308

1 glasses.
2  Q.  You don't remember her name?
3  A.  Yes.
4  Q.  That's right. I remember that. Thank
5 you. Now, Mr. Mack you have filed a charge with the
6 Fairfax County Commission on Human Rights; right?
7  A.  Yes.
8  Q.  And do you remember when you filed that
9 charge?
10  A.  Yes.
11  Q.  It's not a test.
12  A.  If I'm correct, it should be May the 11th.
13 It was quick.
14  Q.  May 11, 2006?
15  A.  Yes.
16  Q.  And what do you claim in that charge, can
17 you remember?
18  A.  I can't remember right now, but it's more
19 than one charge, though.
20  Q.  What do you mean it's more than one
21 charge?
22  A.  I had it amended.

Page 309

1  Q.  You amended it, okay. And can you
2 remember anything about what's in it?
3  A.  Yes. I know Imani McGruder.
4  Q.  That's the female that we talked about?
5  A.  Yes. And I know religion, religion.
6  Q.  Okay.
7  A.  Race.
8  Q.  Okay.
9  A.  There's one more. I don't know what, but
10 there's one more.
11  Q.  Disability?
12  A.  Yes, disabilities.
13  Q.  Okay. Do you know what the status of that
14 charge is? Do you have any idea?
15  A.  No.
16  Q.  Have you had any communications with the
17 Fairfax County Commission on Human Rights?
18  A.  Yes, ma'am.
19  Q.  And what communications are those?
20  A.  They took all my information, and, when I
21 first called, they took all -- let me get her name
22 right.

78 (Pages 306 to 309)

Page 322

1 clear.  It's late.

2          Earlier Mr. Mack testified that he got

3 certain medical records from Kaiser, namely, the

4 late slips or, I'm sorry, the return to work slips,

5 but he didn't ask for things like doctor's notes and

6 progress notes, so I will be making a request for

7 those documents.

8          MR. PETERSON:  You can subpoena them.

9          MS. HOLMES:  I can or you can provide

10 them.  If I subpoena them, then I have to get a

11 release from you.

12          MR. PETERSON:  You don't need a release to

13 subpoena them.

14          .MS. HOLMES:  Sure I do.  They won't give

15 them to me without a release.

16          MR. PETERSON:  Most of the time they do.

17          THE WITNESS:  When I went to Kaiser, they

18 said the only ones who can get this documentation is

19 if it's a Court Order.

20          MS. HOLMES:  Okay.  I can speed it up, but

21 my understanding --

22          MR. PETERSON:  We'll work with you.

Page 323

1          MS. HOLMES:  We'll talk about it.  My only

2 point is I'm going to leave the deposition open just

3 in case there's something in those that I want to

4 bring him back and ask him about.  I don't know that

5 there will be, but I'm not suggesting there will be

6 for sure, but I'm just going to leave it open for

7 that purpose so that we can get that straightened

8 out, and we'll talk about it.  And, like I said,

9 we're happy to subpoena them, if it's appropriate.

10 Otherwise, thank you.  I appreciate it.

11          MR. PETERSON:  I got a few questions.

12          MS. HOLMES:  Okay.

13 EXAMINATION BY COUNSEL FOR THE PLAINTIFF

14 BY MR. PETERSON:

15     Q.   Mr. Mack, did you tell Mr. Smith, you said

16 you testified that you told Mr. Smith that you had

17 the sarcoidosis.  Did you tell him that you needed

18 injections every two months?

19     A.   Yes, ma'am.  I'm sorry.  Yes, sir.

20     Q.   And that you were going to be taking time

21 off for those injections if the doctor ordered

22 those; is that right?

Page 324

1     A.   Yes, sir.

2     Q.   Now, you testified as to Mr. Corso, your

3 testimony was that he said you were being terminated

4 because you took 18 days off.  What, if anything,

5 did he say about the sickness with respect to those

6 days?  Did he say anything?

7     A.   None whatsoever.

8     Q.   Well, my question is did he mention in

9 that conversation, did he mention that the 18 days

10 were for sickness?

11     A.   Yes, yes, he did.

12     Q.   Did the sarcoidosis make the stomach virus

13 worse?  Or were they unrelated?

14     A.   They unrelated.

15     Q.   Now, I've seen that you were given a

16 couple days off most of the time when you got the

17 shots.  Could you have gone back to work the next

18 day, that is not needed two days off if you could

19 have gotten the light duty just sitting at a post

20 like some of the other employees?

21     A.   Yes, ma'am.  Yes, sir.  Yes, sir.

22     Q.   So, basically, the Post made you take

Page 325

1 extra days off by not allowing you to have the light

2 duty?

3     A.   Yes, sir.

4          MS. HOLMES:  Objection.  Leading.

5          MR. PETERSON:  I got to earn my money

6 somehow.

7 BY MR. PETERSON:

8     Q.   Now, as part of your duties were you

9 training other officers, and, if so, how did that

10 go?

11     A.   I trained a lot of the summer climate.  I

12 trained the contract security officers.  I trained

13 them on the does and don'ts, what to look for at the

14 guard shack.  I trained David King when he came.

15     Q.   Did you train some of the people who

16 eventually got to be full time?

17     A.   Yes.  They David King and Imani McGruder.

18     Q.   Now, did you, you talked a lot about

19 telling Mr. Ulysses Smith about your sarcoidosis.

20 Did you tell Mr. Jackson that you also had

21 sarcoidosis?

22     A.   Yes, yes, sir.

82 (Pages 322 to 325)

## William Mack

**Page 322**

1 clear.  It's late.

2        Earlier Mr. Mack testified that he got

3 certain medical records from Kaiser, namely, the

4 late slips or, I'm sorry, the return to work slips,

5 but he didn't ask for things like doctor's notes and

6 progress notes, so I will be making a request for

7 those documents.

8        MR. PETERSON:  You can subpoena them.

9        MS. HOLMES:  I can or you can provide

10 them.  If I subpoena them, then I have to get a

11 release from you.

12        MR. PETERSON:  You don't need a release to

13 subpoena them.

14        MS. HOLMES:  Sure I do.  They won't give

15 them to me without a release.

16        MR. PETERSON:  Most of the time they do.

17        THE WITNESS:  When I went to Kaiser, they

18 said the only ones who can get this documentation is

19 if it's a Court Order.

20        MS. HOLMES:  Okay.  I can speed it up, but

21 my understanding --

22        MR. PETERSON:  We'll work with you.

**Page 323**

1        MS. HOLMES:  We'll talk about it.  My only

2 point is I'm going to leave the deposition open just

3 in case there's something in those that I want to

4 bring him back and ask him about.  I don't know that

5 there will be, but I'm not suggesting there will be

6 for sure, but I'm just going to leave it open for

7 that purpose so that we can get that straightened

8 out, and we'll talk about it.  And, like I said,

9 we're happy to subpoena them, if it's appropriate.

10 Otherwise, thank you.  I appreciate it.

11        MR. PETERSON:  I got a few questions.

12        MS. HOLMES:  Okay.

13        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

14 BY MR. PETERSON:

15        Q.  Mr. Mack, did you tell Mr. Smith, you said

16 you testified that you told Mr. Smith that you had

17 the sarcoidosis.  Did you tell him that you needed

18 injections every two months?

19        A.  Yes, ma'am.  I'm sorry.  Yes, sir.

20        Q.  And that you were going to be taking time

21 off for those injections if the doctor ordered

22 those; is that right?

**Page 324**

1        A.  Yes, sir.

2        Q.  Now, you testified as to Mr. Corso, your

3 testimony was that he said you were being terminated

4 because you took 18 days off.  What, if anything,

5 did he say about the sickness with respect to those

6 days?  Did he say anything?

7        A.  None whatsoever.

8        Q.  Well, my question is did he mention in

9 that conversation, did he mention that the 18 days

10 were for sickness?

11        A.  Yes, yes, he did.

12        Q.  Did the sarcoidosis make the stomach virus

13 worse?  Or were they unrelated?

14        A.  They unrelated.

15        Q.  Now, I've seen that you were given a

16 couple days off most of the time when you got the

17 shots.  Could you have gone back to work the next

18 day, that is not needed two days off if you could

19 have gotten the light duty just sitting at a post

20 like some of the other employees?

21        A.  Yes, ma'am.  Yes, sir.  Yes, sir.

22        Q.  So, basically, the Post made you take

**Page 325**

1 extra days off by not allowing you to have the light

2 duty?

3        A.  Yes, sir.

4        MS. HOLMES:  Objection.  Leading.

5        MR. PETERSON:  I got to earn my money

6 somehow.

7 BY MR. PETERSON:

8        Q.  Now, as part of your duties were you

9 training other officers and, if so, how did that

10 go?

11        A.  I trained a lot of the summer climate.  I

12 trained the contract security officers.  I trained

13 them on the does and don'ts, what to look for at the

14 guard shack.  I trained David King when he came.

15        Q.  Did you train some of the people who

16 eventually got to be full time?

17        A.  Yes.  They David King and Imani McGruder.

18        Q.  Now, did you, you talked a lot about

19 telling Mr. Ulysses Smith about your sarcoidosis.

20 Did you tell Mr. Jackson that you also had

21 sarcoidosis?

22        A.  Yes, yes, sir.

Esquire Deposition Services
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

William Mack

Page 326

1    Q.    And did he know that you were taking the
2  time off for the sarcoidosis?
3    A.    Yes, sir.
4    Q.    Did he offer to give you any light duty
5  like he gave other employees?
6    A.    No, sir.
7    Q.    But did you ask for light duty?
8    A.    Yes, sir.
9    Q.    And who did you ask for the light duty?
10   A.    I talked to Mr. Smith about light duty.
11   Q.    And what did he specifically tell you?
12   A.    He told me they don't have light duty.
13 They don't have light duty in the security
14 department.
15   Q.    Did you ask Mr. Jackson for light duty?
16   A.    Yes, sir.
17   Q.    Did Mr. Smith or anyone else at the Post
18 ask you to tell them about your medical appointments
19 beforehand?
20   A.    No, sir.
21   Q.    Did anyone at the Washington Post explain
22 to you about family medical leave, how the law

Page 327

1  worked?
2    A.    No, sir.  One female, the one with the
3  glasses; that was in 2006.  That's when she said,
4  she mentioned family medical leave.  She said they
5  would be breaking the law.
6    Q.    Did anyone at the Post ever classify any
7  of your leave as Family Medical Leave Act leave?
8    A.    No, sir.
9    Q.    Did anyone at the Post ever give you any
10 forms for Family Medical Leave Act?
11   A.    Brenda Bailey, and that was the year of
12 2000.
13   Q.    And what kind of form did she give you?
14   A.    About the family medical leave.
15   Q.    No, but did they give you any forms to
16 fill out when you needed to leave?
17   A.    No, ma'am.  No, ma'am.
18   Q.    Did the sarcoidosis make you more prone to
19 getting other illnesses?
20   A.    Yes, sir.
21   Q.    Now, you were asked about the evaluation,
22 whether that was fair or not.  Looking at the needs

Page 328

1  improvement where it talks about your timeliness and
2  attendance, you were marked "needs improvement."  Is
3  that fair?
4    A.    No, that's not fair.
5    Q.    Did anyone, did Donald Jackson say
6  anything about any other employees' attendance?
7    A.    Imani McGruder.
8    Q.    What did he say about her?
9    A.    The year 2004 he talked about Imani
10 McGruder having time she have taken off, and also
11 2005 he complained about her taking off a lot.
12   Q.    And did she take off more or less than you
13 for nonmedical reasons?
14   A.    Yes.
15   Q.    Well, for nonmedical reasons did she take
16 off more than you?
17   A.    Yes.
18   Q.    The last question you were asked about
19 your calendar, whether you put everything,
20 everything down.  Did you put everything down or
21 just the high points of every conversation?
22   A.    Just the high points of, after I was

Page 329

1  terminated so I can always remember what was said
2  during the phone conversations.
3        MR. PETERSON:  No further questions.
4        MS. HOLMES:  I'm going to have some follow
5  ups, and I'll do some of them and probably take a
6  quick break, and I may have a few more.
7        EXAMINATION BY COUNSEL FOR THE DEFENDANT
8  BY MS. HOLMES:
9    Q.    Now, you just told Mr. Peterson that you
10 told Smith that you needed to have steroid shots
11 every two months and that you would be taking time
12 off for those?
13   A.    Yes.
14   Q.    Do you remember that?  Now, we talked a
15 lot today about conversations you had with people at
16 the Post including Smith, and you never mentioned
17 that.
18   A.    In October, I mentioned it in October 2002
19 when I was taking, going to see my physical
20 therapist.
21   Q.    Okay.  And you told Smith that?
22   A.    I need time off.

83 (Pages 326 to 329)

William Mack

Page 330

1    Q.    To see your physical therapist?

2    A.    I need time off because my left leg was
3 stiffening up on me 'cause he complained about me
4 making my rounds.

5    Q.    And did that have any, did you tell him
6 anything about steroid shots?  I remember you
7 telling me this.

8    A.    Yes.

9    Q.    What specifically did you tell him about
10 that?

11    A.    I take steroid shots, and, when I take
12 steroid shots in my hip, my leg stiffen up.

13    Q.    You weren't telling him you needed time
14 off for the steroid shots.  You were telling him you
15 needed time off because your leg was stiffening up?

16    A.    I needed time off because of the steroid
17 shots, and he told me we do not have light duty.

18    Q.    Now, was it because your leg was
19 stiffening up or because of the steroid shots?

20    A.    Because of the steroid shots.

21    Q.    Okay.  So how did your leg stiffening up
22 have to do with that?  That's what you keep telling

Page 331

1 me when I asked you what you told him.

2    A.    From taking the steroid shots, the steroid
3 go through the nerve, the veins, and it weakens the
4 bone.  That's why my new doctor now, he won't give
5 me a steroid shot in my left hip no more, because he
6 say it caused a lot of side effects, so he give me
7 the steroid injections in my face or right on the
8 lesions that's on the other parts of my body.

9    Q.    So you told Smith you needed time off
10 because your leg was stiffening up?

11    A.    Yes.

12    Q.    Okay.  Got it.  You just testified a
13 minute ago something that was new to me, which is
14 that you said that Mr. Corso in your conversation
15 with him, when he told you that you weren't going to
16 be called any more, said that you had too many sick
17 days or something like that?

18    A.    Because you missed 18 sick days.

19    Q.    And you're confident that's what he said?

20    A.    Yes.

21    Q.    Not that you missed 18 days?

22    A.    That was on May the 8th.  He said we don't

Page 332

1 need people like you here no more.

2    Q.    I remember that, but I don't remember you
3 telling me he told you you missed a certain number
4 of sick days.

5    A.    18.

6    Q.    Are you sure he said 18 sick days as
7 opposed to 18 days?

8    A.    18 sick days.

9    Q.    Did the letter he sent to you advising you
10 the Post wasn't going to call you any more specify
11 sick days?

12    A.    He gave me two letters.  First letter
13 Mr. Smith gave on April 28, and Gary sent me a
14 letter on, he had to send it out on that Friday,
15 which was the 6th or which was the 5th because
16 Sunday was the 7th.

17    Q.    As much as I hate to do this, I'm going to
18 mark as 44 one more exhibit and ask you to take a
19 look at it.

20        (Mack Exhibit No. 44, 5/8/06 Letter, was
21 marked for identification.)

22 BY MS. HOLMES:

Page 333

1    Q.    Just take a look at that and tell me
2 whether you can identify that.

3    A.    Yes, I can identify this.

4    Q.    What is it?

5    A.    It's the letter that Mr. Gary Corso sent
6 me.  This is the very first letter.

7    Q.    And it doesn't say anything about sick
8 time, does it?

9    A.    No, but, when he called me, he said sick
10 time, sick, because Mr. Smith gave me a letter again
11 on April 28 saying you missed 18 sick days.

12    Q.    I'm not asking you about that letter.  I'm
13 asking you about Mr. Corso 'cause you said that he
14 said sick, and I'm asking you, and it sounds like
15 his termination letter doesn't say sick; is that
16 right?  It just says 18 shifts?

17    A.    And 18 shifts add up to sick.

18    Q.    Okay.  But the word "sick" isn't in the
19 letter; right?  I'm just trying to simplify this.
20 Is that right?

21    A.    It's not in there.

22    Q.    Okay.  Give me two minutes.

84 (Pages 330 to 333)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WILLIAM A. MACK                          :

    Plaintiff,                           :

    v.                                   :

                              :    CA No. 1:06-CV-1144(PLF)

WP COMPANY                               :
  DBA THE WASHINGTON POST                :

    Defendant.                           :

## PLAINTIFF'S INTERROGATORY ANSWERS

    To:  Defendant,

    From: Plaintiff

    COMES NOW Plaintiff, by counsel, pursuant to Rule 33 of the Federal Rules of Civil Procedure, and responds to Defendant's first set of interrogatories.

## Interrogatory No. 1

    Identify each and every person with knowledge or information that is or may be relevant to any allegation in the Complaint and for each state the nature and substance of such knowledge or information.

1.  Ulysses Smith
2.  Donald Jackson
3.  Mary Powell
4.  Mary Clark
5.  Jan Doll
6.  Rody McPherson
7.  Vincent Townes
8.  Bernard Carr
9.  Charles Brown
10.  Imani McGruder
11.  Gary Corso
12.  Ann Griffin
13.  Mary Hurst
14.  Andy, RN
15.  Margaret Cummings
16.  Belcher McNeil

EXHIBIT

Mack   41
3/12/07      KV

the above individuals know of the serious medical condition of Plaintiff, the policies on leave and the policies on absences.

Interrogatory No. 2.  Identify any and all documents regarding,

concerning or otherwise relating to your claims in this lawsuit.

Answer:   See documents produced with responses to document requests.

Interrogatory No. 3.   Identify all persons from whom you have obtained any statement regarding the subject matter of this lawsuit, the date said statement was taken or made, the person who obtained the statement, and the information contained in the statement.

Answer:  None obtained to use in lawsuit.

Interrogatory No. 4.  Identify each and every person who provided, or will provide, an affidavit, declaration or other written sworn (or affirmed) statement to be relied upon, referenced or otherwise utilized on this lawsuit.

Answer: Unknown at present.

Interrogatory No. 5.   Identify each and every one of your prior employers, and for such employer provide the employers address, your dates of employment with the employer, the positions you held with the employer and your reasons for leaving the employer.

Answer:  Department of Labor/ Management Training, Washington D.C. 1997-2001, Security Advisor

Springfield toyota, Springfield, VA 1993-97, Buildings and Grounds technician

Washington Post, 1994, Building maintenance, Springfield Plant

Washington Post, 1999-2006, Security Officer

Personnel Resource, Inc.   2005- present,


Interrogatory No. 6.   Identify each and every person (aside from your attorney) with whom you have discussed the claims and allegations of the complaint.

Answer: Vincent Townes
        Imani McGruder
        Charles Brown

Interrogatory No. 7.  Identify each and every person whom you may call as a fact witness in this matter and the subject matter on which the person will testify.

Answer: Uncertain at present

Interrogatory No. 8. Identify each and every expert or consultant whom you have retained to assist you in this matter, and for each such person state whether you expect to call such person to testify at trial in this case, the subject matter on which such person will testify, the individuals field of expertise and qualifications, the substance of the facts, opinions and conclusions to which that person is expected to testify and a summary of the grounds for each, whether such person has prepared a report of his/her findings and all documents and other material which such person relied upon or consulted in any manner in determining any facts and forming any opinions or conclusions.

Answer: None

Interrogatory No. 9. State whether you have been employed (including employment on a part-time or independent contractor basis) since may 8, 2006, the date you were removed from Defendant's roster of part-time on-call security guards, and if so, identify each employer, the employer's address, each job you have held, your immediate supervisor in each job and your compensation and benefits in each job.

Interrogatory No. 10. Identify each employer or prospective employer with whom you sought employment since may 8, 2006, and as to each provide; the name and address of each employer; the position received or sought; the salary received or sought; the benefits associated with the position; and the dates of employment or dates of application for employment.

Answer: Since may 2005 Plaintiff was employed part time at the Jefferson House condominiums. Supervisor – Michael Barr, $9.00 per hour.

Also employed with Personnel Resources, Inc. in a part time basis. Owner is Valarie Welsh. Starting pay was $11.00 per hour without benefits. After termination by the Washington Post, I became employed full time together with medical insurance. Pay increase to $13.00 per hour.

Interrogatory No. 11. Identify all efforts you have made to obtain employment, whether on a full time basis or as a consultant, independent contractor, partner in a business or self employed individual from may 8, 2006 to present.

Answer: See answer to No 10.

Interrogatory No. 12. Identify your current address and all addresses you have held since January 1, 2001, and state how long you have lived at each address.

Answer: 2003 to present, 5300 Deal Drive, Oxon Hill, MD  20745

3

1997 to 2003, 1111 Shago Drive, Fort Washington, MD

Interrogatory No. 13.    Identify each type or kind of damages or relief sought in this lawsuit, the date and time period for the alleged loss, the exact amount of monetary compensation or other relief sought, provide a complete description of the basis of arriving at such monetary amount or other relief, and identify each and every document which descries, reflects supports or relates to the damages or relief sought.

Answer:  Plaintiff in this suit seeks damages based on lost income. Since such damages are continuing based on the difference between what he was making prior to termination and the income and benefits he has been able to secure, damages that will be sought can not be determined precisely at this point.

Interrogatory No. 14.    Identify and describe all income and compensation that you have received from any source since January 2001, including the date, source, and amount of income or compensation received.

Answer: See documents produced and answer to No. 10.

Interrogatory No. 15.    Identify every doctor, physician, psychologist, psychiatrist, health or medical practitioner, hospital, clinic institution or health care provider involved in the care, treatment or examination of plaintiff as a result of any illness, disability, injury ailment or pain, either physical or psychological, since January 1, 2001, setting forth in detail:
(a) the nature, extent and date of each such examination, treatment or care by each doctor, physician, psychologist, psychiatrist, health or medical practitioner, hospital, clinic, institution or health care provider and identify all documents relating to that care, treatment or examination;
(b) The inclusive dates of each period of examination, treatment or care;
(c) A description of the condition, illness, disability ailment or pain either physical or psychological for which treatment, care or examination was sought;
(d) the diagnosis made and/or treatment recommended by any doctor, physician, psychologist, psychiatrist, health or medical practitioner, hospital clinic institution or health care provider.

Answer: See medical records produced.

Interrogatory No. 16.    Identify all lawsuits or legal proceedings (of any sort whatsoever including but not limited to charges and complaints before local, state or federal agencies, including actions for workers compensation) which you have filed, threatened

4

to file or undertaken against any employer or former employer, including for each such instance the date the case caption, the court or forum in which it was filed, the nature of the case and the disposition of the case.

Answer:  None


Interrogatory No. 17.  If you contend that Defendant, by any of its officers agents managers or employees have made any admissions or declarations against interest concerning the subject matter of this action, identify the circumstances of each such admission or declaration, including but not limited to the person making the statement, the statement itself, the date upon which the statement was made, the persons who heard the statement and whether the statement was reduced to writing.

Answer:  Gary Corso said to Plaintiff after his termination: "We don't want people like you working here anymore."

Mr. Carr was told by Mr. Smith that Mr. mack would not be promoted because he is sick too much.

Martha Lequeux concerning Plaintiff that Mr. Smith should get it together.

Mary Powell of Defendant's Nursing Unit said she could see the effects of the steroid shot on Plaintiff.

Jan Doll told Plaintiff that she would arrange a meeting with Mr. Smith when Plaintiff showed her the effects of his illness on 5/8/06 but Plaintiff was terminated instead.

In may 2006 one of the Washington Post's nurses told Plaintiff there is a law called the FMLA and that Plaintiff's supervisors "can't do that — they will be breaking the law"

Plaintiff's supervisor, bernard Carr told him, "You know you are in the dog house because you are taking sick leave for your illness."

Otis Brooks, a co-worker, told Plaintiff "you know you are in the dog house."

When Plaintiff asked Mr. Smith why he was being terminated, Mr. Smith stated that it was because plaintiff had been abusing his sick leave and have missed 18 shifts.


                              William Mack
                              By Counsel

5

_(signature)_

Nils G. Peterson
DC Bar No. 295261
2009 N. 14th Street, #708
Arlington VA 22201
703-527-9900

### Certificate of Service

I hereby certify that I have this 21 day of December 2006 I sent by facsimile and by U.S. mail, postage prepaid, a copy of the foregoing to:

Jacqueline Holmes
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

_(signature)_

Nils G. Peterson

6

I swear that the above interrogatory answers are true and correct to the best of my knowledge.

_____
William A. Mack

STATE OF VIRGINIA      :
COUNTY OF _____ : to wit:

    Sworn to before me, a Notary Public, by William A. Mack this _____ day of December 2006.

_____
Notary Public

My commission expires _____