William A. Mack        vs.        The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.        Tuesday, March 20, 2007

---

**Page 1**

1 UNITED STATES DISTRICT COURT
2 FOR THE DISTRICT OF COLUMBIA
3
4 WILLIAM A. MACK,     )
5     Plaintiff,     )
6     vs.     ) C.A. 06-1144
7 THE WASHINGTON POST COMPANY,   )
8     Defendant.     )
9    *   *   *   *   *
10
11
12
13
14
15
16     The deposition of ULYSSES S. SMITH, JR.,
17 was taken on Tuesday, March 20, 2007, commencing
18 at 9:52 a.m., at the Law Offices of Nils Peterson,
19 2009 North 14th Street, Suite 708, Arlington,
20 Virginia, before Paula L. Lowery, Notary Public.
21
22     *   *   *   *   *

---

**Page 2**

1     A P P E A R A N C E S
2
3 ON BEHALF OF THE PLAINTIFF:
4     NILS PETERSON, ESQUIRE
5     Law Offices of Nils Peterson
6     2009 North 14th Street
7     Suite 708
8     Arlington, Virginia 22201
9     (703) 241-0076
10
11 ON BEHALF OF THE DEFENDANT:
12     TONYA OSBORNE, ESQUIRE
13     Jones, Day, Reavis & Pogue
14     51 Louisiana Avenue, N.W.
15     Washington, D.C. 20001
16     (202) 879-3939
17     (202) 626-1700 - fax
18
19
20
21
22 (Appearances continued on the next page.)

---

**Page 3**

1 APPEARANCES (continued):
2
3 ON BEHALF OF THE DEFENDANT:
4     JOHN B. KENNEDY, ESQUIRE
5     The Washington Post
6     1150 15th Street, N.W.
7     Washington, D.C. 20071
8     (202) 334-7869
9     (202) 334-5075 - fax

---

**Page 4**

1     I N D E X
2 DEPOSITION OF ULYSSES S. SMITH, JR.
3     MARCH 20, 2007
4
5 EXAMINATION BY:       PAGE
6 Mr. Peterson       5
7
8 SMITH DEPOSITION EXHIBITS:       PAGE
9 No. 1       69
10 No. 2       72
11 No. 3       73
12 No. 4       75
13 No. 5       76
14 No. 6       78
15 No. 7       79
16 No. 8       80
17 No. 9       82
18 No. 10       83
19 No. 11       85
20 No. 12       87
21 No. 13       89
22 No. 14       94

---

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 17

1   Was everyone who worked for you in uniform?
2        A.  No.
3        Q.  How many were plainclothes?
4        A.  It depended on the shift.  Sometimes if
5   we had -- we had five post stations, plus the one
6   that roams in the building.  It could be made up
7   of two uniform guards and full-timers, or it could
8   have been made up of one uniform guard,
9   part-timers and full-timers.
10       We tried to have at least one full-timer
11  on each shift, but sometimes that didn't happen,
12  but we tried.
13       Q.  What I originally asked, though, was
14  everyone uniformed or were some plainclothes?
15       A.  I thought I answered that.  Some was
16  uniform --
17       Q.  And some were plainclothes?
18       A.  Yes.
19       Q.  On each shift?
20       A.  On each shift.
21       Q.  You said there was some outside company.
22  How did that work?

Page 18

1        A.  Uniform guards were the outside company.
2        Q.  Which company was that, sir?
3        A.  Guard Smart.
4        Q.  Did someone from the outside company work
5   every shift, or just as needed?
6        A.  Basically, they had a permanent schedule,
7   and I would say 90 percent of the time there was
8   always somebody there from the uniform service.
9        Q.  Now, did the 16 or 17 employees include
10  the people from Guard Smart, or were they in
11  addition to the 16 or 17?
12       A.  No, that's included -- include Guard
13  Smart.
14       Q.  Okay.  Of the employees of The Washington
15  Post, how many full-time security officers were
16  there, sir?  Again, 2000 to 2006.
17       A.  You're talking about -- since I left
18  there, my numbers are not all together, but
19  possibly eight full-timers.  I just can't
20  remember.  It's almost over a year.
21       Q.  You said there were some part-time
22  employees.

Page 19

1        Q.  Part-time on-call employees.
2        Q.  Part-time on-call.  How many part-time
3   on-call employees were there?
4        A.  I'd say maybe six or seven.  I'm not
5   sure.
6        Q.  Were there schedules for different people
7   to work, sir?
8        A.  Yes.
9        Q.  How frequently was the schedule put out?
10       A.  Once a week.
11       Q.  Who prepared the schedule, sir?
12       A.  Don Jackson.
13       Q.  Would you review it before it was
14  published to the employees?
15       A.  No.  He would always leave me a copy, but
16  Don basically made the schedule.
17       Q.  Did Mr. Jackson work for you?  What was
18  the relationship between you and Mr. Jackson?
19       A.  Yes, I was his supervisor.
20       Q.  What did Mr. Jackson do?
21       A.  Don is a shift supervisor.
22       Q.  Would he be one of the 16 or 17 employees

Page 20

1   that you supervised?
2        A.  Yes.
3        Q.  How many other shift supervisors were
4   there, sir?
5        A.  There was one night supervisor.
6        Q.  Who was that?
7        A.  Belcher McNeil.
8        Q.  Going back to the schedules, were they
9   posted somewhere?
10       A.  In the security center.
11       Q.  And the employees could see that?
12       A.  Yes.
13       Q.  How did the employee, other than seeing
14  that schedule, know they were going to be working
15  the following week?
16       A.  A lot of the guys called in on Friday and
17  asked the person at the desk what I'm working next
18  week.
19       Q.  How many of the 16 or 17 employees were
20  regularly on the schedule, sir?
21       A.  Most of them were regularly on the
22  schedule unless they were out of town or on

5 (Pages 17 to 20)

M.A.R. Reporting Group, LLC
Platt & Dawson

Professional Stenotype Reporters
www.mar-reporting.com

Toll Free (888) 534-1225
(703) 534-1225

William A. Mack                                        vs.
Deposition of ULYSSES S. SMITH, JR.

The Washington Post Company
Tuesday, March 20, 2007

Page 21

1  vacation, something like that.
2      Q.  When you say "most," one or two were not
3  always on the schedule, or how did that work?
4      A.  They may not -- if someone was not on the
5  schedule, it was either due to we had some
6  military guys who were working part-time on-call.
7  They might be out for training.
8          We had people that had other jobs and
9  other responsibilities, and they said, We might
10 not be able to work this week or next week or
11 something like that.  Then we let them let us know
12 when they come back, and we try to fill them with
13 other part-time on-call people.
14     Q.  What you call the part-time on-call, did
15 any of them have a regular schedule, sir?
16     A.  All had regular schedules.
17     Q.  All the employees?  All the 16 or 17,
18 unless they were going to be out of town, had a
19 regular schedule?
20     A.  Yes.
21     Q.  When an employee was going to be out,
22 that is, could not work or was taking vacation --

Page 22

1  let's start with vacation first.  Did all the
2  employees that you supervised earn vacation?
3      A.  Yes.
4      Q.  When an employee wanted to take vacation,
5  what were they required to do, if anything?
6      A.  Fill out a vacation request form.
7      Q.  That was a Post document?
8      A.  Yes, sir.
9      Q.  Who was that submitted to?
10     A.  Don Jackson.
11     Q.  Were there any requirements in terms of
12 the amount of notice that was required for an
13 employee to take vacation?
14     A.  Yes, if you want to take a week, we asked
15 them to give us at least a little time frame to
16 make sure we could fill the shift.
17     Q.  What is "a little time frame"?  What does
18 that mean, sir?
19     A.  If you want to take the rest of the week
20 off, you don't come in today and say, I want the
21 rest of the week off, unless you've got an
22 emergency.

Page 23

1      Q.  Let's leave emergency vacation aside for
2  a minute, but let's talk about needing to take a
3  week or several days off.
4      A.  Normally what people or employees did was
5  to give us at least a week or maybe two weeks
6  ahead of time.
7      Q.  So an employee would bring this form in
8  saying, I want to take off certain days somewhere
9  in the future?
10     A.  Yes.
11     Q.  Who would that form be given to?
12     A.  Like I said, Don Jackson.
13     Q.  Mr. Jackson.  Would the employee be told
14 that leave is either approved or not approved?
15     A.  Yes.
16     Q.  Would that be done some period before the
17 leave was actually to begin?
18     A.  Yes.
19     Q.  You also talked something about emergency
20 leave.  What is that, sir?
21     A.  If someone needed to take tomorrow off,
22 they would say, I need to take tomorrow off.  If

Page 24

1  we could do it, we did it.
2      Q.  That would be counted as vacation week;
3  is that correct?
4      A.  Yes.
5      Q.  For vacation and emergency leave, was
6  there any -- you talked about the vacation you had
7  to give a week or two notice.  Was there any
8  specific notice required for emergency vacation
9  leave?
10     A.  No.
11     Q.  Employees also would sometimes take sick
12 leave; is that correct?
13     A.  Yes.
14     Q.  During the period 2000-2006, have you
15 taken sick leave, sir?
16     A.  Yes.
17     Q.  Do you follow the same procedure as the
18 other employees?
19     A.  With my supervisor, yes.
20     Q.  What is the procedure then for all
21 security department employees in terms of taking
22 sick leave, sir?

6 (Pages 21 to 24)

William A. Mack                                    vs.                    The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                      Tuesday, March 20, 2007

Page 25

1    A.  If you're a part-time on-call person, you
2  are allowed, I think, if I remember the memo
3  right, three days.  You can take one day at a time
4  without a doctor's slip.  Anything after those
5  three days, you have to bring in a doctor's
6  certificate.
7        A full-time employee could have six days
8  they could take one day at a time without a
9  doctor's certificate.
10    Q.  Employees at The Washington Post, whether
11  they're full-time or part-time, are given some
12  amount of sick leave; is that correct, sir?
13    A.  Yes.
14    Q.  Do you have any knowledge as to how that
15  accrues to an employee's sick time?
16    A.  I know it's accrued hourly, and that's
17  all I know.
18    Q.  Okay.  That amount of accrual, the amount
19  of sick leave that an employee has available, is
20  conveyed to them on their pay slips on some
21  regular basis; is that correct?
22    A.  Actually, I'm not sure.

Page 26

1    Q.  Did you as the supervisor know whether an
2  employee had available sick leave or not?
3    A.  We did not get a report on sick leave
4  availability.
5    Q.  But could you find out whether an
6  employee had available sick time?
7    A.  Yes.
8    Q.  Did any employees ever exceed the amount
9  of their available sick time during the period
10  2000 to 2006?
11    A.  Yes.
12    Q.  Who would that be?
13    A.  William Mack.  There were a couple of
14  other -- he's no longer employed at the Post.
15    Q.  Who else would have exceeded their --
16    A.  I can't remember the employee's name, but
17  he was a part-time employee.  I don't have my
18  records.
19    Q.  You said Mr. Mack exceeded his sick leave
20  availability?
21    A.  Repeat that again.
22    Q.  Did anyone exceed their sick leave

Page 27

1  availability?  That is the sick leave that they
2  had accrued that was available to them.
3    A.  Are you talking in a total as what The
4  Washington Post gives, or what the department
5  allows?
6    Q.  What The Washington Post gives.
7    A.  That, I don't know.
8    Q.  So as we sit here, you don't know if any
9  employee of the security department exceeded what
10  The Washington Post gave them as sick leave; is
11  that correct?
12    A.  No.
13    Q.  You said something about what the
14  department allows.  What does that mean, sir?
15    A.  The department allows a certain amount of
16  time that a full-timer and part-timer can take off
17  as sick leave without having a doctor's slip or
18  doctor's certificate.  Now, what he's allowed is
19  what's earned on his hourly, and that, I don't
20  know.  As a department head, we don't track it.
21    Q.  But you can find out about it?
22    A.  If I needed to, yes.

Page 28

1    Q.  Sure.  Other than what you explained
2  before about a part-time employee is allowed three
3  days one at a time without a doctor's slip, and a
4  full-time is allowed six days one at a time
5  without a doctor's slip, are there any other rules
6  and regulations that the security department has
7  for its employees concerning use of sick leave?
8    A.  Yes.  The other one is if you're out two
9  consecutive days, regardless of if you have used
10  your three or your six, you have to bring in a
11  doctor's certificate.
12    Q.  Any other regulations that the department
13  has, sir?
14    A.  Not without -- I don't remember.
15    Q.  You indicated a little earlier that
16  Mr. Mack exceeded the sick leave available.  What
17  did you mean by that, sir?
18    A.  By the department standards.
19    Q.  Which department standard did Mr. Mack
20  violate?
21    A.  The three days one day at a time.
22    Q.  Correct me if I'm wrong.  My

7 (Pages 25 to 28)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

---

Page 29

1  understanding was that if an employee took more
2  than three days one at a time, they brought in the
3  doctor's certificates?
4      A.  Yes.
5      Q.  Did Mr. Mack do that?
6      A.  On some of them, yes.
7      Q.  But not on all?
8      A.  Yes.
9      Q.  And that's what you consider him having
10  violated the department standards?
11      A.  As in?
12      Q.  Well, you said Mr. Mack exceeded the sick
13  leave available.
14      A.  As a department standard, yes.
15      Q.  By failing to bring in the doctor's slip
16  when he missed one day at a time?
17      A.  Yes.
18      Q.  Did Mr. Mack always bring in the doctor's
19  slips when he was out two or more days?
20      A.  No.
21      Q.  So there were times when he didn't bring
22  in a doctor's slip?

---

Page 30

1      A.  Yes.
2      Q.  When an employee was out in the security
3  department and they came back with a doctor's
4  slip, what did the employee do with that doctor's
5  slip?
6      A.  He turned it into the health center.
7      Q.  Directly to the health center?
8      A.  Sometimes they would make me a copy, and
9  I would just take that copy and give it to the
10  health center.
11      Q.  So was there a requirement that the
12  employee visit with the health center or just
13  provide the health center with a copy of the
14  doctor's slip?
15      A.  Yes.
16      Q.  Which one, sir?
17      A.  That they provide the health center with
18  a doctor's slip.
19      Q.  But did they physically have to go to the
20  health center as well?
21      A.  To take the slip, yes.
22      Q.  But you said sometimes they gave you the

---

Page 31

1  copy.
2      A.  Well, what they do is they make a copy of
3  the slip, one to the health center and one to me.
4  I don't need one, so I took that and give it to
5  the health center.
6      Q.  So you also gave it to the health center
7  besides the employee.
8      A.  Yes.
9      Q.  Did the health center in turn do
10  anything?  Inform you whether the employee was
11  allowed to come back to work?
12      A.  They would advise me they'd turned in the
13  doctor's slip.
14      Q.  How did the health center advise you of
15  that, sir?
16      A.  Sometimes the nurse would come over and
17  just tell me, leave me a voice mail.  Sometimes
18  they would just write a note that, I have a
19  doctor's slip for --
20      Q.  So there was no regular procedure for the
21  health center advising you?
22      A.  No.

---

Page 32

1      Q.  Were there any procedures for employees
2  in the security department involving the Family
3  Medical Leave Act, sir?
4      A.  Repeat that.
5      Q.  Sure.  Were there any procedures that you
6  followed in the security department concerning the
7  Family Medical Leave Act?
8      A.  The only -- I would have to notify the
9  benefits department.
10      Q.  What would you have to notify the
11  benefits department about?
12      A.  That -- we've only had one request, and
13  this person wants to request the Family Leave Act,
14  and they explained to me how it worked.  That the
15  employee had to use his own vacation time to take
16  the leave.  When I informed the employee of that,
17  they changed their mind and said, No, I'll stay.
18      Q.  Which employee was this?
19      A.  It's been a while ago.  He's no longer
20  with the Post, but it had to be several years ago.
21      Q.  Do you remember who that was, sir?
22      A.  No, I don't.  I don't remember the name.

---

8 (Pages 29 to 32)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 33

1   He was a part-time on-call.
2       Q.   Did you, as supervisor of the security
3   department, have any literature or forms
4   concerning the Family Medical Leave Act in your
5   office or available to you?
6       A.   If I needed it, I could call benefits and
7   they would send it to me.
8       Q.   Did you have any in your office, sir?
9   Were any ever provided to you by the Post
10  explaining what the Family Medical Leave Act was?
11      A.   I've read some of the material, but if I
12  needed an employee to give an employee, then I
13  would call the benefits office.
14      Q.   Well, I'm asking a little different
15  question, sir.  Did the Post ever give you any
16  literature on the Family Medical Leave Act?
17      A.   I remember seeing literature on the
18  Family Medical Leave Act that the Post had put
19  out.
20      Q.   Where did you see that?
21      A.   It was posted on the board.
22      Q.   What was posted?

Page 34

1       A.   Well, we have notification boards all
2   around the building, equal employment, OSHA forms
3   and Family Leave Act forms -- I mean, the
4   information.  So if we have any questions, we just
5   call the benefits office.
6       Q.   Other than for this one employee you
7   talked about, the part-time employee that asked
8   about the Family Leave Act, have you ever called
9   the benefits office concerning the Family Medical
10  Leave Act other than that, sir?
11      A.   No.
12      Q.   When you called the benefits office
13  concerning this one employee, did they give you
14  any literature?
15      A.   No.
16      Q.   Did they give you any forms?
17      A.   No.
18      Q.   Do you know if the Post has any forms for
19  requesting Family Medical Leave Act?
20      A.   I'm pretty sure they do.
21      Q.   Well, as we sit here, do you know if the
22  Post has any forms for requesting Family Medical Leave

Page 35

1   Act?
2       A.   I would say yes.
3       Q.   What do you base that answer on, sir?
4       A.   Because the Post is very competent in
5   their complying with the law.
6       Q.   Well, let's go through this.  Have you
7   ever seen a form concerning the Family Medical
8   Leave Act at the Post?
9       A.   No.
10      Q.   Have you ever talked to anybody at The
11  Washington Post concerning the Family Medical
12  Leave Act?
13      A.   I talked to benefits about that and she
14  gave me the information about what to tell this
15  employee, and if he wanted to proceed from there,
16  then I'm to contact her again.
17      Q.   Okay.
18      A.   But he didn't want to do that.
19      Q.   But the person in benefits didn't give
20  you any forms.
21      A.   No.
22      Q.   Or any literature explaining things.

Page 36

1       A.   No.
2       Q.   To your knowledge, sir -- and we're just
3   testing your knowledge, not the company's
4   knowledge -- what does an employee have to do to
5   qualify for the Family Medical Leave Act?
6       A.   From my understanding?
7       Q.   That's correct.
8       A.   It's that an employee has to have an
9   emergency.  He has a personal emergency or his
10  family has an emergency that he has to take care
11  of.
12      Q.   How frequently can an employee take
13  advantage of leave under the Family Medical Leave
14  Act, to your knowledge?  Can it be more than once
15  a year?
16          MS. OSBORNE:  Objection.  Asked and
17  answered.
18          BY MR. PETERSON:
19      Q.   Can an employee take advantage of the
20  Family Medical Leave Act more than once a year,
21  sir?
22      A.   I don't know.

9 (Pages 33 to 36)

William A. Mack                                                  vs.                          The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                                          Tuesday, March 20, 2007

Page 37

1    Q.  When you say an employee has to have an
2  emergency for himself or his family, what does
3  that mean to your mind, sir?
4    A.  To my mind, the gentleman that was
5  requesting the Family Leave Act, his wife was
6  pregnant, and he wanted time off because there was
7  some type of problem with the pregnancy.  He
8  wanted to spend that time with her.
9    Q.  And that, to your mind, was an emergency,
10  or you just didn't know?
11    A.  That was something that's why I called.
12  He wanted to know would that fall under his Family
13  Leave Act.
14    Q.  Okay.
15    A.  So from what I know, I said yes, and I
16  called downtown, and they gave me the information.
17    Q.  Concerning Mr. Mack, what did Mr. Mack
18  take time off for for sick leave, sir?
19    A.  The majority of the time, I don't know.
20    Q.  Did you ever ask him?
21    A.  We had one conversation that he said that
22  he had a problem that he'd seen a dermatologist

Page 38

1  for.
2    Q.  What was that problem?
3    A.  I don't know.
4    Q.  Did he say how it affected him?
5    A.  He said that he got an injection from the
6  dermatologist that made him sleepy, and he had to
7  take the day off, and he did not know when he was
8  going to get these injections.  That the doctor
9  called him in and told him to come in and take his
10  injection.
11    Q.  Now, did he get more -- did these
12  injections -- were they required more than one
13  time?
14    A.  I don't know.
15    Q.  You said "injections."  You used the
16  plural, sir.
17    A.  I used what he used.
18    Q.  Did he tell you he had injections?
19    A.  Yes.
20    Q.  So did he tell you this happened to him
21  more than once?
22    A.  He just said injections.

Page 39

1    Q.  Did you ever talk with the health
2  department at The Washington Post about Mr. Mack's
3  leave?
4    A.  I told the nurse that I was going to ask
5  Mack to come over and sign a release form so he
6  could check on his illness -- check to verify that
7  we know everything is okay.
8    Q.  Which nurse did you talk to?
9    A.  Ann Griffin.
10    Q.  What did you talk to Ms. Griffin about?
11  Mr. Mack's illness?
12    A.  Just what I said.
13    Q.  Did you get the release form for Mr. Mack
14  to sign?
15    A.  He refused.
16    Q.  Approximately when was this, sir?
17    A.  I cannot give you a date.
18    Q.  Well, did Ms. Griffin know about
19  Mr. Mack's illness?
20        MS. OSBORNE:  Objection.  Foundation.
21        BY MR. PETERSON:
22    Q.  Other than wanting to know about

Page 40

1  Mr. Mack's illness -- well, why were you going to
2  the nurse to ask about a release form for
3  Mr. Mack's illness?
4    A.  If we have any employee that uses leave
5  and say they have a medical problem, to work with
6  that employee, what we do is we get the nurse to
7  verify it so we can make sure it's justified.
8    Q.  Did Ms. Griffin give you a release form
9  for Mr. Mack to sign?
10    A.  No.
11    Q.  How do you know that Mr. Mack refused to
12  sign it?
13    A.  He told me.
14    Q.  So he had a conversation with
15  Ms. Griffin?
16    A.  No, he told me that he refuses.  That he
17  does not want to tell the nurse his private
18  business because they might tell everyone in the
19  building.  I told him the nurses cannot do that,
20  that they would lose their license if they went
21  around the building telling people what condition
22  that someone else has.  He still said he refused.

10 (Pages 37 to 40)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 41

1    Q.  Did Mr. Mack ever talk to you -- you
2    indicated that after the injection, Mr. Mack
3    became weak; is that correct?
4         MS. OSBORNE:  Objection.
5    Mischaracterizes the testimony.
6         BY MR. PETERSON:
7    Q.  I'm sorry.  What did you say Mr. Mack
8    told you about how he felt after the injection?
9    A.  Made him sleepy.
10   Q.  Sleepy.  Did Mr. Mack ever say anything
11   about any weakness in his legs or anything like
12   that?
13   A.  No.
14   Q.  Did Mr. Mack ever ask you for light duty
15   after he would have the medical appointments?
16   A.  No.
17   Q.  Did you notice Mr. Mack ever having any
18   bloating; that is, he got heavier after injections
19   or after medical treatment?
20   A.  I wouldn't know when he got the shots.
21   Q.  Would you ever see Mr. Mack's face be
22   very puffy?

Page 42

1    A.  No.
2    Q.  Would you ever see any lesions on
3    Mr. Mack's face?
4    A.  No.
5    Q.  Let me go back to light duty.  Did
6    Mr. Mack ever ask you for light duty, sir?
7         MS. OSBORNE:  Objection.  Asked and
8    answered.
9         BY MR. PETERSON:
10   Q.  You can answer, sir.
11   A.  No.
12   Q.  Did anyone else ask you for light duty?
13   A.  Yes.
14   Q.  How many people approximately?
15   A.  I can't give you a number.  There's been
16   a number.
17   Q.  Did you accommodate those people, sir?
18   A.  Yes.
19   Q.  So there was light duty available at The
20   Washington Post?
21   A.  Yes.
22   Q.  And that involved sitting at a post?

Page 43

1    A.  Yes.
2    Q.  We've been talking about Mr. Mack for a
3    while.  Do you have a remembrance of when he came
4    to work at the security department?
5    A.  No, I don't.
6    Q.  He was working part-time, correct?
7    A.  Part-time on-call.
8    Q.  Did he ever try to become full-time?
9    A.  Yes.
10   Q.  And he didn't make it; is that correct?
11   A.  Yeah.
12   Q.  Do you have any knowledge as to why he
13   wasn't selected to be a full-time employee?
14   A.  He wasn't the best candidate.
15   Q.  Approximately how many hours a week did
16   Mr. Mack work on average?
17   A.  I can't tell you that, you know, he's a
18   part-time on-call.  A part-time on-call can work
19   anywhere from 24 to 32 on a regular basis.
20   Sometimes he may even work 5, but I can't give you
21   a number on an average.
22   Q.  Did Mr. Mack ever work more than 40 hours

Page 44

1    in a week?
2    A.  Could be possible.
3    Q.  When Mr. Mack is on the schedule, he's
4    given a certain time to arrive and a certain time
5    to leave usually; is that correct?
6    A.  Yes.
7    Q.  How was Mr. Mack's timeliness in terms of
8    meeting -- when he did come meeting the scheduled
9    time, sir?
10   A.  I would say most of the time -- he had
11   some lates, but most of the time he was on time.
12   Q.  He was average or better than average in
13   terms of timeliness?
14   A.  Average.
15   Q.  Average.  Okay.
16        During Mr. Mack's shift, was he given a
17   lunch period?
18   A.  Yes.
19   Q.  How long is an employee given for a lunch
20   period?
21   A.  Half an hour.
22   Q.  Did Mr. Mack stay within that half an

11 (Pages 41 to 44)

William A. Mack                                    vs.
Deposition of ULYSSES S. SMITH, JR.                        The Washington Post Company
                                                  Tuesday, March 20, 2007

Page 45

1   hour?
2       A.  I do not remember getting any reports
3   that he didn't.  When I worked with him on the
4   evening shift, he I was there, he stayed within
5   the time limit.
6       Q.  So as far as you know, he didn't abuse
7   his lunch times in any way.
8       A.  That's what I think right now.
9       Q.  In terms of calling off or notifying you
10  concerning the vacation times and vacation
11  periods, did Mr. Mack give proper notification for
12  taking vacation, sir?
13      A.  Not all the time, no.
14      Q.  Did he give you proper notification for
15  some of the time?
16      A.  The majority of the time, no.
17      Q.  So he didn't give you the week or so that
18  was required; is that correct?
19      A.  Right.
20      Q.  So the Post would have paperwork where he
21  didn't give proper notice about wanting vacation?
22  Well, we'll break vacation into long-term -- that

Page 46

1   is, a week or more -- and then into short-term.
2   In terms of long-term vacation, did Mr. Mack give
3   proper notice?
4       A.  Yes.
5       Q.  Always?
6       A.  I can't say always because I don't
7   remember.
8       Q.  But for the most part?
9       A.  You're still asking me to guess.  I don't
10  remember.
11      Q.  Do you know of any time where he tried to
12  get a week's vacation at the last minute, sir?
13      A.  Same thing.
14      Q.  You don't remember?
15      A.  Right.
16      Q.  But as far as you know, for the most part
17  he gave proper notification for a long-term
18  vacation.
19      A.  For a long-term, yes.
20      Q.  Let's go to emergency vacation.  Did he
21  give proper notice for emergency vacation?
22      A.  Emergency vacation is emergency vacation.

Page 47

1   There is not a proper time frame.  But when he
2   asked for vacation, it's usually one day of
3   vacation -- it's basically at the last minute.
4   He's due in at 3:00, sometimes at 12:00; depends
5   on what shift he's on.  He always had some type of
6   emergency going on.
7       Q.  What is the procedure, sir, for -- how
8   far in advance does one have to call or should one
9   call for emergency vacation?
10      A.  It's emergency vacation.
11      Q.  Is there any rule or standard in your
12  department, sir?
13      A.  Let's say we have someone off on the
14  shift, and we've got three guards and we have one
15  person off.  So we're going to be short-handed if
16  somebody else calls in, but if this person needs
17  to take that time off -- I have an emergency, I
18  have to take care of this -- then we will try to
19  accommodate him to do that.  But if it's not an
20  emergency, we just deny it.  You cannot do that.
21      Q.  Okay.  Back to my question.  Are security
22  officers in your department told that for

Page 48

1   emergency vacation, you're required to give us X
2   hours of notice?
3       A.  No.
4       Q.  Has Mr. Mack ever requested emergency
5   vacation that you've denied, sir?
6       A.  We've never denied emergency vacation.
7       Q.  For Mr. Mack?
8       A.  For anyone.
9       Q.  For anyone.  Okay.
10          In terms of sickness, how far in advance
11  does an employee have to call in notifying the
12  department that they can't come to work because of
13  illness?
14      A.  There was an unwritten rule, if you're
15  working the midnight shift, which is considered
16  11:00 to 7:00, or you're working the day shift,
17  which is a better example, you don't call in at
18  5:00 to say, I'm sick, because it's hard to find
19  somebody.
20          You normally know by the time you go to
21  bed that you're feeling bad, or you may wake up
22  feeling bad.  We would like four or five hours to

12 (Pages 45 to 48)

William A. Mack                                    vs.                The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                  Tuesday, March 20, 2007

Page 49

1    try to fill it.
2        Q.  Okay.
3        A.  That's on any time.
4        Q.  I've seen in some of the paperwork the
5    term "call off."  Is that a term that your
6    department uses, sir?
7        A.  No, it's a term that some of the guards
8    use.
9        Q.  Some of the guards use?
10       A.  Yes.
11       Q.  So your department or The Washington Post
12   doesn't use the term "call off."  What would your
13   department use?  What term?
14       A.  We don't -- basically if someone calls
15   in, Mary called in sick, that's it.
16       Q.  Is that considered by some of the guards
17   a call off?
18       A.  Yes.
19       Q.  Does someone who, for want of a better
20   phrase, calls in or calls off, that's something
21   that's within a day of the absence; is that
22   correct?

Page 50

1        A.  As a sick?
2        Q.  Let's say as a sick, yes.
3        A.  Say that again.
4        Q.  Sure.  Someone who calls in or calls off,
5    that's notice that occurs with less than 24 hours
6    in advance, or is there some period of time that
7    that's applicable to?
8        A.  Usually if someone calls off, it's maybe
9    eight hours before the shift.
10       Q.  So a call off can apply to, let's say,
11   sickness; is that correct?
12       A.  Yes.
13       Q.  And it can apply to emergency vacation;
14   is that correct?
15       A.  Yes.
16       Q.  Can it apply to vacation that is applied
17   for two weeks in advance?
18       A.  No.
19       Q.  Mr. Mack apparently, to your way of
20   thinking, was taking too much sick leave; is that
21   correct?
22       A.  He was taking -- he had a large number of

Page 51

1    sick leave for a part-time employee.
2        Q.  Did you bring that to Mr. Mack's
3    attention?
4        A.  Yes.
5        Q.  When did you first bring that to
6    Mr. Mack's attention?
7            MS. OSBORNE:  Objection.  Assumes facts
8    not in evidence.
9            BY MR. PETERSON:
10       Q.  When did you first talk to Mr. Mack about
11   being out too much, approximately?
12       A.  I can't even give you an approximate
13   because it seems like there was always a problem
14   with that.
15       Q.  How many times did you talk to Mr. Mack
16   about being out too much?
17       A.  I can't give you a number.
18       Q.  Approximately, sir.
19       A.  You want me to guess?
20       Q.  No, your best approximation.
21       A.  Maybe four or five times.
22       Q.  How frequently would you talk to

Page 52

1    Mr. Mack?  That is, once every six months, once
2    every month?
3        A.  I can't answer that.
4        Q.  During the period 2005 to 2006, how many
5    times did you talk to Mr. Mack about being out too
6    much?
7        A.  I can't give you a number there either.
8    I know I talked to him.
9        Q.  Did you ever show Mr. Mack, give to
10   Mr. Mack, provide Mr. Mack any documents showing
11   how much he was taking in leave?
12       A.  Sure, we had that for all employees.
13   They can request it, or I will sit down and talk
14   to them and show them how much leave they have, or
15   how much leave they used -- not have -- and how
16   it's being used.
17       Q.  For Mr. Mack, have you provided those
18   sorts of documentations, how much leave he's used,
19   to him?
20       A.  Every time I talk to him, yes.
21       Q.  So what do you give him when you talk to
22   him to show him how much leave he's used?

13 (Pages 49 to 52)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 53

1    A.  The copy of the attendance software.
2    Q.  Have you likewise given that to any other
3  employees?
4    A.  All employees.
5    Q.  You provide them with their attendance
6  reports?
7    A.  Yes.
8    Q.  Have there been any employees who have
9  used more sick leave than Mr. Mack during the
10  period, let's say, 2004 through 2006?
11    A.  I can't tell you that today.
12    Q.  Well, does any employee come to mind,
13  other than Mr. Mack, who used a lot of sick leave?
14    A.  They're no longer with the Post.
15    Q.  I didn't ask that question.  Did any
16  employee use a lot of sick leave other than
17  Mr. Mack during the period 2004 to 2006?
18    A.  I don't think so.
19    Q.  Was there an employee named Ms. Magruder
20  at the Post that was in your department?
21    A.  Yes.
22    Q.  How much sick leave was she using, to

Page 54

1  your knowledge?
2    A.  That, I can't tell you.
3    Q.  Was she using as much, equal or less than
4  Mr. Mack?
5    A.  That, I can't tell you.
6    Q.  But you would have known that at the time
7  when you were looking at those attendance reports?
8    A.  Absolutely.
9    Q.  Did you talk to Ms. Magruder about using
10  too much sick time?
11    A.  To my knowledge, no.
12    Q.  Did you talk to any other employee
13  besides Mr. Mack about using too much sick time?
14    A.  Between what year?
15    Q.  2004 and 2006, sir.
16    A.  I would say yes.
17    Q.  Who would that be?
18    A.  Bernard Carr was one; Freddie Martinez,
19  which is no longer at the Post; there's another
20  guy but for some reason I just can't get his name.
21    Q.  But they used less sick leave than
22  Mr. Mack?

Page 55

1    A.  Yes.
2    Q.  Other than these attendance reports, did
3  you in any way make any notations about Mr. Mack
4  or other employees use of sick leave?
5    A.  In their evaluations.
6    Q.  I'm not sure I understand.
7    A.  The Post has a policy we review the
8  full-timers every year.  If there's a problem with
9  their attendance or whatever, it's in their
10  evaluation.  Now, the part-timers, I think we
11  started doing them maybe two years ago, somewhere
12  along in there, and we would put that in if they
13  have a problem with attendance.
14    Q.  Did you put down that Mr. Mack had a
15  problem with attendance?
16    A.  Yes.
17    Q.  What are the evaluations used for, sir?
18    A.  Evaluate their performance.
19    Q.  Well, are they just evaluated and put in
20  a drawer, or do they have some consequence?
21    A.  We sit down and we talk with them.  We'll
22  evaluate them.  We tell them where his things he

Page 56

1  need to work on during the year.  For the
2  part-timers it does not -- I don't remember if it
3  affects their increase, but I know for the
4  full-timers it does affect their increase.
5    Q.  Who decides on an employee's increase in
6  pay?
7    A.  Their evaluation.
8    Q.  I'm sorry?
9    A.  Their evaluation.  Then Roddy McPherson
10  and I will go over their evaluation.
11    Q.  Well, were all part-time employees given
12  the same percentage increase the last time they
13  had an increase?
14    A.  Yes.
15    Q.  The exact same percentage?
16    A.  Yes.
17    Q.  Other than being terminated, did
18  Mr. Mack's attendance have anything to do with how
19  he was treated?  How many shifts he had?  Anything
20  like that, sir?
21    A.  Ask that again, sir.
22    Q.  Sure, other than Mr. Mack being

14 (Pages 53 to 56)

William A. Mack                                       vs.                    The Washington Post Company
Deposition of ULYSSES S. SMITH, JR.                                         Tuesday, March 20, 2007

---

**Page 57**

1  terminated, were there any repercussions for
2  Mr. Mack having too much time off?
3      A.  No.
4      Q.  Do you have any knowledge as to how
5  Mr. Mack's termination occurred?
6      A.  Yes.
7      Q.  Can you tell me about that, sir?
8      A.  I was discussing with Gary Corso, which
9  was at that time the -- we were changing over to a
10  new department head, which was Gary Corso.  I was
11  giving him an overview of the operations at the
12  Springfield plant.
13          During that overview, I was discussing
14  each employee with him, and there were some
15  employees that, you know, we need to take a look
16  at because of their performance.
17      Q.  Were you talking on the phone?  Meeting
18  with Mr. Corso in person?
19      A.  In my office.
20      Q.  In your office.  Okay.
21          What did you tell Mr. Corso about
22  Mr. Mack?

**Page 58**

1      A.  That he was an employee that seemed to
2  call off on a lot of shifts.  That he's had a few
3  problems with employees.  He's had a problem with
4  falsifying documents.
5      Q.  Anything else, sir?
6      A.  And this was a part-time on-call guy.
7      Q.  Did you tell Mr. Corso how many times
8  Mr. Mack called off?
9      A.  I gave Gary everyone's attendance record
10  to show him how we at Springfield kept account of
11  attendance for the whole department.
12      Q.  When you say the "attendance record,"
13  what do you mean by that, sir?
14      A.  It's a software program that you have
15  that when an employee calls in for vacation, sick
16  time, unexcused absence, work on a holiday, late,
17  or left early that you can record for a year.
18      Q.  For how long?
19      A.  A year.
20      Q.  Okay.  So you gave Mr. Corso a copy of
21  that?
22      A.  Yes, of everyone's.

**Page 59**

1      Q.  What time period did you give Mr. Corso
2  that for Mr. Mack and the other employees?
3      A.  What do you mean, "time frame"?
4      Q.  What time period?  How long a period did
5  you give this attendance record to Mr. Corso?
6      A.  Oh, I gave it to him the day we were
7  talking about the department.
8      Q.  But how long --
9      A.  It was for the year.
10      Q.  It was for a one-year period, sir?
11      A.  Yes.
12      Q.  Do you remember how many days Mr. Mack
13  had called off for that one-year period?
14      A.  No.
15      Q.  You said it also showed whether Mr. Mack
16  was late or left early; is that correct?
17      A.  The program will show that if any
18  employee left early or late.
19      Q.  Did the information you provided to
20  Mr. Corso show that Mr. Mack was late or left
21  early?
22      A.  I don't remember.

**Page 60**

1      Q.  Did Mr. Corso ask you whether any of the
2  employees you were talking about should be
3  retained or terminated?
4      A.  No, we didn't talk about that.
5      Q.  Did you provide Mr. Corso with any
6  documents about Mr. Mack having problems with
7  other employees?
8      A.  No.
9      Q.  Did you provide Mr. Corso with any
10  documents concerning Mr. Mack falsifying anything?
11      A.  No.
12      Q.  You just told him about that?
13      A.  Yes.
14      Q.  How long did you talk to Mr. Corso about
15  Mr. Mack?
16      A.  I can't give you a time because we were
17  talking about other employees also.  It wasn't
18  specifically William Mack.
19      Q.  So you don't remember how long in the
20  conversation you talked about Mr. Mack?
21      A.  No.
22      Q.  Do you remember how long you talked with

---

15 (Pages 57 to 60)

M.A.R. Reporting Group, LLC          Professional Stenotype Reporters          Toll Free (888) 534-1225
Platt & Dawson                              www.mar-reporting.com                        (703) 534-1225

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 61

1 Mr. Corso that day at all in total?
2    A.  Probably about an hour or so.
3    Q.  Did Mr. Corso ask you if you thought any
4 employees should be terminated?
5    A.  No.
6    Q.  Besides this one-year attendance record,
7 how many sheets of paper was that attendance
8 record on, sir?
9    A.  It depends on how much time a person took
10 off.
11    Q.  Well, for Mr. Mack, was it several
12 sheets?  One sheet?
13    A.  I don't know.
14    Q.  Where in the performance spectrum did you
15 tell Mr. Corso that Mr. Mack was?
16    A.  I think he was below average.
17    Q.  Were there any employees that were worse
18 than Mr. Mack?
19    A.  No.
20    Q.  Were there any employees that had as
21 serious a problem as Mr. Mack?
22    A.  No.

Page 62

1    Q.  Which was Mr. Mack's principal problem or
2 largest problem, sir?
3    A.  One, he liked to instigate problems.  On
4 one of the reviews that I remember, we requested
5 if he has any problem, that he needs to talk to
6 us.  He had a habit of going around the building
7 and talking about a little bit of everything when
8 he should be doing his job.  He would tell things
9 that, basically, were not true to employees.
10       One being he told this one young lady
11 that the Corvette in the parking lot was his, and
12 that he leaves it there sometimes to catch a ride
13 home with somebody else.  The Corvette in the
14 parking lot was mine.
15    Q.  Did you take offense at that, sir?
16    A.  I told him about it, and he laughed and
17 wanted to know how I found out.  I said, you know,
18 If the young lady got upset with you over
19 something and did something to my car, that would
20 not be funny.
21    Q.  I understand.
22       When was the first time that you knew

Page 63

1 Mr. Mack was going to be terminated from the Post?
2    A.  I can't give you a date.
3    Q.  Was it before Mr. Corso wrote him a
4 letter?
5    A.  Gary called me and said that, We're going
6 to terminate Mr. Mack, but I can't give you what
7 date that was.
8    Q.  Well, did he tell you why he was going to
9 terminate Mr. Mack?
10    A.  Because of his attendance and the
11 problems that he had.
12    Q.  Well, as best you can remember, what are
13 the exact words that Mr. Corso told you about why
14 he was going to terminate Mr. Mack?
15    A.  That's it.  I mean, I can't give you
16 verbatim conversation.  We're talking about
17 something over a year ago.
18    Q.  As best you can, sir.
19    A.  Because of, you know, his attendance
20 record, the problems, and we're going to -- you
21 know, we're going to terminate him.
22    Q.  Did Mr. Corso ask about Mr. Mack?  Did

Page 64

1 you tell Mr. Corso about Mr. Mack having
2 injections?
3    A.  No.
4    Q.  Did you know of any other health problems
5 that Mr. Mack had besides the injections?
6    A.  No.
7    Q.  At some point Mr. Mack failed the
8 breathing test; is that correct?
9    A.  I don't know.
10    Q.  The breathing test for masks and things?
11 You wouldn't be informed about that?
12    A.  I don't remember anybody informing me
13 that he failed the test.  I mean, I failed the
14 test once myself and had to take it again.  So I
15 don't remember him not going through the training.
16    Q.  When Mr. Corso called you and told you he
17 was going to terminate Mr. Mack, did you protest
18 in any way?
19    A.  No.
20    Q.  Did you agree with him?
21    A.  According to his record, I said, Yes,
22 that's fine.

16 (Pages 61 to 64)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

---

Page 65

1  Q. Well, you said he mentioned Mr. Mack's
2  attendance record.
3  A. And the problems he had in the
4  department.
5  Q. When you were telling Mr. Corso -- how
6  long between your meeting with Mr. Corso where you
7  told him about the various employees and him
8  calling you telling you he was going to terminate
9  Mr. Mack?
10  A. I don't know. Maybe -- I don't know. It
11  wasn't like he went downtown, turned around and
12  called me back. I know it wasn't like that. I
13  don't know how many days it was.
14  Q. When you were meeting with Mr. Corso and
15  talking about Mr. Mack's attendance record, were
16  you focusing on his sick leave when he called off,
17  or what were you focusing on, sir?
18  A. I was talking about everyone's record,
19  not just Mr. Mack's.
20  Q. But when you talked about Mr. Mack in
21  particular, what were you telling Mr. Corso about?
22  A. We were talking about his attendance, his

Page 66

1  call-off times on shift, his not taking shifts,
2  the trouble that he sometimes instigates with
3  starting confusion in the department, as in -- you
4  know, he made this big deal about not being paid
5  for a shift. You know, they're trying to cheat me
6  out of, you know, eight hours and on and on and
7  on.
8     Come to find out when we pulled out his
9  time cards after two weeks, he didn't sign his
10  time card, but he's told everyone in the
11  department and anyone who'd listen that the Post
12  was trying to cheat him.
13  Q. You just said something about Mr. Mack
14  not taking shifts. What does that mean, sir?
15  A. Sometimes if you call him -- Don Jackson
16  would call him and ask him, you know, We have an
17  extra shift outside of what you may have, or can
18  you work this shift, because I need somebody here.
19  He would turn it down.
20     The reason that comes to mind is because
21  he made a big issue about it because one time he
22  went to Roddy and told Roddy that we were cutting

Page 67

1  on his shifts. When Roddy told me about it, I
2  talked to Don and Don said, He turned it down. He
3  didn't want to work the shifts I want to give him,
4  so I couldn't put him anyplace else.
5  Q. When you're trying to fill a shift, sir,
6  when someone else calls off and you're looking
7  around for somebody, Mr. Mack is a candidate for
8  filling other shifts; is that correct?
9  A. Sure.
10  Q. Would Mr. Jackson always be the one
11  calling, or would other people call trying to fill
12  shifts?
13  A. Sometimes it would be the shift
14  supervisor. Sometimes it may be me. Depends on
15  what time the shift was. Sometimes it would be
16  Don or maybe another employee that we might say,
17  you know, We need to fill this shift. Can you do
18  this for us to fill it?
19  Q. So the shift supervisor would be able to
20  call and fill a shift? He would have that
21  authority, or she would have that authority?
22  A. Yes.

Page 68

1  Q. Going back to the records, did you
2  prepare anything else other than that attendance
3  record that you talked about with Mr. Corso where
4  you would keep track of people missing shifts and
5  taking time off and such?
6  A. No, that's the only one.
7  Q. Would it be a, for lack of a better
8  phrase, a pass-on log that was maintained at The
9  Washington Post security desk?
10  A. Yes.
11  Q. Those are in composition books; is that
12  correct?
13  A. Yes.
14  Q. Black and white covers, about a hundred
15  pages each?
16  A. Some of them were a husband, some of them
17  were 50 or 90.
18  Q. Well, just approximately.
19  A. Yes.
20  Q. I'm not trying to trick you in any way.
21     Was something written in those books
22  every day?

---

17 (Pages 65 to 68)

Page 77

1    Q.  Sir, you've been handed what's been
2  marked as Number 5, Bates 247. Do you recognize
3  the form of that document?
4    A.  It should be a pay stub.
5    Q.  For Mr. Mack; is that correct?
6    A.  Yes.
7    Q.  On this pay stub, under "description," it
8  talks about higher class under the first line
9  there. Do you know what "higher class" means?
10    A.  If there's not a supervisor on shift,
11  usually there are someone who will take
12  responsibility for that shift, and that's the
13  person we would go to if there's a problem on that
14  shift to say what happened.
15      What the guards will do is maybe one
16  guard will take one night if there was a
17  consistent time, and the other guard would do it
18  the other night.
19    Q.  So at times Mr. Mack was classified as
20  the higher class? The person in charge?
21    A.  If it's got the higher class on that
22  shift, yes.

Page 78

1    Q.  And there's also something here called
2  "night differential regular." Do you remember
3  what that is?
4    A.  Yes, you got paid for working on the
5  midnight shift -- evening shift and midnight
6  shift -- and extra salary.
7    Q.  So you got extra money --
8    A.  For the night time.
9    Q.  -- for the nighttime shift. Okay.
10      (Smith Deposition Exhibit Number 6 was
11  marked for identification.)
12      BY MR. PETERSON:
13    Q.  Sir, you've been handed what's been
14  marked as Number 6, Bates 613 and 614. Do you
15  recognize this document?
16    A.  No.
17    Q.  When Mr. Mack was out on sick leave, when
18  he brought back the notes from the health care
19  provider, would you ever look at those before you
20  pass them on to the health center?
21    A.  Normally, they would be laying on my
22  desk, and yes, I would see them.

Page 79

1    Q.  Would you read them?
2    A.  Yes.
3    Q.  But you don't remember reading this?
4    A.  No.
5    Q.  Could you have read it and you just
6  forgot about it?
7    A.  I'm pretty sure I never seen this one.
8      (Smith Deposition Exhibit Number 7 was
9  marked for identification.)
10      BY MR. PETERSON:
11    Q.  Sir, you've been handed what's been
12  marked as Number 7, Bates 624 through and
13  including 626. It's titled "respirator
14  certification." Have you seen this document
15  before?
16    A.  No.
17    Q.  Forgive me if I've asked you before --
18  did you have any knowledge that Mr. Mack had
19  failed the respirator certification?
20    A.  Not to my recollection.
21    Q.  Does someone have to pass this
22  certification?

Page 80

1    A.  Sooner or later they did. We only had
2  one employee who could not, and that was because
3  of a heart condition.
4    Q.  What happened to that employee?
5    A.  He didn't get to participate in the
6  training, which we finally did away with after a
7  while.
8    Q.  Okay.
9      (Smith Deposition Exhibit Number 8 was
10  marked for identification.)
11      BY MR. PETERSON:
12    Q.  Sir, you've been handed what's been
13  marked as Number 8, Bates 627 through 628. Do you
14  recognize the form of that document?
15    A.  Release to work form, yes.
16    Q.  You indicated that would always come back
17  to you from the health center when the employee
18  came back to work?
19      MS. OSBORNE: Objection. I think that
20  mischaracterizes his prior testimony.
21      BY MR. PETERSON:
22    Q.  Would this always come back to you from

20 (Pages 77 to 80)

M.A.R. Reporting Group, LLC
Platt & Dawson

Professional Stenotype Reporters
www.mar-reporting.com

Toll Free (888) 534-1225
(703) 534-1225

William A. Mack                                vs.
Deposition of ULYSSES S. SMITH, JR.                    The Washington Post Company
                                                       Tuesday, March 20, 2007

Page 81

1  the health center?
2      A.  The release to work form?
3      Q.  Yes.
4      A.  No.
5      Q.  Would it usually come back to you?
6      A.  I wouldn't say usually.  I said most of
7  the time the nurse just told me.
8      Q.  When it did come back to you, did it have
9  any medical information stapled to it or attached
10 to it in any way?
11     A.  No.
12     Q.  Only a single form would come back and
13 all the medical information would stay in the
14 health center; is that correct?
15     A.  As far as I know, I never got any.
16     Q.  So the only time you ever saw the health
17 information is when the employee would leave it on
18 your desk for you to transmit it to the health
19 center?
20     A.  Well, sometimes they would make a copy
21 for me, like they thought I would keep a copy, but
22 I would give it to the health department.

Page 82

1  Usually, in William Mack's case, it would be this
2  form here.
3      Q.  The Bates 628?
4      A.  Yes.
5      Q.  Would Mr. Mack usually leave his health
6  forms on your desk?
7      MS. OSBORNE:  Objection.  Vague.
8      THE WITNESS:  Sometimes.
9      BY MR. PETERSON:
10     Q.  What percentage of time would Mr. Mack
11 leave either --
12     A.  I couldn't give you a percentage.
13     Q.  Okay.  More than 50 percent?
14     A.  I can't give you a percentage.
15     (Smith Deposition Exhibit Number 9 was
16 marked for identification.)
17     BY MR. PETERSON:
18     Q.  Sir, you've been handed what's been
19 marked as Number 9, Bates 118, a letter dated
20 May 8, 2006.  Have you ever seen that letter
21 before?
22     A.  Yes.

Page 83

1      Q.  When did you first see that?
2      A.  Yesterday.
3      Q.  This letter talks about -- this is the
4  letter Mr. Corso sent to Mr. Mack terminating his
5  employment; is that correct?
6      A.  From what I see here, yes.
7      Q.  It references 18 shifts.  Did you tell
8  Mr. Corso that Mr. Mack had been unavailable for
9  18 shifts?
10     A.  No.
11     Q.  Did you tell him that Mr. Mack had been
12 unavailable for any number of shifts?
13     A.  No.
14     (Smith Deposition Exhibit Number 10 was
15 marked for identification.)
16     BY MR. PETERSON:
17     Q.  Sir, you've been handed what's been
18 marked as Number 10, I believe, Bates 97.  Do you
19 recognize the form of that document?
20     A.  Yes.
21     Q.  What is that document?
22     A.  It's an attendance record.

Page 84

1      Q.  Is this the same kind of attendance
2  record you gave to Mr. Corso?
3      A.  Yes.
4      Q.  For Mr. Mack and for all the other
5  employees?
6      A.  Yes.
7      Q.  Which of these vacations and illnesses
8  and such from this form, sir, would be considered
9  Mr. Mack calling off?
10     A.  You mean a shift that he can't work?
11     Q.  Well, using the term "call off" as used
12 by your employees, which would be considered to be
13 called off?
14     A.  Vacation and sick.
15     Q.  Even the long-term vacation?
16     A.  Not the long-term vacation.
17     Q.  How can you tell which of these vacations
18 are long-term as opposed to short-term or
19 emergency vacation?
20     A.  Basically, you can't.
21     Q.  From this form.
22     A.  From this form.

21 (Pages 81 to 84)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 85

1   Q.  Okay.
2   Q.  Let's look at the 4/22 through 4/29
3   vacation.  Are those more likely than not
4   long-term vacation?
5   A.  Not necessarily.  There were several
6   times that William called in and said he had an
7   emergency, he had to go to the college for his
8   daughter because she had a problem with something
9   or other, and he needed that weekend off.  That
10  could be considered as his emergency leave because
11  he was scheduled to work.
12       (Smith Deposition Exhibit Number 11 was
13  marked for identification.)
14       BY MR. PETERSON:
15  Q.  Sir, you've been handed what's been
16  marked as Number 11, Bates 93 and 94, I believe,
17  or maybe 95 and 94.  Do you recognize that
18  document?
19  A.  Yes.
20  Q.  What is this?
21  A.  This is the attendance form.
22  Q.  And the cover sheet is a fax cover sheet?

Page 86

1   A.  Yes.
2   Q.  Is that your handwriting?
3   A.  Yes.
4   Q.  Why were you sending Mr. Mack this fax on
5   4/28?
6   A.  I don't remember.
7   Q.  Did you ever send any other employee by
8   fax their attendance detail report?
9   A.  I don't remember.
10  Q.  You don't remember, you don't know or --
11  A.  I don't remember if I did.  I mean, this
12  is not a document that we keep secret from the
13  employees.  We give it to them.
14  Q.  All right.
15  A.  If he had asked me to fax it to him, I
16  probably would have faxed it to him.  I just don't
17  remember.
18  Q.  Why were you faxing it to Mr. Mack at
19  this point in time, sir?
20       MS. OSBORNE:  Objection.  Asked and
21  answered.
22       THE WITNESS:  I don't remember.

Page 87

1       BY MR. PETERSON:
2   Q.  Well, did Mr. Mack ask you to fax it to
3   him?
4   A.  Normally, I wouldn't fax anything to
5   anyone unless they asked me.  I mean, I wouldn't
6   just arbitrarily just fax it, but I just don't
7   remember what the reason was.
8   Q.  Do you remember whether you were bringing
9   up attendance problems to Mr. Mack, or Mr. Mack
10  was telling you how much time he'd taken off, or
11  how that came about?
12       MS. OSBORNE:  Objection.  Asked and
13  answered.
14       THE WITNESS:  I don't remember.  I can't
15  speculate on that.
16       BY MR. PETERSON:
17  Q.  Thank you.
18       (Smith Deposition Exhibit Number 12 was
19  marked for identification.)
20       BY MR. PETERSON:
21  Q.  Sir, you've been handed what's marked as
22  Number 12, I believe, Bates 321 and 322.

Page 88

1   A.  Um-hum.
2   Q.  What are these documents, sir?
3   A.  Vacation requests.
4   Q.  This is for, as you describe it, the
5   long-term vacation?
6   A.  Well, in his thing, long-term would
7   probably be four days.
8   Q.  Okay.
9   A.  It still could have been emergency leave
10  or whatever, because they still fill this out if
11  they take a vacation just as a precaution.  Some
12  people do that.
13  Q.  Here Mr. Mack is asking for -- on the
14  first page, the 321 -- Mr. Mack is asking for time
15  on the week of 7/7/03 and he's asking for that.
16  He's submitting that form on 6/22/03; is that
17  correct?
18  A.  Yes.
19  Q.  About two weeks early.
20  A.  Um-hum.
21  Q.  Is that proper time for submitting leave
22  to The Washington Post for long-term vacation?

22 (Pages 85 to 88)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 89

1  A.  Like I said, this was a long enough time
2  that we could do it, so --
3  Q.  This would be a form where Mr. Mack
4  wasn't calling off; is that correct?
5  A.  I said "calling off" is just a term that
6  if somebody called in and said, I can't make it
7  because of.
8  Q.  So this would not be considered a call
9  off as such.
10  A.  No.
11  (Smith Deposition Exhibit Number 13 was
12  marked for identification.)
13  BY MR. PETERSON:
14  Q.  Sir, you've been handed what's been
15  marked Number 13, Bates 9 through and including
16  11.  Do you recognize this document?
17  A.  Yes.
18  Q.  This is the performance review for
19  Mr. Mack; is that correct?
20  A.  Yes.
21  Q.  On the third page, that's your signature;
22  is that correct?  As manager?

Page 90

1  A.  Yes.
2  Q.  Calling your attention to the second
3  page, Bates 10, under "employee development,"
4  here, Mr. Mack needs improvement, for the fourth
5  bullet there, "The extent, to which an employee is
6  punctual, observes prescribed work break/meal
7  periods and has an acceptable overall attendance
8  record."
9  A.  Um-hum.
10  Q.  You indicate Mr. Mack needs improvement
11  there; is that correct?
12  A.  Yes.
13  Q.  Why is that?
14  A.  It's not only I.  Also on here is Don
15  Jackson.
16  Q.  Okay.  Why did you and Mr. Jackson say
17  that Mr. Mack needs improvement on that bullet?
18  A.  Because of his attendance record.
19  Q.  What particularly about his attendance
20  record?
21  A.  His leave, his taking off time.  There
22  were several occasions when he had a car broken

Page 91

1  into, kid problems.  It was just something -- it
2  was always some reason why he couldn't make it to
3  work.
4  Q.  And this includes the sick leave?  The
5  call offs for sick leave?
6  A.  This was basically the attendance record
7  as a whole.
8  Q.  And that includes the call offs for the
9  sick leave?
10  A.  It includes attendance as a whole.
11  Q.  But that includes the sick leave; is that
12  correct, sir?
13  A.  I thought I answered that.  It's
14  attendance as a whole -- it's basically just
15  attendance.  That would also include the shifts
16  that he cannot work, or he would not work, but it
17  basically is attendance.
18  Q.  And is the shifts -- well, I'm going to
19  ask a question until -- you say attendance means
20  both sick -- what does attendance mean besides
21  sick and call offs for emergency vacation?
22  A.  If he has attendance problems with

Page 92

1  vacation, he had attendance with unexcused leave,
2  if he has attendance where he takes off a lot --
3  that.  If we have a question about some sick
4  leave, then would also be considered.
5  Q.  What question would you have about
6  Mr. Mack's sick leave, sir?
7  A.  It's not only William Mack; it would be
8  the department.  You can take the person's leave,
9  and over the years I've been there doing this,
10  there have been times when we have people that
11  would get sick every Thursday every other week.
12  We would bring that to their attention.
13  There's times when they would call off
14  shifts every Monday just before their time off, or
15  they would get sick a certain time a month, or
16  they'd request vacation a certain time of the
17  month.
18  What we would do is we would sit down and
19  show them that, This is the pattern of your time,
20  and we need to make you aware of it.
21  Q.  Well, besides Mr. Mack -- let's go back a
22  step.  You indicated Mr. Mack took too much sick

23 (Pages 89 to 92)

William A. Mack                                    vs.
Deposition of ULYSSES S. SMITH, JR.                              The Washington Post Company
                                                                Tuesday, March 20, 2007

Page 93

1  leave; is that correct?
2      A.  That he took too much sick leave?
3      Q.  Yes.
4      A.  He was over the limit of the department,
5  yes.
6      Q.  Okay.  Was there any other employees that
7  were over the limit of the department for sick
8  leave?
9      A.  Yes.
10     Q.  Who would that be, sir?
11     A.  In the past it was Bernard Carr, Freddie
12 Martinez -- a couple of guys that are no longer
13 there.
14     Q.  Were any of them disciplined for taking
15 too much leave?
16     A.  Disciplined as in?
17     Q.  Either terminated or disciplined in any
18 other way?
19     A.  It was brought to their attention.  They
20 might have been made the correction to that.
21     Q.  Was Mr. Mack given an opportunity to make
22 the correction, as you say?

Page 94

1      A.  Yes.
2      Q.  Can you tell me about that, sir.
3      A.  One conversation when I brought it to his
4  attention on the leave, he said, Well, this year
5  you're going to see a better employee.  I won't
6  be -- you know, I'll make sure I won't be taking
7  as much leave.  You know, I'm changing.  I think
8  you gave me some examples and things to work on
9  that I'm going to work on.
10     Q.  All right.  But no other employee was
11 terminated because of leave issues; is that
12 correct?
13     A.  Falsifying a doctor's slip, yes.
14     Q.  Besides that, sir?
15     A.  Besides that?  I can't say for certain.
16         (Smith Deposition Exhibit Number 14 was
17 marked for identification.)
18         BY MR. PETERSON:
19     Q.  Sir, you've been handed what's been
20 marked as 14, Bates 319 and 320.  Is this the
21 leave request/vacation request that you referenced
22 earlier about Mr. Mack taking off time for his

Page 95

1  daughter at college?
2      A.  No.
3      Q.  It was another time that he requested
4  time?
5      A.  Yes.
6      Q.  How many days was that second time?
7      A.  I think it was the whole weekend shift.
8      Q.  Okay.  Did Mr. Mack have any troubles
9  performing any of the duties of his job?
10         MS. OSBORNE:  Objection.  Vague.
11         BY MR. PETERSON:
12     Q.  That you know of?
13     A.  Can you --
14     Q.  Sure.  Did Mr. Mack ever tell you he had
15 difficulty walking up stairs or anything like
16 that?
17     A.  No.
18     Q.  Did you ever tell Mr. Mack that you would
19 terminate him for abusing the sick leave?
20     A.  No.
21     Q.  Did you ever tell Ms. Griffin that you
22 were tired of Mr. Mack abusing and taking too much

Page 96

1  sick leave?
2      A.  No.
3      Q.  Did Ms. Griffin ever tell you about
4  Mr. Mack's sarcoidosis?
5      A.  No.
6      Q.  Do you have any knowledge as to how much
7  sick leave Ms. Magruder would have taken over 2005
8  to 2006?
9      A.  No.
10     Q.  But you would have seen her employee
11 attendance reports; is that correct?
12     A.  Yes.
13     Q.  As you sit here, do you think she took
14 less time than Mr. Mack?
15     A.  I would have to guess -- Jesse's been
16 gone a long time.
17     Q.  When did Ms. Magruder leave?
18     A.  A few years back.
19     Q.  But as far as you know, let's say the
20 period 2004-2005, you don't know if she took more
21 sick leave than Mr. Mack?
22     A.  No, off of my head, no.  Jesse was a good

24 (Pages 93 to 96)

William A. Mack
Deposition of ULYSSES S. SMITH, JR.

vs.

The Washington Post Company
Tuesday, March 20, 2007

Page 97

1  employee.
2      MS. OSBORNE: Nils, I don't know you are
3  necessarily talking about the same person. Are
4  you talking about Jesse Moore?
5      MR. PETERSON: I'm asking about Imani
6  Magruder, I believe her name is.
7      THE WITNESS: Oh, Imani.
8      MS. OSBORNE: I thought you guys were
9  talking about two different people.
10     THE WITNESS: Oh, okay. I'm talking
11 about Moore.
12     Imani? Imani had a couple of operations
13 during the year, which she took off, yes.
14     BY MR. PETERSON:
15     Q. But did she have more time off for
16 sickness than Mr. Mack?
17     A. I don't know for sure.
18     Q. But her attendance reports you would have
19 looked at would have told you that?
20     A. Yes, because I remember her bringing in
21 the slips and saying she had to have an operation
22 on her feet. As soon as she was okay, she was

Page 98

1  going to come back in on light duty and she'd stay
2  at her desk.
3      Q. Did you provide Mr. Corso with Ms. Imani
4  Magruder's attendance record as well as
5  Mr. Mack's?
6      A. Everyone's.
7      Q. Including Ms. Magruder's?
8      A. Yes.
9      Q. Did you ever speak to Mr. Mack about the
10 times when he would have medical appointments,
11 whether they could be arranged so he wouldn't miss
12 so much work at The Washington Post?
13     A. Yes.
14     Q. Can you tell me about that?
15     A. He said that -- what I told you before,
16 that the doctor calls him when he was due for the
17 shots.
18     Q. And then what did you say in return, sir?
19     A. To see if he could schedule them on his
20 day off because he was only working maybe at that
21 time three days or four days a week.
22     Q. Did Mr. Mack respond to that?

Page 99

1      A. He said he only goes when the doctor
2  calls him in.
3      Q. Did you ask him how much foreknowledge he
4  had about when he would be called in to see the
5  doctor?
6      A. He said he doesn't have any. The doctor
7  just calls him and says he has to come in and get
8  his shot.
9      Q. Did you ever have any discussions with
10 Mr. Mack about the Family Medical Leave Act?
11     A. No.
12     Q. Would there have been any reason for you
13 ever to talk with him about the Family Medical
14 Leave Act?
15     A. Not unless he brought it up.
16     Q. So he would have to bring that up?
17     A. Yes.
18     Q. Do you have any knowledge what the term
19 "intermittent leave" means?
20     A. To my knowledge, every now and then.
21     Q. Is that term used in the Family Medical
22 Leave Act?

Page 100

1      A. Right now I can't tell you ever word
2  that's in there. I don't know.
3      Q. Well, have you ever read anything about
4  intermittent leave, sir?
5      A. I don't remember.
6      MR. PETERSON: No further questions.
7      MS. OSBORNE: Can we take just a
8  two-minute break and let me look at my notes and
9  see if I have anything?
10     MR. PETERSON: Sure.
11     (A recess was taken.)
12     MS. OSBORNE: I don't have any follow-up
13 questions.
14     MR. PETERSON: Very good. Thank you.
15     (Reading and signature not waived.)
16     (Whereupon, the proceedings at 11:51 a.m.
17 were concluded.)
18
19
20
21
22

25 (Pages 97 to 100)

M.A.R. Reporting Group, LLC
Platt & Dawson

Professional Stenotype Reporters
www.mar-reporting.com

Toll Free (888) 534-1225
(703) 534-1225

# The Washington Post

## HEALTH CENTER

### RELEASE TO WORK SLIP

_David King_          Work related? Y   N

**Name of employee**

_2/19/03_

**Date of injury**

**Returned to:** **RESTRICTED DUTY** on   _3/12/03_

         **Date**

     **Explain restrictions:**   _Sedentary work_

**FULL DUTY** on   _~~_____~~_

         **Date**

_3/13/03_           _N. Nurse_

**Today's date**           **Nurse's signature**

DEPOSITION
EXHIBIT
PENGAD 800-631-6989
Smith 4
3/20/07

**ORIGINAL TO HEALTH CENTER MANAGER; COPY TO EMPLOYEE'S SUPERVISOR**

000240

Rev 4/95

 **KAISER PERMANENTE.**

Mid-Atlantic Permanente Medical group, P.C.
Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.
2101 East Jefferson Street Rockville, MD 20852

11/6/2005

William Mack                                          551051675
836 Neptune Ave
Oxon Hill, MD 20745

Mr. Mack seen in urgent care today on 11/6/05.

Sincerely,

SHARADA JAIN MD
Uc Cs Im
6104 Old Branch Avenue,
Temple Hills, MD 20748
Phone: 301-702-6100



DEPOSITION
EXHIBIT
Smith 6
3/20/07

POST 000613

After Visit Summary                                                    William Mack (MR# 551051675)

## Visit Information

| Visit Information | Date | Time | Department | Provider | Encounter # |
|---|---|---|---|---|---|
| | 11/06/2005 | 7:30 PM | Uc Cs Im | SHARADA JAIN MD, MEDICAL DOCTOR | 63728261 |

## Visit Summary

**Diagnoses**

Visit Diagnosis
**SARCOIDOSIS [135B]**

**Vitals (Last Filed)**

| BP | Temp (Src) |
|---|---|
| 122/80 | 97.7 (Oral) |

## Medications

**Medications Started This Visit**

Prescriptions
KENALOG 40 MG/ML SUSP FOR INJECTION

## Orders

**Orders Placed This Visit**

Orders
**TRIAMCINOLONE ACETONIDE INJ [J3301]**

**INTRAMUSCULAR INJECTION [90782D]**

## Instructions and Follow-Up

**Patient Instructions**

Topical steroid cream to the area he has at home and he will follow
up with dermatology
Warm compress

POST 000614



THE WASHINGTON POST

Employer Notification
Form

| EXAMINEE'S NAME (Last, First) | OFFICE | FAX # | PROJECT # | EXAM DATE |
|---|---|---|---|---|
| *Mack, William  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* | *Springfield, VA* | *703-916-2005* | *PST10* | *06/11/2004* |

## Washington Occupational Health Associates, Inc. has reviewed the results of the history, physical examination, and laboratory tests authorized by THE WASHINGTON POST.

*This was a Respirator Review examination.  The record is COMPLETE.*

### RESPIRATOR CERTIFICATION

This individual has been examined per OSHA Standards (29 CFR 1910.134).  In my opinion, this individual: is medically UNQUALIFIED.

Needs further evaluation.

THE WASHINGTON POST limits the maximum weight an employee can lift to 50 pounds.

*I have informed the examinee in writing of  medical conditions discovered that require further examination or treatment*

| REVIEWING PHYSICIAN (PRINT) | PHYSICIAN'S SIGNATURE | DATE |
|---|---|---|
| *Samuel J. Scott, Jr., M.D., M.P.H.* | *Samuel J. Scott, M.D.* | *06/16/2004* |
| MANAGER (PRINT) | MANAGER'S SIGNATURE | DATE |
| | | |
| EMPLOYEE (PRINT)  Mack, William  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 | EMPLOYEE'S SIGNATURE | DATE |

WMRPENFX.FRX                    Distribution: PST, Examinee, Chart                    REVISION 2/2/95



DEPOSITION
EXHIBIT
Smith I
3/20/07

POST 000624

Communications Established with Satellite.

1 record has been automatically downloaded to
the Base Station.

03/24/00          01:46 AM   BTPS   25°C
Hgt ---- 69"    Sex ----------   Male
Age ---- 43     Race ------  Non Caucasian
Subject ID --------------- 577967572
Subject Name <u>WmMack</u>

|          | Pred | Meas | % | 2nd-Best | % |
|----------|------|------|------|----------|------|
| FVC      | 4.00 | 3.65 | 91 | 3.64 | 91 |
| FEV1     | 3.28 | 3.17 | 97 | 3.09 | 94 |
| FEV1%    | 84   | 87   | 3  | 85   | 1  |
| MMEF     | 4.05 | 3.81 | 94 | 3.25 | 80 |
| PEFR     |      | 4.78 |    | 4.20 |    |
| FEV.5    |      | 2.24 |    | 1.89 |    |
| FEV2     |      | 3.60 |    | 3.60 |    |
| FEV3     |      | 3.65 |    | 3.64 |    |
| FEV2%    |      | 99   |    | 99   |    |
| FEV3%    |      | 100  |    | 100  |    |
| FEF25    |      | 4.41 |    | 4.08 |    |
| FEF50    | 4.86 | 4.17 | 86 | 3.73 | 77 |
| FEF75    | 1.95 | 1.73 | 89 | 2.20 | 117 |
| FEF75-85 |      | 1.32 |    | 1.64 |    |
| INDEX    | 100  | 136  | 36 | 117  | 17 |

Lung function normal.

Meets minimum criteria for repeatability.



Health Associates, inc.

| Exam Date: 5 / 21 / 04 | Social Security #: 577 — 96 — 7512 | Sex: X Male / Female |
| Last Name: Macie | First Name: William | Birth Date: 11 / 16 / 60 |
| Job Title: Security Guard | | Location Code: |

[ ] Respirator User's History Form Reviewed - No comments required.

[ ] Respirator User's History Form Reviewed - Comments as noted:

_____

_____

**VITAL SIGNS:** BP 130/88   PULSE 88   HGT 70"   WGT 238   RESP 18   TEMP 98

| **VISION:** | | With Correction | | | Without Correction | | | |
|---|---|---|---|---|---|---|---|---|
| NEAR | R 20/ | L 20/ | Both 20/ | | R 20/ | L 20/ | Both 20/ | N |
| FAR | R 20/ | L 20/ | Both 20/ | | R 20/ | L 20/ | Both 20/ | |

| | NORMAL | ABNORMAL | COMMENTS (DESCRIBE ANY ABNORMAL FINDINGS) |
|---|---|---|---|
| General | | | |
| ENT | | | |
| Heart | | | |
| Lungs | | | |

Pulmonary Function Tests:
FVC = _____ L      FEV1 = _____ L/S      FEV1/FVC = _____ %

Respirator Certification:
This individual was examined as per OSHA Standard [29 CFR § 1910.134(b)(10)] and found:

☐ Qualified      ☐ Qualified with limitations      ☐ Not Qualified      to use a respirator.

Restrictions / Comments: _____

_____

_____

| EXAMINING PHYSICIAN (PRINT) | PHYSICIAN SIGNATURE | DATE |
|---|---|---|
| | | |

\FORMS\WAB'NEW 9 SEX FRM                                    FORM 099      REVISION 00/15/00

POST 000626

# The Washington Post

## HEALTH CENTER

### RELEASE TO WORK SLIP

*William Mack (Security)*                Work related? Y (N)

Name of employee

*4/30/04*

Date of injury *illness*

Returned to: **RESTRICTED DUTY** on _____

                                        **Date**

    **Explain restrictions:** _____

                                       _____

                                       _____

                                       _____

    **FULL DUTY** on        *5/1/04*

                                **Date**

*5/1/04*                        *Pat Priest*

Today's date                Nurse's signature

ORIGINAL TO HEALTH CENTER MANAGER; COPY TO EMPLOYEE'S SUPERVISOR

Rev. 4/95



*rec'd 5/1/04*
*7A PPriest*
*Noted in*
*chc*

DEPOSITION
EXHIBIT
*Smith 8*
*3/20/07*

POST 000627

Tracking # KP 1084028



**KAISER PERMANENTE.**

551051675
MACK,WILLIAM

11/16/1960

Patient Identification
042904

## OPL REFERRAL FORM / VERIFICATION OF TREATMENT

IS THERE EVIDENCE THAT THIS INJURY/ILLNESS IS WORK-RELATED, OR THE RESULT OF AN ACCIDENT?    ☐ Yes  ☐ No   **Injury date** _____

The above named patient has: (circle all appropriate)

   (1.) received medical treatment        treatment date(s) _4/30/04_

   2. received medical advice          advice date(s) _____

Physical Findings/Diagnosis ___MEDICAL ILLNESS_____

Disability/Illness _____ Disability/Illness date from _____ to _____

_____

The patient:

☐ Has been ill and unable to work from _4/30/04_ to _____

☑ May resume regular work on _5/1/04_

☐ May resume restricted work as follows _____

  from (date) _____ until approximately _____

☐ Will need a follow-up appointment on or about _____

☐ Is able to participate in competitive sports.

☐ May return to school on _____

☐ Should be excused from Physical Education until _____

☐ Is on _____ medication and should receive _____ dose(s).

  At _____ and _____ for _____ days. Possible reaction _____

  Special instructions _____

  Advice protocol _____

_Signature_                                 _4/30/04_

Signature and printed name             Provider #           Date

I HEREBY CERTIFY THAT I HAVE REVIEWED, UNDERSTAND AND AGREE TO THE INFORMATION ABOVE, AND I AUTHORIZE THE RELEASE OF THIS INFORMATION TO MY EMPLOYER OR ANY OTHER PERSON OR ENTITY THAT MAY BE RESPONSIBLE FOR PAYMENT OF SERVICES RENDERED.

X _William A Mack_       POST 000628       _4/30/04_

Signature (patient)                                   Date

## The Washington Post

1150 15TH STREET, N.W

WASHINGTON, D.C. 20071

(202) 334-6000

May 8, 2006

Mr. William Mack
5300 Deal Drive
Oxon Hill, Maryland 20745

Dear Mr. Mack:

This letter is to advise you that since January 1, 2005, you have been unavailable for work when called for 18 shifts.  The Washington Post places a great deal of emphasis on the safety and security of our employees and requires that all part time on call security personnel be able to work when required by their respective managers.  Because you have not been able to work, we are removing your name from the employment rolls of The Washington Post effective May 31, 2006.  If you need any additional information or have any questions, please contact me at 202-334-7894.

Sincerely,

Gary Corso
Director
Security and Administration
The Washington Post
202-334-7894



EXHIBIT

Smith 9

3/20/07

PENGAD 800-631-6989

000128

# Washington Post Springfield Plant
## Absence Detail Report

See Summary for Parameters

| Employee | Absence Type | Absence Date | Hours |
|---|---|---|---|

**Springfield Virginia**

### Security Department

**Mack, William**

| | Absence Type | Absence Date | Hours |
|---|---|---|---|
| | V Vacation | 01/23/2002 | 8.00 |
| | G Illness - Self | 02/11/2002 | 8.00 |
| | V Vacation | 02/12/2002 | 8.00 |
| | V Vacation | 03/07/2002 | 8.00 |
| | G Illness - Self | 03/11/2002 | 8.00 |
| | G Illness - Self | 04/03/2002 | 8.00 |
| | V Vacation | 04/22/2002 | 8.00 |
| | V Vacation | 04/23/2002 | 8.00 |
| | V Vacation | 04/29/2002 | 8.00 |
| | G Illness - Self | 05/15/2002 | 8.00 |
| | V Vacation | 06/03/2002 | 8.00 |
| | G Illness - Self | 06/20/2002 | 8.00 |
| | G Illness - Self | 07/08/2002 | 8.00 |
| | V Vacation | 07/17/2002 | 8.00 |
| | V Vacation | 07/18/2002 | 8.00 |
| | G Illness - Self | 08/13/2002 | 8.00 |
| | V Vacation | 08/14/2002 | 8.00 |
| | V Vacation | 08/15/2002 | 8.00 |
| | G Illness - Self | 09/09/2002 | 8.00 |
| | G Illness - Self | 10/07/2002 | 8.00 |
| | V Vacation | 10/15/2002 | 8.00 |
| | G Illness - Self | 10/16/2002 | 8.00 |
| | G Illness - Self | 10/28/2002 | 8.00 |
| | G Illness - Self | 12/16/2002 | 8.00 |
| | | **Absence Total** | **192.00** |

**Count in Department Security Department: 1**

**Count in Location Springfield Virginia: 1**

**Total Count: 1**

Employees: Active
Hire Range: All
Include: Full Time Part Time
Group on: Location Department
From 01/01/2002 through 12/23/2002

EXHIBIT
Smith 10
3/20/07

00.0087

Mack
This is the date
you was in Smitty
office

12/23/2002

# The Washington Post

1150 15TH STREET, N.W.
WASHINGTON, D.C. 20071
(202) 334-6000

SPRINGFIELD PLANT
7171 WIMSATT ROAD
SPRINGFIELD, VIRGINIA 22151

WRITER'S DIRECT TELEPHONE NUMBER

## FAX COVER SHEET

TO: _William Mack_          FAX NO. _____

COMPANY: _____     PHONE: _____

FROM: _Smith_               FAX NO. _____

DATE: _4/28/06_             NO OF PAGES _2_

If you did not receive a clear transmission, please phone the writer on the number listed above.

**Comments:**



EXHIBIT
Smith 11
3/20/07

003095

# Washington Post Springfield Pl
## Absence Detail Report

See Summary for Parameters

| Employee | Absence Type | Absence Date | Hours |
|---|---|---|---|
| **Springfield Virginia** | | | |
| **Security Department** | | | |
| **Mack, William** | | | |
| | S llness - Self | 01/07/2005 | 8.00 |
| | S llness - Self | 01/14/2005 | 8.00 |
| | S llness - Self | 01/15/2005 | 8.00 |
| | S llness - Self | 01/16/2005 | 8.00 |
| | S llness - Self | 01/17/2005 | 8.00 |
| | V Vacation | 01/21/2005 | 8.00 |
| | V Vacation | 01/22/2005 | 8.00 |
| | V Vacation | 01/23/2005 | 8.00 |
| | V Vacation | 01/24/2005 | 8.00 |
| | S llness - Self | 01/28/2005 | 8.00 |
| | S llness - Self | 01/29/2005 | 8.00 |
| | S llness - Self | 01/30/2005 | 8.00 |
| | S llness - Self | 01/31/2005 | 8.00 |
| | S llness - Self | 03/25/2005 | 8.00 |
| | S llness - Self | 04/29/2005 | 8.00 |
| | S llness - Self | 04/30/2005 | 8.00 |
| | S llness - Self | 05/01/2005 | 8.00 |
| | S llness - Self | 05/02/2005 | 8.00 |
| | S llness - Self | 05/06/2005 | 8.00 |
| | S llness - Self | 05/07/2005 | 8.00 |
| | V Vacation | 05/21/2005 | 8.00 |
| | V Vacation | 06/13/2005 | 8.00 |
| | V Vacation | 06/18/2005 | 8.00 |
| | V Vacation | 07/30/2005 | 8.00 |
| | V Vacation | 08/13/2005 | 8.00 |
| | V Vacation | 10/03/2005 | 8.00 |
| | V Vacation | 10/22/2005 | 8.00 |
| | U Unexcused | 12/03/2005 | 8.00 |
| | U Unexcused | 12/04/2005 | 8.00 |
| | U Unexcused | 12/05/2005 | 8.00 |
| | V Vacation | 01/23/2006 | 8.00 |
| | V Vacation | 02/04/2006 | 8.00 |
| | V Vacation | 02/13/2006 | 8.00 |
| | V Vacation | 03/04/2006 | 8.00 |
| | S llness - Self | 03/11/2006 | 8.00 |
| | V Vacation | 03/25/2006 | 8.00 |
| | V Vacation | 04/08/2006 | 8.00 |
| | V Vacation | 04/15/2006 | 8.00 |
| | S llness - Self | 04/17/2006 | 8.00 |
| | | **Absence Total** | **312.00** |

**Count in Department Security Department: 1**

1

4/28/2006

000094

# *WASHINGTON POST*
## VACATION REQUEST FORM

*Smitty Copy*

### "IF YOU DON'T GET IT, YOU DON'T GET IT"

NAME: *William A. Mack*    DATE: (DD/MMM/YY) *6/22/03*

REQUEST VACATION LEAVE AS FOLLOWS:    NUMBER OF DAYS    *5*
(SHOW WORKING DAYS ONLY)

BEGINNING AND ENDING OF WEEK: *7-7-03 to 7-13-03    7-14-03 to 7-20-03*

EMPLOYEE'S DAYS OFF:    (SUN) (MON) TUE  WED  THU (FRI) SAT
(PLEASE CIRCLE ALL APPLICABLE DAYS)

FIRST CHOICE FROM: ~~_____~~ _____ TO _____

FIRST CHOICE FROM: _____ TO _____

*William A Mack*
SIGNATURE OF EMPLOYEE

APPROVED BY: *Donald Jackson*

COMMENTS: *MR. JACKSON I would like to take VACATION days on July 12, 15, 16, 17, 19*

## PLEASE READ CAREFULLY

1.    This request must be filled out and turned into the SECURITY SUPERVISOR prior to confirmation of the request and the validity of the vacation period. All vacation requests must be submitted at least two weeks in advance.

2.    All vacation requests submitted in less than minimum of one week will be granted only in cases of where the employee submits valid reasons within limits, and the needs of their shifts are not jeopardized.

3.    All vacations will begin at the start of the employees work week. If two employees of the same schedule request vacation for the same period, the vacation will be granted to the employee with the higher seniority and/or the employee who has not had the opportunity to vacation during their chosen period because of previous conflict in scheduling.

4.    NOT MORE THAN TWO(2) employees will be scheduled for vacation within the same period.



EXHIBIT
*Smitty 12*
*2/20/07*
PENGAD 800-631-6989

**POST 000321**

*Smith*
*Copy*

# WASHINGTON POST
## VACATION REQUEST FORM

## "IF YOU DON'T GET IT, YOU DON'T GET IT"

NAME: *William A. Mack*    DATE: (DD/MMM/YY) *4/4/04*

REQUEST VACATION LEAVE AS FOLLOWS:    NUMBER OF DAYS *1*
(SHOW WORKING DAYS ONLY)

BEGINNING AND ENDING OF WEEK: *4/19/04* to *4/25/04*

EMPLOYEE'S DAYS OFF:    SUN (MON) (TUE) (WED) (THU) FRI SAT
(PLEASE CIRCLE ALL APPLICABLE DAYS)

FIRST CHOICE FROM: *4/24/04* TO _____

FIRST CHOICE FROM: _____ TO _____

*William A Mack*
SIGNATURE OF EMPLOYEE

APPROVED BY: *Donald Jackson*

COMMENTS: _____

_____

## PLEASE READ CAREFULLY

1.    This request must be filled out and turned into the SECURITY SUPERVISOR prior to confirmation of the request and the validity of the vacation period. All vacation requests must be submitted at least two weeks in advance.

2.    All vacation requests submitted in less than minimum of one week will be granted only in cases of where the employee submits valid reasons within limits, and the needs of their shifts are not jeopardized.

3.    All vacations will begin at the start of the employees work week. If two employees of the same schedule request vacation for the same period, the vacation will be granted to the employee with the higher seniority and/or the employee who has not had the opportunity to vacation during their chosen period because of previous conflict in scheduling.

4.    NOT MORE THAN TWO(2) employees will be scheduled for vacation within the same period.

# The Washington Post

## Production Department
## PERFORMANCE REVIEW
### (Exempt)

**Name:** William Mack

**Job Title:** On-Call Security Guard

**Date:** September 9, 2005

**Reviewer:** Donald Jackson/ Ulysses Smith Jr.

**Period Review Dates: Annual Review**

## Assessment Scale

The following assessment scale is designed to assist the reviewer in the evaluation of different skills. Provide comments as required for further explanation or clarification.

| | |
|---|---|
| **EXCEEDS** | Employee routinely exceeds expectations. |
| **MEETS** | Employee meets expectations. |
| **NEEDS IMPROVEMENT** | Employee does not meet expectations and/or is at risk in terms of performance. May be a novice in the job and still learning how to apply the skill. Requires further feedback and guidance for success. |
| **N/A** | Not Applicable |

### Results/Accomplishments

| | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Quality – The extent to which an employee's work is accurate, thorough and neat. | ☐ | ☒ | ☐ | ☐ |
| The extent to which an employee produces a significant volume of work efficiently in a specified period of time | ☐ | ☐ | ☒ | ☐ |
| Does the employee possess the practical/technical knowledge required on the job? | ☐ | ☒ | ☐ | ☐ |

Comment: We need all incidents regardless of how small or apparently insignificant they may be documented on the incident database.

### Production Policies/Procedures

| | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Ensures that Production Department policies and procedures are followed (Safety, PPE, Quality) | ☐ | ☒ | ☐ | ☐ |
| Ensures that TWP policies and procedures are followed (Code of Business Conduct, Respect in the Workplace) | ☐ | ☒ | ☐ | ☐ |
| Holds employees accountable for their actions | ☐ | ☒ | ☐ | ☐ |

Comments:

William Mack.doc

**POST 000009**

EXHIBIT
Smith 13
3/20/07
PENGAD 800-631-6989

## Teamwork

|  | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Promotes cooperation and collaboration with work unit | ☐ | ☒ | ☐ | ☐ |
| Promotes collaboration between employees of work unit and other Production employees | ☐ | ☒ | ☐ | ☐ |
| Demonstrates a professional and courteous demeanor to employees and peers | ☐ | ☒ | ☐ | ☐ |
| Builds a strong sense of teamwork and purpose | ☐ | ☒ | ☐ | ☐ |
| Resolves team conflicts with diplomacy and tact | ☐ | ☐ | ☒ | ☐ |

Comments: When you have problems, they should be brought to your supervisior or the department head, not discussed among employees.

## Employee Development

|  | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| The extent to which an employee seeks out new assignment and assumes additional duties when necessary | ☐ | ☒ | ☐ | ☐ |
| The extent to which an employee can be relied upon regarding task completion and follow-up | ☐ | ☒ | ☐ | ☐ |
| The extent to which an employee performs work with little or no supervision. | ☐ | ☒ | ☐ | ☐ |
| The extent, to which an employee is punctual, observes prescribed work break/meal periods and has an acceptable overall attendance record. | ☐ | ☐ | ☒ | ☐ |

Comments:

## Communications

|  | Exceeds | Meets | Needs improvement | N/A |
|---|---|---|---|---|
| Provides timely information to others | ☐ | ☒ | ☐ | ☐ |
| Communicates good ideas and insights frequently | ☐ | ☒ | ☐ | ☐ |
| Contributes effectively in meetings and group discussions | ☐ | ☐ | ☒ | ☐ |

Comments: When in group meetings and discussions you must present thoughtful and pertinent dialog.

2

POST 000010

| Leadership | Exceeds | Meets | Needs Improvement | N/A |
|---|---|---|---|---|
| • Direct and truthful in all interactions with management, peers and employees/team | ☐ | ☒ | ☐ | ☐ |
| • Demonstrates care and respect with individuals | ☐ | ☒ | ☐ | ☐ |

Comments:

| Driven Decision Making | Exceeds | Meets | Needs Improvement | N/A |
|---|---|---|---|---|
| • Recognizes issues, problems or opportunities and determines appropriate action to take. | ☐ | ☒ | ☐ | ☐ |
| • Identifies the need for and collects information to better understand issues, problems and opportunities. | ☐ | ☒ | ☐ | ☐ |
| • Formulates clear decision criteria; evaluates options by considering implications and consequences. | ☐ | ☐ | ☒ | ☐ |

Comments:  To add your name to turn-in applications questioned your decision-making.  I hope you understand the implications of your actions and this will not occur again.

## SUMMARY
William, overall you have performed well this past year. Take some time to review the assessment and comments above, then we may discuss this.

## GOALS AND OBJECTIVES FOR COMING YEAR

I would like to see more incident reports, parking violations and safety issue reports filled during you shift next year..

## EMPLOYEE COMMENTS

## SIGNATURES

| | | |
|---|---|---|
| Employee | *William A Mack* | Date: 10/3/05 |
| Supervisor | *signature* | Date: 10/3/05 |
| Manager | *signature* | Date: 10/3/05 |
| | *signature* | Date: 10/4/05 |

3

POST 000011