Case 1:06-cv-01144-PLF   Document 14-5   Filed 06/21/2007   Page 1 of 11

William A. Mack                    vs.         The Washington Post Company
Deposition of DONALD L. JACKSON                      Tuesday, March 20, 2007

**Page 1**

```
 1      UNITED STATES DISTRICT COURT
 2       FOR THE DISTRICT OF COLUMBIA
 3
 4   WILLIAM A. MACK,         )
 5        Plaintiff,          )
 6   vs.                      ) C.A. 06-1144
 7   THE WASHINGTON POST COMPANY, )
 8        Defendant.          )
 9       *    *    *    *    *
10
11
12
13
14
15
16      The deposition of DONALD L. JACKSON was
17   taken on Tuesday, March 20, 2007, commencing
18   at 2:07 p.m., at the Law Offices of Nils Peterson,
19   2009 North 14th Street, Suite 708, Arlington,
20   Virginia, before Paula L. Lowery, Notary Public.
21
22       *    *    *    *    *
```

**Page 2**

```
 1            APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4      NILS PETERSON, ESQUIRE
 5      Law Offices of Nils Peterson
 6      2009 North 14th Street
 7      Suite 708
 8      Arlington, Virginia  22201
 9      (703) 241-0076
10
11   ON BEHALF OF THE DEFENDANT:
12      TONYA OSBORNE, ESQUIRE
13      Jones, Day, Reavis & Pogue
14      51 Louisiana Avenue, N.W.
15      Washington, D.C.  20001
16      (202) 879-3939
17      (202) 626-1700 - fax
18
19
20
21
22   (Appearances continued on the next page.)
```

**Page 3**

```
 1   APPEARANCES (continued):
 2
 3   ON BEHALF OF THE DEFENDANT:
 4      JOHN B. KENNEDY, ESQUIRE
 5      The Washington Post
 6      1150 15th Street, N.W.
 7      Washington, D.C.  20071
 8      (202) 334-7869
 9      (202) 334-5075 - fax
```

**Page 4**

```
 1              INDEX
 2     DEPOSITION OF DONALD L. JACKSON
 3             MARCH 20, 2007
 4
 5   EXAMINATION BY:              PAGE
 6   Mr. Peterson                  5
 7
 8   JACKSON DEPOSITION EXHIBITS:   PAGE
 9   No. 1                          50
10   No. 2                          54
11   No. 3                          56
12   No. 4                          57
13   No. 5                          60
14   No. 6                          61
15   No. 7                          62
```

1 (Pages 1 to 4)

M.A.R. Reporting Group, LLC    Professional Stenotype Reporters    Toll Free (888) 534-1225
Platt & Dawson                  www.mar-reporting.com              (703) 534-1225

Case 1:06-cv-01144-PLF   Document 14-5   Filed 06/21/2007   Page 2 of 11

William A. Mack                                    vs.                          The Washington Post Company
Deposition of DONALD L. JACKSON                                                 Tuesday, March 20, 2007

Page 9

1    Q. Have you been with the Post at
2    Springfield since that time?
3    A. Yes.
4    Q. You became full-time at some point, sir?
5    A. Yes.
6    Q. When was that, approximately?
7    A. 1989.
8    Q. At that time were you a security officer?
9    A. Yes.
10   Q. Had you had any training or experience in
11   the security field prior to going to the Post?
12   A. No.
13   Q. How long did you remain as a security
14   officer with The Washington Post in that position?
15   A. Presently I'm still in security.
16   Q. Yes, but right now you're a supervisor;
17   is that correct?
18   A. Yes.
19   Q. When did you become a supervisor?
20   A. I don't know the exact year.
21   Q. Approximately.
22   A. 1993.

Page 10

1    Q. What position as a supervisor did you
2    have at that point, sir?
3    A. I was a shift supervisor.
4    Q. Have you had any promotions since that
5    time?
6    A. Yes.
7    Q. When did that promotion or promotions
8    occur?
9    A. May 2006.
10   Q. What happened then?
11   A. I'm currently the site security
12   supervisor.
13   Q. Is that the job that Mr. Smith had before
14   he left the Post?
15   A. No, Mr. Smith was the security manager.
16   Q. So you are now the site supervisor; is
17   that correct?
18   A. Security site supervisor.
19   Q. Who held that position before you?
20   A. That position was not in place at the
21   time.
22   Q. Who is the security manager now, sir?

Page 11

1    A. The security manager is Jeff Cox.
2    Q. Is he a new employee or was he in the
3    security department when Mr. Smith was still
4    there?
5    A. No.
6    Q. So he's a new employee?
7    A. Yes.
8    Q. So you were a shift supervisor from 1993
9    to May 2006; is that correct?
10   A. Yes.
11   Q. What was your role as a shift supervisor,
12   sir?
13   A. To supervise the 3:00 to 11:00 shift. I
14   also was the scheduling person.
15   Q. Approximately how many employees are
16   there in the security department at The Washington
17   Post in Springfield, sir? During the period 2004
18   to 2006, approximately.
19   A. Approximately 13.
20   Q. Are there part-time versus full-time
21   employees? Are you including all of those in the
22   13 number?

Page 12

1    A. Yes.
2    Q. How many full-time employees are there?
3    Again, during the period 2004 to 2006.
4    A. Approximately eight.
5    Q. Are the others part-time?
6    A. Yes.
7    Q. Is there a guard service that also
8    provides additional help?
9    A. Yes.
10   Q. How often does that guard service provide
11   additional help?
12   A. Daily.
13   Q. Do they provide a set number of employees
14   daily to help you?
15   A. Yes.
16   Q. How many do they provide on a daily
17   basis?
18   A. Approximately six.
19   Q. So there's 6 in addition to the
20   13 regular employees; is that correct?
21   A. Yes.
22   Q. What's the difference between a full-time

3 (Pages 9 to 12)

M.A.R. Reporting Group, LLC          Professional Stenotype Reporters          Toll Free (888) 534-1225
Platt & Dawson                       www.mar-reporting.com                     (703) 534-1225

Case 1:06-cv-01144-PLF   Document 14-5   Filed 06/21/2007   Page 3 of 11

William A. Mack
Deposition of DONALD L. JACKSON
vs.
The Washington Post Company
Tuesday, March 20, 2007

Page 17

1 permanent schedule, sir?
2   A. Three.
3   Q. Who would those be?
4   A. Bernard Carr, Charles Snead and Otis
5 Brooks.
6   Q. Did Mr. Mack ever have a permanent
7 schedule?
8   A. Yes.
9   Q. For what period, sir?
10  A. For what period? As in --
11  Q. Yes, beginning when and ending when?
12  A. Usually his schedule started on Friday
13 through Monday.
14  Q. I'm asking a little different question.
15 When did Mr. Mack start having a permanent
16 schedule?
17  A. I don't know the exact --
18  Q. Approximately. Are we talking about 2006
19 or 2004 or sometime before that?
20  A. Before that.
21  Q. Okay. And when did Mr. Mack stop having
22 a permanent schedule?

Page 18

1   A. May 2006.
2   Q. That's when he was terminated; is that
3 correct?
4   A. Yes.
5   Q. So there were four part-timers who had
6 permanent schedules: Mr. Carr, Mr. Snead,
7 Mr. Brooks and Mr. Mack?
8   A. Yes.
9   Q. You said that you made sure everybody was
10 on time on the 3:00 to 11:00 shift; is that
11 correct?
12  A. Yes.
13  Q. How did you go and keep track of when an
14 employee came in and was on time or not? Did you
15 keep any records? How was that documented?
16  A. They would all meet at the security
17 center and get their assigned duties.
18  Q. Okay. At the end of the 11:00 shift, who
19 became the site supervisor for the 11:00 to 7:00
20 shift, sir?
21  A. We did not have a site supervisor.
22  Q. Well, with respect to Mr. Mack, you were

Page 19

1 his supervisor at times. He worked the 3:00 to
2 11:00 shift at times; is that correct?
3   A. Yes.
4   Q. How was his timeliness for showing up on
5 time for his shift?
6   A. He was on time.
7   Q. Always on time, sir?
8   A. Yes.
9   Q. During the shift employees are given a
10 lunch break; is that correct?
11  A. Yes.
12  Q. Approximately how long a lunch break was
13 the employee given?
14  A. 30 minutes.
15  Q. Is that break -- are you free to take
16 that where you want, or how does that work, sir?
17  A. We ask that you take it on the property
18 in the event something happened and we need you.
19  Q. Certainly. And was there a lunch room
20 where employees took their lunch break?
21  A. Yes, there was a lunch room.
22  Q. Did all the security officers take the

Page 20

1 lunch break in the lunch room? How did that work,
2 sir?
3   A. I'm not sure.
4   Q. Well, did any of the employees work
5 through lunch; that is, sit at a station and just
6 eat their lunch while they're off duty?
7   A. Yes.
8   Q. How did that come about, sir?
9   A. It was their choice. Sometimes it was
10 their choice to take their lunch while they was at
11 their station.
12  Q. Was that because there was no relief for
13 them that day, or what happened?
14  A. Occasionally sometimes they would be
15 asked to work through their lunch.
16  Q. And when an employee works through their
17 lunch, are they paid for that lunch period or it
18 still gets deducted?
19  A. They get paid for the lunch.
20  Q. That's reflected on their time card?
21  A. Yes.
22  Q. Did Mr. Mack work through his lunch from

5 (Pages 17 to 20)

M.A.R. Reporting Group, LLC
Platt & Dawson
Professional Stenotype Reporters
www.mar-reporting.com
Toll Free (888) 534-1225
(703) 534-1225

Case 1:06-cv-01144-PLF   Document 14-5   Filed 06/21/2007   Page 4 of 11

William A. Mack
Deposition of DONALD L. JACKSON
vs.
The Washington Post Company
Tuesday, March 20, 2007

Page 21

1 time to time?
2  A. Yes.
3  Q. Was he compensated for working through
4 his lunch?
5  A. Yes.
6  Q. With respect to the schedule, did there
7 ever come a time when employee's schedules were
8 changed during 2005?
9  A. Yes.
10  Q. Did that occur for all employees or just
11 some of the employees?
12  A. Some of the employees.
13  Q. Was Mr. Mack one of them?
14  A. Yes.
15  Q. I've seen documents that suggested
16 Mr. Mack before mid-2005 was working during the
17 week, and thereafter he mostly worked on the
18 weekend. Does that strike a bell?
19  A. Yes.
20  Q. How did that come about, sir?
21  A. That was upon his request.
22  Q. So his schedule was changed to work

Page 22

1 weekends when he requested that?
2  A. Yes.
3  Q. Now, it looked like Mr. Mack was working,
4 like, 16 hours some weekend days.
5  A. Yes.
6  Q. Did any other employee work that many
7 hours on a weekend day?
8  A. Yes.
9  Q. Who would that be, sir?
10  A. Charles Snead, Bernard Carr also.
11  Q. Now, I've seen there's a pass-on log
12 that's maintained by the security department of
13 The Washington Post; is that correct, sir?
14  A. Yes.
15  Q. Is that kept at a certain place? A
16 certain duty station?
17  A. Yes, it's kept at the security center.
18  Q. One security officer usually works at the
19 security center?
20  A. Yes.
21  Q. What kinds of things are written in the
22 pass-on log, to your knowledge?

Page 23

1  A. Any events that occur during the day, an
2 employee calling in unable to come to work,
3 information that the other shift would leave.
4  Q. Usually something is written in the
5 employee log every day; is that correct?
6  A. Yes.
7  Q. Would Mr. Mack ever work at the security
8 center where he would have occasion to write in
9 the security log?
10  A. Yes.
11  Q. How frequently did that happen?
12  A. At least two hours during his tour of
13 duty.
14  Q. So every time Mr. Mack worked, he would
15 be writing in the security log? Or most times
16 that he worked, he would be assigned at least two
17 hours in the security office?
18  A. Yes.
19  Q. When you begin your duty in the security
20 office, do you write down that you're there?
21  A. Yes.
22  Q. So to keep some continuity who was

Page 24

1 covering that post?
2  A. Yes.
3  Q. So virtually every day Mr. Mack worked,
4 he would go and write in that security log; is
5 that correct?
6  A. Yes.
7  Q. You mentioned something about -- you used
8 the word call off.
9  A. Yes.
10  Q. What does that mean, sir?
11  A. Any reason -- vacation, sick leave,
12 unable to make it to work on time.
13  Q. So that's when an employee calls up
14 giving some amount of notice that they're not able
15 to be where they're supposed to be at a given
16 point in time; is that correct?
17  A. Yes.
18  Q. Is that different than requesting
19 long-term vacation leave?
20  A. Long-term vacation?
21  Q. Let's say you want a week's vacation.
22 You want to take off for a week. Would you call

6 (Pages 21 to 24)

M.A.R. Reporting Group, LLC
Platt & Dawson
Professional Stenotype Reporters
www.mar-reporting.com
Toll Free (888) 534-1225
(703) 534-1225

Case 1:06-cv-01144-PLF   Document 14-5   Filed 06/21/2007   Page 5 of 11

| William A. Mack | vs. | The Washington Post Company |
|---|---|---|
| Deposition of DONALD L. JACKSON | | Tuesday, March 20, 2007 |

Page 25

1  in the day before or that day and say, I'm taking
2  leave, or is that handled in a different fashion,
3  sir?
4      A.  It's handled in a different fashion.
5      Q.  How is long-term vacation handled?
6      A.  We have a vacation request form.
7      Q.  Okay. Do those forms come to you or
8  somebody like Mr. Smith? How is that handled?
9      A.  They would go to either one of us,
10 Mr. Smith or myself.
11     Q.  One of you has to approve that long-term
12 vacation before it occurs?
13     A.  Yes.
14     Q.  What is the amount of notice for an
15 employee to take the longer term vacation?
16     A.  At least two weeks prior to the beginning
17 of the vacation.
18     Q.  So if somebody is calling in the day
19 they're supposed to be working, that's not
20 long-term vacation.
21     A.  No.
22     Q.  Is that considered vacation, or is that

Page 26

1  considered something else, sir?
2      A.  It depends on what they're calling for.
3      Q.  Okay. Let's say they have a problem with
4  whatever, and they call up and say they can't make
5  it. How is that treated, sir?
6          MS. OSBORNE: Objection. Vague.
7          BY MR. PETERSON:
8      Q.  Well, let's say somebody is involved in
9  an auto accident, and they call up six hours
10 before their shift is supposed to start and say, I
11 can't make it.
12     A.  That would be determined by the
13 supervisor.
14     Q.  What is available to the supervisor to do
15 at that point in time? What are the choices the
16 supervisor can make?
17     A.  Either that person would have to report
18 to work or we'd have to find some person to
19 replace them.
20     Q.  If you're able to find someone to replace
21 the officer, then the officer is allowed to take
22 leave?

Page 27

1      A.  Upon approval of the supervisor.
2      Q.  If the supervisor approves that leave,
3  how is that leave classified then, sir?
4      A.  It could be classified with regards to a
5  regular vacation.
6      Q.  If an employee calls up and says, I can't
7  come to work because I'm ill, how is that handled,
8  sir?
9      A.  It still has to be considered by the
10 supervisor, and if we can find someone to replace
11 them.
12     Q.  You would call whom -- how would you know
13 who to call to find a replacement? How is that
14 determined?
15     A.  It's determined by the part-timers. He
16 has a list of who's allowed and who's available to
17 work the shift.
18     Q.  So the site supervisor makes the call, or
19 does the person in the security center make the
20 call?
21     A.  It's the supervisor's responsibility.
22     Q.  If someone calls up and says they're

Page 28

1  going to be out sick, is the employee asked why
2  you're sick or anything like that, or sick is
3  enough?
4      A.  Sick is enough.
5      Q.  When the employee comes back from being
6  ill, is that employee required to bring a note of
7  some kind?
8      A.  Upon the request of the security manager.
9      Q.  When that employee brings back in the
10 note for medical care, who does that employee give
11 that note to?
12     A.  It's usually passed on to Smitty or
13 myself, and in turn go to the health center.
14     Q.  So you or Mr. Smith would take the
15 medical documentation to the health center?
16     A.  I would, yes.
17     Q.  Do you read the documentation before you
18 take it over to the health center to find out if
19 it's in proper form?
20     A.  Yes.
21     Q.  Does Mr. Smith likewise read the medical
22 documentation to see it's in proper form?

7 (Pages 25 to 28)

M.A.R. Reporting Group, LLC          Professional Stenotype Reporters          Toll Free (888) 534-1225
Platt & Dawson                       www.mar-reporting.com                     (703) 534-1225

Case 1:06-cv-01144-PLF    Document 14-5    Filed 06/21/2007    Page 6 of 11

William A. Mack                           vs.                    The Washington Post Company
Deposition of DONALD L. JACKSON                                  Tuesday, March 20, 2007

Page 33

1     BY MR. PETERSON:
2     Q.  To the extent you know, sir.
3     A.  No.
4     Q.  How did you know Mr. Mack didn't bring
5  back the proper form? Did you ask him for a form
6  when he came back, or was it you had heard from
7  Mr. Smith that Mr. Mack didn't bring back the
8  proper form?
9     A.  Mr. Smith.
10    Q.  Did Mr. Smith say anything else to you?
11    A.  No.
12    Q.  Do you know how any of that was resolved?
13    A.  No.
14    Q.  During, let's say, the years 2005 and
15 2006, while Mr. Mack worked for The Washington
16 Post, do you know how many times he was out
17 concerning sickness?
18    A.  No.
19    Q.  Have you seen any documentation on that,
20 sir?
21    A.  Yes.
22    Q.  What have you seen?

Page 34

1     A.  An absentee form.
2     Q.  How did you come to see that?
3     A.  It was shown to me.
4     Q.  By whom, sir?
5     A.  Mr. Smith.
6     Q.  Did Mr. Smith show you any other
7  employee's absentee forms?
8     A.  Yes.
9     Q.  Who else did you see absentee forms for?
10    A.  Bernard Carr, Charles Snead, Otis Brooks,
11 Debbie Brennan, myself, Jean Winger. I can't
12 remember all of them.
13    Q.  Did Mr. Smith just show you the forms, or
14 did he go over them with you? How did that work?
15    A.  He just showed it to me.
16    Q.  Did he leave them with you, or just show
17 you he had them?
18    A.  Showed me that he had them.
19    Q.  Did he make any comments about any
20 particular employee?
21    A.  No.
22    Q.  Approximately when did Mr. Smith show you

Page 35

1  these forms?
2     A.  I don't know the exact date.
3         MS. OSBORNE: Objection. Calls for
4  speculation.
5         BY MR. PETERSON:
6     Q.  Was it sometime in 2006?
7     A.  Yes.
8     Q.  Do you remember approximately when in
9  2006?
10    A.  No.
11    Q.  At The Washington Post, is there
12 something called light duty in the security
13 department?
14    A.  No.
15    Q.  Is there any restricted duty in the
16 security department?
17    A.  No.
18    Q.  Does every officer have to do the
19 activities -- if she's working, or he's working --
20 of every other officer?
21    A.  Yes.
22    Q.  So there's no desk jobs available at The

Page 36

1  Washington Post in the security department.
2     A.  Yes.
3     Q.  There are?
4     A.  Yes.
5     Q.  Can you tell me about that, sir.
6     A.  We have assigned posts that we work
7  security set-up. We have three fixed posts, and
8  we have a roving post.
9     Q.  Okay. Well, does each employee who is
10 assigned -- who works, can they only sit at a desk
11 during an entire day, let's say?
12    A.  No.
13    Q.  All right. Going on to the Family
14 Medical Leave Act, are you familiar with the
15 Family Medical Leave Act, sir? Have you heard of
16 that?
17    A.  Yes.
18    Q.  Where did you hear of that?
19    A.  Through The Washington Post and on the
20 news.
21    Q.  Okay. Well, let's concentrate on The
22 Washington Post. How have you received

9 (Pages 33 to 36)

M.A.R. Reporting Group, LLC          Professional Stenotype Reporters      Toll Free (888) 534-1225
Platt & Dawson                       www.mar-reporting.com                 (703) 534-1225

Case 1:06-cv-01144-PLF    Document 14-5    Filed 06/21/2007    Page 7 of 11

William A. Mack                           vs.                    The Washington Post Company
Deposition of DONALD L. JACKSON                                  Tuesday, March 20, 2007

Page 33

1   BY MR. PETERSON:
2   Q. To the extent you know, sir.
3   A. No.
4   Q. How did you know Mr. Mack didn't bring
5   back the proper form? Did you ask him for a form
6   when he came back, or was it you had heard from
7   Mr. Smith that Mr. Mack didn't bring back the
8   proper form?
9   A. Mr. Smith.
10  Q. Did Mr. Smith say anything else to you?
11  A. No.
12  Q. Do you know how any of that was resolved?
13  A. No.
14  Q. During, let's say, the years 2005 and
15  2006, while Mr. Mack worked for The Washington
16  Post, do you know how many times he was out
17  concerning sickness?
18  A. No.
19  Q. Have you seen any documentation on that,
20  sir?
21  A. Yes.
22  Q. What have you seen?

Page 34

1   A. An absentee form.
2   Q. How did you come to see that?
3   A. It was shown to me.
4   Q. By whom, sir?
5   A. Mr. Smith.
6   Q. Did Mr. Smith show you any other
7   employee's absentee forms?
8   A. Yes.
9   Q. Who else did you see absentee forms for?
10  A. Bernard Carr, Charles Snead, Otis Brooks,
11  Debbie Brennan, myself, Jean Winger. I can't
12  remember all of them.
13  Q. Did Mr. Smith just show you the forms, or
14  did he go over them with you? How did that work?
15  A. He just showed it to me.
16  Q. Did he leave them with you, or just show
17  you he had them?
18  A. Showed me that he had them.
19  Q. Did he make any comments about any
20  particular employee?
21  A. No.
22  Q. Approximately when did Mr. Smith show you

Page 35

1   these forms?
2   A. I don't know the exact date.
3   MS. OSBORNE: Objection. Calls for
4   speculation.
5   BY MR. PETERSON:
6   Q. Was it sometime in 2006?
7   A. Yes.
8   Q. Do you remember approximately when in
9   2006?
10  A. No.
11  Q. At The Washington Post, is there
12  something called light duty in the security
13  department?
14  A. No.
15  Q. Is there any restricted duty in the
16  security department?
17  A. No.
18  Q. Does every officer have to do the
19  activities -- if she's working, or he's working --
20  of every other officer?
21  A. Yes.
22  Q. So there's no desk jobs available at The

Page 36

1   Washington Post in the security department.
2   A. Yes.
3   Q. There are?
4   A. Yes.
5   Q. Can you tell me about that, sir.
6   A. We have assigned posts that we work
7   security set-up. We have three fixed posts, and
8   we have a roving post.
9   Q. Okay. Well, does each employee who is
10  assigned -- who works, can they only sit at a desk
11  during an entire day, let's say?
12  A. No.
13  Q. All right. Going on to the Family
14  Medical Leave Act, are you familiar with the
15  Family Medical Leave Act, sir? Have you heard of
16  that?
17  A. Yes.
18  Q. Where did you hear of that?
19  A. Through The Washington Post and on the
20  news.
21  Q. Okay. Well, let's concentrate on The
22  Washington Post. How have you received

9 (Pages 33 to 36)

M.A.R. Reporting Group, LLC        Professional Stenotype Reporters        Toll Free (888) 534-1225
Platt & Dawson                     www.mar-reporting.com                   (703) 534-1225

Case 1:06-cv-01144-PLF   Document 14-5   Filed 06/21/2007   Page 8 of 11

William A. Mack                                vs.            The Washington Post Company
Deposition of DONALD L. JACKSON                               Tuesday, March 20, 2007

Page 45

1  Were any other employees absent as much
2  or close to as much as Mr. Mack for sickness, sir?
3  A. I haven't really sat down and determined
4  how much sickness.
5  Q. Well, do any other employees beside
6  Mr. Mack come to mind as having taken a
7  significant amount of sick leave, sir?
8  A. No.
9  Q. Did Ms. Imani Magruder take as much sick
10 leave as Mr. Mack?
11 A. I don't know.
12 Q. So you've never looked at how many days
13 Ms. Magruder has taken?
14 A. No.
15 Q. Would that information be available to
16 you on those absence reports that you previously
17 talked about Mr. Smith showing you?
18 A. Yes.
19 Q. Did it at some point come to your
20 attention that Mr. Mack had been terminated?
21 A. Yes.
22 Q. Who told you about that?

Page 46

1  A. Mr. Smith.
2  Q. What did Mr. Smith tell you?
3  A. That Mr. Mack is not on the schedule.
4  Q. Did he tell you why?
5  A. No.
6  Q. Did you ask why?
7  A. No.
8  Q. Did he tell you how that came about? Who
9  terminated Mr. Mack?
10 A. No.
11 Q. Did he tell you whose decision it was?
12    MS. OSBORNE: Objection. Speculation.
13    BY MR. PETERSON:
14 Q. Did Mr. Smith tell you whose decision it
15 was that Mr. Mack was no longer on the schedule?
16 A. No.
17 Q. Do you have any knowledge as to whose
18 decision it was?
19 A. No.
20 Q. Or why Mr. Mack was no longer on the
21 schedule?
22 A. Because of attendance.

Page 47

1  Q. How do you know Mr. Mack wasn't on the
2  schedule any more because of attendance?
3  A. Speculation.
4     MS. OSBORNE: Objection.
5     BY MR. PETERSON:
6  Q. Nobody told you that?
7  A. Mr. Smith told me a little bit; didn't
8  get into detail.
9  Q. What did Mr. Smith tell you, sir?
10 A. Mr. Mack is no longer on the schedule.
11 Q. Did he say attendance is the reason? How
12 did that come up?
13 A. I'm not really sure, but he told me he's
14 no longer on the schedule.
15 Q. Did Mr. Smith mention attendance as being
16 the problem?
17 A. It's been a long time. I'm not really
18 sure.
19 Q. Had Mr. Smith ever talked to you about
20 Mr. Mack's attendance before the time he told you
21 that Mr. Mack was no longer on the schedule and
22 had been terminated?

Page 48

1  A. Yes.
2  Q. Can you tell me about that, sir.
3  A. He just said that Mack was missing a lot
4  of days.
5  Q. Did he say what for? How he knew?
6  A. Can you ask me the question again?
7  Q. Sure. Did Mr. Smith tell you how he knew
8  Mr. Mack was missing a lot of days?
9  A. Yes.
10 Q. Can you tell me about that, sir.
11 A. Mr. Smith is the one who approved the
12 time cards.
13 Q. Okay. Did Mr. Smith say Mr. Mack was
14 missing a lot of days for sickness or for
15 vacation? What did he say, sir?
16    MS. OSBORNE: Objection. Compound.
17    BY MR. PETERSON:
18 Q. You can answer.
19 A. He said Mack missed a lot of days.
20 Q. Okay. Did Mr. Smith ever say any other
21 employees missed a lot of days?
22 A. Yes.

12 (Pages 45 to 48)

M.A.R. Reporting Group, LLC          Professional Stenotype Reporters    Toll Free (888) 534-1225
Platt & Dawson                       www.mar-reporting.com               (703) 534-1225

Case 1:06-cv-01144-PLF    Document 14-5    Filed 06/21/2007    Page 9 of 11

William A. Mack                                      vs.           The Washington Post Company
Deposition of DONALD L. JACKSON                                    Tuesday, March 20, 2007

Page 49
1  Q. Who would those be?
2  A. Carr.
3  Q. Anyone else, sir?
4  A. Mr. Brown.
5  Q. Did anyone other than Mr. Mack get
6  terminated for missing a lot of days?
7     MS. OSBORNE: Objection. Assumes facts
8  not in evidence.
9     BY MR. PETERSON:
10 Q. You can answer.
11 A. Can you say that again?
12 Q. Sure. Did anyone other than Mr. Mack get
13 terminated for missing a lot of days?
14    MS. OSBORNE: Same objection.
15    THE WITNESS: Yes.
16    BY MR. PETERSON:
17 Q. Who was that?
18 A. Carr and Brown.
19 Q. They've been terminated?
20 A. Oh, have they been terminated?
21 Q. Yes.
22 A. No.

Page 50
1  Q. So no one other than Mr. Mack has been
2  terminated for missing a lot of days?
3  A. No.
4  Q. Did you ever try to find out why -- you
5  or Mr. Smith -- try to find out why Mr. Mack was
6  missing a lot of days?
7  A. I did.
8  Q. Do you know if Mr. Smith did?
9  A. I don't know.
10    (Jackson Deposition Exhibit Number 1 was
11 marked for identification.)
12    BY MR. PETERSON:
13 Q. Let me show you a document, sir.
14    MS. OSBORNE: Are we going to enter this?
15    MR. PETERSON: Yes, they're being marked.
16    BY MR. PETERSON:
17 Q. Sir, you've been handed what's been
18 marked as Number 1, Bates 118, a document dated
19 May 8th. I'd ask if you've ever seen this
20 document before.
21 A. No.
22 Q. It says here Mr. Mack had been

Page 51
1  unavailable for work when called for 18 shifts.
2  Had the number 18 missed shifts ever been told to
3  you for Mr. Mack?
4  A. No.
5  Q. To your knowledge -- you made the
6  schedule -- was Mr. Mack called for shifts when he
7  was supposed to be working?
8  A. Repeat that again, please.
9  Q. Sure. When you wanted Mr. Mack to work,
10 was he called? Physically called to come in to
11 work a shift?
12 A. No.
13 Q. So he was already on the schedule; is
14 that correct?
15 A. Yes.
16 Q. Was he called, and did Mr. Mack, when he
17 was called to work shifts -- he could be called to
18 replace someone else; is that correct?
19 A. Yes.
20 Q. Did he refuse to come in to work shifts?
21 A. Yes.
22 Q. How many, sir?

Page 52
1  A. I don't know.
2  Q. Would that be documented anywhere?
3  A. No.
4  Q. Would other employees who were called to
5  work shifts refuse shifts?
6  A. Yes.
7  Q. That similarly isn't documented anywhere;
8  is that correct?
9  A. No.
10 Q. Did Mr. Mack refuse to work shifts more
11 frequently than other employees that are called?
12 A. I don't know.
13 Q. Who would know that, sir?
14 A. I don't know.
15 Q. In the pass-on log when someone calls in
16 or calls off for a shift, oftentimes I believe it
17 reflects some other employee is coming in to take
18 that shift; is that correct?
19 A. Yes.
20 Q. Would you make the call to get someone to
21 cover a missing shift? Or who would make that
22 call?

13 (Pages 49 to 52)

M.A.R. Reporting Group, LLC         Professional Stenotype Reporters      Toll Free (888) 534-1225
Platt & Dawson                      www.mar-reporting.com                 (703) 534-1225

Case 1:06-cv-01144-PLF   Document 14-5   Filed 06/21/2007   Page 10 of 11

William A. Mack                           vs.           The Washington Post Company
Deposition of DONALD L. JACKSON                         Tuesday, March 20, 2007

### Page 61

1    (Jackson Deposition Exhibit Number 6 was
2    marked for identification.)
3        BY MR. PETERSON:
4    Q.  Sir, you've been handed what's been
5    marked as Number 6, Bates 184, it looks like. Do
6    you recognize that document?
7    A.  What date is this document?
8    Q.  I don't see a date, but have you ever
9    seen it before, sir?
10   A.  No.
11   Q.  It says here that at some point Mr. Mack
12   was working a total of 40 hours a week, and he was
13   changed to 32; is that correct?
14   A.  Yes.
15   Q.  At some point prior to this Mr. Mack
16   wasn't working the weekends; is that correct?  He
17   was working during the week for The Washington
18   Post?
19   A.  Yes.
20   Q.  Do you know why Mr. Mack was changed to
21   working principally on the weekends?
22   A.  Mr. Mack requested that his days be

### Page 62

1    changed because he found another job.  He was
2    working at another job, so he couldn't work the
3    hours he was previously doing.
4    Q.  When did he make that request, sir?
5    A.  I don't know the exact date.
6    Q.  Did he make that request in writing or
7    orally?
8    A.  I can't remember.
9    Q.  Did he make more than one request or just
10   one request, sir?
11   A.  One request.
12       (Jackson Deposition Exhibit Number 7 was
13   marked for identification.)
14       BY MR. PETERSON:
15   Q.  Sir, you've been handed what's been
16   marked as Number 7, Bates 172.  Is that the
17   request that you're referring to?
18   A.  Yes.
19   Q.  Since Mr. Mack started working with you
20   at The Washington Post, has he put on weight, sir?
21   A.  I really can't say.
22   Q.  Now, when Mr. Mack works on your shift,

### Page 63

1    are you considered his supervisor, sir?
2    A.  Yes.
3    Q.  When he works on a different shift, would
4    he similarly have a different supervisor?
5    A.  Yes.
6    Q.  Would Mr. David King sometimes be
7    Mr. Mack's supervisor?
8    A.  Yes.
9    Q.  Would Mr. Bernard Carr sometimes be
10   Mr. Mack's supervisor?
11   A.  Yes.
12   Q.  When they're his supervisor, do they have
13   all the authority that you have when he works on
14   your shift as his supervisor?
15   A.  No.
16   Q.  What authority don't they have, sir, that
17   you would have?
18   A.  They would not have authority to send
19   them home for whatever reason because they're in
20   an acting capacity.
21   Q.  Is that written down somewhere that
22   they're in an acting capacity so they have limited

### Page 64

1    supervisory authority?
2    A.  Yes.
3    Q.  What document says that?
4    A.  It would be indicated on the schedule
5    that they're high class position.
6    Q.  Okay.  Other than that, anything else?
7    A.  I'm not sure if Smitty had a document
8    stating that.
9    Q.  When you say they can't send him home,
10   send him home for what, sir?
11   A.  Any type of disciplinary.
12   Q.  Anything else they can't do?  Those other
13   supervisors?
14   A.  Change the schedule, increase his pay.
15   Q.  Can you increase Mr. Mack's pay?
16   A.  No.
17   Q.  I'm asking about things you can do that
18   they can't, sir.
19   Q.  They would not be able to send him home
20   for disciplinary reasons.
21   Q.  When he brings in a doctor's note, would
22   they have the same duties that you have in terms

16 (Pages 61 to 64)

M.A.R. Reporting Group, LLC       Professional Stenotype Reporters       Toll Free (888) 534-1225
Platt & Dawson                    www.mar-reporting.com                  (703) 534-1225

William A. Mack                              vs.                The Washington Post Company
Deposition of DONALD L. JACKSON                                    Tuesday, March 20, 2007

Page 65

1 of going to employee health with the medical
2 documents?
3    A. Yes.
4    Q. As a supervisor with The Washington Post,
5 do you receive any human resources training, sir?
6    A. You're asking what kind of training?
7    Q. Concerning employee relations or employee
8 functions of any type.
9    A. Yes.
10   Q. When's the last time you received
11 training from The Washington Post?
12   A. April 2006.
13   Q. What was that training about?
14   A. I forgot -- coaching for results.
15   Q. Coaching for results?
16   A. I think so.
17   Q. Before that, had you received any
18 training?
19   A. Yes.
20   Q. How frequently do you receive training
21 from The Washington Post?
22   A. How frequently? Repeat that again.

Page 66

1    Q. How frequently do you receive training
2 from The Washington Post concerning HR matters?
3    A. Right now it's at least two times a year.
4    Q. Have you ever received any training
5 concerning leave from The Washington Post?
6    A. No.
7    Q. Have you ever received any training
8 concerning the Family Medical Leave Act from The
9 Washington Post?
10   A. No.
11   Q. Did Mr. Smith go with you to any HR
12 training that you did receive?
13   A. Yes.
14   Q. Does he go with you to all HR training
15 that you received?
16   A. No.
17   Q. So he goes to more than you do?
18   A. I don't know.
19      MR. PETERSON: No further questions.
20      MS. OSBORNE: Can we take a quick break?
21      MR. PETERSON: Sure.
22      (A recess was taken.)

Page 67

1      MS. OSBORNE: I don't have any questions.
2      MR. PETERSON: Very good.
3      Thank you for your time, sir.
4      (Reading and signature not waived.)
5      (Whereupon, the proceedings at 3:27 p.m.
6 were concluded.)

Page 68

1 COMMONWEALTH OF VIRGINIA, to wit:
2      I, Paula L. Lowery, before whom the
3 foregoing deposition was taken, do hereby certify
4 that the within-named witness personally appeared
5 before me at the time and place herein set out,
6 and after having been duly sworn by me, according
7 to law, was examined by counsel.
8      I further certify that the examination
9 was recorded stenographically by me and this
10 transcript is a true record of the proceedings.
11     I further certify that I am not of
12 counsel to any party, nor an employee of counsel,
13 nor related to any party, nor in any way
14 interested in the outcome of this action.
15     As witness my hand and notarial seal this
16 _____ day of _____, 2007.
17
18     _____
19        Paula L. Lowery
20        Notary Public
21 My Commission expires:
22 May 31, 2007

17 (Pages 65 to 68)

M.A.R. Reporting Group, LLC    Professional Stenotype Reporters    Toll Free (888) 534-1225
Platt & Dawson                 www.mar-reporting.com                      (703) 534-1225